**CHRISTOPHER LINDSAY - September 04, 2024**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01413-NYW-STV
_____

VIDEOTAPE DEPOSITION OF:
CHRISTOPHER LINDSAY - September 4, 2024
_____

ERIN LINDSAY and CHRISTOPHER LINDSAY,

Plaintiffs,

v.

THE TRAVELERS HOME AND MARINE INSURANCE COMPANY; and
GEICO INSURANCE AGENCY, LLC,

Defendants.
_____

PURSUANT TO NOTICE, the videotape
deposition of CHRISTOPHER LINDSAY was taken on
behalf of the Defendant The Travelers Home and
Marine Insurance Company at 1200 28th Street,
Suite 302, Boulder, Colorado 80303, on September 4,
2024, at 9:02 a.m., before Carin C. Geist,
Registered Diplomate Reporter and Notary Public
within Colorado.

**EXHIBIT 1**

## CHRISTOPHER LINDSAY - September 04, 2024

Page 50

1 initial response to interrogatory 10 -- I realize
2 this was changed later and we'll get to that -- but
3 in your initial response to interrogatory No. 10,
4 you claimed $571,378 for personal contents.
5     A.    Uh-huh.
6     Q.    In addition to attorney's fees and to
7 costs be determined pursuant to C.R.S. Section
8 10-3-1116.  Do you see that?
9     A.    I do.
10     Q.    So I just want to make sure I
11 understand.  Is the 571,378, is that double damages
12 under the statute that you're citing there, or is
13 that -- you believe that you should be paid $571,378
14 in additional contractual benefits for personal
15 property?
16         MS. MINAMIZONO:  Objection.  Form.
17     A.    I believe -- let me see here.  So --
18 **yeah.  That is 60 percent of what the adjusted**
19 **personal-contents bucket would have been.  So if the**
20 **contract had been reformed to the number on the**
21 **front, the 2.6 million, and then you took 60**
22 **percent -- well, you took 70 percent of that because**
23 **I believe that was what our -- our coverage was for**
24 **our personal property, and then took 60 percent of**
25 **that because that's what Travelers was paying out**

Page 51

1 **without an inventory, that's the number you would**
2 **get in additional.**
3     Q.    (BY MR. STEPHENSON)  I see.  So just to
4 make sure I understand it, where you're getting the
5 $571,378 is the idea that the limits are reformed?
6     A.    Uh-huh.
7     Q.    And, oh, I should have said this in the
8 beginning.  Let me start over.  Because our intrepid
9 court reporter is writing a transcript that consists
10 entirely of spoken words, the only way we will know
11 what your answer is, is if you use a word --
12     A.    Okay.
13     Q.    -- to answer.  Does that make sense?
14     A.    Yes.
15     Q.    So you can't gesture or nod or make
16 sounds like uh-huh or nuh-huh.  Do you understand?
17     A.    Uh-huh.  Yes.
18     Q.    That was too good.  That was too good.
19 All right.
20         So Mr. Lindsay, just is to make sure I
21 have understood correctly, in your original answer
22 to interrogatory No. 10 in Exhibit 52, when you
23 calculated $571,378 for personal contents, that was
24 a contractual number, correct?
25     A.    Correct.

Page 52

1     Q.    The idea was that the limits would be
2 reformed up to the amount that you were seeking, and
3 then Travelers would pay without an inventory 60
4 percent of that higher number.  And that 571,378
5 figure is the difference between what you had
6 already received and what you wanted to receive
7 under reformed limits; is that right?
8     A.    Correct.
9     Q.    Got it.  Okay.  Got it.
10     A.    **And I'm looking at -- looking at this,**
11 **you were asking how we got the 1.3 million number.**
12 **That looks like the difference between our current**
13 **limit and the number we're claiming here, 2.6 and**
14 **change.  I would have to, you know, use a**
15 **calculator.  I don't want to do the math longhand**
16 **right now, but it looks -- from a rough estimate,**
17 **that looks pretty close to that.**
18     Q.    Okay.  Thank you, Mr. Lindsay.  That
19 was helpful.  That was clarifying.  Let's go to
20 Exhibit 53.
21     A.    Okay.
22     Q.    Which is your -- a set of supplemental
23 responses by you.
24     A.    Okay.
25     Q.    That you served on December 7, 2023,

Page 53

1 correct?
2     A.    **If that's what the date is.**
3     Q.    Looking at page 14, can you confirm
4 that the date on Exhibit 53, which is a set of
5 supplemental responses by you, was December 7, 2023?
6     A.    **December 7, 2023, that is correct.**
7     Q.    And you're aware that all of your
8 interrogatory responses were provided under oath in
9 this case, correct?
10     A.    **Yes, I do.**
11     Q.    Okay.  And you supplemented and changed
12 your answer to interrogatory No. 10 in Exhibit 53,
13 which begins on page 4, correct?
14     A.    **Begins on page 4, No. 10.  Yes.  I see**
15 **that.  Okay.**
16     Q.    Okay.  And do you see you actually do
17 have numbers here for the additional living costs?
18     A.    **Yes.**
19     Q.    Do you see that?  Okay.  And are those
20 numbers still accurate today?
21     A.    **I do not know.  I would have to go**
22 **through them.**
23     Q.    Okay.  And then you also added a
24 quantitative figure for emotional distress and
25 inconvenience --

