**ERIN LINDSAY - September 05, 2024**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01413-NYW-STV
_____

VIDEOTAPE DEPOSITION OF:
ERIN LINDSAY - September 5, 2024
_____

ERIN LINDSAY and CHRISTOPHER LINDSAY,

Plaintiffs,

v.

THE TRAVELERS HOME AND MARINE INSURANCE COMPANY; and GEICO INSURANCE AGENCY, LLC,

Defendants.
_____

     PURSUANT TO NOTICE, the videotape deposition of ERIN LINDSAY was taken on behalf of the Defendant The Travelers Home and Marine Insurance Company at 1200 28th Street, Suite 302, Boulder, Colorado 80303, on September 5, 2024, at 9:02 a.m., before Carin C. Geist, Registered Diplomate Reporter and Notary Public within Colorado.

**EXHIBIT 4**

ALDRICH REPORTING
(303) 225-9356

Page 22

1    Q.   And did these webinars teach the
2 viewers about the insurance claim process?
3    A.   Sorry.  Could you repeat the question,
4 please?
5    Q.   Oh, yeah, no problem.  Can you just
6 give me the most broad, 50,000-foot-up,
7 table-of-contents kind of idea of what was covered
8 in the webinars with United Policyholders?
9    A.   The general process of how to work
10 through a claim, order of operations, like get your
11 family safe first.  Yeah, everything I can recall
12 right now is under the umbrella of working through a
13 policy -- excuse me, working through a claim.
14    Q.   Okay.  Do you remember whether any of
15 the webinars or any of the information that you or
16 your husband received from the resource center dealt
17 with how to go through the claim process with the
18 insurance company?
19    A.   Yes.
20    Q.   Okay.  So there's one particular thing
21 that I have seen in the communications that I want
22 to explore with you, and I'll just have you refer to
23 a couple of exhibits.  If you go to Exhibit 64.
24 Should be in front of you.  Let me know when you get
25 there.

Page 23

1    A.   Sure thing.  Looks like I'm there.
2    Q.   Great.  And you've seen this e-mail
3 before, this e-mail chain on February 2, 2022, and
4 February 7, 2022, that is Exhibit 64, between your
5 husband's e-mail address and Peter Van Riper.
6 You've seen this before, correct?
7    A.   Let me read it.
8    Q.   Sure.
9         (Deponent reviewed the document.)
10    A.   Just the one page, it looks like.  I
11 don't recall actually seeing these e-mails.
12    Q.   Okay.  Well, let's just talk about what
13 happened here.
14    A.   Okay.
15    Q.   So Mr. Van Riper, within 35 days of the
16 fire, as you can see, paid out the policy limits
17 on -- the then-existing policy limits on the subject
18 policy.  Do you see that in the February 2 e-mail in
19 Exhibit 64 from Mr. Van Riper?
20    A.   That's what it says in the e-mail, it
21 looks like, but I -- I'm not familiar with the
22 numbers, so I hesitate to confirm that.
23    Q.   I'm just asking about what the e-mail
24 says, right?  The e-mail says that Mr. Van Riper
25 paid out the limits within 35 days of the fire.  And

Page 24

1 I'm just using this as a background fact to get
2 where I'm going with this question.  Do you see
3 that?
4    A.   No, I -- oh, sorry.  Yes.
5    Q.   Yeah.  And the reaction from your
6 husband's response e-mail is that -- that both of
7 you were unhappy with the estimate that he provided,
8 that he was relying on to pay the limits.  Do you
9 see that in the first line of your husband's return
10 e-mail on February 7, Exhibit 64?
11    A.   Yes, I do.
12    Q.   Right.  And he expresses that the
13 estimate that Mr. Van Riper provided to support his
14 claim decision drastically undervalues our home.  Do
15 you see that?
16    A.   Yes.
17    Q.   And later on in that same e-mail
18 address, your husband says, "We would like an
19 assessment of the full scope of loss on our property
20 so that we can better understand our situation."  Do
21 you see that?
22    A.   Yes.
23    Q.   Right.  So this is the part that I want
24 to explore with you.  There are a lot of e-mails
25 that talk about getting an accurate and complete

Page 25

1 scope of loss.
2    A.   Pardon me.
3    Q.   No problem.  When you and your husband
4 use that phrase, what did you mean by "scope of
5 loss" or "accurate scope of loss" or "full scope of
6 loss"?  What did you guys mean?
7    A.   We were concerned with making sure that
8 the scope of loss represented the house that we
9 actually lost in its pre-loss condition, say, on
10 Christmas Day.
11    Q.   Right.  Okay.  So I want to make sure I
12 understand what you're saying.  You used the phrase
13 "scope of loss" --
14    A.   Uh-huh.
15    Q.   -- in your answer where I asked you
16 what you meant by it.  But I think I understand what
17 you're saying, but I want you to tell me if I've
18 misunderstood, okay?  When you and your husband use
19 the phrase "scope of loss," you're using it to mean
20 a description of the accurate characteristics of
21 your house that was lost.  In other words, how big
22 it was, what it was made of, what the layout was.
23 The scope of loss is literally what you lost.  It's
24 a description of what the house was that you lost;
25 is that correct?

