```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF COLORADO
 3           CIVIL ACTION NO. 1:23-CV-01413-NYW-STV
 4
 5          ERIN LINDSAY AND CHRISTOPHER LINDSAY,
 6                         Plaintiffs
 7
 8                            V.
 9
10     THE TRAVELERS HOME AND MARINE INSURANCE COMPANY AND
11                GEICO INSURANCE AGENCY, LLC,
12                         Defendants
13
14
15
16
17
18
19
20
21
22
23   DEPONENT:  PETER VAN RIPER
24   DATE:      NOVEMBER 30, 2023
25   REPORTER:  ASHLEY KIND
```



**EXHIBIT 5**

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202

PIKE REPORTING COMPANY — YOUR PATH THROUGH LITIGATION

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Page 94

1    A.   It would have been via e-mail.  I don't think
2  they uploaded any directly.
3    Q.   What is PhotoWeb?
4    A.   That's where the photos are stored in our
5  system.
6    Q.   Okay.  And when you labeled your photos "risk
7  and builder info," did you give another label to the
8  photos provided by my clients?
9    A.   I don't recall.  I wouldn't have called it
10 "risk and builder info."
11   Q.   Okay.  Do you recall seeing -- well, so on
12 April --
13   A.   Actually --
14   Q.   Go ahead.
15   A.   The photos, those aren't -- the insurance
16 photos aren't in PhotoWeb.  They are in the -- I believe
17 they're in the file cabinet somewhere on an e-mail.
18   Q.   Okay.  So are you saying that my clients'
19 photos would have been separate from PhotoWeb or from
20 the photos you took that were uploaded on PhotoWeb?
21   A.   Correct, because they're not in PhotoWeb.
22   Q.   Okay.  And who has access to PhotoWeb?
23   A.   People -- employees at Travelers or claim
24 handlers.  I -- outside of, like, me and my -- and Aaron
25 Stone, Mike Gatti, I'm not sure if anybody else outside

Page 95

1  of us three would have access.
2    Q.   You said that my clients' photos would have
3  been uploaded to the electronic file cabinet; is that
4  right?
5    A.   They're not in PhotoWeb, so -- so if I did get
6  photos from them, they were attached to the e-mail and
7  put in the file cabinet.
8    Q.   Who has access to the file cabinet?
9    A.   People handling -- involved in the claim.
10   Q.   Do you know if underwriting has access to
11 photos in the file cabinet?
12   A.   I do not know.
13   Q.   Do you know if underwriting has access to
14 photos saved in PhotoWeb?
15   A.   I don't know.
16   Q.   Okay.  You continue on in this note dated
17 April 21st, 2022, that, "Total loss was confirmed," and
18 noted that, "Wood Brothers Homes has signage installed
19 inside the insured's fence line."  Why did you include
20 that note about the signage?
21   A.   It's just informational for the file.
22   Q.   Is there any significance in the fact that
23 Wood Brothers posted sign inside the insured's fence
24 line?
25   A.   No.  It's just informational.

Page 96

1    Q.   So at this site visit, who else besides you
2  was present?
3    A.   Nobody else was.
4    Q.   Were the Lindsays there?
5    A.   No, they were not.
6    Q.   Did they know you were coming?
7    A.   I don't recall if I told them I'd be
8  performing a site visit.  Our scheduled meeting was at
9  their house -- at their temporary residence.
10   Q.   Were there any handwritten notes that you took
11 during your site visit on April 20th, 2022?
12   A.   No.
13   Q.   So what we see here in this entry is the full
14 extent of what you observed at the site?
15   A.   Correct.
16   Q.   You didn't take any measurements that day,
17 correct?
18   A.   Correct.
19   Q.   When did you meet with the Lindsays in April;
20 do you recall the exact date?
21   A.   I believe my note said April 20th or 21st.  I
22 thought I --
23   Q.   Okay.  So I'm scrolling through.  Let's see.
24 I'm like -- I'm looking at Travelers 36, now 37.  The
25 note that we --

