```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF COLORADO
 3            CIVIL ACTION NO. 1:23-cv-01413-NYW-STV
 4
 5           ERIN LINDSAY AND CHRISTOPHER LINDSAY,
 6                           Plaintiffs
 7
 8                              V.
 9
10     THE TRAVELERS HOME AND MARINE INSURANCE COMPANY AND
11                 GEICO INSURANCE AGENCY, LLC,
12                           Defendants
13
14
15
16
17
18
19
20
21
22
23   DEPONENT:   MICHAEL GATTI
24   DATE:       SEPTEMBER 27, 2024
25   REPORTER:   EMMA HOCKENBERRY
```



**EXHIBIT 6**

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202

PIKE REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Page 82

1  the fire was a couple days later, they're going to get
2  9.3, and Travelers just made the decision to give
3  everybody 9 -- well, again, give everybody what they
4  would've gotten had the fire happened a few days later.
5  I don't want to say everybody was at 9.3.
6      Q.   Do you know who made this decision?
7      A.   It was in the underwriting chain of command. I
8  don't know who specifically did that.
9      Q.   Okay.  Have you ever handled or supervised a -
10 - a total loss claim where the original blueprints could
11 not be found?
12     A.   Yes.
13     Q.   Can you tell me what steps you personally or
14 your report took in handling such a claim?
15     A.   Yeah.  I'll have to tell you about a report, a
16 -- a direct report.  I -- I hadn't handled claims since
17 the early '90s, and things are completely different. But
18 without a blueprint you can still try and get building
19 permits, you can still try and get, who did the
20 renovation?  Oh, Smith Construction.  Let's get a hold
21 of Smith Construction and -- and -- and got information
22 from that.  Assuming that the insured had that
23 documentation and it was destroyed in the fire. You
24 know, if they had it in a file cabinet in their business
25 office, they still might be able to provide something

Page 83

1  like that to us.  So seeking information from the
2  insured as to prior repairs, that's -- that's always a
3  good idea, prior renovations if -- if there's something
4  available like that.  I mentioned Trulia and -- and
5  Zillow, that -- that sometimes they have a lot of photos
6  there, especially if the house had been listed
7  previously.  If -- if they bought the house fairly
8  recently, they still may have the -- the walkthrough
9  still might be available on -- on the website, and we
10 could really garner a lot of information from that.
11 They might be able to get some stuff from -- now, since
12 I don't do this firsthand, I - - I think Google Earth
13 might provide something along those lines as well, some
14 photos that they -- they can access.  So any -- I guess,
15 any and all public -- publicly available information as
16 well as a detailed interview with the insured.
17 Obviously you're going off the insured's memory, right?
18 They -- they know their house a lot better than we do.
19 So you work with them on that, and getting kind of
20 history of the house.  You know, what -- what happened
21 renovation wise and so on and so forth.
22     Q.   Anything else that an adjuster --
23     A.   That -- I mean, that's off the -- the top of
24 my head.  Like I said, I haven't adjusted a claim in a
25 long time.

Page 84

1      MS. MINAMIZONO:  It is noon Mountain Time.
2  Would anyone like to take a break?
3      MR. STEPHENSON:  So why don't we discuss it --
4  well, let me just ask you.  How much longer do you
5  think you've got?
6      MS. MINAMIZONO:  Definitely an hour.  Might go
7  an hour and a half.  And I -- I guess it depends on
8  whether Ryan has any questions as well.
9      MR. GILL:  I -- I don't think I will.
10     MS. MINAMIZONO:  Okay.
11     MR. STEPHENSON:  Okay.  Why don't we just go
12 ahead and take a five, ten-minute break?
13     THE REPORTER:  Okay.  I'm going to go off the
14 record.  The time is 2:00.
15     (OFF THE RECORD)
16     THE REPORTER:  We are back on the record.  The
17 time is 2:19.
18 BY MS. MINAMIZONO:
19     Q.   Okay.  Let me go back to what was previously
20 marked as Exhibit 1.  Okay.  I'm looking at Page Bates
21 stamp Travelers 32.  It's an entry by Peter Van Riper
22 dated April 13th, 2022, at 4:17:23 p.m.  Do you see
23 that?
24     A.   Yes, I do.
25     Q.   Okay.  Here Mr. Van Riper states, "Requesting

Page 85

1  director approval to hire construction consultant expert
2  to assist with our evaluation based on disputes raised
3  by the insured."  Is it your understanding that the
4  director referred here is Aaron Stone?
5      A.   Correct.
6      Q.   Okay.  Were you involved at all with the
7  decision to hire Sedgwick as the construction
8  consultant?
9      A.   I -- as the matter was over Mr. Stone's
10 authority, I would have to sign off on the approval.
11     Q.   Did Mr. Stone explain to you why a
12 construction consultant expert was necessary for this
13 case?
14     A.   I -- he may have as in his request.  But based
15 on my conversation with Mr. Lindsay, you know, it wasn't
16 surprising that we'd want to get someone else retained
17 to review it as well.
18     Q.   Okay.  And was it your understanding that
19 Travelers would rely on the estimate provided by the
20 building construction consultant, in this case Sedgwick,
21 to further evaluate whether the scope and the repair
22 estimate needed to be revised?
23     A.   Well, he would collaborate with Peter on any
24 revisions to the original estimate.  The estimate would
25 -- the one we would share with the insured would still,



Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Page 86

1  you know, go out on the Travelers' letterhead and -- and
2  have Peter's name on it.  But we would -- as the name
3  describes, he -- we would consult with him for
4  revisions.
5      Q.  Okay.  Then on Page Bates stamped Travelers 33
6  is -- there's an entry by Mr. Stone dated April 13th,
7  2022, at 4:56:51 p.m.  Do you see that?
8      A.  Yes.
9      Q.  Okay.  And here he states, "Approving building
10 consultant to help with estimate.  Referring to AVP."
11 And that AVP is you, right?
12     A.  Correct.
13     Q.  Okay.  And do you recall how many
14 conversations you had with Mr. Stone about the retention
15 of Sedgwick for this claim?
16     A.  I -- I don't.  He either sent me an e-mail, or
17 a system diary with the request.  We may not have even
18 verbally discussed it after our initial meeting that we
19 had on it.
20     Q.  What was discussed during that initial
21 meeting?
22     A.  With -- with Aaron, he -- we -- we spoke about
23 the reformation call that he was on, and some of the
24 issues raised by Mr. Lindsay in the conversation with
25 me.

Page 87

1      Q.  Did he mention -- did he mention the need for
2  a building construction consultant during that
3  conversation?
4      A.  You know, I don't know if he specifically did.
5  But I would've been -- if he -- obviously I ultimately
6  approved it, so I was on the same page with him whenever
7  we -- you know, however we did communicate about it.
8      Q.  Going back to Exhibit 1 on Page Bates stamp
9  33.  There's a note dated April 14th, 2022, at 8:32:17
10 a.m. by Tiffany Hunton.
11         Do you know who that is?
12     A.  Yes.  It -- the -- his name is Hunton Tiffany.
13     Q.  Ah.  Who is he?
14     A.  He is a director that oversees outside claim
15 contents representatives.  That's why he would be
16 interjected into this file.
17     Q.  Okay.  Do you know what he meant by the
18 acronym POA, in this entry?
19     A.  I would say that's plan of action.
20     Q.  And I'm sorry, going back to -- let's see.
21 Mr. Stone's entry dated April 13th, 2022.  Was it your
22 understanding around that time that Sedgwick was
23 identified as the building consultant for this claim?
24     A.  At this point he probably didn't mention a
25 specific name.  He may have.  I -- I don't recall.

Page 88

1      Q.  Do you recall when you first became aware that
2  Sedgwick was the building consultant for this claim?
3      A.  I don't know exactly.  If -- if Aaron didn't
4  specifically mention them upfront, it was probably in
5  one of our biweekly meetings when he would give me
6  status updates.
7      Q.  Still in Exhibit 1, moving on to Page Bates
8  stamp Travelers 34.  There is an entry dated April 14th,
9  2022, at -- at 3:37:43 p.m. by Mr. Van Riper.  Do you
10 see that?
11     A.  I do.
12     Q.  It appears that he is documenting an e-mail
13 that he sent to Michael at Sedgwick regarding the
14 construction consultant referral; is that right?
15     A.  It does look like that is part of an e-mail.
16     Q.  Okay.  Here he states, "Claim information is
17 located below.  I will need the following items adhered
18 to in your estimate."  In the first bullet point he
19 states, "Include a sketch for which to base your line
20 items off of."  Is this in line of the methodology we
21 discussed earlier in our deposition today about, you
22 know, the sketch method versus the -- I actually forgot
23 the name of the other method that you testified about.
24     A.  That would be the grouping and dimensioning.
25 And sketch probably means the same thing as it did when

Page 89

1  I was in that training, although the Xactimate product
2  has been updated several times since I've been in that
3  training.
4      Q.  Okay.  Do you know how many times?
5      A.  Do not know.
6      Q.  And I apologize if I already asked this
7  question.  Do you know who is responsible at Travelers
8  in providing training, with respect to Xactimate?
9      A.  I'm not certain, no.
10     Q.  Okay.  The second bullet point, going back to
11 Exhibit 1, this entry by Mr. Van Riper on April 14th,
12 2022.  The second bullet point says, "Use unit cost. If
13 time and materials is needed, I will need supporting
14 documentation to validate why unit cost cannot be used."
15 Is unit cost the pricing method that Travelers always
16 uses for the rebuild of a home?
17     A.  Not -- not always.  It's a -- a method within
18 -- it's -- it's a primary method within Xactimate.
19     Q.  In what type of instances would the unit cost
20 method not be used?
21     A.  Well, that -- as Peter is questioning there,
22 that if the consultant felt unit code -- cost was not
23 appropriate, he would need some supporting
24 documentation.  I -- you know, I can't really speculate.
25 I don't write estimates, and haven't written them in a

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com