**CHRISTOPHER LINDSAY - September 04, 2024**

Page 62

1 the basics of a contract and how you pay things is
2 it fully depends on this going all the way through
3 court and whatever, and there are various fees
4 involved in that, and I'm not sure of the exact
5 amounts, plus the hours and prep and -- you know, I
6 have no way of estimating that.
7        Q.    (BY MR. STEPHENSON)  Thank you, sir.
8 All right.  Going to interrogatory No. 11 on page 6
9 of Exhibit 53, which is one of your supplemental
10 sets of discovery responses.
11        A.    Sure.
12        Q.    Do you see that in response to
13 interrogatory No. 11, which asks about repairs and
14 construction --
15        A.    Uh-huh.
16        Q.    -- you said, "I was laid off from my
17 work and didn't feel comfortable with proceeding
18 with construction until I could secure a new job."
19 Do you see that?
20        A.    I do.
21        Q.    Is that a true statement?
22        A.    That was one of many delays.
23        Q.    Is it really true, though, that you
24 were uncomfortable proceeding with construction at
25 any point because you were without a job?

Page 63

1        A.    Yes.
2        Q.    What was that time period?
3        A.    Well, I was laid off at the end of
4 January, I believe, and I secured my new job at the
5 end of March.  So approximately two months.
6        Q.    So from January to the end of February
7 and maybe the beginning of March 2023 --
8        A.    End of March.
9        Q.    Oh, I'm sorry, thank you.  I'm sorry,
10 when were you laid off?
11        A.    End of January.  I don't remember the
12 exact date.
13        Q.    I was kind of off there a little bit.
14 My apologies.  So for the very end of January, all
15 of February, and all the way till the end of March,
16 during that roughly two-month period, you felt
17 uncomfortable proceeding with the build because you
18 needed to get a new job?
19        A.    Correct.
20        Q.    Okay.  Did you ever say anything
21 different than that to your builder?
22        A.    Previous -- before then, yes.  We told
23 them we needed to have our scope of loss finished
24 and things figured out with the insurance company
25 before we could sign a build contract because that's

Page 64

1 how we knew what our budget would be.
2        Q.    During that time period you just
3 mentioned to me, did you ever represent to your
4 builder that you did want to move forward with the
5 build?
6        A.    Between January -- end of January and
7 end of March?
8        Q.    Yes.
9        A.    I may have.  I definitely wanted to
10 move forward, but I -- I believe that we had not
11 finished our work with the architect, the engineer,
12 et cetera, and so really there was nothing to do
13 with the builder.  So wanting to --
14        Q.    Well, I'm focusing on the part
15 about --
16        A.    Sure.
17        Q.    -- the job.
18        A.    What about the job?
19        Q.    Did you ever represent to the builder,
20 your builder, that you wanted to move forward and --
21 with the rebuild during the time period you just
22 described, despite knowing that you were being laid
23 off?
24        A.    I don't remember specifically doing
25 that.  I may have.  I do know that I had been

Page 65

1 interviewing at Apple since before I was laid off.
2 I started interviewing there in November, and so I
3 already had a lot of irons in the fire and was
4 confident that I would land a new job, but until I
5 had it in hand, knew I couldn't move forward.
6              So I may have kept him apprised of
7 various things just to make sure he was ready to go,
8 but I felt I made it clear he would not be moving
9 forward until we had that figured out, along with
10 other financial things.
11        Q.    All right.  And Mr. Lindsay, in
12 response to interrogatory No. 11 in Exhibit 53, you
13 have listed a number of payments that you made to
14 various professionals who were helping you with your
15 property.
16        A.    Yes.
17        Q.    The architect, the payment to the
18 builder for the debris removal, the soils report,
19 the engineers at Sagan Design.  You know, you listed
20 a number of professionals that you paid in order to
21 help you with your work on the property, correct?
22        A.    Correct.
23        Q.    And do you agree that all of these
24 payments were made before September of 2022?
25        A.    Oh, I don't know when these were all

**CHRISTOPHER LINDSAY - September 04, 2024**

Page 202

1 believe it also includes debris removal and
2 architecture and engineering fees and other things
3 of that nature.  That is not the cost of the
4 dwelling portion of the house, which is what Wood
5 Brothers is doing for us.
6        Q.    All right.  So tell me what you think
7 is the apples-to-apples comparison, then, from the
8 Glimmer Claims Services estimate.
9        A.    I do not have a good way of doing that
10 right here because, first of all, I'm not an
11 Xactimate expert, so I wouldn't know how to get this
12 in a format in Xactimate to start pulling things
13 out; but I don't know which pieces are assigned to
14 dwelling, which ones are assigned to other
15 structures.  Demolition is called out.  I could pull
16 that out.  But there's a lot of pieces here that I
17 don't know how to pull them out into just the
18 dwelling.
19        Q.    Okay.
20        (Deposition Exhibit 62 was marked.)
21        Q.    Mr. Lindsay, do you have Exhibit 62 in
22 front of you?
23        A.    I sure do.
24        Q.    And do you recognize that document?
25        A.    I do.