**ERIN LINDSAY - September 05, 2024**

Page 26

1  A.  **It's the collection of line items that**
2  **shows everything that we had in the house, describes**
3  **accurate qualities, quantities.  Effectively, if you**
4  **were to disassemble the house, what you would need**
5  **to make it, and I -- if I recall correctly, scopes**
6  **also have other nontangible pieces that would be**
7  **needed to actually reconstruct the house.**
8      Q.  Okay.  That's a great way of putting
9  it.  I really appreciate you clarifying that.  Okay.
10 That's what you meant by scope of loss.  And if you
11 go to Exhibit 65, which should be right behind
12 Exhibit 64 -- and actually, I'm sorry.  Yeah, that's
13 right.  Exhibit 65.  You see there's an e-mail at
14 the bottom from your husband's e-mail address to
15 Mr. Van Riper on February 15, 2022.  Do you see
16 that?
17     A.  Yes, I do.
18     Q.  And do you see that your husband asks
19 him, What are the next steps to resolve that,
20 referring to the disagreement regarding the scope of
21 loss.  Do you see that?
22     A.  Yes, I do.
23     Q.  Okay.  And Mr. Van Riper responds in
24 his e-mail at the top of Exhibit 65 on February 16,
25 2022, regarding resolving the disagreement.  "The

Page 27

1  next step would normally," I think he's missing the
2  word "be" there.  "The next step would normally [be]
3  for your contractor to provide me with their
4  estimate so that I can review it."  Do you see that?
5      A.  I do.
6      Q.  So he's kind of saying what you would
7  normally do to resolve a scope disagreement in a
8  loss.  Do you see that?
9      A.  **It sounds like he's saying what his**
10 **expectation of that would be.**
11     Q.  Right.  Then he goes on and says, Well,
12 we don't really need to do that here because I'm
13 paying you the maximum.  Do you see that?
14     A.  Yes, I do.
15     Q.  But I want to go back to his
16 suggestion.  I shouldn't even say "suggestion."  Let
17 me strike -- strike that.
18         I want to go back to Mr. Van Riper's, I
19 guess, instruction, you could call it.  If you
20 disagree and you want to resolve this disagreement
21 about scope, the thing to do is to give us your
22 contractor's estimate, which will have what you guys
23 say the scope is.  So regarding that, you guys did
24 not do that, correct?
25         MS. MINAMIZONO:  Objection.  Form.

Page 28

1      Q.  (BY MR. STEPHENSON)  You didn't take
2  that instruction or suggestion, whatever we call it.
3  You did not provide an estimate from a contractor to
4  resolve the disagreement regarding scope, correct?
5      A.  Correct.
6      Q.  Okay.  And I want to explore why.  I
7  think there are more e-mails that explain why, and
8  let me see if I can just cut to the chase.  Do you
9  recall that your husband's position, your side's
10 position in response to Mr. Van Riper was, Well,
11 we're not going to do that because first we need the
12 scope of loss agreed upon with Travelers before we
13 can give it to a contractor and provide you a
14 contractor's estimate.  Do you remember that that
15 was your side's position on this issue?
16     A.  Yes.
17     Q.  Okay.  And so what I want to explore
18 with you is where you got that idea, because that's
19 not in the e-mails, right?  So where did you guys
20 get the belief that there had to be some kind of
21 agreed-upon scope of loss with Travelers before you
22 could provide something from a contractor?
23     A.  **It -- that would have been through**
24 **United Policyholders.**
25     Q.  Okay.  And spoiler alert, that's what