Page 97

1    A.   Okay.
2    Q.   -- spoke of is dated April 21st, 2022.
3    A.   Okay.  So we did meet on April 21st.  The next
4  note after that, "During meeting today --" it starts off
5  with, "During meeting today."  That was referencing the
6  sit-down meeting in -- in the temporary residence with
7  Michael Gurule and the Lindsays and Susan, I believe,
8  their -- their -- their builder contact.
9    Q.   Oh, okay.  It's the Stephanie from Glimmer;
10 does that sound right?
11   A.   Stephanie from -- sorry.  Yes, Stephanie from
12 Glimmer.
13   Q.   Okay.  Why is your entry related to this
14 in-person meeting limited to four sentences?
15   A.   Because I had retained -- I had an expert
16 retained, Michael Gurule, and he took his own scope
17 notes so that he could perform the task of providing --
18 providing us with a repair estimate.
19   Q.   How long was that meeting?
20   A.   I don't recall.
21   Q.   Were you-all in the same room?
22   A.   We were in the dining room all together, but I
23 don't recall how long I was there.
24   Q.   Did you leave early?
25   A.   I think Michael and I left at the same time,



Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202

(855) 693-1300 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Page 98
1  but I'm not sure.
2      Q.  Was Michael Gatti there?
3      A.  No, he was not.
4      Q.  Do you recall that Stephanie of Glimmer Claims
5  Services left first?
6      A.  I do not recall.
7      Q.  Was there any new information you obtained
8  about the Lindsays' home during this April meeting?
9      A.  I don't recall anything new that came up.  You
10 know, I had -- I had tasked Michael Gurule to, you know,
11 confirm -- or put together his accurate scope and
12 estimate based on -- based on information that could be
13 provided by the Lindsays or obtained from the
14 photographs.
15     Q.  Okay.
16     A.  And also -- and Stephanie was there too to
17 provide input on some of those facts.
18     Q.  Did you convey to Michael of Sedgwick that he
19 was responsible for noting all the features and
20 descriptions provided by the Lindsays during this
21 meeting?
22     A.  He -- Mike -- all right.  Michael was tasked
23 -- Michael Gurule was tasked with providing us with an
24 estimate of reconstruction for the dwelling.
25     Q.  You just -- you didn't tell him specifically

Page 99
1  how to go about it, right?
2      A.  Correct, except my -- I did have instructions
3  to -- to try to -- to use unit cost and obtain a sketch
4  of the house and --
5      Q.  And nothing --
6      A.  -- base his -- base his estimate off of that
7  if possible.
8      Q.  And nothing beyond that?
9      A.  No.
10     Q.  Okay.  I am going back to Exhibit 2, and you
11 see at the top -- this is, again, Ms. Lindsay's notes
12 from the recorded conversations, and this one Bates
13 stamped Lindsay 3940 is of the April 21st meeting with
14 Michael Gurule of Sedgwick and you and Stephanie; do you
15 see this?
16     A.  Yes, I see -- I see part of the document.
17     Q.  Okay.  And here she notes, "Forgot to hit
18 start at the beginning.  Starts in the middle."  So it
19 looks like she started recording, you know, at some
20 point after the initial few minutes of the conversation,
21 so it starts in the middle.  So approximately halfway
22 through the conversation -- or halfway through the
23 meeting is when Ms. Lindsay started recording.  So here,
24 as you can see, I mean, there is a lot of description of
25 what was discussed.  Do you recall this discussion?

Page 100
1      A.  Not in -- I -- I recall that -- I recall
2  having a meeting in their dining room.  And judging by
3  the -- the time at the top, we were there for an hour,
4  so I'm not going to recall specific detail of what was
5  discussed.
6      Q.  Since you weren't taking notes during this
7  meeting, what were you doing?
8      A.  I was listening and -- yeah, I was listening
9  and participating in the conversation and letting
10 Michael obtain the facts that he needed to -- to -- to
11 provide the estimate we had requested.
12     Q.  Do you recall the Lindsays showing photos
13 during this meeting?
14     A.  That I don't recall.  I remember seeing them
15 in the initial meeting.
16     Q.  I'm going to play what I'll mark as Exhibit 4.
17 It's the actual recording of the latter half of the
18 meeting on April 21st, 2022.
19         (EXHIBIT 4 MARKED FOR IDENTIFICATION)
20         (AUDIO RECORDING PLAYED)
21     FEMALE SPEAKER:  (Inaudible).
22     MALE SPEAKER:  (Inaudible).
23         (AUDIO RECORDING STOPPED)
24     BY MS. MINAMIZONO:
25     Q.  Okay.  I'm going to start playing.  Obviously,