Page 203

1        Q.    What is that document?
2        A.    This is a spreadsheet that I created.
3 I don't know which version it is.  I'd have to look
4 a little closer.  But it's a document I created
5 based on the various scopes of loss that I received
6 and that we submitted.
7        Q.    Okay.  And do you know when you
8 provided this final what you call -- what you're
9 calling "Our Final Scope" to Travelers?
10        A.    So this one, if it's the one I am
11 thinking of -- there have been many iterations of
12 this, which is why it is difficult to know.  And
13 also I'm used to looking at it in a spreadsheet app
14 instead of printed out on a bunch of pieces of
15 paper, which can be tough.  I don't know when this
16 was given to them.
17        Q.    When did you complete Exhibit 62, which
18 you have entitled, "Our Final Scope"?
19        A.    I don't know.
20        Q.    And have you done a comparison of
21 Exhibit 62 to the Glimmer estimate that was provided
22 in August of 2022?
23        A.    I believe the spreadsheet this was all
24 based on came from the representative at Sedgwick,
25 Mike Gurule -- I don't know if that's how you

Page 204

1 pronounce his name -- but I believe he imported
2 her -- her scope and then had, you know, a line item
3 for everything; and that's where these line items
4 come from.  And then they had a response to every
5 single line item, which we responded to.  And so I
6 believe the origin of this document is the Glimmer
7 claim.
8        Q.    Right.  Well, you notice that the total
9 amount on page 80 of Exhibit 62, your final scope,
10 Bates page LINDSAY 17452, you have a grand total at
11 the end there of $2,419,669.24.  Do you see that?
12        A.    I do.
13        Q.    And that's quite a bit lower by -- over
14 $300,000 lower than the Glimmer estimate, right?
15        A.    Yes, it is.
16        Q.    And have you done a comparison to see
17 why your final scope is over $300,000 lower than the
18 Glimmer estimate?
19        A.    Yes.  I believe that's part of what
20 this document was.  And I believe I spelled those
21 out in an e-mail to Travelers at the time where I
22 cited all the different things that were edited.
23 Some were things they pointed out to us.  Others
24 were things -- were errors that we found in their
25 work, and so I did an analysis of that to show, to

Page 205

1 argue that what we were getting was not correct.
2        Q.    I see.  And so do you agree, then, that
3 the Glimmer estimate, Exhibit 13, is not accurate?
4        A.    It was accurate at the time in terms of
5 what we thought was needed, to the best of our
6 knowledge.  When errors were pointed out and we went
7 through again, we found and corrected the errors
8 that we could find, and so that made the original
9 scope no longer valid or correct, and so we stopped
10 using it at that point.
11        Q.    When you say, "the original scope," you
12 mean Exhibit 13 --
13        A.    Sorry, the original Glimmer scope.
14        Q.    All right.  And I understand what
15 you're saying, that you thought it was accurate.
16        A.    Yes.
17        Q.    But what I'm getting at is, you are not
18 demanding at this point that Travelers pay based on
19 the Glimmer estimate, Exhibit 13, correct?
20        A.    Not in that form of it, no.
21        Q.    And that's because as you just
22 mentioned, you've done a new analysis, and you now
23 have concluded that the original Glimmer estimate,
24 Exhibit 13, is no longer valid or correct, I think
25 is how you just put it, correct?

CHRISTOPHER LINDSAY - September 04, 2024

Page 234

1 to charge over 35 percent combined overhead and
2 profit?
3            MS. MINAMIZONO:  Objection.  Form and
4 foundation.
5       **A.   I don't know what the standards are in**
6 **that industry.**
7       Q.   (BY MR. STEPHENSON)  Fair enough, okay.
8 Who was the builder that you were referring to in
9 Exhibit 45 who -- whose square-footage-price figure
10 you used to calculate a low end of $1.6 million to
11 rebuild your house?
12      **A.   I don't know their name.  They -- I'm**
13 **sure I did at one point, but I don't know it now.**
14 **They showed up at the neighborhood meeting and just**
15 **spoke to the process of building a house; and that**
16 **was part of that presentation, was giving that**
17 **general range so we could have an understanding of**
18 **where we were sitting.**
19      Q.   All I asked is if you know who it was.
20      **A.   I do not.**
21      Q.   Yeah, so, you know, I don't need all of
22 the --
23      **A.   Trying to be thorough.**
24      Q.   No, I hear you.  Have you ever done any
25 investigation into what McStain currently charges or