Page 29

1  your husband said too.  Okay.  So tell me about
2  that.  How -- how -- I'll just strike that.  Let me
3  start again.  Sorry, Carin.
4          Tell me about that.  How did you get
5  that understanding or belief from United
6  Policyholders?
7      A.  **That was the process that they laid out**
8  **for the beginnings of how to work through a**
9  **total-loss claim.**
10     Q.  Okay.  Was it in a webinar?
11     A.  **Yes, I believe so.**
12     Q.  Okay.  Do you have any idea when that
13 webinar was?  I assume it was before February 22,
14 2017 (sic), right?
15     A.  **Probably.  I don't remember when the**
16 **first webinar was that I watched.**
17     Q.  And to the best of your recollection,
18 can you tell me exactly what it was that United
19 Policyholders said on this webinar that gave you and
20 your husband this understanding or belief that there
21 had to be an agreement with Travelers on the scope
22 of loss before you could provide a contractor's
23 estimate or scope?
24     A.  **They advised that getting an accurate**
25 **scope was absolutely crucial for the rest of the**

Page 30

1 **claim and that it was important for other things as**
2 **well, not just the claim, and that it was crucial to**
3 **get that in place first before you even discussed**
4 **dollars.**
5     Q.   Did they say anything else about that,
6 that you can recall, referring to United
7 Policyholders or any other experts you may have
8 consulted with around the time of this claim?
9     A.   Such as?
10    Q.   You tell me.  Well, I'll say the thing
11 I'm really looking for, the thing I would love to
12 know is, where was the idea that the scope -- let me
13 back up, provide a little more explanation.  I
14 totally agree that getting an accurate scope can be
15 very vital.  What I'm struggling to find, what I
16 want to discover, hopefully today, is, where did the
17 idea come from that there had to be an agreement
18 with Travelers about the scope of loss before you
19 could get a contractor involved?
20         That's the part -- that's the part of
21 it that I'm still missing, I'm still trying to find.
22 Did United Policyholders or someone else say,
23 "Before you get a contractor involved, you first
24 need to have agreement with the insurance company on
25 what the scope of loss is," or something like

Page 31

1 that?
2     A.   Yeah.  As I recall, that was the
3 advice.
4     Q.   Okay.  And just to the best of your
5 recollection, can you tell me as closely as you can
6 to what they said, you know, what they imparted to
7 you or your husband on that issue?
8     A.   **Well, that it's necessary to work**
9 **through the claim; and once you have a scope of loss**
10 **by which they had defined, that that's the list I**
11 **was talking about without any dollars.  It's just**
12 **the list, the shopping list, so to speak.**
13         **And once you have that in place, once**
14 **it accurately reflects your home, then you can add**
15 **dollars to it; and if the list -- if the list itself**
16 **adequately reflects the home and what you would need**
17 **to reconstruct it before it burned down, then you're**
18 **-- pardon me -- you're on your way to getting an**
19 **understanding of what that would actually cost in**
20 **dollars to replace.**
21    Q.   And this is what you were told by
22 United Policyholders?
23    A.   Well, I'm -- that's what they were
24 advising in the webinar.
25    Q.   Thank you.  Was there anything specific

Page 32

1 about not having a contractor get involved in that
2 part of the process of resolving a disagreement
3 about scope?  Was there anything about that?
4     A.   Yes, there was.
5     Q.   Tell me what was said about that by
6 United Policyholders or anyone else that you were
7 receiving instruction from regarding insurance
8 claims.
9     A.   Sure.  They said something to the
10 **effect of, "Do not let your insurance company tell**
11 **you that this is a necessary step."**
12    Q.   That what is a necessary step?
13    A.   **That involving your contractor to**
14 **actually get the scope of loss is a necessary step.**
15    Q.   Interesting.  And this was during one
16 of those same seminars or webinars that you were
17 telling me about that earlier, correct?
18    A.   Yes.
19    Q.   Okay.  This is really fascinating, by
20 the way.  I feel like I'm learning something I've
21 always wanted to know about this claim.  I feel like
22 this explains a lot, because at least what I see in
23 the claim is that this issue of how to resolve a
24 disagreement about scope really seems to have caused
25 a lot of the back-and-forth and issues in the claim

Page 33

1 in the middle of 2022.  I mean, would you agree with
2 that?
3         MS. MINAMIZONO:  Objection.  Form.
4     A.   Would you restate the question, please?
5     Q.   (BY MR. STEPHENSON)  I'll try to state
6 it more simply.  Many months of time from February
7 all the way up till August of 2022 were spent on
8 this issue of how to come to an agreement on the
9 scope of the loss.  Is that fair?
10    A.   Yes.  We spent a bunch of time trying
11 to reach a scope of loss that accurately reflected
12 the home we lost.
13    Q.   Right.  And did United Policyholders or
14 anyone else that you may have been consulting with
15 about insurance, did any of them say why a
16 contractor should not be involved in a disagreement
17 about scope of loss?
18    A.   I believe it was that it wasn't
19 necessary.
20    Q.   Okay.  Can you think of any other
21 reason that may have been provided as a
22 justification for that advice you received about not
23 involving a contractor in a disagreement regarding
24 scope of loss?
25    A.   The idea that I recall is that at the