Page 101
1  you know, it's marked -- I'll start roughly around 28 --
2  at minute 28:11, but that does not denote the actual, I
3  guess, time stamp of the conversation, just because
4  Ms. Lindsay started recording halfway.
5         (AUDIO RECORDING PLAYED)
6     MR. LINDSAY:  He believed they were underneath
7         all the main beams.  So I know there was a beam
8         basically here, and I know there was one in
9         there.  I know there was one in this room.  But
10        it was just, like, a metal thing you could adjust
11        the height on a little bit, right?  I don't know
12        what they're called.
13    MS. BROWN:  I might -- oh, I think I know what
14        you're talking about now.  I don't know what
15        he --
16    MR. LINDSAY:  And another couple in here.
17    MS. BROWN:  It's almost like -- not a hurricane
18        clip, but almost kind of like that, but it's a
19        spring load instead.
20    MR. LINDSAY:  It was -- no, it wasn't a spring.
21        It had just, like, a screw.
22    MS. BROWN:  Yeah, and it --
23    MR. LINDSAY:  And so that was how you would move
24        it up.
25    MS. BROWN:  But that's how it would move.  Yeah.

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202

(855) 693-7500 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Case No. 1:23-cv-01413-NYW-STV   Document 127-5   filed 10/17/25   USDC Colorado
pg 4 of 6
The Deposition of PETER VAN RIPER, taken on November 30, 2023
138..141

Page 138

1  example, the steel flange beam wasn't verified because
2  you didn't personally get notice of its existence; is
3  that right?
4      MR. STEPHENSON: Object to form and foundation.
5      THE WITNESS: No, we hadn't seen the photos of
6      the steel flange beam.
7      BY MS. MINAMIZONO:
8   Q.  And who does "we" refer to?
9   A.  Me, Aaron Stone, Michael Gatti, and, I
10  believe, Michael Gurule.
11  Q.  And how do you know that these other
12  individuals didn't see a photo or evidence of a steel
13  beam?
14  A.  They told me.
15  Q.  When did they tell you?
16  A.  I don't recall specific dates of those
17  conversations.
18  Q.  Going back to this entry dated January 31st,
19  2023 on a document Bates stamped Travelers 53, you
20  indicate that Travelers is declining their request for
21  an additional reformation to their policy. Who made
22  that decision?
23  A.  I don't recall. I had collaborated on the
24  contents of this communication with Aaron Stone and
25  Michael Gatti, is what I remember.

Page 139

1   Q.  Were there any e-mails with respect to the
2  decision not to further reform the policy?
3   A.  I don't recall.
4   Q.  Were there any meeting minutes with respect to
5  this issue?
6   A.  I don't have minutes for -- no, I don't have
7  any meetings minutes.
8   Q.  Any handwritten notes?
9   A.  No.
10  Q.  Okay. Well, let's actually break off here
11  because I need to introduce a new exhibit, so this will
12  be a good time to stop.
13      THE REPORTER: All right. We are off record. The
14      current time is 1:57 p.m. Mountain Time.
15      (OFF THE RECORD)
16      THE REPORTER: We are now back on the record for
17      the deposition of Peter Van Riper. The current
18      time is 2:17 p.m. Mountain Time. Counsel, you
19      may proceed.
20      BY MS. MINAMIZONO:
21  Q.  Great. Before we jump to the next exhibit, I
22  want to go back to Exhibit 3. It's an audio recording
23  of the January 2022 meeting that you had with the
24  Lindsays. And I'm going to start roughly at 2:04.
25      MR. STEPHENSON: I'm sorry. What? This is