Page 235

1 charged during this claim for a house of comparable
2 size as the house that you used to have at the
3 property?
4       **A.   No.  We didn't look into McStain as a**
5 **builder.**
6       Q.   Well, yeah, I know you didn't look at
7 McStain actually coming out and building something
8 because they're not a custom builder, and you wanted
9 a custom house, right, correct?
10      **A.   Correct.  I wanted a custom builder.**
11 **Custom local builder was really a top priority.**
12      Q.   And McStain isn't.
13      **A.   Is not that.**
14      Q.   Isn't a custom local builder, right?
15      **A.   Uh-huh.**
16      Q.   But did you ever look at what McStain
17 charges for a comparably sized house?  Did you ever
18 look at that?
19      **A.   No.**
20      Q.   Okay.  Do you have any idea what
21 McStain charges for a comparably sized house?
22      **A.   I have no clue.**
23           (Deposition Exhibit 63 was marked.)
24           MR. GILL:  I assume this hasn't been
25 produced before.

Page 236

1            MR. STEPHENSON:  No, it has not.  We
2 just pulled this off the McStain website.
3       Q.   (BY MR. STEPHENSON)  And Mr. Lindsay,
4 if you could go to the -- it's near the back, the
5 6160 model, which has 4,087 square feet, 5 beds, 4
6 1/2 baths, and a 3-car garage.  Let me know when you
7 get there.
8       **A.   6160?**
9       Q.   Yeah.
10      **A.   Okay.**
11      Q.   Do you see that?
12      **A.   I do.**
13      Q.   And that's 4,087 square feet of
14 above-ground finished space, meaning it's actually a
15 bigger house than the one you had at the property
16 before the fire, correct?
17      **A.   Correct.**
18      Q.   And McStain, the same builder that
19 built your old house, charges $1,449,982 for that
20 model, correct?
21      **A.   That's what it says.**
22      Q.   And you weren't aware of that until
23 today, correct?
24      **A.   Not until you handed me this.**
25      Q.   Okay.  All right.  Let's talk about the

Page 237

1 alternative-living-expense coverage part of your
2 claim.
3       **A.   Okay.**
4       Q.   Do you agree that your builder is not
5 using the Glimmer estimate or any of the other
6 permutations of it, or the Travelers estimate or any
7 of its permutations to build your new house?
8       **A.   I have never sent them any permutation**
9 **of the scopes.  If Stephanie did, then they would**
10 **have that; but I don't believe they're using that at**
11 **all because we're building a different house.**
12      Q.   Right.  And the Glimmer estimate, you
13 know, that you've now modified, that is what you are
14 referring to as an accurate scope of loss from the
15 fire, correct?
16           MS. MINAMIZONO:  Objection.  Form.
17      **A.   The last scope that we sent to**
18 **Travelers in, I believe it was October 2022,**
19 **basically after -- so we did the Sedgwick scope.  We**
20 **responded in late August.  They responded, I**
21 **believe, late September, early October.  The**
22 **response to that, which was the last scope we sent**
23 **them, that was a spreadsheet, not a -- I don't know**
24 **if it was a formal scope or not.  I'd have to look**
25 **at the e-mail, but the spreadsheet that we sent is**

## CHRISTOPHER LINDSAY - September 04, 2024

Page 238

1 what I refer to as an accurate scope to the best of
2 our knowledge at the time.
3      Q.   (BY MR. STEPHENSON)  The point is, what
4 you have referred to as an accurate scope in all of
5 your communications with Travelers is really about
6 the cost to you of losing the old house, and it
7 really has nothing to do with what your builder is
8 building now, correct?
9      A.   Correct, other than that amount is what
10 sets our budget.
11      Q.   Well, let's talk about that.  All
12 right.  So let me establish the first part.  I think
13 you've agreed that you don't need to agree with
14 Travelers or Travelers doesn't need to agree with
15 Glimmer or you guys about any of these spreadsheets
16 that set the scope of loss in order for you to build
17 this new house because your builder is not using any
18 of that material to build your new house.  It's a
19 different house, correct?
20      A.   No.  We need the scope in order to
21 understand our budget because we have to sign a
22 contract for a $2 million build, 2 million-plus, or
23 even just a million plus, any of those, it's an
24 absurd amount of money I've never had to deal with.
25 And so I cannot in good conscience sign a contract

Page 239

1 saying I will pay set amount of money when I have no
2 idea how I'm going to pay for it.
3           And so I needed that scope in order to
4 sign my build contract because that scope and its
5 accuracy and the money I would be getting from
6 Travelers from a proper reformation and from an
7 accurate scope of loss would directly dictate my
8 budget in my new house, and I could make adjustments
9 to that budget, then, using my own money for any
10 overages to build this house.
11           A lot of the upgrades and such we were
12 going for were items that are difficult to add
13 later.  It's a lot less expensive to do when
14 building the house.  So we wanted to do our best
15 to -- to think ahead and build a great house that we
16 could retire in, just like we'd planned to do with
17 the previous house.
18      Q.   Thank you, Mr. Lindsay.  So even though
19 the actual budget for the new house -- I mean, what
20 we saw, the Exhibit 40, Exhibit 39, those documents
21 are not based on the Glimmer estimate or any of the
22 other spreadsheets including Exhibit 62, correct?
23      A.   Correct.  Those -- that budget is based
24 entirely on what we figured we could afford with
25 various contingencies in place.