Page 34
1  end of the day, you're just trying to get the list.
2  The contractor presumably, unless they're the ones
3  that built the home, doesn't know the house you had.
4  They don't know what was in it.  You do, and you've
5  got photos, you've got receipts, you've got your own
6  descriptions of -- from recollection of what was in
7  your home.
8             That's all that's needed to sit down
9  and have a conversation to get that list down
10 accurately, at least in terms of the pieces that a
11 layman would understand.  I wouldn't know about the
12 2-by-4s or anything like that, but for the most
13 part.
14      Q.   Thank you, Ms. Lindsay.  Did United
15 Policyholders or anyone else that you were
16 consulting with about insurance give kind of any
17 source or evidence to support this idea that a
18 contractor should not be involved in resolving a
19 disagreement about scope of loss?
20      A.   There were experts there to speak on
21 the webinars, people who understood total-loss
22 claims.  They were giving advice based on their
23 experience.  I can't speak to their job history or
24 why specifically they would have given whatever
25 information they gave when they didn't say it

Page 35
1  specifically.
2       Q.   Fair enough.  Did you trust United
3  Policyholders and their webinars that they were
4  giving you good advice and information?
5       A.   I did.
6       Q.   And is it fair to say that early on in
7  the claim process, you did not trust Travelers or
8  Peter Van Riper?
9       A.   Yes.
10      Q.   So tell me when the mistrust in Peter
11 Van Riper and Travelers began.  I just want to know
12 when first, and then we'll dive into why.  So let's
13 start with when.  About when did you start to feel
14 mistrustful of Peter Van Riper and Travelers?
15      A.   I can speak to the mistrust of Peter
16 Van Riper.  At the time we hadn't really had a ton
17 of contact with Travelers, the rest of Travelers;
18 but Peter was there as a part of Travelers, so it
19 was pretty early on.  I would say roughly within a
20 week, give or take.
21      Q.   Okay.  Thank you.  And tell me why you
22 began mistrusting Peter Van Riper and Travelers.
23      A.   We had asked -- excuse me.  I shouldn't
24 say "we."  I wasn't on the phone call, but if I
25 remember correctly, Chris had asked for a full and

Page 36
1  complete scope of loss and was outright refused by
2  Peter.
3       Q.   Okay.  Are you done with your answer?
4       A.   Yeah.
5       Q.   Okay.  All right.  So just to make sure
6  I understand, your understanding of what happened is
7  that your husband straight out asked for a complete
8  scope of loss, and Peter Van Riper just said, "No,
9  I'm not going to give you one," or something like
10 that?
11      A.   I wasn't on the call, but my
12 understanding is it was something to that effect.
13      Q.   Okay.  And do you agree that the
14 mistrust in Travelers and Peter Van Riper kind of
15 tainted the relationship going forward?
16           MS. MINAMIZONO:  Objection.  Form.
17      A.   Would you rephrase the question,
18 please?
19      Q.   (BY MR. STEPHENSON)  I don't know if I
20 can rephrase it.  I'll -- I thought it was pretty
21 simple.  Let me try it this way:  You agree trust in
22 any relationship is important, right?
23      A.   It's important to trust those who are
24 supposed to be working with you.
25      Q.   Yeah.  I mean, a relationship that is

Page 37
1  marred by mistrust is not as good as a relationship
2  that is based on good and healthy well-placed trust,
3  correct?
4       A.   Under ideal circumstances.
5       Q.   Right.  When you don't trust someone,
6  you can't rely on anything they say, right?
7       A.   You don't know -- they become someone
8  who is just -- how can I say this?  They become
9  someone you -- I -- excuse me, I did not feel that I
10 could rely on.
11      Q.   Right.  So when someone you don't
12 trust, like Peter Van Riper, says, "Here is what you
13 ought to do," you don't necessarily believe that's
14 right, correct?
15      A.   I did not believe that that was right
16 because of the advice from United Policyholders.  So
17 when Peter gave different advice, that's correct, I
18 did not believe him.
19      Q.   Right.  And would you agree also that
20 you also questioned Peter Van Riper's motives
21 towards you guys, towards you and your husband?
22      A.   I'm not sure.
23      Q.   Okay.  And do you agree that not
24 trusting Peter Van Riper affected the relationship
25 that you had with him on this claim?