Page 140

1  Exhibit 3? So this is the January meeting, I
2  think you said?
3   MS. MINAMIZONO: Right.
4   (AUDIO RECORDING PLAYED)
5   MS. LINDSAY: The purpose of the pinball machine
6   was not to (Inaudible). So just because the pots
7   and (Inaudible) are still there, doesn't mean the
8   pinball machines will be.
9   MR. LINDSAY: And you can see some of that stone
10  facade is still there.
11  MS. LINDSAY: Is that ours or is that our
12  neighbors? Is that the back of ours?
13  MR. LINDSAY: It's ours. It's the back of ours.
14  MS. LINDSAY: Oh, that. Well -- yeah. Okay. I
15  see (Inaudible).
16  MR. LINDSAY: You can see, like, it got so hot.
17  That's one of the support beams bent -- it's just
18  bent. Yeah. Those stairs I told --
19  (AUDIO RECORDING STOPPED)
20  BY MS. MINAMIZONO:
21  Q.  Okay. Did you hear Chris mention the bent
22  steel beams in that excerpt?
23  A.  I thought I heard him say "support beam".
24  Q.  Okay. Do you recall the Lindsays showing you
25  the pictures they took of the wreckage post-fire?

Page 141

1   A.  You know, I don't remember what's -- I don't
2  remember seeing wreckage in that meeting.
3   Q.  Okay. I am going to mark as Exhibit 7,
4  document Bates stamped Travelers 159 through 178.
5       (EXHIBIT 7 MARKED FOR IDENTIFICATION)
6   MR. STEPHENSON: And this is Exhibit 7?
7   MS. MINAMIZONO: Correct.
8   MR. STEPHENSON: And is that in the chat?
9   MS. MINAMIZONO: Yes.
10  MR. STEPHENSON: I am not seeing it. Are you
11  sure it's to everyone?
12  MS. MINAMIZONO: No, that's possible. Let me see
13  here. Oh, I forgot to press send. Okay. Here
14  you go. You should have received it.
15  BY MS. MINAMIZONO:
16  Q.  Okay. So these appear to be screenshots of
17  communications with GEICO; do you see that?
18  A.  Is that the Travelers Bates?
19  Q.  It is. Yeah. So yeah, sorry about that. It's
20  Travelers 159 through 178. Have you ever seen this
21  before?
22  A.  No, I have not.
23  Q.  Okay. I'm going to mark Travelers 207 through
24  221 as Exhibit 8.
25      (EXHIBIT 8 MARKED FOR IDENTIFICATION)

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202
(855) 693-3787 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Page 158

1    A.   Do you have -- I'd have to see what Mr.
2  Lindsay's e-mail that we're responding to, that prompted
3  that.
4    Q.   Okay.  So in this e-mail thread, we have an
5  e-mail from Christopher Lindsay dated August 29th of
6  2022, starting at Travelers 690 to 691.  And it appears
7  that he is asking for a thorough and complete scope of
8  loss. He is also asking here to ensure that underwriting
9  adjusts their estimates in a similar fashion.  Does this
10 information help you in answering my question as to --
11   A.   Yes.  He requested that we send that scope of
12 loss to underwriting, the scope of loss pertaining to
13 Glimmer -- the Glimmer Claims estimate.  In my response,
14 my e-mail response, it was our position that we were not
15 going to forward that to underwriting.
16   Q.   And why was that?
17   A.   But he -- but he -- because that was --
18 because he -- but I referred him to his agent.  That
19 would be the correct avenue to discuss underwriting
20 items.
21   Q.   Is that a Travelers policy?
22   A.   No.  My job -- my -- my -- my -- my role in
23 this is a claims adjuster, which is, as I've stated,
24 being fair and reasonable and ensuring that whatever --
25 the damage -- the cover damages are paid -- are paid