Page 240

1      Q.   Right.  So the only relationship
2 between your discussions with Travelers about the
3 scope and actually doing the new build at your new
4 house is just trying to get money to pay for it from
5 Travelers; isn't that right?
6      A.   It's to figure out what our budget
7 would be; and, you know, we have savings and
8 investments and stuff that we have, but those are
9 for things like retirement and other such later
10 things and various security.
11      Q.   Let me interrupt you.  I just want to
12 make sure I heard you right.  I think you're
13 agreeing with me on this; that the actual creation
14 of the budget for your new build isn't in any way
15 based on Glimmer or Exhibit 62, your final scope, or
16 any of that discussion with Travelers, nor are the
17 actual plans in any way based on the scopes from
18 Glimmer or your spreadsheet, Exhibit 62, or any of
19 that.
20           The only relationship between your
21 disputes with Travelers about scope and your new
22 build is that you are trying to ensure money to pay
23 for the new build; isn't that right?
24      A.   No, there was something in your
25 original statement there that I couldn't agree with.

Page 241

1 The new build was completely reliant on getting an
2 accurate scope because at the time that I was
3 communicating with Travelers directly, before
4 litigation, we did not know how to have enough money
5 to rebuild our understanding of our old home, and we
6 wanted at least that.
7           And so all of our decision-making was
8 on what the new contract would be, what the new
9 build would be, the decisions we were making with
10 the engineer, architect was informed by what we
11 thought our old house was, in terms of cost.
12      Q.   No, I think we're saying the same
13 thing.
14      A.   I don't know that we are.
15      Q.   That the relationship between the scope
16 of loss for the old house and how much would be paid
17 for that, the relationship of that to the new house
18 was that it was the source of funding you wanted to
19 use, correct?
20      A.   It was the primary source of funding,
21 yes.
22      Q.   Okay.  It's not that the scope of the
23 old house was going to somehow define what the new
24 house looked like in any way, right?
25      A.   It wasn't going to define anything

CHRISTOPHER LINDSAY - September 04, 2024

Page 242

1 other than what we knew our budget would be so that
2 we could then appropriately plan with our own funds
3 what our new house would be.
4    Q.   Fair enough.  I think that -- that is
5 what I was asking.
6    A.   Okay.
7    Q.   In your original complaint, do you
8 recall alleging that Travelers never paid you for
9 trees and shrubs?
10    A.   I remember there was a part of the
11 complaint because there was some missing money.
12 There was a discrepancy between what we had been
13 said we had been paid and the numbers we were coming
14 up with in terms of what was in the bank accounts.
15 And at the time I believe I thought it was the trees
16 and shrubs.  After digging through some things, I
17 believe that piece was amended.
18    Q.   Uh-huh.
19    A.   But I believe the source of that
20 confusion was that there was some money that moved
21 buckets.  There was an explanation-of-benefits piece
22 that Peter would attach to various e-mails; and if
23 you go through those in chronological order, you can
24 see that he starts moving money to different
25 buckets, including that amount.  It was weird, and

Page 243

1 it accounted for some of that.
2         But also as we went through, we found
3 that one of the payments that was issued according
4 to Travelers, we have no record of ever getting
5 deposited, and so I don't know what happened to that
6 payment, and that ends up being like 20-something
7 thousand that is missing.
8    Q.   Just looking at Exhibit 60, which is
9 your original lawsuit.
10    A.   Okay.
11    Q.   On page 8.
12    A.   Give me a moment here.  60, you said?
13    Q.   Yeah.  Exhibit 60.
14    A.   There is it is.  Sorry.  Page 8, you
15 said?
16    Q.   That's right.  Paragraph 70.
17    A.   Page 8, 7 on the page?  Okay.
18    Q.   Paragraph 70.  You see --
19    A.   70.
20    Q.   70 where you alleged in your original
21 lawsuit, "Today Travelers has not issued payment to
22 the Lindsays in the amount of $34,293.53 for trees,
23 plants, and shrubs."  Do you see that?
24    A.   Yes I do.
25    Q.   And that was false, right?