Page 159

1  correctly under the policy.  Anything related to sales
2  underwriting, you know, they need to -- they need to go
3  through their -- their agent.
4    Q.   But weren't you responsible for obtaining, you
5  know, information from the Lindsays with respect to the
6  dimensions and the features of their home to come up
7  with a scope of loss that was used by underwriting?
8    A.   My responsibility is -- is -- is to obtain the
9  facts to provide an accurate scope and estimate, and I
10 did do that.
11   Q.   And for the Lindsays?
12   A.   Yes, I did.  I do that -- I did that for the
13 Lindsays so that, you know, as their adjuster, their
14 claims adjuster, I can adjust their claim.
15   Q.   But you did --
16   A.   In this -- in this instance, they provided the
17 -- the Glimmer estimate, which I reviewed and provided
18 to Michael Gurule for his review as well.  And -- and at
19 the same time -- but we did not forward that to -- we
20 were -- we didn't -- we did not forward that to
21 underwriting.
22   Q.   Did you provide any scope of loss to
23 underwriting?
24   A.   No.
25   Q.   And you did not prepare an accurate scope of

Page 160

1  loss after your meeting with -- or immediately after
2  meeting with the Lindsays back in January of 2022,
3  correct?
4         MR. STEPHENSON:  I'm sorry.  Could you repeat
5       that question, Susan?
6         BY MS. MINAMIZONO:
7    Q.   Yeah.  You did not prepare an accurate scope
8  of loss for the Lindsays prior to your retention of
9  Michael Gurule at Sedgwick, correct?
10        MR. STEPHENSON:  Objection, form and foundation.
11        THE WITNESS:  That's not correct.  I did provide
12      an accurate scope and estimate.
13        BY MS. MINAMIZONO:
14   Q.   But it was significantly different from what
15 Mr. Gurule provided, right?
16   A.   It was different.
17   Q.   So if it was different, it wasn't accurate,
18 right?
19        MR. STEPHENSON:  Object to form and foundation.
20        THE WITNESS:  I prepared an accurate scope and
21      estimate based on the facts, using an -- using --
22      not underwriting, I'm sorry, using the estimating
23      tool Xactimate.  We tasked Michael Gurule to
24      provide the same.  And using Xactimate, he -- he
25      wrote his estimate a different way, and gave us -

Page 161

1      - and reported that to us.
2         BY MS. MINAMIZONO:
3    Q.   And --
4    A.   And based on his -- and based on his -- based
5  on his reporting to us, we reevaluated the claim and
6  adjusted the claim accordingly.
7    Q.   And you agree that Michael Gurule's estimate
8  was significantly higher than what you had estimated,
9  correct?
10   A.   It was -- I -- it's -- it's -- it's a
11 subjective term.  It was higher and we adjusted it. It's
12 -- it -- it's additional information that I took in as a
13 -- as an adjuster, and I revised my -- my estimate. I
14 revised my valuation.
15   Q.   Was your original estimate using Xactimate
16 approximately 980,000?
17   A.   Yes.
18   Q.   Do you recall what Mr. Gurule's initial
19 estimate was?
20   A.   No, I don't.  I'd have to look in the -- in
21 the notes.
22   Q.   I'm showing you Exhibit 10 and Sedgwick's
23 estimate.  Does this refresh your recollection as to
24 what Mr. Gurule estimated this total loss?
25   A.   Yes.

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202

PIKE REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Page 162

1    Q.   And you see a total of $1,571,00.063?
2    A.   Yes, I see that.
3    Q.   You agree that the difference between your
4  initial scope using Xactimate was roughly $600,000 less
5  than what Mr. Gurule estimated?
6    A.   Roughly.
7    Q.   I'm going to show you what I'm going to mark
8  as Exhibit 13, and it's Travelers 2928 to 3032.
9         (EXHIBIT 13 MARKED FOR IDENTIFICATION)
10    MS. MINAMIZONO:  All right.  Sorry.  I have to
11    black out again.  One second.
12    MR. STEPHENSON:  I'm sorry, Susan.  Why do you
13    need to do that?  It looks like you're moving
14    your camera.  I'm just curious.
15    MS. MINAMIZONO:  Yeah.  No.  It -- I'm working
16    off of three screens, including my laptop.  And
17    sometimes when I open a PDF, if it appears on my
18    laptop screen, I am unable to move it, so...
19    MR. STEPHENSON:  Oh, all right.
20    MS. MINAMIZONO:  Yeah.  It's a rudimentary fix,
21    but it's working, so I apologize.  Okay.  So I
22    will share with you what I will mark as Exhibit
23    13.
24    BY MS. MINAMIZONO:
25    Q.   Okay.  Have you ever seen this document before