Page 244

1    A.   That at the time, to the best of my
2 knowledge, was true, but with subsequent
3 investigation found that the amount of money for
4 that had been moved to a different bucket and was
5 accounted for separately.
6    Q.   Yeah, but the allegation that Travelers
7 didn't pay you any of the $34,293.53 for trees,
8 plants, and shrubs in paragraph 70 of your original
9 complaint, Exhibit 60, that was false, correct?
10    A.   It appears so.
11    Q.   Okay.  And in several of the letters
12 and estimates sent to you by Travelers, they
13 identified that you had been paid for the trees,
14 plants, and shrubs, correct?
15    A.   I think that was part of the confusion
16 I was just speaking to.  In one document they would
17 say it was paid for, and in the explanation of
18 benefits it was showing up somewhere else.  It was
19 very confusing.  And I still don't know why things
20 were moving around.  That didn't seem to make any
21 sense either; but when you just add up the raw
22 numbers, it's -- it is accounted for.  It's just not
23 accounted for in the buckets in the way you would
24 expect.
25    Q.   Okay.  Now, Travelers determined very

Page 245

1 early in your claim that your policy was going to be
2 exhausted by this loss.  I mean --
3    A.   Yeah, I think everyone understood
4 that.
5    Q.   In fact, they paid you your original
6 limit within 40 days of the fire, correct?
7    A.   Yes, I believe 40 sounds about right.
8 I don't know the exact date, but it was after the
9 first scope we received from Peter.
10    Q.   Right.  And Travelers had no obligation
11 to increase or change your limits after that point,
12 did it?
13         MS. MINAMIZONO:  Objection to form and
14 foundation.
15    A.   I don't know what their legal
16 requirements were.
17    Q.   (BY MR. STEPHENSON)  Okay.  When you
18 talked to the Division of Insurance about getting
19 higher limits, did they ever tell you that Travelers
20 had an obligation to increase your limits or reform
21 your limits?
22    A.   I don't remember them ever telling me
23 that.
24    Q.   Okay.  You know, I saw in your e-mails
25 that you were critical of Peter Van Riper for what

## CHRISTOPHER LINDSAY - September 04, 2024

Page 250

1  sure to use that specific language of getting a full
2  scope of loss, making sure it was accurate, to make
3  sure that there was no ambiguity in what I was
4  asking for.
5       Q.  (BY MR. STEPHENSON)  What are the names
6  of these experts?
7       A.  United Policyholders is the primary
8  one.  I mentioned before there were some lawyers who
9  did pro bono work.  Those were the main ones.
10           (Deposition Exhibit 65 was marked.)
11      Q.  Mr. Lindsay, have you been handed
12  Exhibit 65, which is an e-mail from Peter Van Riper
13  to you dated February 16, 2022, and with a page
14  number of TRAVELERS 269 in the bottom right-hand
15  corner?
16      A.  Yes.
17      Q.  And this is an e-mail that you received
18  during the claim, correct?
19      A.  Yes.
20      Q.  Now, do you recall that in your e-mail
21  to him that's below, you asked him for a sit-down,
22  and I think you also asked him what the next steps
23  are to resolve your disagreement with his scope of
24  loss?  Do you see that?
25      A.  I'm looking at the bottom part here

Page 251

1  saying we did not agree with their estimate that was
2  provided.  What are the next steps to resolve that?
3  Do we need to sit down with someone?  Yeah, I see
4  those parts.
5       Q.  Okay.  Thank you.  And Mr. Van Riper
6  says to you regarding resolving the disagreement
7  that next step would normally -- I think he left out
8  the word "be."  What he means here is, the next step
9  would normally be for your contractor to provide me
10  with their estimate so that I can review it.  Do you
11  see that?
12      A.  I do see that.
13      Q.  And does that comport with what you
14  learned from United Policyholders and otherwise,
15  that that is the way it's generally handled when
16  there's a disagreement about scope or cost in a
17  property claim?
18      A.  No.  That was actually one of the
19  things that was advised to watch out for and to not
20  do.
21      Q.  To not do?
22      A.  To not do.
23      Q.  Tell me what you heard in that regard.
24      A.  Sure.  They said the first thing you
25  need to do is make sure you have an accurate scope

Page 252

1  of loss, and they referred to the scope of loss as
2  being a list of all the items without the values
3  attached to them, and that you worked on that first.
4  Then you attached the values.
5           And at that point your insurance
6  provider would provide their values, and you could
7  take that scope of loss to a builder, who could
8  provide their values; but until you had that list of
9  an agreed-upon list of items that made up your
10  house, then there was no step two.  You needed that
11  as the very first step.  And I tried to get that.
12      Q.  Who said this?
13      A.  I remember getting that from United
14  Policyholders.  It was probably in a webinar, but I
15  don't remember exactly where.
16      Q.  Here's what I'm struggling with.
17  Sounds like what you said, if I heard you right, is
18  that step one is to have an agreed scope of loss
19  where both sides agree on the scope of loss.  Is
20  that what you just said?
21      A.  Yes.  And the scope of loss having no
22  numbers attached.  It was specifically the items
23  required to rebuild the home.
24      Q.  And your belief in February 2022 and
25  later was that you couldn't get a builder or