Page 163

1  by Glimmer Claims Services?
2    A.   Yes.
3    Q.   And do you recall when, approximately, you saw
4  this?
5    A.   I believe in the notes it was around
6  September.  It's in the notes.
7    Q.   And you would have indicated that it was a --
8  an estimate from Glimmer, correct?
9    A.   Correct.
10    Q.   Okay.  What did you -- oh, how did you receive
11  this estimate?
12    A.   I believe the Lindsays e-mailed it to me.
13    Q.   Okay.  And what did you do with it upon
14  receipt?
15    A.   I forwarded it to Michael for review, Michael
16  Gurule.
17    Q.   Did you discuss any -- or have any discussions
18  regarding any particular line items in this estimate
19  with Michael?
20    A.   Not -- no, we didn't.
21    Q.   Actually, just -- okay.  I'm looking at page
22  Bates stamped 2930, line item 17 states wide flange
23  beam.  I know we've talked probably a little ad nauseam
24  about this beam, but here the -- Glimmer includes this
25  as a line item.  And yet this is something that both you

Page 164

1  and Sedgwick disputed.  Why is that?
2    A.   We already -- because -- I remember discussing
3  this with Michael, asking him about it after he's had a
4  chance to review it.  And while reviewing the whole
5  thing, I remember talking about the wide flange beam.
6  And it was his -- it was his opinion that a house like
7  that wouldn't have that kind of beam as part of its
8  structural support, and absent any other evidence that
9  there was one, it didn't seem -- it didn't seem
10  reasonable to include that in the scope.
11    Q.   Did the both of you discuss the big
12  discrepancy between Travelers' and Sedgwick's total
13  estimate, and Glimmer's total cost estimate?
14    A.   We did not -- we didn't compare what Sedgwick
15  -- when Sedgwick presented -- Michael Gurule and
16  Sedgwick presented their estimate reported -- in
17  reporting to us, I didn't compare it against the
18  Travelers estimate that -- that we initially provided to
19  the Lindsays.  We -- I -- we -- as far as comparing that
20  to the Glimmer estimate, any comments -- and this is
21  documented in the file notes, any comments that Michael
22  had in comparisons was in that spreadsheet.
23    Q.   Were there certain items in this Glimmer
24  estimate that Travelers and Sedgwick did not include in
25  their scopes?

Page 165

1    A.   I believe that was itemized in the -- in the
2  spreadsheet.
3    Q.   And that you're referring to the spreadsheet
4  prepared by Michael Gurule?
5    A.   Correct, when he was comparing -- when he --
6  that had the column with "SBC Comments".
7    Q.   Was Aaron Stone involved in your
8  communications with Michael Sedgwick?
9    A.   I don't know.
10    Q.   Was he -- what do you mean by "I don't know"?
11  You -- that you don't recall if Aaron jumped on a call
12  with you and Michael at any point in time?
13    A.   No, he -- he did not.  If Aaron called him and
14  he didn't tell me about it, then I wouldn't have known.
15  But I don't see a circumstance where he would have
16  called Michael.
17    Q.   Okay.  I'm going to mark as Exhibit 14,
18  Travelers Bates stamped 701 through 1062.
19         (EXHIBIT 14 MARKED FOR IDENTIFICATION)
20    BY MS. MINAMIZONE:
21    Q.   All right.  These -- well, there is a bunch of
22  e-mails, and I'm looking at, I believe, starting at
23  Travelers 701.  There's an e-mail from Christopher
24  Lindsay to you dated September 23rd, 2022.  And he
25  indicates, "We have freely provided photos on January

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com