Page 253

1  contractor involved until there was agreement on the
2  scope of the loss with the insurance company?
3       A.  My understanding was that while it was
4  possible, it was not advised; that you needed to get
5  this list, because that was how you could maintain
6  credibility in saying, look, this is what I had in
7  the house, without any regard to the cost.  I'm not
8  trying to get a specific dollar amount met.  I'm
9  trying to tell you, this is what was in the house.
10          And once you have that, you could use
11  that to then go to your builder or use standard
12  cost, you know, whatevers, to generate the cost of
13  that list; but that you needed to do this without
14  the numbers in order to have the best credibility,
15  and you needed to do that first.
16      Q.  Okay.  All right.
17      A.  So that was our attempt.  We were
18  trying very hard to do that.  We asked Peter for one
19  without the numbers, which he did eventually give us
20  from the first one, but none of the future ones came
21  in that way.
22      Q.  Did the people at United Policyholders
23  say that you can't or -- strike that.  I'll start
24  over.
25          I mean, did you ask these people at

## CHRISTOPHER LINDSAY - September 04, 2024

Page 310

1 Wood Brothers, correct?

2 **A. Yes, I did.**

3 Q. Did the debris removal involved --

4 strike that. Let me start over.

5 Did the debris-removal work involve a

6 water truck?

7 **A. I have no idea what it involved. It**

8 **was not itemized.**

9 Q. Okay. And the contract with Wood

10 Brothers obligated them to perform all of the

11 debris-removal work, correct?

12 **A. Correct. I believe that's what the**

13 **language of it said.**

14 Q. And it was initially priced at $31,000,

15 correct?

16 **A. No. It was originally priced at**

17 **$39,000; and when I told them I didn't have that**

18 **much and we were massively underinsured, they**

19 **graciously agreed to do it for 31,000, which was the**

20 **total amount we had.**

21 Q. Okay. So it was -- it was reduced to

22 what the policy limit was?

23 **A. Yes.**

24 Q. Well, do you know what the actual cost

25 of the debris removal was through the subcontractor?

Page 311

1 **A. I have no idea.**

2 Q. Yeah, okay.

3 **A. I was not privy to that.**

4 Q. You're not aware it was way less than

5 31,000. So you didn't know that, correct?

6 **A. I still don't know what it is. I don't**

7 **know what they charged.**

8 Q. All right. And then after your limits

9 were reformed, you submit an estimate for over

10 $60,000 of debris removal, correct?

11 **A. I believe that's what's on there.**

12 Q. So you already had a contract to do

13 that work for $31,000 that wasn't disclosed until

14 2023 when Travelers asked for it, correct?

15 **A. That's not true either.**

16 Q. When do you think you disclosed the

17 contract with Wood Brothers to do the debris-removal

18 work?

19 **A. I told Peter that we had the debris**

20 **removed, at the meeting in our house in April of**

21 **2022.**

22 Q. When did you disclose the contract

23 showing the price of the debris removal?

24 **A. Oh, I don't know, but I told him that**

25 **we had done it, and that they ran into issues, and**

Page 312

1 **so it wasn't complete.**

2 Q. Okay. So after you had already been

3 invoiced -- strike that. Let me start with this.

4 You were invoiced for the

5 debris-removal work in April?

6 **A. I believe that's about when I was**

7 **invoiced for it.**

8 Q. When did you pay that invoice?

9 **A. Right around that time.**

10 Q. Okay. And you didn't disclose any of

11 that to Travelers at that time; the contract, the

12 work order, the invoice or the payment, correct?

13 **A. I don't believe -- other than what came**

14 **up in the meeting where I said we had the debris**

15 **removal done, I don't believe so.**

16 Q. Why was that not disclosed to

17 Travelers?

18 **A. There were a lot of pieces that were**

19 **done partial. I had also already done the soils**

20 **report and a few other pieces. It was all just part**

21 **of the build, and so the idea was to submit them as**

22 **it became a bigger -- you know, we were moving along**

23 **further in the build.**

24 **We were focused so carefully -- not**

25 **carefully, so heavily on just getting that scope of**

Page 313

1 loss, that submitting these kinds of things was not

2 really a top priority. Just like a lot of the ALE

3 receipts we had from early on, Peter made it clear

4 there was no real time limit to get those to him and

5 just get them to him when we could, so we did.

6 Q. So tell me, then, why did you submit an

7 estimate from Glimmer seeking over $60,000 in debris

8 removal when you knew that you had a contract to do

9 the debris-removal work for $31,000?

10 MS. MINAMIZONO: Objection. Form.

11 **A. I knew that the contract I had paid for**

12 **was for partial debris removal. I had been told**

13 **that on-site by someone who was doing the debris**

14 **removal; that they had run into our helical piers,**

15 **and brought that up to Peter and Mike in our meeting**

16 **in April saying, yeah, we had it removed as best we**

17 **could, but there was an issue with the helical**

18 **piers, and that they're very expensive to remove.**

19 **It's easier to mark them, and then when you go to**

20 **dig out your basement, either work around them or**

21 **dig them up at that point, and then you're only**

22 **spending the cost. And so it would be a lower cost**

23 **or no cost. We didn't know what it would be.**

24 **And so Mike, I remember, agreed with**

25 **us. Mike Gurule agreed with us saying, yeah, those**

**CHRISTOPHER LINDSAY - September 04, 2024**

---

Page 314

1  can be very expensive to pull out, something about
2  overexcavation, I think; and so my understanding was
3  any extra that was put in there was to account for
4  whatever was going to be needed once we broke
5  ground.
6      Q.   (BY MR. STEPHENSON)  But your contract
7  with Wood Brothers was for all of the debris
8  removal, was for complete debris removal, correct?
9      A.   That was the original intention.
10     Q.   Right.
11     A.   But they were helping us out by giving
12  us a lower price.  We knew they were doing it at a
13  discount.  We didn't want to add to that cost by
14  having them dig out more when we knew we were at our
15  limit, and we could look to -- you know, at that
16  point our contract hadn't been reformed.  I believe
17  I met with him on the 28th of March.  Our contract
18  hadn't been reformed at that point, so we -- 31,000
19  was all we had, and so we were going to just deal
20  with it in as inexpensive of a way as we could when
21  it came time to excavate for the build.
22     Q.   Do you allege that Peter Van Riper
23  somehow promised you or led you to believe that your
24  ALE time period would be tolled in your original
25  meeting with him on January 3?

Page 315

1      A.   He indicated that --
2      Q.   Oh, sorry, January 21st.  My mistake.
3      A.   I know what you meant.  He indicated
4  that it was something that he felt could happen.  He
5  was not promising it, but he said it could happen.
6          MR. STEPHENSON:  Why don't we take a
7  break.
8          THE VIDEOGRAPHER:  Okay.  We're going
9  to go off the record.  The time is 5:15.
10         (Recess taken.)
11         THE VIDEOGRAPHER:  We're now back on
12  the record.  The time is 5:18.
13     Q.   (BY MR. STEPHENSON)  Mr. Lindsay,
14  just -- I have just a couple more questions, and I'm
15  going to pass the witness to Mr. Gill.
16     A.   Okay.
17     Q.   You allege that you had a conversation
18  with Michael Gatti in this case or in claim
19  adjustment before litigation.  Am I correct that you
20  participated in such a call?
21     A.   I had a phone call with him, yes.
22     Q.   And I saw some e-mail traffic in
23  which it appeared that you were attributing to him
24  an admission of fault in -- in the prior claim
25  handling.  Some kind of admission that something

Page 316

1  Peter Van Riper had done was wrong or bad faith or
2  something of that nature.
3          And so what I'd like to ask you is, can
4  you tell me what you remember from your call with
5  Michael Gatti, and in particular anything that you
6  believe was some kind of criticism of the claim
7  handling or Peter Van Riper or anything else.
8      A.   I do remember the phone call.  I told
9  him in that phone call that we had not received a
10  scope of loss that accurately reflected our home;
11  that we wanted a new adjuster and a new manager.
12  It's consistent with the other things we'd been
13  requesting.  And he told me that what Peter did was
14  wrong.  That was the quote.  He said, "What Peter
15  did was wrong.  We expect all of our insureds to get
16  an accurate and complete scope of loss."  That's
17  what he told me.
18     Q.   Okay.
19     A.   To the best of my recollection, that
20  was a quote.
21     Q.   And he followed up that by pointing out
22  that he hadn't spoken to Peter Van Riper yet.  Do
23  you remember that?
24     A.   I don't remember the specifics of the
25  follow-up.  I know he followed up in an e-mail.  I

Page 317

1  had e-mailed him with my notes from that meeting and
2  asked him for any corrections, and I believe he came
3  back with a couple of corrections.  I don't remember
4  the specifics.
5      Q.   Okay.  So when Mr. Gatti allegedly said
6  that, he was just relying on your side of the story.
7  Is that fair?
8          MS. MINAMIZONO:  Objection.
9  Foundation.
10     A.   I have no idea what he was relying on.
11     Q.   (BY MR. STEPHENSON)  Okay.  And then
12  the other thing I wanted to ask you, and then I'll
13  pass the witness, is, has anybody at Travelers, to
14  your recollection, admitted to you that the company
15  acted in bad faith or equivalent to that?
16     A.   I don't know.
17     Q.   What do you mean, you don't know?
18     A.   I don't know.  There's plenty of
19  actions they have admitted to that, with my layman
20  understanding of bad faith, amount to bad faith; but
21  I don't know if them admitting to those actions is
22  them admitting that they've committed bad faith.
23         MR. STEPHENSON:  I understand.  Okay.
24  I'll pass the witness to you, Ryan.
25