IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01413-NYW-STV

ERIN LINDSAY and CHRISTOPHER LINDSAY,

    Plaintiffs,

v.

THE TRAVELERS HOME AND MARINE INSURANCE COMPANY and
GEICO INSURANCE AGENCY, LLC,

    Defendants.

## DECLARATION OF BRIAN SEIGAL

I, Brian Seigal, declare that I am older than 18 years of age, of sound mind and competent to testify, and have personal knowledge of the following facts:

1.    I am the Principal of FIVE L, a consulting practice based in Longmont, Colorado. In this capacity, I have served as a Claims and Risk Management Consultant to a full-service insurance brokerage firm based in Florida and currently provide risk management, business development, and expert litigation services to my clients.

2.    I possess an AIC insurance designation and am a licensed insurance producer, having held licenses in Colorado, Utah, Florida, Illinois, Ohio, Texas, and New York. I have also earned a Data Ethics certification through Cornell University.

3.    My past work experience includes supervising business teams, claims professionals and underwriters for insurance companies. I am familiar with insurance industry standards governing such claims like the one at issue in this litigation.

4.    My opinions in this case are set forth in my reports dated April 1, 2025, June 20, 2025, and August 18, 2025. My opinions are based on my education, training, experience, and the documents I reviewed that have been produced during the course of this litigation.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated this ⅃ ⑥ day of October 2025.

Brian Seigal

2

**EXHIBIT 7**

Brian Seigal

4323 Bella Vista Dr.

Longmont, CO 80503

(303) 929-7912

bseigal@fivelco.com

April 1, 2025
Susan Minamizono, Esq.
Levin Sitcoff PC
455 Sherman St. Ste. 490
Denver, CO 80203

| | |
|---|---|
| **Re:** | Erin and Christopher Lindsay |
| **Carrier:** | The Travelers Home and Marine Insurance Company and Geico Insurance Agency, LLC |
| **DOL:** | 12/30/2021 |
| **Claim #:** | IRX8418 |
| **Civil Action Number:** | 2023CV30297 |

| **Policy Numbers:** | **Policy Effective Dates:** |
|---|---|
| 994039763633 | 6/4/2021 to 6/4/2022 |

Dear Ms. Minamizono,

This letter is in response to your request for a report summarizing my opinions as an insurance producer Standard of Care Expert and insurance claims handling Standard of Care Expert regarding evaluations and adjustments of Mr. and Ms. Lindsay's first-party property claim for benefits under their Traveler's Home and Marine Insurance Company policy that was secured by Geico Insurance Agency, LLC.

Throughout this report I will refer to Travelers Home and Marien Insurance Company as "Travelers". I will refer to Mr. and Ms. Lindsay as the "Lindsay's". I will refer to Geico Insurance Agency as "Geico" or the "Agent." Travelers' underwriting department will be referred to as "UW." Travelers' claims department will be referred to as "Claims." Travelers' Customer Advocacy department will be referred to as "Customer Advocacy." Travelers' construction expert will be referred to as "Mr. Gurule" or "Sedgwick." This is a preliminary report and will be supplemented after the discovery period is completed.

## Qualifications

My qualifications are contained in my attached CV. In summary, I have been involved with the insurance industry throughout my career since 1995 working in and being responsible for claims departments. I have a multi-line background in P&C and Health Insurance. I have been involved in the management of claim departments for carriers and TPAs. This work has spanned the primary, excess, and reinsurance levels. Over the years, I have managed and been responsible for the training of hundreds of adjusters. During this time, I have been involved with and been responsible for thousands of claims. I have held department reserve and settlement authority.[1]

I am familiar with claim-related standards, customs, practices, and procedures in the insurance industry-relevant across the various lines of business referenced above; especially as it relates to fair dealing and good faith claims practices. Based on my education, training, and experience I understand the applicable standards of care and practice for many types of claims some of which include property, construction defect, auto liability (bodily injury and uninsured/ underinsured motorist coverage), general liability, workers compensation, health insurance, and subrogation. My experiences have spanned the investigation, evaluation, settlement, litigation management, and resolution phases of claims for first-party and third- party claims. These activities have included reviewing and auditing thousands of open and closed claim files from 50+ claims departments for the adherence to company standards and practices. As a trainer and as a Claims Department leader, I have counseled scores of adjusters on how to maintain high professional standards of good faith in all their dealings.

In the past, I have been retained as an expert by a large national insurance carrier to provide opinions regarding the relationship between the Affordable Care Act, the Colorado Health Exchanges, COBRA, and specific workers' compensation claims. Due to the resolution of the issues, I did not testify in any of these cases.

I possess an AIC insurance designation and successfully passed the licensing exams for a Colorado Property & Casualty and Life Producer. I am currently licensed insurance producer and have held licenses in the following states: CO, UT, FL, IL, OH, TX, and NY. This allows me to sell tailored insurance products to clients on a case-by-case basis. I have earned a Data Ethics certification through Cornell University.

Through FIVE L, LLC, my consulting practice, I have worked with investment funds, purchasing subrogation claims from carriers, TPAs, captives, self-insurance groups and individual self-insured customers. I also have served as a Claims and Risk Management Consultant to a full-service insurance brokerage firm based in Florida. This firm has a focus on large real estate and property clients with complex insurance programs. In addition to leadership and business development, I supported the firm's clients (Defendants) in cases involving complex litigation and significant

---

[1] Working for carriers and TPAs, I have been involved in the process of responding to Division of Insurance Complaints, evaluating whether policies should be reformed to expand coverage, and have had P&L responsibility with management oversight for Claims and Underwriting personnel. I have also had experience with making business decisions involving staffing assignments when questions of trust emerged between a first-party insureds and assigned personnel. I am familiar with the industry best practices in these areas.

exposure. Currently, I work with internationally focused non-profits on their strategic, risk-associated, operational challenges. As a licensed insurance producer, I work within an agency team with other agents. My responsibilities include sales, coaching, and team development.

In 2018, I expanded my practice to assist injured parties in the settlement of their claims to avoid unnecessary litigation. I have evaluated more than 350+ first-party and third- party auto claims, premise liability claims, assault and battery claims, property claims, and workers compensation claims (Plaintiffs and Defense). From time to time, I am a retained standard of care expert in insurance and agent E&O litigated matters.

My fee for services to prepare this expert file review and initial report preparation is $275 per hour plus expenses. For litigation preparation and testimony, my fee is $375 per hour plus expenses including travel.

## Methodology

I utilized the following methodology/steps when evaluating this claim and formulating my opinions:

1. Before accepting the engagement, I conducted a conflict check.
2. I evaluated the material with a neutral mindset.
3. I read the Complaint and Answer.
4. I reviewed the disclosures and policies.
5. I noted questions and areas of the claim that were unclear.
6. I read the correspondence, and all other pertinent documents produced for my review.
7. When applicable I requested additional documents to review.
8. I reviewed industry norms and standards, statutes, case law, etc.
9. I developed my opinions and recommendations.
10. I drafted this report and created appendices for reference. The content of these may be used as exhibits during trial.

**************************

## Reviewed Documents and Resources

In preparation for this opinion, I have reviewed the documents provided as well as other materials identified below:

**The documents that were provided include:**

- +Exh 35 Wood Subpoena Production (WOOD_000001-WOOD_000550)
- +Exh 36 2022-11-14 Wood Brothers Bill for Insurance Adjustment Services
- +Exh 38 2022-04-22 Debris Removal Invoice
- +Exh 39 2022-10-10 Wood Brothers Estimate
- +Exh 40 2023-09-20 Wood Brothers Estimate
- +Exh 41 City of Louisville Rebuild Permit (TRAVELERS_009269-009270)
- +Exh 42 20220507 Email
- +Exh 43 LINDSAY017599-017655
- +Exh 44 WOOD_000551
- 3 Complaint
- 5 Answer – Geico
- 10 P's Responses to Travelers First Set of Discovery Requests to Plaintiff Christopher Lindsay
- 13 Travelers Responses and Objections to Ps' First Set of Discovery
- 13-1 Travelers - Verification for Responses to Plaintiffs' First Set of Interrogatories
- 16 Travelers Answer to Complaint
- 40 P's Supplemental Responses to Travelers First Set of Discovery Requests to Plaintiff Christopher Lindsay –
- 43 P's Second Supplemental Responses to Travelers First Set of Discovery Requests to Plaintiff Christopher Lindsay –
- 45 P's Responses to Travelers Second Set of Written Discovery to Plaintiff Christopher Lindsay
- 48 P's Responses to Travelers First Set of Written Discovery to Plaintiff Erin Lindsay
- 49 P's Responses to Travelers Third

Set of Written Discovery to Plaintiff Christopher Lindsay
- 51 P's Responses to Travelers Fourth Set of Written Discovery to Plaintiff Christopher Lindsay
- 52 P's Amended Responses to Travelers First Set of Written Discovery to Plaintiff Erin Lindsay
- 53 P's Responses to Travelers Second Set of Written Discovery to Plaintiff Erin Lindsay
- 63 Travelers Responses and Objections to Plaintiffs' Third Set of Discovery
- 64 Travelers - Responses and Objections to Plaintiffs' Third Set of Interrogatories and Requests for Production - 1-19-24(8429790.3)-c
- 66 Travelers - Verification for Responses to Plaintiffs' First Set of Interrogatories
- 67 Travelers - Responses and Objections to Plaintiffs' Second Set of Interrogatories, Requests for Production, and Requests for Admission - 01-26-24(8389325.3)
- 73 P's Responses to Travelers Third of Written Discovery to Plaintiff Erin Lindsay
- 79 Travelers' Responses to Plaintiffs' Fourth Set of Requets for Production
- 90 Amended Responses and Objections to Plaintiffs' Third Set of Written Discovery
- 90-1 Verification for Amended Responses to Third Set of Interrogatories
- 93 Travelers - Responses and Objections to Ps' Amended Fourth Set of Requests for Production
- 95 P's Amended Responses to Travelers Fifth Set of Written Discovery to Plaintiff Christopher Lindsay

- 112 P's Responses to Travelers Sixth Set of Written Discovery to Plaintiff Christopher Lindsay
- 113 P's Responses to Travelers Fourth Set of Written Discovery to Plaintiff Erin Lindsay
- 20231218 Core Remodeling Docs
- CHRISTOPHER_LINDSAY (Condensed)
- CHRISTOPHER_LINDSAY (FullSize)
- CONFIDENTIAL BRITTANY JOHNSON 30(b)(6) 02-29-2024_cond_N_ex
- CONFIDENTIAL BRITTANY JOHNSON 30(b)(6) 02-29-2024_full_ex
- CONFIDENTIAL MICHAEL GATTI 09-27-24 _cond_N
- CONFIDENTIAL MICHAEL GATTI 09-27-24 _full
- CONFIDENTIAL REDACTED BRITTANY JOHNSON 30(b)(6) 02-29-2024_cond_N_ex
- CONFIDENTIAL REDACTED BRITTANY JOHNSON 30(b)(6) 02-29-2024_full_ex
- CORE_000001-CORE_000093
- EFFICIENT_000001-EFFICIENT_000005
- ERIN_LINDSAY (Condensed)
- ERIN_LINDSAY (FullSize)
- ERIN_LINDSAY-Errata and Signature
- Exhibit 1_ Van Riper
- Exhibit 2_Van Riper
- Exhibit 5_Van Riper
- Exhibit 6_ Van Riper
- Exhibit 7_Van Riper
- Exhibit 8_Van Riper
- Exhibit 9_Van Riper
- Exhibit 10_Van Riper
- Exhibit 11_Van Riper
- Exhibit 12_Van Riper
- Exhibit 13_Van Riper
- Exhibit 14_Van Riper
- Exhibit 15_Van Riper

- Exhibit 16_Van Riper
- Exhibit 17_Van Riper
- Exhibit 18_Van Riper
- Exhibit 19_Van Riper
- Exhibit 20_Van Riper
- Exhibit 45_Ruggiero
- Exhibit 46_Ruggiero
- Exhibit 47_Ruggiero
- Exhibit 48_ Ruggiero
- Exhibit 49_ Ruggiero
- Exhibit 50_ Ruggiero
- Exhibit 76_Gatti
- Exhibit 80_Gatti
- Exhibit 81_Gatti
- Exhibit 82_Gatti
- Exhibit 83_Gatti
- Exhibit 84_Gatti
- Exhibit21_Johnson
- Exhibit22_Johnson
- Exhibit23_Johnson
- Exhibit24_Johnson
- Exhibit25_Johnson
- Exhibit26_Johnson
- Exhibit27_Johnson
- Exhibit28_Johnson
- Exhibit29_Johnson
- Exhibit30_Johnson
- Exhibit31_Johnson
- Exhibit32_Johnson
- Exhibit33_Johnson
- Exhibit34_Johnson
- GIA-000001-000030
- GIA-000031-000061
- GIA-000062 - 000099 [Lindsay 2015 Sales Info]
- GIA-000100 - 000154 [Lindsay 2019 Service Guidelines]
- GIA-000155 - 000180 [2019 Travelers Coverage A Service Guidelines]
- GIA-000181 - 000210 [Travelers Service Guidelines - Cancellation]
- GIA-000211 - 000230 [Travelers Service Guidelines - Change of

Address]
- GIA-000231 - 000236 [Travelers Service Guidelines - Claims Topics]
- GIA-000237 - 000252 [Travelers Service Guidelines - Discounts and Surcharges]
- GIA-000253 - 000272 [Travelers Service Guidelines - DNOC and Non-Renewals]
- GIA-000273 - 000318 [Travelers Service Guidelines - Endorsements]
- GIA-000319 - 000321 [Travelers Service Guidelines - Linking and Delinking Policies]
- GIA-000322 - 000337 [Travelers Service Guidelines - Named Insured Guidelines]
- GIA-000338 - 000352 [Travelers Service Guidelines - Occupancy Change]
- GIA-000353 - 000374 [Travelers Service Guidelines - PAF]
- GIA-000375 - 000391 [Travelers Service Guidelines - Reinstate]
- GIA-000405 - 000409 [Travelers Service Guidelines - Travelers CDE]
- GIA-000410 [Travelers Service Guidelines - Travelers Partner Resource]
- GIA-000411 - 000983 [Agent Lessons 1-23]
- GIA-000984 - 001488 [Agent Workbook Lessons 1-23]
- GIA-001489 - 001517 [Counselor Initiated Training (combined)]
- GIA-001518 - 003297 [Trainer Lessons 1-23]
- GIA-003298 [CI Job Aide 4.6.18]
- GIA-003299 - 003310 [original]
- GIA-003299 - 003310 [PP - Construction Grade Activity]
- GIA-003311 - 003317 [original] CONFIDENTIAL
- GIA-003311 - 003317 [PP - Dwelling Styles Activity]
- GIA-003318 - 003328 [original] CONFIDENTIAL
- GIA-003318 - 003328 [PP - Lesson 14 - Rate Manual Hunt]
- GIA-003329 - 003337 [original] CONFIDENTIAL
- GIA-003329 - 003337 [PP - Lesson 19 - Customer Description]
- GIA-003338 - 003346 [original] CONFIDENTIAL
- GIA-003338 - 003346 [PP - Lesson 19 - Is It Custom]
- GIA-003347 - 003357 [original] CONFIDENTIAL
- GIA-003347 - 003357 [PP - Travelers Lesson 7 - Taking a Payment]
- GIA-003358 - 003364 [original] CONFIDENTIAL
- GIA-003358 - 003364 [PP - Travelers Lesson 8 - Policy Billing]
- GIA-003365 - 004040 [Agent Lessons 1-26]
- GIA-004041 - 004381 [Agent Workbook Lessons 1-26]
- GIA-004382 - 006052 [Trainer Lessons 1-26]
- GIA-006053 - 006283 (Emails re DOI Complaint)
- GIA-006284 - 006332 (Emails re Travelers Guidance) CONFIDENTIAL
- GORILLA_000001-000012
- JENIFER RUGGIERO 07-24-24_cond_N_ex
- JENIFER RUGGIERO 07-24-24_full_ex
- JUSTIN_WOOD (Condensed)
- JUSTIN_WOOD (FullSize)
- Lindsay Contract 4.18 edited
- LINDSAY000001-002643
- LINDSAY002644-003936
- LINDSAY003937
- LINDSAY003938

- LINDSAY003939
- LINDSAY003940-003957
- LINDSAY003958-003960
- LINDSAY003961-004003
- LINDSAY004040-004050
- LINDSAY004051-004053
- LINDSAY004054-004060
- LINDSAY004061- voicemail-ALE Solutions 1_4_22
- LINDSAY004062 - voicemail-ALe Solutions 4_21_22
- LINDSAY004063 - voicemail-ALE Solutions 7_13_22
- LINDSAY004064 - voicemail-ALE Solutions 12_27_22
- LINDSAY004065 - voicemail-Pete 2_7_22
- LINDSAY004066 - voicemail-Pete 2_14_22
- LINDSAY004067 - voicemail-Pete 3_14_22
- LINDSAY004068 - voicemail-Pete 4_11_22
- LINDSAY004069 - voicemail-Pete 7_7_22
- LINDSAY004070 - voicemail-Pete 12_27_22
- LINDSAY004071 - voicemail-wood bros 11_23_22
- LINDSAY004072-004091 - WoodBros Texts
- LINDSAY004092 - FILE_0401
- LINDSAY004093-004102 - FILE_3105
- LINDSAY004103 - NO TRESPASSING AGREEMENT _ 828 Trail Ridge Drive
- LINDSAY004104-004174
- LINDSAY004175 - 416_22-074 - LINDSAY REBUILD - V16-Floor Plan - LOWER LEVEL PLAN
- LINDSAY004176 - 417_22-074 - LINDSAY REBUILD - V16-Floor Plan - MAIN LEVEL PLAN
- LINDSAY004177 - 419_22-074 -

- LINDSAY REBUILD - V16-Floor Plan - UPPER LEVEL PLAN
- LINDSAY004178 - 421_22-074 - LINDSAY REBUILD - V16-Floor Plan - ROOF PLAN
- LINDSAY004179 - 422_22-074 - LINDSAY REBUILD - V16-Floor Plan - SITE PLAN
- LINDSAY004180 - ALESolutions_LTH MoveIn Checklist
- LINDSAY004181-004182 - attachment 1
- LINDSAY004183-004194 - Lease814
- LINDSAY004195-004203 - Lindsay.826TrailRidge.4-4-22
- LINDSAY004204 - Moving charges
- LINDSAY004205 - RES-3498-2023 (001)
- LINDSAY004206 - RES-3498-2023
- LINDSAY004207 - Signed_Chris LindsayP1Contract
- LINDSAY004208 - Wood Brothers Homes_Debris Removal Invoice_Lindsay
- LINDSAY004209-004212 Lindsay proposal rev 1 - signed.
- LINDSAY004213-005037 ALE Solutions Emails
- LINDSAY005038-006094 DOI Emails
- LINDSAY006095-006694 Engineering Emails - Part 1
- LINDSAY006695-007294 Engineering Emails - Part 2
- LINDSAY007295-007894 Engineering Emails - Part 3
- LINDSAY007895-008431 Engineering Emails - Part 4
- LINDSAY008432-008465 FEMAAndSBAEmails
- LINDSAY008466-009513 GlimmerEmails
- LINDSAY009514-010813 TravelersEmails - Part 1
- LINDSAY010814-012298

TravelersEmails - Part 2
- LINDSAY012299-012759 Wood Brothers Emails - Part 1
- LINDSAY012758-013035 Wood Brothers Emails - Part 2
- LINDSAY013036-013504 Wood Brothers Emails - Part 3
- LINDSAY013505-013778 Architect Emails - Part 1
- LINDSAY013779-014046 Architect Emails - Part 2
- LINDSAY014047-014453 Architect Emails - Part 3
- LINDSAY014454-014815 Architect Emails - Part 4
- LINDSAY014816-015301 Architect Emails - Part 5
- LINDSAY015302-015506 Architect Emails - Part 6
- LINDSAY015507-015554 033 Original Policy
- LINDSAY015555-015558 122 Boulder County ROE
- LINDSAY015559-015631 Images
- LINDSAY015632
- LINDSAY015634-015795
- LINDSAY015796-016630
- LINDSAY016631 027_vmail_59136be2
- LINDSAY016632-017314
- LINDSAY017315 029_vmail_59136be2
- LINDSAY017316-017371
- LINDSAY017372
- LINDSAY017373-017452
- LINDSAY017453-017460
- LINDSAY017461-017463
- LINDSAY017464-017598
- LINDSAY017599-017655
- LINDSAY017656-017670
- LINDSAY017671-017696
- LINDSAY017697-017710
- LINDSAY017711-017723

- Lindsay-Demolitiion-Debris Removal Agreement
- Lindsay-Exhibit 51
- Lindsay-Exhibit 52
- Lindsay-Exhibit 53
- Lindsay-Exhibit 54
- Lindsay-Exhibit 55
- Lindsay-Exhibit 56
- Lindsay-Exhibit 57
- Lindsay-Exhibit 58
- Lindsay-Exhibit 59
- Lindsay-Exhibit 60
- Lindsay-Exhibit 61
- Lindsay-Exhibit 62
- Lindsay-Exhibit 63
- Lindsay-Exhibit 64
- Lindsay-Exhibit 65
- Lindsay-Exhibit 66
- Lindsay-Exhibit 67
- Lindsay-Exhibit 68
- Lindsay-Exhibit 69
- Lindsay-Exhibit 70
- Lindsay-Exhibit 71
- Lindsay-Exhibit 72
- Lindsay-Exhibit 73
- Lindsay-Exhibit 74
- Lindsay-Exhibit 75
- Lindsay-Exhibit 76
- Lindsay-Exhibit 77
- Lindsay-Exhibit 78
- Lindsay-Exhibit 79
- LODESTONE_000001-LODESTONE_000925
- LODESTONE_00898 -22-074 - LINDSAY REBUILD - V1
- LODESTONE_00899 -22-074 - LINDSAY REBUILD - V2
- LODESTONE_00900 -22-074 - LINDSAY REBUILD - V3
- LODESTONE_00901 -22-074 - LINDSAY REBUILD - V4
- LODESTONE_00902 -22-074 - LINDSAY REBUILD - V5

- LODESTONE_00903 -22-074 - LINDSAY REBUILD - V6
- LODESTONE_00904 -22-074 - LINDSAY REBUILD - V7
- LODESTONE_00905 -22-074 - LINDSAY REBUILD - V8
- LODESTONE_00906 - 22-074 - LINDSAY REBUILD - V8b
- LODESTONE_00907 -22-074 - LINDSAY REBUILD - V9
- LODESTONE_00908 - 22-074 - LINDSAY REBUILD - V10
- LODESTONE_00909 - 22-074 - LINDSAY REBUILD - V11
- LODESTONE_00910 - 22-074 - LINDSAY REBUILD - V12
- LODESTONE_00911 - 22-074 - LINDSAY REBUILD - V13
- LODESTONE_00912 - 22-074 - LINDSAY REBUILD - V13a
- LODESTONE_00913 - 22-074 - LINDSAY REBUILD - V14
- LODESTONE_00914 - 22-074 - LINDSAY REBUILD - V15
- LODESTONE_00915 - 22-074 - LINDSAY REBUILD - V16
- LODESTONE_00916 - 22-074 - LINDSAY REBUILD - V17 - Floor Plan - LOWER LEVEL PLAN
- LODESTONE_00917 - 22-074 - LINDSAY REBUILD - V17 - Floor Plan - ROOF PLAN
- LODESTONE_00918 - 22-074 - LINDSAY REBUILD - V17
- LODESTONE_00919 - ARCH SURVEY BACKGROUND
- LODESTONE_00920 - ARCH SURVEY BACKGROUND
- LODESTONE_00921 - Drawing1
- LODESTONE_00922 - Drawing1
- LODESTONE_00923 - LDG 36x24 TITLEBLOCK_LINDSAY
- LODESTONE_00924 - LINDSAY S1

- LODESTONE_00925 - Lot Grading
- MICHAEL GATTI 09-27-24 _cond_N_ex
- MICHAEL GATTI 09-27-24 _full_ex
- NAMASTE_000001-NAMASTE_000107
- PETER VAN RIPER 11-30-23_cond_N_ex
- PETER VAN RIPER 11-30-23_full_ex
- Phase 1 Engagement Agreement_Exhibit A_Insurance Contractor Costs_Lindsay
- SEDGWICK_000001
- SEDGWICK_000001-000005
- SEDGWICK_000002
- SEDGWICK_000003
- SEDGWICK_000004
- SEDGWICK_000005
- signature and errata CL
- signature and errata EL
- SIGNATURE_000001-SIGNATURE_000684
- SIGNATURE_000684 - erin.a.lindsay_2--kdelorraine@signaturewindows.co-vM8LFr
- TRAVELERS_000001-005669
- TRAVELERS_005670-TRAVELERS_005684
- TRAVELERS_005685
- TRAVELERS_005685
- TRAVELERS_005686-008694
- TRAVELERS_008695-009265
- TRAVELERS_009266-c
- TRAVELERS_009267-009268
- TRAVELERS_009269-009270
- TRAVELERS_009271
- TRAVELERS_009272
- TRAVELERS_009273-009382
- TRAVELERS_009383-009388
- TRAVELERS_009389
- TRAVELERS_009390-009393
- TRAVELERS_009394-9396
- Wood Bros emails
- wood brothers emails 2
- WOOD_000001-WOOD_000550

- WOOD_000546 - 2023-08-15 Email Attachment from C. Lindsay to J. Wood (1)
- WOOD_000547 - 2023-08-15 Email Attachment from C. Lindsay to J. Wood (2)
- WOOD_000548 - 2023-08-15 Email Attachment from C. Lindsay to J. Wood (3)

- WOOD_000549 - 2023-08-15 Email Attachment from C. Lindsay to J. Wood (4)
- WOOD_000550 - 2023-08-15 Email Attachment from C. Lindsay to J. Wood (5)
- WOOD_000551-000566

**Reviewed Colorado Statutes and DORA Regulations:**

- CRS 10-1-101
- CRS 10-3-1102

- CRS 10-3-1104

**Sources for industry Standards for insurer and agent conduct. These include publications from The Institutes which are utilized in the examinations for the AIC designation (nationwide insurance claims designation) and professional articles.**

- <u>Claim Handling Principles and Practices</u>
- <u>Colorado Producers Supplement</u>
- Offline QBank Policy Binder
- Offline QBank Underwriting
- Offline QBank Needs Analysis
- Offline QBank 4 Factors fo Negligence
- Offline QBank Insurance Producer Summary Disclosure Statement
- Offline QBank Good Faith
- Offline QBank Representation
- Offline QBank Negligence
- Field Underwriting -

- <u>The Claims Environment</u>
- <u>Property Loss Adjusting Vol. I</u> Classifying and Assigning Risk
- Offline QBank Underwriting Insuranceopedia June 2023
- Policy Reformation - Insuranceopedia June 2023
- PROPERTY & CASUALTY M13
- PROPERTY & CASUALTY M14
- Property Casualty Insurance License Exam Manual
- Colorado Property Casualty Insurance Law Supplement

# Table of Contents

**Section I General Summary of Opinions and Initial Findings**          **Page: 11**

**Section II – Discussions and Analysis Topics:**          **Page: 24**

- A. Discussion: Relationship with Geico, Travelers, and their HO Policy          Page:  24
- B. Discussion:  HO Policy on Date of loss, Status of their Lives, Expectations          Page:  31
- C. Discussion: Marshall Fire, Construction Market, Travelers Experience          Page:  36
- D. Discussion: History DORA Complaints between 2015 and 2023 - Reformation          Page:  44
- E. Discussion: Claim Comprehensive Timeline – Impressions and Concerns          Page:  48
- F. Discussion: Concerns with Complaint and Reformation Process          Page:  65
- G. Discussion: First and Third Party Claims – The Lindsays' Claim          Page:  68
- H. Discussion: Contracts of Adhesion – ALE Issues          Page:  72
- I. Discussion: Removing Personnel When there are Trust Issues          Page:  74
- J. Discussion: Vendor Management – MSA - Contracts          Page:  92
- K. Discussion: Underwriting Files, Claim Manuals, Training Materials          Page:  92
- L. Discussion: (industry Standards) Geico/ Travelers Training Disclosures          Page:  94
- M. Discussion: (industry Standards) Agent Training Resources          Page: 106
- N. Discussion: (industry Standards) Claims Standards – AIC Texts          Page: 109
- O: Discussion: (Industry Standards) CO Statutes          Page: 114
- P: Discussion: (Industry Standards) CO Case Law          Page: 116

**Section III – Conclusion**          **Page: 118**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# Section I: General Summary and Initial Opinions

## A.  General Summary:

**NOTE: Section I A. General Summary is not intended to be read separately without considering the analysis of the various discussion topics (Section II A. through II O.) and the various appendix exhibits that support the analysis of those discussion topics. Considering Section I independently could lead the reader to mistakenly believe that the statements in Section I are unsupported, unfounded, and ipse dixit in nature. Section II and the appendices are a fundamental component of Section I and should be considered in its entirety as the basis of this report.**

Insurance is a highly regulated financial product built upon trust between the parties that participate in the product offering. Fundamentally, it is expected by industry and legal standards that the duties and promises made within the insurance contract that are to be carried out fairly and in good faith by the parties. Consumers (referred to as insured's) purchase insurance from State Licensed Insurance Producers, Agents, or Brokers who through their expertise sell consumers insurance products designed to offer protection against future calamity or loss. The state approved insurance carriers, who offer insurance products, write insurance policies[2] which outline the terms underpinning the insurer's promise to compensate their insured for a potential predefined future loss in exchange for premium paid upfront by the insured. In this arrangement, both parties (the insured and the insurer) assume risk. The insured pays a non-refundable premium payment to the insurer for a loss they may or may not have, and the insurer agrees to pay for a future loss if it occurs. To facilitate this transaction, the state approved insurer appoints a state licensed producer, agent, or broker to facilitate this transfer of risk from the insured to the insurer. In Colorado, the Division of Insurance/ Division of Regulatory Affairs oversees these transactions, licenses agents, admits carriers, approves of policy terms and rates. The Division of Insurance and Department of Regulatory Affairs regulates the insurance industry on behalf of Colorado's citizens.

In 2015, the Lindsays conducted a search for insurance coverage for their home on 826 Trail Ridge Dr., in Louisville, CO. To make their purchasing decision, they looked at various agents and insurance carriers and decided to work with Geico's insurance agents who placed insurance coverage on behalf of Travelers Insurance Company. The Geico and Travelers application process was completed remotely (not in person) with the Lindsays'. According to the disclosures in this case, the Lindsays' were interested in making sure they had enough coverage to replace their home if there was a total loss. Geico understood this during the initial application process, during subsequent renewals, and during later customer inquiries which occurred between 2015 and 2019.

The litigation in this case involves multiple areas of conflict resulting from the erosion of trust between the Lindsays, Geico, and Travelers relating to how Gieco and Travelers fell short in their duties with the Lindsays before and after their claim was filed. The areas of conflict which eroded trust in the relationship surround these topics:

- Errors in the Lindsays' initial application and policy renewals (pre-loss) managed by Geico and Travelers.
- The repeated incomplete scopes of loss by Claims through Peter Van Riper's involvement (multiple attempts were made between 1/21/2022 and 1/31/2023)
- The impact of the incomplete scope of loss used in the reformation calculation by UW (4/1/2022 and 1/31/2023)
- The Claims ALE decisions that appeared unreasonable, arbitrary, and based on unfair interpretations of ambiguous policy language
- Travelers' repeated decisions not to replace Peter Van Riper and Aaron Stone as decision makers/ key influencers on the claim that coincided with the likelihood of their retaliation

---

[2] The insurance policy is considered a contract of adhesion which is discussed within in Section II of this report.

in claim decisions, reformation decision, and the DORA complaint process. All these areas were handled without transparency or objectivity.

On 12/30/2021, the Lindsays' home burned down in the Marshall Fire. Their home was considered a total loss, and their policy limit was insufficient to cover the loss. The Lindsays reported their claim promptly to Travelers. Travelers conducted a coverage investigation and quickly accepted the claim. The case was assigned to General Adjuster, Peter Van Riper, who met with the Lindsays in person on 1/21/2022 to complete a scope of loss to understand the pre-loss condition of their home.  The erosion of trust began during this initial meeting and continued throughout the entirety of the claim process.

At this initial meeting, Mr. Van Riper began to obtain a scope of loss for the Lindsays' home but he did not complete his work once he realized that the damage was going to exceed the policy limit of $500,000. While meeting with the Lindsays', he informed them he was not going to complete a full scope because the Lindsays were underinsured, and he concluded that they were going to meet their policy limit. Simply put, Mr. Van Riper did not consider it a necessary exercise to get a full or accurate scope of loss reflecting the pre-loss state of the Lindsays' home.

This decision by Mr. Van Riper concerned the Lindsays for the following reasons:

- It alerted the Lindsays to the errors in Geico/Travelers pre-loss UW processes which caused the Lindsays' to be underinsured.
- Mr. Van Riper's lack of engagement and unwillingness to understand the pre-loss condition of their home was off-putting to the Lindsays' (who are detail-oriented people). His decision appeared lazy, unprofessional, and unempathetic given the severe nature of their loss. He was not sensitive to their situation, their needs, or expections. Furthermore, Mr. Van Riper's approach went against the guidance the Lindsays' had been given from a non-profit consumer advocacy group they had been in contact with. It had been recommended that the insurer obtain an accurate pre-loss scope of loss.

The Lindsays' filed two complaints with Colorado's Division of Regulatory Affairs "DORA".  The first complaint was filed on 1/26/2022. It named Geico. The second Complaint was filed on 2/7/2022 and named Travelers. Both complaints noted the challenges the Lindsays' had securing adequate coverage with Geico and Travelers (pre-loss) and asked for their policy to be reformed to provide adequate coverage. The Lindsays noted a faulty application and underwriting process by Geico and Travelers prior to Marshall Fire. [3]

While Geico and Travelers were working through the process to formally respond to the regulators who were managing the Colorado DORA Complaint and the Lindsays' concerns directly, a series of claim related communications were taking place involving ALE, the scope of loss, and overall general dissatisfaction in

---

[3] It is important to note, that the initial responses by Geico and Travelers were disjointed. They indicated/ insinuated to the regulators and the Lindsays' that nothing incorrect had taken place. (Geico's response occurred 1/26/22 - 5 days after the first complaint.  Travelers responded on 2/23/2022 - 16 days after the second complaint.) These responses occurred before a full investigation had taken place. Later, Travelers admitted that errors had occurred and reformed the Lindsays' policy. These initial conclusions (before a full investigation occurred and was finalized) are concerning and point to a flawed process with predetermined results and an overall lack of objectivity.

the way the claim was being managed by Peter Van Riper. The Lindsays were documenting their concerns and asking that the claim be escalated to Mr. Van Riper's manager, Aaron Stone and later to Aaron Stone's manager, Mr. Michael Gatti. The Lindsays were asking that Mr. Van Riper and Mr. Stone be removed from the claim and replaced with other personnel.  The Lindsays' were concerned that Mr. Van Riper and Mr. Stone were taking claim positions that appeared unreasonable, petty (especially considering the gravity of their loss)/ short-sighted, arbitrary, and/or unfair.

At the same time, the Lindsays' policy was undergoing an investigation and consideration for an internal reformation process within the Travelers organization. There were various teams and executives managing this process. Because of the DORA complaint, the reformation process was being formally reviewed by UW, who after investigating, agreed to recalculate the policy limit and reform the policy. To accomplish this task, they utilized information from Peter Van Riper as a Claims subject matter expert. This occurred during the same time, the Lindsays' were publicly criticizing his work product and asking for him and Aaron Stone to be removed from the claim.

The investigation between Geico and Travelers formally occurred to respond to the DORA complaints and the Lindsays' request for a policy reformation.  Because of the friction points listed above, the background surrounding this investigation was problematic. While formal answers to the DORA complaints were responded to by Geico and Travelers, Travelers UW depended on Travelers Claims (Peter Van Riper) to understand "attributes" about the Lindsay's pre-loss home. The haphazard nature of his scope of loss from 1/21/2022 combined with the potential for retaliation against the Lindsays for publicly questioning his abilities and the overall lack of transparency in his involvement in the process, brought suspicion and tainted the objectivity of the reformation process as well as its conclusions.

Nonetheless, through their process Travelers UW identified that errors had occurred in the application and renewal processes with GEICO and Travelers, and they voluntarily chose to reform the Lindsays' policy limit. To accomplish this, Mr. Van Riper's partial information from the scope of loss he created from 1/21/2022 was used as UW's basis to calculate a new policy limit.  As a result of UW internal investigation, Travelers approved reforming the Lindsays' policy and increased the policy limit.  The Lindsays were informed of this decision and the new calculated policy limit on 4/4/2022.

This voluntary act of Travelers for reformation demonstrates an admission that the pre-loss application process by Geico and Travelers was flawed and the UW processes at the inception of the initial policy and during renewals were incorrect. This should no longer be in dispute. The only remaining issue is whether Travelers calculated the new policy limit accurately when they reformed the policy.

Unfortunately, as noted above, the new policy limit that Travelers unilaterally agreed to was based on Mr. Van Riper's meeting from 1/21/2022. This is the same meeting where he failed to complete a thorough scope of loss. His partial assessment from that date directly limited UW's ability to accurately calculate the new policy limit. The Lindsays were concerned that his assessment, which was not fully or accurately informed, resulted in a second miscalculation leading them to be further underinsured. This was upsetting to the Lindsays, and it became a fundamental element in the continued erosion of trust between them, Geico and Travelers.

From 4/4/2022, (the date the Lindsays were told the policy was going to be reformed), until 1/31/2023, (the date the Lindsays were told their policy limit would not be recalculated), the Lindsays attempted to work with Travelers to have their claim managed satisfactorily and have the policy reformed with an accurate policy limit based on a complete and accurate scope of loss.  During this 10-month period, the problems experienced by the Lindsays continued to escalate, the claim process became contentious (as documented by many letters), and the challenges surrounding underinsurance and delay in obtaining an accurate scope continued unabated.

The Lindsays filed suit against Geico and Travelers on 4/26/2023.  In completing my analysis, a thorough review of the disclosures and deposition testimony has occurred. It is important to note that additional discovery, disclosures, and depositions are expected.  Through my analysis, I have gained insight into the period between the time the Lindsays started working with Geico and suit was filed.  These disclosures have helped me identify key trends which have been noteworthy in forming my conclusions and opinions. Below are some observations from this period which led the Lindsays to filing suit.

- The Lindsays did not trust Peter Van Riper's work ethic, commitment, fairness, good faith, and/or motives. They shared these concerns with his boss (Aaron Stone), his boss's boss (Michael Gatti), and other members of the Travelers team.  These concerns were being discussed by executive team members within multiple departments within the Travelers organization.
- Responding to filed complaints with State Regulatory Agencies requires a great deal of work under intense scrutiny to author a thoughtful response. This level of attention is usually not welcomed by the insurance carrier. In this case, having to respond to Colorado's regulators repeatedly throughout the life of the claim, it appears that Travelers' decisions about the claim and their responses to the Lindsays' reformation requests were disjointed and informed by incomplete information provided by Travelers' Claims Department.
- The tone of letters from Claims (authored by Mr. Van Riper) at times were argumentative and/or defensive in nature. This reinforced a climate of distrust. Mr. Van Riper was aware of this situation and there were internal discussions about the tone of his communications.
- When questions were raised by the Lindsays' about ambiguous ALE policy language (surrounding their pre-loss standard of living). the Claims team chose to interpret the language arbitrarily in Travelers' favor without conducting an objective review by an outside party (such as coverage counsel). In doing so, they unilaterally decided to deny ALE coverage in a manner that appeared short sighted and unfair to their first-party insured.  This reaction was especially offensive to the Lindsays because they had previously lived in a large well-furnished custom home. Their temporary housing was far less than their usual standard of living. The inflexibility of Claim's ALE denial for relatively low-cost items like a computer rental, entry table, or storage compartments/devices given the circumstances of the Lindsays' total loss came off as personally motivated and unreasonable.  Mr. Van Riper's communications with Mr. Stone to address the Lindsays' concerns appeared reflexive in nature, personal, and unreasonable. The position Travelers took appears petty, small, and/or short sighted,

given the significance of the Lindsays' loss.

- Despite the Lindsays' requests, Mr. Stone and Mr. Gatti each made decisions to leave Mr. Van Riper on the claim. As managers, their oversight into his work product lacked the level of supervision to ensure thoroughness and transparency in his work product. This decision and their approach to management is concerning given that there were clearly other Travelers staff who could have been utilized to alleviate the tensions in the case.

- The supervision and accountability in the case was problematic. Mr. Gatti chose to leave Mr. Stone in place as the manager of the process, despite the repeated protests of the Lindsays, and at the same time, he did not ensure that Mr. Stone reviewed Mr. Van Riper's work with thoroughness or objectivity. During his deposition, Mr. Gatti maintained that this was Mr. Stone's job. This is troubling, because Mr. Van Riper had no documentation to support the decisions he was making regarding the scope of loss. His decisions directly influenced the reformation analysis of the UW department and became the basis for all Claim decisions. Their choice to leave Mr. Van Riper as the key decision maker on the claim without the typical checks and balances to ensure fairness, objectivity, and transparency in the claim process is concerning. It is unclear if this was an oversight or intentional on their part. Nonetheless, it was a miss and an area where Travelers fell short of industry standards.[4]

- Mr. Van Riper consistently showed a pattern of behavior that lacked attention to detail. He did not do thorough work during the initial meeting, did not participate in an engaged manner during the second meeting (according to his file postings - he did not plan on attending the entire meeting), he did not take notes during the second meeting or in later meetings, he indiscriminately reduced Sedgwick's scope of loss without any recollection of why or documented support for his decision making, he did not post the file with conversations between him and UW, and used only his undocumented recollection as the basis for the reformation process on multiple occasions. There was little to no accountability in his work and the Travelers management team did not appear concerned or attentive to the impact his work had on the Lindsays.

- The Claim team decided the policy was not going to be reformed a second time before they had even engaged the UW team in an objective review process. This is well documented in letters and deposition testimony. The Claim team's bias and preconceived thoughts skewing this process were later reinforced through the direct influence of Peter Van Riper. It is well documented that this predetermined bias occurred within the Claim team. It is unclear if it also existed in the UW team who understood the reformation process.

- Given the DORA complaints and the second reformation process, it is surprising that there are no notes to document the rationale for the denial of the second policy reformation. This is not a typical industry practice, especially given the allegations of unfairness that were raised by a first-party insured over 10 months before the decision

---

[4] This is like a farmer deciding to place a fox in a position of guarding the henhouse without adequate oversight or supervision to ensure safety for the chickens. Ensuring a clearly transparent, objective, and accountable environment in the supervision and management of Mr. Van Riper and Mr. Stone would have restored trust in the relationship between the Lindsays and Travelers.

to deny the reformation occurred.

- The process to obtain an accurate scope of loss and Travelers' subsequent decision to decline reforming the policy took 10 months. The delays in this process were repeatedly documented by the Lindsays and Travelers' denial appears to have been predetermined, making the delay more egregious. At one point in the process, Travelers suggested that the Lindsays go back to Geico to address their policy limit concerns. This is a strange recommendation and could be seen as another delay tactic, because Travelers knew Geico had no power to address the Lindsays' policy limit concerns or reform the Travelers policy. This recommendation to contact Geico does not demonstrate a fair or good faith productive approach to resolve the issues the Lindsays were raising with Travelers.[5]

## B. Initial Opinions:

The foundation of my opinion relies on the combination of personal experience, knowledge of industry practices and standards, Colorado standards of good faith and fair dealing, the Unfair Claims Practices Act, summarizations, and reviews of statutes, regulations, texts relating to Colorado Producer Licensing study materials and exams, texts utilized in AIC examinations, and the disclosed discovery documents (including Geico and Travelers training documents) surrounding how this claim was managed between Geico and Travelers and Travelers' vendor Sedgwick.

In Colorado, there is a common understanding of an insurer's duty of good faith and fair dealing that comes from cases, statutes, and regulations. Colorado has many cases that support the standard that every contract in Colorado contains an implied duty of good faith and fair dealing.

Furthermore, in the insurance industry, there is a recognition that a special relationship exists between the insurer and their insured. This is well documented by industry certification agencies, state legislative and regulatory bodies, governmental departments, and is also incorporated into many carriers' training guides. By obtaining insurance, an insured seeks to obtain some measure of financial security and protection against calamity, rather than secure a commercial advantage. Insurers typically take this responsibility seriously ensuring that their agents are properly trained and well-versed in their product offerings. This allows their agents to offer insurance coverages to policyholders that fully meet the policyholders' needs. In fulfilling this duty, carriers routinely audit their agents to make sure that the coverage they offer is adequate and the tools their agents use are up to date to accurately underwrite policy coverage.

Typically, once an insurance carrier knows a policyholder, first-party insured/claimant, or a third-party claimant has sustained a loss that will most likely involve coverage, the standard in the industry is to

---

[5] It is unclear if Mr. Van Riper was suggesting that Geico should be paying for an additional policy limit increase instead of Travelers through Geico's E&O coverage. If this was his intention, referring the Lindsays to Geico seems questionable given the nature of the E&O documents involved in Travelers training materials disclosed by Geico. See Section II.

promptly move forward with a full and proper investigation of the claim to make a reasonable payment for the claim. In good faith the insurance carrier's investigation is conducted fairly, thoroughly and with an open mindset looking for ways to find coverage rather than seeking ways to deny it. When questions are posed by the insured that require the carrier to explore coverage questions or extracontractual policy requests, typically insurers do so with an open mindset, often hiring experts such as coverage counsel to explore requests in an unbiased manner. This is especially true when their insured's request could result in the carrier denying the request. This type of review by an outside expert such as coverage counsel is commonplace in matters like the ones raised by the Lindsays. [6]

There were multiple events throughout Travelers' handling of this claim that do not reflect Colorado's insurance industry standards of good faith and fair dealing. The claim records demonstrate preconceived thoughts, bias, and an unwillingness to bring objectivity as Travelers' disregarded industry norms and standards during their administration of the Lindsays' first-party claim. Their actions and inactions led to delays and denial in the claim process. The trends in their actions and inactions resulted in the Lindsays' filing suit against Travelers and Geico.

**<u>My Summarized Opinion:</u>**

**It is my opinion based on the analysis below and as described in Section II and the referenced Appendix Exhibits, that Travelers' claims handling, file investigation, and claim evaluation fell significantly short of the industry norms and standards of good faith and fair dealing which are typically seen in first-party claims involving problems with an insurance application where extracontractual policy requests are made. Furthermore, the way Travelers and Travelers' vendor (Sedgwick) managed the Lindsays' scope of loss constitutes an overall and consistent breach of the insurance industry's standards of good faith and fair dealing that lacked objectivity, thoroughness, and transparency.**

**I believe there were multiple lapses by both Geico and Travelers UW between 2015 and 2021. The disclosures, discovery, and depositions clearly demonstrate that Travelers controlled many aspects of the application process and subsequent renewals. Together, their combined actions led to the Lindsays' being underinsured. Travelers initially conducted a review and voluntarily decided to reform their policy. The evidence they obtained supported Travelers' decision to reform the policy in April 2022, and in doing so, their admission of error in the application and renewal process is clear. The only remaining issue is the amount of underinsurance that remains and the correct amount of the Lindsays' reformed policy limit.**

**It is important to recognize that both Geico and Travelers are highly sophisticated insurance organizations with experienced personnel who are familiar with industry standards and best practices**

---

[6] It is important to note that Travelers did not hire any outside, independent, objective experts. They hired Sedgwick to create a scope of loss, but this expert's work product was not submitted as an independent source. Instead, it was arbitrarily modified (without rationale or documentation) and later adopted as a Travelers standalone document. An outside expert like coverage counsel was not considered as an option in the claim file notes when ALE requests were denied based on ambiguous policy language that was interpreted in Travelers interest.

for placing insurance coverages, underwriting risk at appropriate levels for their insureds, responding to regulatory inquiries and complaints, reforming policies, and managing claims. Insurance companies like Geico and Travelers routinely have internal manuals, procedures, training departments, and auditing teams to ensure their own compliance and adherence with industry standards. Taking this into consideration, it is my opinion that Geico and Travelers had the knowledge or should have had the knowledge to ensure the Lindsays' policy coverages and claim processes adhered to Colorado's industry standards. Furthermore, I believe that in the Lindsays' case, choices were actively made by Geico and Travelers that went against those standards.

In my opinion, Travelers did not make sure their claim staff work with their claim vendors objectively to understand or obtain an accurate scope documenting the pre-loss condition of the Lindsays' home before the fire. In doing so, the Lindsays' claim was not managed or evaluated with the level of fairness and objectivity typically seen in first-party claims. It is my opinion Travelers did not administer the Lindsays' claim according to the industry norms and standards of good faith and fair dealing. As a result of Travelers' actions and inactions, the Lindsays' claims were delayed and denied. Travelers actively made claim decisions to put their interest ahead of the Lindsays', instead of being mutually focused as described in the industry documentation. Travelers put their first-party insureds in a position where they needed to file a lawsuit to bring transparency and accountability into the process.[7] Travelers' claims handling do not exemplify the level of transparency and care typically seen in first-party claims. Travelers' claim processes do not reflect the standards embraced by carriers in Colorado who manage similar claims.

Below I address examples of violations of industry standards with examples from Section II where I believe Travelers' and Geico's engaged in business practices (actions and inactions) that were not in aligned with Colorado's insurance industry.

1. **In the initial application process, during subsequent renewals, and customer inquiries, GEICO and Travelers did not acknowledge or act reasonably and promptly to communications from the Lindsays to have adequate levels of insurance in place to protect their property from a total loss.**

   - Travelers conducted an internal investigation of Geico's work product and determined that the initial application was flawed. This was the basis for the decision to reform the policy.
   - Travelers managed the inspection process and renewal process. There were opportunities to correct mistakes.

---

[7] I have been responsible for the management of thousands of litigated matters on behalf of insurers. It is well understood within the insurance industry that filing a lawsuit can be a daunting process for a policyholder, and this deterrent can lead to a resolution that is often unfair to the insured. The litigation process often uses defense strategies which target the credibility of the plaintiff and the plaintiff's experts and seeks to make the process costly to pursue from a financial, emotional, and time perspective. Because of these various costs, for many, filing a lawsuit against a large insurance carrier/insurance agency is seen as an option of last resort that is not taken lightly.

- When the Lindsays' had a new replacement cost estimate ran, it was run with the faulty information from the initial application. This occurred during the renewal periods managed by Travelers.
- Travelers never audited the Lindsays' policies or Geico's work product despite indications that there were problems.

**2.  Travelers failed to acknowledge and act reasonably promptly upon communication with respect to the Lindsays' claim.**

- The file is well documented with concerns raised by the Lindsays' about the work product of Peter Van Riper and the impact it was having on the Lindsays' policy limit. Regardless of these issues, Mr. Gatti did not take a firsthand review to see if the Lindsays's concerns had merit, instead he delegated this oversight to the people the Lindsays' were openly complaining about.
- The file is documented repeatedly with delays (over 10+ months) in obtaining an accurate and complete pre-loss scope of the Lindsays' home.

**3.  Travelers and Geico failed to adopt and implement reasonable standards for the prompt investigation of claims arising under the Lindsays' insurance policy.**

- Travelers and Gieco had experience with DOI/ DORA complaints with policyholders involving underinsurance. They understood how to implement reasonable standards of investigation. In the Lindsays' claim, both Geico and Travelers were quick to respond that the Lindsays' coverages were correct. This was done before a full investigation had occurred.
- Before an investigation had occurred, Travelers had already concluded that the policy would not be reformed the first time (see 2/23/2022 letter by Jennifer Ruggiero.)  After being pushed further by the Lindsays' through the complaint process and other documentation, the investigation continued, and the policy was reformed later on 4/4/2022.  The calculation process was highly compromised and not done with a reasonable basis of accuracy or transparency.
- Before the team fully reviewed the request for second reformation (1/2023), the Travelers Claim team had already predetermined that they did not want to reform the policy and then influenced the process that resulted in a denial.

**4.  Travelers refusing to pay claims without conducting a reasonable investigation based upon all available information.**

- Travelers denied the Lindsays' ALE request outright without evaluating the ambiguous language concerns the Lindsays' had raised. Travelers did not consult coverage counsel and there is no documentation to indicate this was considered.
- Travelers denied the Lindsays first reformation on 2/23/2022, without conducting an UW investigation.
- The Travelers Claim Team denied the Lindsays second reformation on 10/5/2022, before conducting an UW investigation. According to deposition testimony from the Claim Team, they understood this was a UW decision.
- The Travelers Claims team influenced the calculation for the reformed policy limit based on an inaccurate pre-loss scope of loss. This suppressed and lowered the value of the Lindsays' claim under Coverage A on 4/2022 and 1/31/2023.

5. **Travelers failed to affirm or deny coverage of claims within a reasonable time after the Lindsays proof of loss statements had been completed.**

- Travelers received the Lindsays' claim promptly and were aware as of 2/7/2022 that their policy needed to be reformed to the correct value. After many months and many documented letters explaining the issues, Travelers did not complete an accurate or complete pre-loss scope of loss for the Lindsays's home. Travelers simply reformed the policy based on an incomplete review on 1/21/2022 and maintained that calculation through the second denial on 1/31/2023.

6. **Travelers and Geico did not attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability had become reasonably clear.**

- Travelers and Geico understood the issues in the case and had determined they were responsible for reforming the policy. This is clearly documented and referenced in the various letters and communications between the parties. However, the Travelers' process took over a year to complete, was not fairly conducted (it was not done accurately, thoroughly, transparently, or with accountability) and did not result in a correctly calculated policy limit for the Lindsays' reformed policy.

7. **Travelers and Geico compelled the Lindsays to institute litigation to recover**

**amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds.**

- Travelers and Geico understood the issues the Lindsays were presenting about the policy limit being incorrectly calculated based on an inaccurate pre-loss scope of loss. This is well documented. The Lindsays asked Travelers to get the calculation correct over a 10-month period. Travelers recommend the Lindsays contact Geico for relief. On 1/31/2023, Travelers denied the Lindsays request and never completed an accurate scope of loss. This put the Lindsays in a position where they had no other recourse other than filing suit.

8. **Travelers and Geico attempted to settle the Lindsays' claim for less than the amount to which a reasonable person would have believed they were entitled by reference to written or printed advertising material accompanying or made part of an application.**

- Travelers' and Geico's reformation of the Lindsays' policy on 4/4/2022, was calculated based on an inaccurate pre-loss scope of loss. This left the Lindsays underinsured and decreased the value of their claim. The Geico and Travelers' materials clearly point to the importance of protecting their client's most important asset as Geico's #1 priority and making sure that Travelers' policyholders are not underinsured.

  The application process was flawed, and after an investigation, Travelers reformed the policy. This was not done because Travelers is a benevolent organization that gave the Lindsays something they were not owed. This was done because Travelers had a responsibility to fulfill their duties to Lindsays.

  Nonetheless, Travelers fell short in the reformation process when they based the calculation on incomplete and inaccurate information leaving the Lindsays still underinsured. Geico and Travelers then attempted to settle the Lindsays' claim for less than a reasonable person would have believed they were entitled. Geico and Travelers each pointed to the other as the party to resolve the issue while the Lindsays' request for a correct policy limit calculation remained denied by Travelers.

9. **Travelers attempted to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of, the Lindsays.**

- Through filing a complaint with CO DORA, the Lindsays initiated the request for their policy to be reformed. Within 16 days of receiving this

request, Travelers responded that the policy limit would not be changed. Subsequently, Travelers indicated that the investigation into the Lindsays' initial policy with Geico and renewals would continue. This included deciding if the policy would be reformed.

Without involving the Lindsays in the details of the investigation or the recalculation process of the reformed policy limit, Travelers and Geico unilaterally calculated the new policy limit based on the recollection and partial assessment of Peter Van Riper's incomplete scope of loss. Travelers as an organization had knowledge that his scope was not complete and had knowledge to understand the financial impact to the Lindsays of recalculating the policy limit on incomplete and inaccurate information.

Nonetheless, Travelers chose to reform the policy without the involvement of the Lindsays. Afterward, Travelers informed them of the results.   During the meeting on 4/4/2022, these results were communicated by Mr. Stone. The Lindsays expressed concerns during that call about Travelers' process and explained that they did not trust how the reformation and claim was being managed.  Their concerns were noted in the claim file but were not truly addressed or rectified.

10. <u>**Travelers and Geico failed to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for their denials of the second reformation or decisions surrounding ALE.**</u>

- Travelers and Geico, in issuing their denial of 1/31/2023, did not explain why their calculation of the policy limit in 4/4/2022 was correct. They simply indicated that they were not willing to reform the policy a second time.
- Travelers denied the Lindsays' request for ALE benefits as it related to a computer and end table based on ambiguous policy language. Travelers chose to interpret the language in a manner to benefit Travelers and did not consider whether their interpretation was accurate. They did not consider obtaining an outside expert such as coverage counsel.

<u>**Additional examples that support this opinion can be found in Section II and the Appendix Exhibits referenced therein.**</u>

| | |
|---|---|
| ❖ **See Section II A.** | ❖ **See Section II E.** |
| ❖ **See Section II B.** | ❖ **See Section II F.** |
| ❖ **See Section II C.** | ❖ **See Section II G.** |
| ❖ **See Section II D.** | ❖ **See Section II H.** |

❖  **See Section II I.**          ❖  **See Section II M.**

❖  **See Section II J.**          ❖  **See Section II N.**

❖  **See Section II K.**          ❖  **See Section II O.**

❖  **See Section II L.**          ❖  **See Section II P.**

# Section II: Discussion and Analysis Topics

## A. Discussion: The Lindsays' relationship with Geico, the policy they purchased with Travelers (including renewals), and the Lindsays' concerns about the coverage limits prior to the Marshall Fire

**1. The Lindsays owned a 4,072 square foot[8] custom-built house located at 826 Trail Ridge Drive, Louisville, Colorado 80027.**
Their home was built based on the winning design in a competition between local architects and was constructed with very high standards not characteristic of a typical tract home. In 2015, Geico procured for the Lindsays a homeowners policy issued by Travelers. The policy was effective on 6/4/2015.

Prior to purchasing the insurance policy, the Lindsays shopped the market looking at other agents and carriers. As part of the policy application process and in subsequent conversations, the Lindsays informed Geico of the numerous unique and customized features, finishes, and amenities of their home.

**2. Geico used CoreLogic (a Travelers' mandated system for estimating replacement cost) to submit the application and evaluate the property during subsequent renewals.[9]**
Below are examples from 2015 and 2018. The CoreLogic reports demonstrate that different square footage amounts were used by Geico. In 2019, the CoreLogic system was used after a customer service inquiry and indicated that a lower policy limit was necessary. This was discussed in Ms. Brittany Johnson's deposition testimony and documented in Geico's electronic notes. [10]

---

[8] This square footage comes from Chris Lindsay's deposition page 141 (lines 8-9).

[9] According to Geico's disclosures, training guides, and deposition testimony, Travelers took a very active role in controlling the environment that Geico worked in when transacting Travelers business. They dictated the systems for the applications, determining replacement cost, conducted training on those systems, managed renewals, maintained responsibility for auditing for compliance, and managed the vendor relationship between Geico and Travelers. The contractual agreements between Travelers and Geico which outline the terms of adherence between the organizations (MSA or other similarly constructed contractual agreements) have not been disclosed.

[10] Within this report, deposition testimony is listed in red, and the grey highlights reflect areas that directly influence the conclusions, observations, impressions and opinions contained within each section's findings.





**Page 34:**

11· · · · Q.· ·I'm looking at page Bates stamped GIA15.

12· ·There's an entry here by Jesse Broulette dated March

13· ·28th, 2019, which states, "Erin Lindsay recalc RCE and

14· ·returned amount lower than coverage A."· What does that

15· ·mean?

16· · · · A.· ·Jesse spoke with Erin Lindsay and reviewed the

17· ·replacement cost estimator, and the coverage A came back

18· ·lower than what was currently on the policy.

19· · · · Q.· ·On what platform was the replacement cost

20· ·estimate run on?

21· · · · A.· ·Travelers.

22· · · · Q.· ·Does Travelers have -- does Travelers have its

23· ·own cost estimator that it uses?

24· · · · · MR. GILL:· Object to form and foundation.· Go

25· · · ·ahead.

·1· · · · · · THE WITNESS:· Yes, they do.

·2· ·BY MS. MINAMIZONO:

·3· · · · Q.· ·Do you know who the vendor is for that cost

·4· ·estimator?

·5· · · · A.· ·CoreLogic.

Lindsay Travelers System GIA Notes

| Subject | Reason | Detail | Cmt |
|---------|--------|--------|-----|
| Other | Other | Issued H03 | Yes (1) |

**Comments**

5/11/2015 11:58 AM, Tiara t Parker
Rec'd MIF closing 06/04/2015

Issued pol# 994039763 633 1 Efft 06/04/2015 prem $1481 escrowed Y,
sent dec/inv to sheufel@pmglending.com
and erin.a.lindsay@gmail.com

| Subject | Reason | Detail | Cmt |
|---------|--------|--------|-----|
| 994039763 6331 | Other | FYI | Yes (1) |

**Comments**

6/11/2015 4:08 PM, Theresa James
GUARDIAN TITLE AGENCY CK# 62004497 $1461.00 TO TRAVELERS   PAYMENT
WILL GO OUT ON 6/12/15

neral/Internal

GIA - 000058



GIA-000015

**3. An external inspection occurred after the initial application was completed and the policy was originally bound.**

The inspection was coordinated on 7/2/2015 by Travelers through Information Providers Inc. The external inspection included information that attempts were made to do an internal inspection of the property and the insured did not respond when contacted.

This was an element explored in Ms. Brittany Johnson's deposition testimony (Geico's Representative). On page 14, she admitted that there is no documentation proving that this process was explained to the Lindsays as Geico was trained to do. On pages 43 and 44, she explained that Travelers controlled the inspection process, the fields are prefilled, the inspection occurs after the policy was bound, and the policy would not be amended by the agent after the inspection results are obtained.   The excerpts below are from her deposition:

<u>Page 14 and 15</u>
20· · · · Q.· ·I'm looking at page Bates stamped GIA88. There
21· ·is a section here called Inspection and for HO3 forms,
22· ·which is pertinent to the Lindsays' policy here. It
23· ·states that "you must advise the customer upon issue
24· ·that their home may undergo an

inspection."· Is this an
25· ·instruction to a GEICO agent?

·1· · · · · · MR. GILL:· Object to form.
·2· · · · · · THE WITNESS:· Yes.
·3· ·BY MS. MINAMIZONO:
·4· · · · Q.· ·But you mentioned earlier that in this case,
·5· ·the inspection vendor was not retained by GEICO.· Is
·6· ·that the correct reiteration of

your testimony?
·7· · · ·A.· ·Yes.
·8· · · ·Q.· ·So in this instance, should
GEICO had --
·9· ·should they have notified the
Lindsays that Travelers
10· ·would have the inspection
company come to their home?
11· · · ·A.· ·They advise the customer
that an inspection --
12· ·that their home may undergo an
inspection after we issue
13· ·the policy.
14· · · ·Q.· ·And where was that
notice when you
15· ·memorialized?
16· · · ·A.· ·That's an as-trained
expectation, is not
17· ·documented.

**Page 43 and 44**
13· · · ·Q.· ·Okay.· And I'm looking at
Materials.· There's
14· ·a lot of percentages here.·
Where would GEICO have --
15· ·where did GEICO get this
information under Materials?
16· · · ·A.· ·Most prefills based off
Travelers' system.
17· · · ·Q.· ·You said most.· So which
fields aren't
18· ·prefilled?
19· · · ·A.· ·I'll correct that.· They all
prefill.· There
20· ·are some items that the agent
would review and make

21· ·changes to based off of the
customer's guidance.
22· · · ·Q.· ·Okay.· Would the agent
make further changes to
23· ·any of this information that
we're looking at now after
24· ·an inspection of the home is
conducted?
25· · · ·A.· ·No.

·1· · · ·Q.· ·Why is that?
·2· · · ·A.· ·When Travelers completes
the inspection, the
·3· ·as-trained expectation for the
agent is to use that
·4· ·inspection data to calculate
rebuild cost.
·5· · · ·Q.· ·So once -- let me
understand just the
·6· ·sequence.· So here we see a
replacement cost estimate
·7· ·with data inputted by the GEICO
agent and the
·8· ·policyholder.· An inspection
thereafter occurs.· Is
·9· ·GEICO still involved in the
application process?
10· · · ·A.· ·No.· It's issued at that
point.
11· · · ·Q.· ·What do you mean -- and
can you describe what
12· ·you mean by "at that point?"
13· · · ·A.· ·The policy is active before
Travelers orders
14· ·and completes an inspection.



**4. On various occasions between 2015 to 2021, the Lindsays expressed concern to Geico as to whether there was sufficient coverage for their home under their Travelers Homeowner's policy and requested increased policy limits.**

During the various interactions between the period the policy was bound (6/14/2015) through (12/30/2021) the fire, several customer service inquiries occurred. The Lindsays were told over the phone that they could not procure a policy with higher limits, and that another insurer would not sell a higher policy limit than was already provided for in the Travelers policy. The Lindsays were led to believe by Geico that insurance companies are forbidden from "over insuring" a property. Geico also stated that Travelers could not and would not increase coverage, and that no other insurer would because rebuilding their home would not cost more than the policy limits. In 2019, when the Lindsays called Geico about the installed solar panels and again requested increased policy limits, Geico reassured the Lindsays over the phone that their home was "overinsured." Geico did not offer to obtain a policy with increased limits.[11] The approach that Geico took did not follow the standard of care for insurance licensed producers in Colorado.[12] Geico (Colorado Licensed Producers and Service Agents) incorrectly informed the Lindsays that replacement cost coverage or increased policy limits were not available with any insurer. In doing so, Geico fell short of industry standards of care by failing to conduct a proper replacement cost analysis; by failing to provide the Lindsays with an accurate analysis utilizing the tools at their disposal based on the correct square footage of the Home, the appropriate level of high construction standards their Home was built with (including its custom features, finishes, and amenities);[13] and by failing to obtain the proper amount of replacement cost coverage, including coverage which would exceed the amount of the Travelers policy limit. Geico's actions and inactions directly resulted in the Lindsays' home being underinsured, exposing them to risk and harm.

### Section II A. Conclusions, Observations, Impressions, and Opinions:

o **Geico was aware that the Lindsays wanted to insure their home for the full replacement cost when the initial policy was created.**

o **The initial policy was not accurately created in terms of square footage with the correct amenities to reflect the quality of the Lindsays' home.**

o **The CoreLogic tool was not accurately utilized by Geico originally when the policy was bound and later during the period when coverage questions were raised between 2015 and the 12/30/2021 claim.**

o **The mistakes in the original application carried through during the renewal processes and were repeated during customer service inquiries.**

o **The inspection process occurred after the policy was bound, and there is no proof that Geico explained this process to the Lindsays as Geico was trained to do.**

o **Geico maintained that Travelers is ultimately responsible for and has control of the CoreLogic system, the inspection process, the renewals, and coverage limits. Travelers maintained that Geico is responsible for binding the initial policy and retaining**

---

[11] It is important to note that through the DORA complaint process and litigation disclosures, Geico had calculated the replacement cost in 2019 at $436,205. At that time, the policy had a limit of $506,000.  This would have been a decrease.

[12] In Colorado, it is the standard practice for licensed agents to conduct an accurate replacement cost analysis to help clients in reviewing their needs analysis. In this case, it would have looked like Geico conducting an accurate replacement cost analysis based on the type and style of the Lindsays' home, its square footage, custom features, finishes and amenities in the home, and the need for replacement cost coverage to exceed the amount of the policy limit due to the risk of rising construction prices. Such replacement cost coverage was generally available in the insurance market in Colorado.

[13] This is information that was provided by Ms. Lindsay to Geico on multiple occasions.

**policyholders through customer service inquiries.**

❖    **See Appendix Exhibit G1**        ❖    **See Appendix Exhibit 3.5**

❖    **See Appendix Exhibit G1.5**      ❖    **See Appendix Exhibit B1**

❖    **See Appendix Exhibit G2**        ❖    **See Appendix Exhibit B2**

❖    **See Appendix Exhibit G2.5**      ❖    **See Appendix Exhibit D1**

❖    **See Appendix Exhibit G3**        ❖    **See Appendix Exhibit D2**

B.  **Discussion: The Lindsays' Policy on the Date of Loss, the state of their lives, and their expectations for coverage.**

    1.  **The policy declarations page on the date of loss shows the coverages.**

**TRAVELERS** J

CONTINUATION DECLARATIONS

**Homeowners Policy**

**INSURED AND AGENT INFORMATION**

(Named Insured)
**Name and Mailing Address**
ERIN A LINDSAY
CHRISTOPHER J LINDSAY
826 TRAIL RIDGE DR
LOUISVILLE CO 80027-3114

**The Residence premises is located at**
826 TRAIL RIDGE DR
LOUISVILLE CO 80027-3114

**Agent Information**
GEICO INS AGENCY INC
1 GEICO BLVD
FREDERICKSBURG, VA  22412

**Mortgagee Name and Address**
1, JPMORGAN CHASE BANK, NA
ITS SUCCESSORS AND/OR ASSIGNS
PO BOX 47020
ATLANTA    GA 30362
LOAN NUMBER 1857508090

2. CHASE
PO BOX 47208
ATLANTA    GA 30362
LOAN NUMBER 415010391323

**POLICY INFORMATION**
**Homeowners Policy No.**
994039763 633 1

**Policy Period**
06/04/21 - 06/04/22   12:01 A.M,
Standard Time at the residence premises

**Your Insurer**
The Travelers Home and Marine Insurance Company
One of The Travelers Property Casualty Companies
One Tower Square, Hartford, CT 06183

**For Claim Service Call**    1-800-CLAIM33
**For Policy Service Call**    (800) 841-3005

**TOTAL POLICY PREMIUM**                    $  3,204.00
Thi i  not a bill; you will be invoiced eparately.

**POLICY COVERAGES AND LIMITS OF LIABILITY**

                                                 LIMIT

**Section I - Property Coverages**
A - DWELLING.................................................... $    557,000
B - OTHER STRUCTURES........................................... $     55,700
C - PERSONAL PROPERTY.......................................... $    389,900
D - LOSS OF USE...............................................    12 Months

LIMITED FUNGI, OTHER MICROBES OR ROT REMEDIATION
Section I - Property Coverage................................. $      5,000

**Section II - Liability Coverages**
E - Personal Liability (Bodily Injury and Property Damage) Each Occurrence.. $   300,000
F - Medical Payments to Others Each Person.................... $      2,000

**POLICY SAVINGS AND DEDUCTIBLES**
**Your Savings**
The following credits or discounts reduced your premium: Loss Free Discount,
Protective Devices Discount

                                        DEDUCTIBLE
**Deductibles**
Section I  Property Coverages Deductible (All Perils)...................... $      1,000

In case of loss under section I, only that part of the loss over the stated
deductible is covered.

| **OPTIONAL ENDORSEMENTS AND COVERAGES** | | LIMIT | PREMIUM |
|---|---|---|---|
| **Optional Endorsements** | | | |
| HO-208 | (08-15) Water Back Up and Sump Discharge or ......... Overflow | $5,000 | Included* |
| HO-290 | (06-06) Personal Property Replacement Cost..................... Loss Settlement | | Included* |
| HO-420 | (04-19) Additional Replacement Cost Protection.... 25% | | Included* |

**MANDATORY FORMS AND ENDORSEMENTS**
HO-3     (10-06) Homeowners 3 Special Form
HO-300 CO (08-19) Special Provisions - Colorado

Continued on next page

Continued on next page

6750I5796

PL+12630.3+11 Insured Copy Page 1 of 4

000478/00004  F311SCHT  8881  0411/321

TRAVELERS_000057

6750I5796

PL+12630.3+11 Insured Copy Page 2 of 4

TRAVELERS_000058

**2. Before the fire, the Lindsays were preparing for the birth of their first child. Their baby was born on 2/25/2022.**

For most policyholders losing home in a wildfire would be a difficult experience.  Losing a home in a significant community-wide event like the Marshall Fire where temporary housing options were limited would be even more extraordinarily challenging. Given the pending birth of their first child, (less than 60 days after the fire) must have made this already difficult situation exponentially more stressful to navigate for the Lindsay family.  Below is the letter where Christopher Lindsay notified Travelers about the birth of their child. It occurred in the same correspondence where the Lindsays were requesting for an ALE accommodation that Travelers outright denied.

---

**From:** Christopher Lindsay <weedlum@me.com>
**Sent:** Saturday, March 5, 2022 9:00 AM
**To:** Van Riper, Peter K <PVANRIPE@travelers.com>
**Cc:** Stone, Aaron W <AWSTONE@travelers.com>
**Subject:** Re: [External] ALE questions 2/16/22 - THE TRAVELERS HOME AND MARINE INSURANCE COMPANY

Hey Pete,

A computer is absolutely a necessary expense. In my entire life, this is the first time I have been without a home computer. The policy you quoted says, "we cover any necessary increase in living expenses incurred by you so that your household can **maintain its normal standard of living.**" A computer in the home is a critical part of maintaining that standard of living and therefore is covered under ALE coverage.

An entry table, not accent table, allows us to maintain organization in our home as we navigate being displaced. It's a place to put gloves, keys, mail, etc. as we come in out of the snow. It is a basic in any household.

Additionally, my wife gave birth to our first child last Friday (2/25).  As such, my responses for the next while will be delayed.

1

TRAVELERS_000287

---

**3. During Ms. Lindsay's deposition she was asked about her expectations in the application and renewal process for Geico and Travelers. Below are segments of her testimony that outline her expectations.**

**77 and 78**
23······ Q.· ·Do you feel that GEICO Insurance Agency
24··or Travelers should have contacted you in 2021 and
25··said to you, "You need to increase your limits"?

·1······ A.· ·I believe that limits should have been
·2··correctly set in the first place because Travelers
·3··and GEICO had access to the right information.··As a
·4··customer, I go in and trust a number that is given
·5··to me, a number that they have advised, that they
·6··have created.··Contacting or not, this number could
·7··have and should have been set correctly.··No reason
·8··it couldn't have been.

**129 and 130**
·9······ Q.· ·I just want to get back to my question.
10··It's much narrower than all

that.··It's just, do you
11··think that Travelers had an obligation or should
12··have initiated a review of your limits because it
13··processed your 2018 hail claim?
14·· · · · · A.· ·My expert -- pardon me.··My expectation
15··be that when I consult a licensed expert who works
16··in a field of expertise I do not have, when they
17··advertise that they're dedicated to making sure that
18··we get the right amount of coverage, that they are
19··there to help, and then they advise a number, a
20··representation of what it is that's actually needed
21··to replace the home fully, that the information
22··necessary to actually arrive at that number
23··appropriately, accurately, to make sure you get a
24··number that will cover the

home -- pardon me -- that
25··they use whatever information is needed, whatever
·1··information they have access to to make sure that
·2··number is appropriate.
·3·· · · · · And in 2018, there was an opportunity
·4··on the part of Travelers to see, appreciate, acquire
·5··additional information on my home.··Given how far
·6··off the limits were compared to what I actually
·7··needed, given the information that was available, I
·8··believe that Travelers did not fulfill an obligation
·9··they have to their customers to make sure that the
10··number they are advising is accurate.··And in 2019,
11··I expect that they would -- would have advised
12··appropriately.

During this same deposition, a portion of the inquiry by Travelers attorney focused on the organizational challenges the Lindsays experienced in their temporary housing. Specifically, there were concerns about the questions surrounding the changes in their standard of living that were expressed in letters (especially related to "filthiness"). This line of questioning speaks directly to the issues about the standard of living that were raised by the Lindsays in their request for ALE accommodations. The testimony and nature of the questions (especially the tone of the questions) posed post-suit by Travelers insinuate that the Lindsays were responsible for the condition of their temporary housing's cleanliness. Travelers insinuated that the requests made by the Lindsays were unreasonable. Below are excerpts from pages 182 to 185 of Ms. Lindsay's deposition. It is important to note that this level of investigation did not occur pre-suit by the Travelers claims staff to understand the Lindsays' needs. Instead, Travelers just denied their request outright.

·7·· · · · · Q.· ·You say here that you were -- or the

·8··e-mail says that you were living in filth.··Do you

·9··see that on the fourth bullet point down?

10·· · · · · A.· ·Ah, yes.

11·· · · · · Q.· ·Do you agree this is a very aggressive

12··e-mail?

13·· · · · · · · MS. MINAMIZONO:··Objection.··Form.

14·· · · · · A.· ·I wouldn't -- I don't know that I would

15··call it aggressive.··It's strong.

16·· · · · · · · MR. STEPHENSON:··Okay.··By the way, I'm

17··sure I said, do you agree instead of -- all right.

18·· · · · · Q.· ·(BY MR. STEPHENSON)··Well, I mean, you

19··had a baby during those eight months that are being

20··referenced in the fourth bullet point of this

21··October 27 e-mail, correct?

22·· · · · · A.· ·October 27.··At that point, we'd had

23··the baby for about six months -- no.··October.

24··Yeah, eight months.

25·· · · · · Q.· ·Right.··And is it true that you and

·1··your family and your baby were living in filth?

·2·· · · · · A.· ·I believe so.

·3·· · · · · Q.· ·Do you think that's Travelers' fault?

·4·· · · · · A.· ·I do.

·5·· · · · · Q.· ·How did Travelers cause you and your

·6··family and your baby to live in filth?

·7·· · · · · A.· ·There were issues with ALE

·8··accommodations.··There were -- the place we had

·9··rented was lacking in a lot of

necessary basics, and

10··we had to struggle really hard to get the necessary

11··ALE in place.

12·· · · · · Q.· ·But whether your house is filthy

13··depends entirely on whether it's cleaned by the

14··people living in it, right?

15·· · · · · A.· ·Not necessarily.

16·· · · · · Q.· ·How did Travelers put filth in your

17··house?

18·· · · · · · · MS. MINAMIZONO:··Objection.··Form.

19·· · · · · A.· ·Travelers being responsible for -- for

20··the situation, it's not the same as them, like,

21··coming and throwing dirt into the house.

22·· · · · · Q.· ·(BY MR. STEPHENSON)··So, I mean,

23··what -- you just agreed that you were living in

24··filth.··Can you describe how you and your family and

25··your baby were living in filth?··What does that

·1··mean?

·2·· · · · · A.· ·So we didn't really have the

·3··infrastructure in place to keep our things off the

·4··floor.··You would walk into the front door,

·5··wintertime, mud, that sort of deal; and all of the

·6··scarves and blankets and belongings that you

·7··wouldn't want to keep on the floor were effectively

·8··just piled on the floor right by the door, free to

·9··get anything blown on them as the door would open

10··and close, normal traffic going through.

11········ You walk into the living room or what

12··have you.··All of those things were on the floor in

13··piles.··You walk into the dining room and the

14··kitchen, you'd see the same thing.··And this wasn't

15··about taking things out and then just leaving them

16··wherever they were.··This was, there was truly

17··nowhere to set them; and you walked into the home,

18··and it started to look like a -- I almost hesitate

19··to say this, but almost like an episode of Hoarders,

20··you know.··You just had these piles of things.

21··That's -- that's filthy.

22····· Q.· ·Every room had a pile?

23····· A.· ·The commonly used rooms, we just had to

24··keep our things on the floor, including the

25··kitchen.

·1····· Q.· ·Were there no closets with hangers in

·2··this house?

·3····· A.· ·There were for the most part very

·4··minimal closets, both in number and in size.··But

·5··the issue is, you can't keep all of these things in

·6··a closet.··I wouldn't keep my groceries, my food in

·7··a closet.··I also wouldn't normally

keep them on the

·8··floor either.

·9····· Q.· ·Did you put your groceries on the

10··floor?

11····· A.··We were forced into that situation,

12··yes.

13····· Q.· ·Did you ever tell Travelers that you

14··were putting groceries on the floor?

15····· A.··We were talking about the need for ALE

16··accommodations, and that that was causing us to

17··leave our things on the floor.

**Section II B. Conclusions, Observations, Impressions, and Opinions:**

o **The Lindsays purchased a policy with Travelers for the home that is the subject of this claim. They were led to believe their coverage was adequate for the replacement of their home. They relied on Geico's expertise regarding the coverage amount. During her deposition, Ms. Lindsay explained that Geico and Travelers were experts and had the opportunity to use their expertise to make sure the Lindsays were not underinsured. This is relevant because the Lindsays had previously explained to Geico that they wanted adequate coverage on multiple occasions.**

o **The Lindsays had not planned on the occurrence of the Marshall fire. They were expecting the birth of their first child. Losing a home is a very difficult situation. Competing for temporary housing after an event like the Marshall fire is even more difficult. When one factors the birth of a first child into the decision to find temporary housing, the situation must have been very problematic and stressful for the Lindsays.**

o **The Lindsays' pre-loss home was set up and organized in a manner to provide the Lindsays with a standard of living where they could live in a clean and organized way. Their temporary housing (as explained in Ms. Lindsays' deposition) did not meet this same standard.**

o **When the requests surrounding the ALE were presented to Travelers (computer and entry table), they declined them outright without seeking information necessary for their investigation, as Travelers did post-suit during the deposition process.**

❖ **See Appendix Exhibit A1**
❖ **See Appendix Exhibit A2**
❖ **See Appendix Exhibit E1**
❖ **See Appendix Exhibit G2**
❖ **See Appendix Exhibit G2.5**

## C. Discussion: The Marshall Fire and the impact on Boulder's Construction Market and Travelers' Prior Experience with Wildfires in Colorado

**1. The Marshall Fire and the Lindsays' claim**

The Marshall Fire was a destructive wildfire and urban conflagration that started on December 30, 2021, shortly after 11:00 am MST, as a grass fire in Boulder County, Colorado. The fire killed two people and became the most destructive fire in Colorado history in terms of buildings destroyed. The fire caused over 37,500 people to be evacuated in under six hours. There were 1084 residential structures destroyed and 149 residential structures damaged.

With these many homes destroyed and damaged, the local market was inundated with claims and requests for repair. This puts considerable strain on construction resources within the community. It is important to note that supply chains were previously suffering, and construction costs were soaring during Covid.  The Marshall Fire exacerbated an already stressed construction market within Boulder County. [14] Below are the links to various articles from this period that discuss the construction market surrounding this period and predate the Marshall Fire.

- ( https://www.marcumllp.com/insights/cost-inflation-construction-costs-and-the-covid-19-pandemic )
- ( https://www.cbsnews.com/colorado/news/lumber-price-colorado-construction/ )
- ( https://www.arcadis.com/en-us/knowledge-hub/blog/united-states/david-hudd/2021/how-covid-19-impacted )
- ( https://www.denverpost.com/2021/07/23/colorado-homebuilding-permits/ )

The Lindsays' home was one of the residential structures that were destroyed in the Marshall Fire. The date of loss is listed as December 30, 2021.  They reported the claim promptly to Travelers. When the loss occurred, the housing market was already stressed within Colorado and Boulder County. With these many homes destroyed, the costs of construction soared. The estimates of construction were dramatically increased and the costs of rebuilding and the ability to find qualified contractors to do the work were a difficult endeavor. Being underinsured makes the rebuilding process difficult for insureds in this type of market. [15]

---

[14] Geico and Travelers should have been aware of the construction market in Colorado and especially Boulder County before and after Covid. This is especially true as the complaints they received from their policyholders increased during the period between 2015 through the Marshall Fire. Advising clients like the Lindsays, who are detail- oriented and risk adverse and looking for adequate levels of insurance coverage (if a total loss were to occur), is a standard practice in the industry that insurance producers and carriers like Geico and Travelers are familiar with and routinely incorporate into their sales and underwriting practices.

[15] Determining reconstruction costs after the Marshall Fire in Boulder County was a difficult endeavor for many policyholders who did not have the expertise to understand the market, were competing for contractors, and under time constraints. This is a factor to be considered in the Lindsays' claim and the delays that were documented in the various letters surrounding an accurate scope of loss. In this environment, policyholders are dependent/ reliant on the advice and expertise of the contractors they can afford to hire in these market conditions. Policyholders put in situations to rebuild often lack the experience or expertise to know if the information provided to them by the contractors they hire is accurate and reliable. They often rely on the expertise of their insurer's claim team (who they are in a first-party relationship with) to help them evaluate and respond to these data points from their own contractors.

2.  **Prior to The Marshall Fire, Agents and Insurance Carriers in Colorado had Experience with Colorado Wildfires and a History of Underinsurance**

Colorado has a history of wildfires and is one of the leading states with homeowner claims stemming from wildfire loss. Travelers is a well-known and sophisticated carrier in the Colorado market with experience and history in insuring these types of risks Colorado. Prior to the Marshall Fire, there had been well documented instances of underinsurance relating to Homeowners insurance with insurance carriers, agents, and insurance industry professionals working in this space. Many parties were actively taking steps to respond proactively to these concerns, recognize problems to address, and rectify gaps and inadequacies in their insureds' coverages.

As an example, the East Troublesome Fire was one of the most destructive wildfires in Colorado history and predates the Marshall Fire. The East Troublesome Fire began on **October 14, 2020**, in the central Rocky Mountains east of Troublesome Creek in Grand County. The cost was listed at greater than $266 million.

**NOTE:** There is a series of articles that indicate widespread underinsurance. There was a series of DORA Complaints (40) by policyholders. Travelers is one of the insurers who had complaints from policyholders stemming from this event.[16]

3.  **Following the Marshall Fire, The Lindsays are not the only Policyholders in Colorado who filed complaints surrounding issues with Underinsurance, ALE Issues, and requests for policy reformation.**

Below are excerpts from the DORA Annual Complaint and Recovery report that show that the issues in the Lindsays' claim are not unique to them.



# Colorado Division of Insurance Annual Complaint and Recoveries Report
FY 2022-23 (July 2022 - June 2023)

---

[16] Appendix Exhibit H3 – Is an example of a Travelers Complaint from the East Troublesome Fire (that predated the Marshall Fire) with E&O and UW issues.



## DOI's Work
# Digging Deeper Into Issues

### Marshall Fire and Homeowners Insurance

Even though the Marshall Fire happened in December 2021, the Division continued to investigate complaints related to the fire during this past year. And while the DOI investigated each of the individual complaints, working with policyholders on their specific problems and questions, our work also turned up a number of issues that impacted broader groups of Marshall Fire survivors.





**Extending Additional Living Expenses**

The DOI Consumer Services Team discovered that an insurance company had placed dollar limits on Additional Living Expenses (ALE), which was not allowed under State law. This impacted a number of policyholders who had lost their homes in the Marshall Fire. The Division required the insurance company to review all policies connected to the Marshall Fire, and to correctly apply the ALE, with no dollar limit, for the first 12 months after the fire. The result was that the Marshall Fire survivors with policies from this company received further ALE benefits, as they were no longer restricted by a dollar limit.



## Digging Deeper Into Issues

**Meeting Insurance Requirements**

The DOI discovered that an insurance company had not been making necessary coverage available to policyholders as required by law - specifically the company was not offering a minimum of 10% of Ordinance & Law (O&L) coverage and 20% of Extended Replacement coverage. A number of policyholders in the Marshall Fire were impacted by this omission. Due to the Division's investigation, the company amended these policies, updating the coverage and providing additional benefits to these survivors.

**Policy Reformations**



One of the major issues that became apparent immediately following the Marshall Fire was that many people found themselves underinsured. As a result, many people sought to reform their policy. While most insurance companies refused to change their policies, the DOI was able to get some companies to reform policies. This resulted in adjustments that sometimes ran up to six-figures of increased coverage available to rebuild homes.



DOI's Work - Digging Deeper Into Issues | 7

4. **During Ms. Lindsay's deposition questions were asked that insinuated that the Marshall Fire created a unique situation beyond the industry's ability to predict or prepare.**

Below is an excerpt from Ms. Lindsay's response to this line of questioning. Her response explains the policyholder's perspective.

**74 to 77**

11· · · · · Q.· ·(BY MR. STEPHENSON)··Okay.···But do you
12··agree that all of these things, pandemic, dramatic

13··increases in inflation, supply-chain crisis, a surge
14··of demand in your area, these are all things that
15··you would not expect either

Travelers or GEICO
16··Insurance Agency to be able to predict in 2015.
17··True?

18·· · · · · · · MS. MINAMIZONO:··Same objection.

19·· · · · · A.· ·Honestly, I don't know that anyone
20··could have predicted it; but Travelers and GEICO
21··were selling insurance policies, including to me,
22··after these events had started, at least many of
23··them.
24·· · · · · · · They're licensed industry experts who
25··have access to accurate information on pricing

·1··locally.··They advertise that they're dedicated to
·2··helping their customers find the appropriate amount
·3··of insurance, the right amount, so that customers
·4··are fully protected when -- the things that matter
·5··most are fully protected in the event of a disaster,
·6··like the one that I went through.
·7·· · · · · · They take in a number, information that
·8··I give.··There is easily accessible, publicly
·9··available information in addition to whatever it is
10··that the insurance companies have access to, which
11··is certainly more than I do.··They take in those

12··features, or at least I know they have them, and run
13··it through whatever proprietary software they have,
14··and they advise a number.··They spit out a number.
15··Their number, not mine.··That number becomes a
16··representation of the amount of money that I
17··actually need to rebuild my house.··I've asked to be
18··fully covered.
19·· · · · · · · And I am told at multiple points that I
20··am, in fact, overinsured by these licensed experts
21··who are in the business of sales and the business of
22··insurance.··With all those credentials, it's
23··reasonable for me to imagine that Travelers and
24··GEICO understands what it actually needs, what --
25··excuse me, what is actually needed to rebuild the

·1··home that I lost.
·2·· · · · · · · Given that these are companies selling
·3··a product, it's also reasonable for me to imagine
·4··that you're trying to sell things.··If -- if there's
·5··a customer who's asking and willing to buy more if
·6··it's needed, a customer's checking in, saying, "Hey,
·7··licensed experts" -- nicer than that, though --
·8··"please, you have the information.··I'd like to

·9··check it out.··Tell me, do I have enough?··Do I need
10··more?"··And they say, "No.
11··No, you're overinsured."
12·· · · · · · · · Not only is that a representation of
13··what it is that I actually need to rebuild the
14··house, but it gives the impression of ethical
15··behavior because here I am asking and willing if
16··that's needed for the situation, and I'm being
17··outright told no.··"No, you have enough.··You don't
18··need more.··I won't sell you more."··You go, "Oh, my
19··goodness, these people must really be serious.··They
20··won't sell me more."
21·· · · · · · · · This is true when they've had access to
22··the information.··They represent to customers that
23··they can and will protect what matters most; that
24··they are there to help.··And then when it turns out
25··that I've lost my house in a wildfire, and that

·1··number that was advised to me by a trusted, licensed
·2··professional who was rightfully expected to have and

·3··use correct information with software that would
·4··give the right information, the right number, and I
·5··used their number, their number that has their
·6··fingerprints all over it.
·7·· · · · · · · · And then -- and then you realize that
·8··this isn't a policy that was sold, gosh, what is it,
·9··roughly nine years ago at this point.··This is a
10··policy that in effect started, what, roughly six,
11··seven years -- excuse me, I misspoke.··Six or seven
12··months before the fire.
13·· · · · · · · · The information was there.··They might
14··not have been able to predict the pandemic and all
15··those other pieces that you had listed out; but in
16··2021 after a lot of what you listed out had
17··happened, yeah, there would have been the
18··information available and necessary to make sure
19··that the limits were adequately set in the manner I
20··had asked for, in the manner that had been
21··represented to me; that I was, in fact,
22··overinsured.

**Section I C. Conclusions, Observations, Impressions, and Opinions:**

o **Geico and Travelers should have been aware of the construction market in Colorado, and especially Boulder County, before and after Covid. This is especially true as the complaints they received from their policyholders increased during the period between 2015 through the Marshall Fire. Advising clients like the Lindsays, who are detail-oriented and risk adverse and looking for adequate levels of insurance coverage (if a total loss were to occur), is a standard practice in the industry that insurance producers and carriers like Geico and Travelers are familiar with and routinely incorporate into their sales and underwriting practices.**

o **After the East Troublesome Fire, Travelers and Geico should have had enough experience to know how to handle situations like underinsurance and policy reformation involving DOI/ DORA complaints.**

o **According to the CO DORA Annual Report, the Lindsays' concerns (as referenced in the complaints) were not unique to them. This further reinforces the point that there was industry-wide awareness of these types of issues within Colorado.**

o **The argument that the Insurance Industry was unable to predict catastrophic events like the Pandemic, Marshall Fire, etc. was addressed in Ms. Lindsay's deposition. She provided a policyholder's perspective which essentially stated that industry experts were informed and in control of determining policy limits and they had the knowledge and expertise to do so accurately. In my experience working within the insurance industry, I agree with Ms. Lindsay that, while nobody can predict when, where, and what type of catastrophic event will occur, the insurance industry is in the business of calculating risk, preparing for that risk, and mitigating risk. Insurers factor events like the Pandemic and other catastrophes like the Marshall Fire into their models, pricing, and forecasts at the primary and reinsurance levels of the industry. Travelers and Geico are sophisticated organizations who are well-versed and have staff who plan for the type of scenarios discussed in Ms. Lindsay's deposition. The suggestion that the unplanned nature of a catastrophic event excuses a licensed agent and/or a sophisticated agency/ insurer of their duty to offer adequate levels of coverage to their policyholders during the application and renewal process in my opinion is untrue, misguided, and uninformed.**

❖ **See Appendix Exhibit H1**

❖ **See Appendix Exhibit H2**

❖ **See Appendix Exhibit H3**

❖ **See Appendix Exhibit H4**

❖ **See Appendix Exhibit H5**

❖ **See Appendix Exhibit H6**

❖ **See Appendix Exhibit I1**

❖ **See Appendix Exhibit G2**

❖ **See Appendix Exhibit G2.5**

**D. Discussion:  Travelers' History of DORA Complaints between 2015 and 2023 and the Reformation Investigations in the Lindsays' Case.**

1. **In completing this report, I conducted research regarding the nature of complaints that were filed with Colorado's Department of Regulatory Agencies during the years that the Lindsays did business with Geico and Travelers.**

   The following reports were obtained and reviewed. This list addresses reports that highlight the total complaints received by CO DORA for all carriers. It is not specific to Travelers. These reports show the trends that were occurring within the state and demonstrate that the insurance community was aware of the issues in Colorado. These reports highlight issues that involve elements of the Lindsays' claim and demonstrate that sophisticated organizations like Geico and Travelers had knowledge or should have had knowledge of these circumstances with the ability to improve business practices for their policyholders before the Marshall Fire occurred.:

   - Complaints Against Insurers 2015-2016
   - Complaints Against Insurers 2016-2017
   - Complaints Against Insurers 2017-2018
   - Complaints Against Insurers 2019-2020
   - Property and Casualty Insurance Complaints 2015 -2016
   - Property and Casualty Insurance Complaints 2016 -2017
   - Property and Casualty Insurance Complaints 2018 -2019
   - Annual Complaint and Inquiry Report 2020-2021
   - Annual Complaint and Inquiry Report 2021-2022
   - Annual Complaint and Recoveries Report 2022-2023

   **I conducted analysis into the CO DORA Homeowner Insurance complaints that were filed against Travelers during the years that the Lindsays did business with Geico and Travelers.**

   To accomplish this, I ran interactive reports in Excel from for the following years:

- 2015 – Complaint Ratio and Complaint Index Search Report (Travelers)
- 2016 – Complaint Ratio and Complaint Index Search Report (Travelers)
- 2017 – Complaint Ratio and Complaint Index Search Report (Travelers)
- 2018 – Complaint Ratio and Complaint Index Search Report (Travelers)
- 2019 – Complaint Ratio and Complaint Index Search Report (Travelers)
- 2021 – Complaint Ratio and Complaint Index Search Report (Travelers)
- 2022 – Complaint Ratio and Complaint Index Search Report (Travelers)
- 2023 – Complaint Ratio and Complaint Index Search Report (Travelers) I combined and normalized the data from these reports (Homeowner insurance specific reports) to complete pivot table analysis to understand Travelers' role in Colorado, their market share, premium, and frequency of Homeowner complaints. [17] Below is a snapshot of my initial findings. (NOTE: A 2020 report was not available from DORA)

| Year | Market Share | Sum of converted premium | Total Complaints |
|------|------|------|------|
| 2015 | 4.44% | $    93,410,000.00 | 25 |
| 2016 | 4.74% | $    55,710,000.00 | 30 |
| 2017 | 4.98% | $  117,610,000.00 | 29 |
| 2018 | 5.72% | $  142,130,000.00 | 18 |
| 2019 | 6.52% | $  177,380,000.00 | 35 |
| 2021 | 6.42% | $  209,690,000.00 | 29 |
| 2022 | 6.36% | $  242,260,000.00 | 40 |
| 2023 | 6.53% | $  299,080,000.00 | 62 |

- From 2015 through 2023, **Travelers booked $1.34B in Homeowner Insurance Premium**. It is not clear how much of this came from Geico Agency business.
- **Over these 9 years the premium tripled, and the market share grew modestly** (4.44% 2015 to 6.53% in 2023)
- During this period **there were 268 complaints**, and **the annual complaints grew dramatically** following the Marshall Fire.
- In 2022, on average three out of every four weeks, Travelers formally responded to Homeowner Insurance Complaints in Colorado.
- In 2023, on average every week Travelers formally responded to one to two Homeowner Insurance Complaints in Colorado.

In the business of insurance, reducing risk with lower policy limits accompanied by modest market share increases, while at the same time dramatically increasing premium is generally seen as a profitable business strategy for financially strong insurance organizations. It is clearly one of the benefits of hard

---

[17] It is likely that these complaints involve a blend of issues involving policy reformation, underinsurance, underwriting, and claims issues. Additional discovery is recommended to get more specific data related to the complaint issues and Travelers knowledge/ response to these types of matters.

insurance market seen in recent years.[18] It is important to mention that running an insurance business in a manner that embraces adherence to insurance industry standards of good faith and fair dealing is a duty that well-run insurance organizations are committed to regardless of their profit motives or market conditions.  This is true in both hard and soft market conditions.

Regulatory agencies, such as CO DOI/ DORA, play a vital role for policyholders within a state. They hold insurers accountable and provide valuable feedback as the insurer increases their profit margins and the insurer works to strengthen their combined ratios[19]. The frequency and type of complaints received about an insurer's conduct provides important feedback for that organization's leadership - especially where gaps exist, and where the insurer could be falling short. The transparency that is required in the complaint process encourages investigation and self-examination by the organization that receives the complaint. The process is conducted through the oversight of the regulator. I have participated in these types of reviews. In my experience, I have found that many organizations (under the right leadership) use complaints as a mechanism to examine their own performance, correct wrongs that have occurred with policyholders by making them whole and have improved the insurer's product offering and policyholder experience.  However, in some organizations with embattled leaders with less altruistic or different motivations, defensive postures are taken. In these organizations, complaints are seen as an irritant or simply as the cost of doing business. They can be seen as a business problem or obstacle that the carrier is forced to deal with or overcome.

2. **The Lindsay's Complaint Against Geico (1/21/2022) and Travelers (2/7/2022) and Travelers Investigative Decision to Reform the Policy**

When the complaints were filed against Geico and Travelers, each organization responded to the regulator as required. Letters were sent documenting their investigations. Staff from both organizations were assigned to conduct these reviews and respond formally to both CO DORA and the Lindsays. Behind the scenes, coordination and communication between Geico and Travelers occurred to understand what had happened and not happened during the initial application process and subsequent renewals between 2015 and 2021.  Travelers determined that errors had occurred, and that the policy deserved to be reformed. [20] This decision was made after an investigation was conducted with various departments within Geico and Travelers.  In doing so, Geico and Travelers admitted that errors occurred, and the policy deserved to be reformed. This is not in question. This decision was made and communicated on 4/4/2022. The issue that remained is how the new policy limit was calculated, if it was done fairly and/ or accurately.

### Section I D. Conclusions, Observations, Impressions, and Opinions:
  o **From 2015 through 2023, Travelers modestly increased market share in Colorado**

---

[18] In insurance, a "hard market" is a period characterized by rising premiums, stricter underwriting standards, and reduced coverage availability as insurers become more cautious and selective about the risks they are willing to cover.  Whereas a "soft market" is a period characterized by low premiums, broad coverage terms, and greater competition among insurers, making it a "buyer's market" where insurance is readily available and affordable.

[19] In insurance, the combined ratio is a key performance indicator (KPI) that measures an insurer's underwriting profitability by comparing the sum of losses and expenses to earned premiums. A combined ratio below 100% indicates an underwriting profit, while a ratio above 100% suggests an underwriting loss. In my career, I have had responsibility for managing toward profitable combined ratios and understand how regulatory feedback plays an important aspect in managing profitability while appropriately meeting a carrier's obligations and duties.

[20] From my experience, insurance companies do not decide to provide or extend coverage lightly when it comes to reforming policies. These are not actions of charity or good will. Instead, carriers reform policies when mistakes were made, and the situation requires them to make corrections, because it is the right thing to do given the specific set of circumstances that occurred.

        **while tripling premium for Homeowners insurance coverage. During this same period the frequency of complaints to CO DORA increased significantly. This appears to be a very profitable period for Travelers within Colorado.**

- o **Travelers were well versed in how to respond to consumer/policyholder complaints before the Lindsays filed their complaint on 2/7/2022. Travelers had responded to more than 160 Homeowner insurance-based complaints since the time that the Lindsays purchased coverage in 2015 before the Marshall Fire. Assuming that some percentage of these involved reformation, it is reasonable to believe that Travelers understood the role that Claims would play in the process to calculate the new policy limit.**

- o **Travelers and Geico had the experience of investigating DORA complaints like the ones the Lindsays presented. Ultimately, Geico and Travelers decided that errors had occurred and reformed the Lindsays' policy accordingly. However, the method Geico and Travelers used to calculate the new policy limit is questionable and appears to have been done with full knowledge and disregard of the Lindsays' concerns for accuracy and fairness.**

- ❖ **See Appendix Exhibit I1**
- ❖ **See Appendix Exhibit I2**
- ❖ **See Appendix Exhibit I3**
- ❖ **See Appendix Exhibit I4**
- ❖ **See Appendix Exhibit I5**
- ❖ **See Appendix Exhibit I6**
- ❖ **See Appendix Exhibit I7**
- ❖ **See Appendix Exhibit I8**
- ❖ **See Appendix Exhibit I9**
- ❖ **See Appendix Exhibit I10**
- ❖ **See Appendix Exhibit I11**
- ❖ **See Appendix Exhibit I12**
- ❖ **See Appendix Exhibit I13**
- ❖ **See Appendix Exhibit I14**
- ❖ **See Appendix Exhibit II5**
- ❖ **See Appendix Exhibit I16**
- ❖ **See Appendix Exhibit II7**
- ❖ **See Appendix Exhibit II8**
- ❖ **See Appendix Exhibit II9**
- ❖ **See Appendix Exhibit I20**

E.  **Discussion: Analysis Claim Comprehensive Timeline – Impressions and Areas of Concern**

To complete the analysis a comprehensive timeline was created (Appendix Exhibit C1 – 416 pages) and analysis was conducted in Appendix Exhibit C2. Appendix C1 and Appendix C2 serve as the basis of this section's conclusions, observations and opinions. As noted in Section I, the way Geico and Travelers interacted with the Lindsays created an atmosphere where trust was eroded. Within this section, examples are enumerated that led to the breakdown of trust between the Lindsays and Geico/ Travelers.

- **12/31/2021** - **C1 #6** - First notice of loss to Travelers.
- **1/3/2022** - **C1 #8** – Multiple activities occurred on this date.
  - o  Travelers' subrogation indicated that this was a possible total loss with a value of $1,091,300.00. (1/3/2022) This is the same day that Mr. Van Riper sent his first letter documenting how to upload documents and his conversation with the Lindsays.
  - o  Mr. Van Riper sent a letter to ALE Solutions saying he is taking over the claim. Indicating there is confusion regarding multiple properties.
  - o  Mr. Van Riper posted the file about his call with the Lindsays. He explained the coverages and processes in general.
    He noted that ALE does not have a limit but is limited to 12 months. He will keep an eye out for government extensions. Any changes to his cell phone plan will need prior approval for payment by the policy. A certified policy will be ordered. Other ALE items, mileage, PO box, meals, utilities, rent, pet charges at hotels. Roads closed; total loss was confirmed on a website he will share. A claim recovery kit was sent via PDF and link to claim upload center.
  - o  Ms. Frey sent a letter to the Lindsays notifying them that a $10,000 advance payment for personal property was being issued. She notified them that the payment will be deducted from the final payment once she completes the estimate. They were instructed to keep all receipts relating to expenses that are incurred and submit them to her for review.
- **1/4/2022** - **C1#9** - Van Riper approved potential ALE housing option for the Lindsays.
- **1/6/2022** - **C1#11** - Housing was approved for ALE.
- **1/7/2022** - **C1#12** - The temporary housing wanted the Lindsays to have renters' insurance. Mr. Van Riper said it could be covered but wanted to make sure it was documented in a certain way.
- **1/10/2022** - **C1#13** - Mr. Van Riper agreed to a phone meeting on 1/12/2022 (due to a cold). They will meet the following week to finalize. He indicated that he would use Xactimate for the estimate.
- **1/11/2022** - **C1#14** – Mr. Van Riper issues advance of Dwelling (80%) at $452,619 and Personal Property (30%) at $108,813.00.
- **1/12/2022** - **C1#15** - The Lindsays requested that the Xactimate estimate be done in person (face to face) instead of over the phone. Van Riper agreed.
- **1/21/2022** - **C1#19** - Mr. Van Riper met with the Lindsays and completed his estimate. The file was noted. He indicated the following: "Expressed concerns about limits. Builders are telling them

+$600/ square foot to rebuild. Confirmed that policy limits do not increase for inflation or increased cost of materials/ labor. We can adjust price list if there is a reasonable delay in reconstruction beginning, but that won't increase limits available. Cannot speculate on what DOI will make insurance companies do, if anything, beyond what benefits are available under the policy. "

> #### **Action to Erode Trust (1):**
> **Mr. Van Riper alerted the Lindsays that their policy limits were inadequate. He made it seem like it was out of the carrier's control, and they would have to follow the DOI's lead.**

> #### **Action to Erode Trust (2):**
> **Mr. Van Riper did not want to complete the full scope of loss; he appeared to give up midway during his assessment.**

- **1/21/2022 - C1#19** - The Lindsays filed a DORA complaint against Geico insurance agency.
- **1/26/2022- C1#20** - GEICO sent a response to the DORA Complaint.
- **1/27/2022 - C1#22** - Mr. Van Riper posted the file with Xactimate property estimate dates and details of coverage confirmations. A letter was sent by Van Riper detailing the estimate and coverage.
- **1/28/2022 - C1#23** - Van Riper completed a LLR and sent it the Director Aaron Stone for review. Director Stone approved it. It was published and distributed.
- **2/1/2022 - C1#24** -Mr. Van Riper posted the file with his Xactimate analysis and a request for payment approval for Coverage A and Coverage B.
- **2/2/2022 - C1#25** - Mr. Van Riper posted the file with a breakdown of payment that was approved and sent a letter to the Lindsays'.

    Total payment is $198,019.67
    - Loss Adjustment - Coverage A - Dwelling payment $113,153.75
    - Loss Adjustment - Coverage A - Trees Plants Shrubs Payment: $28,288.64
    - Loss Adjustment - Coverage B - Other Structures Payment: $56,577.28
- **2/2/2022 - C1#25** - ALE Payment Coverage D - $88,741.77 Requested approval from Director Stone.
- A letter was sent from 2/22/2022 explaining the payments
- **2/3/2022 - C1#26** - Director Stone approved the ALE request.
- **2/7/2022 - C1#28** - A complaint was filed by the Lindsays about Travelers' policy reformation.
- **2/15/2022 - C1#32** - A email was sent by the Lindsays to Van Riper asking that he respond to the last email. They are not in agreement with the estimate, and he had not followed through with his commitment to put them in touch with someone on the contents (coverage C). They requested that Van Riper respond in 5 business days.
- **2/16/2022 - C1#33** - Van Riper responded to the email with a phone call. He posted the file. He explained the estimate exceeds the policy limits so there is no dispute. Explained availability of ARCP (*additional replacement cost protection*). Advised we will not advance more than 30% and will evaluate their claim when inventory is submitted.

- o   The letter was sent to the Lindsays on this date.
- **2/18/2022** - **C1#34** - Jennifer Ruggiero from Travelers sent an email to Geico - Jeffery Brown and William Rodgers to address the complaint regards to the concerns about coverage.
- **2/22/2022** - **C1#35** – Mr. Van Riper posted the claim file. He had an email exchange with insured. He provided the scope of report per his request.  Director Stone was copied on the reply. He cited policy conditions and advised that an inventory is required.
- **2/22/2022** - Geico responded to Travelers on the complaint request. They sent their response from January for Travelers to review.
- **2/23/2022** - **C1#36** – Jennifer Ruggiero sent a letter to the Lindsays informing them that their policy was investigated and would not be reformed. (Travelers 005939)
- **2/28/2022** - **C1#38** - Mr. Van Riper posted the file that the Lindsays are requesting a computer, accent table, and storage containers as part of ALE. He discussed it with Director Stone. He wrote back to the Lindsays that the computer and table is considered contents. They will take the storage containers into consideration. In the letter that was sent he stated policy language. The letter is from 2/16/2022 and has several days of email exchanges explaining the issues. The language that was cited indicates the following:

  "The Additional Living Expense Coverage under your policy states:

  1. Additional Living Expense. If a loss covered under Section I makes that part of the "residence premises" where you reside not fit to live in, we cover any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living."

  - o   The request for the table and computer as ALE were denied.

  - ➢ **Action to Erode Trust (3):**
    **Mr. Van Riper chose to interpret the ambiguous policy language in an unobjective manner that benefited Travelers. His method was not in accordance with insurance industry standards. Coverage counsel was not considered before a denial was issued.**


- **3/4/2022** - **C1#39** - Director Aaron Stone from Travelers sent a response to the Lindsays on their DORA-complaint.  NOTE: His title says claim manager not Director.
- **3/5/2022** - **C1#40** - There had been a series of communications about some ALE expenses the Lindsays needed. This letter outlines their position on the dispute and explains the birth of their child. (10 days before) and a delay in response. They asked for reconsideration of Mr. Van Riper's / Traveler's denial.
- **3/7/2022** - **C1#41** - Mr. Van Riper sent a letter to the Lindsays that they could not use ALE and would need to handle the requests as personal property. Aaron Stone was copied on the email.
  - o   Christopher Lindsay sent an email directly to Aaron Stone without Mr. Van Riper. He stated he is frustrated with the stone walling from Mr. Van Riper and requested a new adjuster and a response in 5 business days.

> ➤ **Action to Erode Trust (4):**
> **Unilaterally, Mr. Stone refused to address the Lindsays' concerns about Mr. Van Riper. As a leader within Travelers, he did not take the Lindsays' concern seriously.**

- **3/8/2022 - C1#42** - Aaron Stone sent a letter back to the Lindsays. He agreed with Mr. Van Riper on the request and this is their final position. They were offering an increase in the advance to 60% of contents. He did not want to remove Mr. Van Riper as the General Adjuster.

  > ➤ **Action to Erode Trust (5):**
  > **Mr. Stone refused to consider the Lindsays' concerns or provide an objective check and balance in the process. He did not provide an adequate explanation regarding why he made his decision.**

- **3/9/2022 - C1#43** - The Lindsays responded to Aaron Stone, cc'ing Mr. Van Riper, that the denial of coverage is unacceptable, as coverage includes additional costs related to maintaining "normal standard of living." He explained that a computer is like a phone or toaster. Discussed the utility of an entry table. He asked where in the policy it says that this would                                       not                          be                          covered.

  He asked that Aaron Stone's manager be copied and that a response be received in 5 business days.

  > ➤ **Action to Erode Trust (6):**
  > **Coverage counsel was not considered and Mr. Stone refused to include his manager in the communication.**

- **3/9/2022 - C1#45** - Mr. Stone responded to Lindsay with CC to Van Riper. He did not include his manager. He said their position was final and he would not be escalating this above. He invited a call.

  > ➤ **Action to Erode Trust (7):**
  > **Mr. Stone refused to embrace a transparent process with higher levels of authority or decision making. He included Mr. Van Riper in the communications (as if to show solidarity) and would not allow any higher-level authority to intervene as requested by the Lindsays. This approach left the Lindsays at the mercy of a team they had directly documented concerns against, with no other recourse.**

  NOTE - His signature line says claim manager - Mr. Van Riper refers to him as Director. His actual title within the Travelers organization is unclear.

- **3/11/2022 - C1#45** - Jennifer Ruggiero sent the Lindsays a letter about the complaint with DORA. It stated they are actively reviewing the policy and the current dwelling coverage limit of $557,000.

- **3/14/2022 - C1#46** - Mr. Van Riper sent a letter He agreed to change the inflation rate applied to the coverage limit from 2.7% to 9.3%. The net impact to the Lindsays is:
  - $21,444.50 for Dwelling coverage
  - $1,072.22 Trees, Plants and Shrubs
  - $2,144.45 Other Structures.
- **3/23/2022 - C1#50** Ms. Ruggiero posted the file. She spoke with Mr. Lindsay after receiving voice mail and indicated that his policy is still under review. Insured stated that they had requested to escalate some things from their adjuster and have not had a response. She indicated that she would forward his concerns to Claims.
- **4/1/2022 - C1#50** - The Lindsays' Reformation - Original Amount available as of loss date: $557,000. Reformed Amount available for loss: $1,216,395
- **4/4/2022 - C1#54** Aaron Stone had call with Ms. Lindsay and posted the file. He explained reformed policy limits. She was pleased with that but still believes it is not enough. She states she had difficulty with her limits from her agent and has no reason to trust us now as well. She had a few main points: He wrote the following:

  *(a) She does not trust Peter Van Riper. She said he stopped estimating once he hit limits and that she deserves full estimate.  He agreed to review this further.*

  ➢ **<span style="color:red">Action to Erode Trust (8)</span>:**
    **Ms. Lindsay directly explained to Aaron Stone that she did not trust Peter Van Riper. Yet, he did nothing to respond to this concern.**

  *(b) Because Aaron Stone backed up Peter on ALE she does not want to work with him either. The email from 3/11/2022 shows our position on the purchase of a computer and furniture as ALE and I stand behind the position. I stated that we may be interested in discussion of furniture rental. She stated that I already lost my credibility and refuses to speak with me.*

  ➢ **<span style="color:red">Action to Erode Trust (9)</span>:**
    **Ms. Lindsay also explained that she did not trust Aaron Stone. He did nothing to respond to this concern. He was aware that he had allowed a process to continue that impacted the reformation calculation, essentially tainted the result and yielded a miscalculation. It is not clear if he fully disclosed his level of involvement in influencing the reformation process with Ms. Lindsay.**

  *(c) The call ended with her saying that she doesn't feel comfortable speaking with me, or Peter and she wants a new adjuster and manager. I stated that Peter and I can still help, and "it is atypical to change personnel."[21] She didn't believe me and said this is more reason she doesn't trust me. Due to her expressing discomfort with me and the conversation not producing any positive outcome, I stated that while I disagree with her characterization of the events, I respect her wishes and agreed to end the call.*

---

[21] See Analysis in Section II. This is not a true statement based on my industry experience.

> **Action to Erode Trust (10):**
> **Aaron Stone did not provide any direct solution to the problems that were raised. Instead, he ended the call. The harm he had already caused was not acknowledged or addressed in a meaningful or constructive manner. His statement about it being "atypical to change personnel" was misleading.**

- **4/6/2022 - C1#56** - Aaron Stone sent a letter to the Lindsays. He said the appropriate parties have reviewed this matter and there would not be a change of adjuster. Mr. Van Riper will address the scope and estimate. They will also assist with developing a contents inventory. A group call between Mr. Van Riper, Mr. Stone, and the Lindsays could be arranged.

  > **Action to Erode Trust (11):**
  > **Aaron Stone's documentation indicated that the decision was final, and it pledged that there would be further work on a scope and estimate. However, the methodology that was used was not identified and there were no processes included to yield transparent, accurate, or fair results.**

  o The reserves were also reviewed. The total initial reserve from 1/5/2022 was $1,172,602. The new reserve from 4/5/2022 was $2,404,275.
  o Christopher Lindsay sent an email to Jennifer Ruggiero. He documented his conversation with her.
    ▪ He wanted to know how the new limits were set. She did not know.
    ▪ He told her he was concerned the new limits were not set properly because they had not received an accurate scope of loss.
    ▪ He explained the current estimate from Pete was very inaccurate both in what they had in their house and the quality of the items.
    ▪ He told her they were working on getting a complete scope of loss and an estimate based on that scope of loss.
    ▪ She said she would take this back to the underwriting department.
    ▪ He mentioned they were never offered 24 months of ALE coverage, and they would like that to be included as part of the current reformation.
    ▪ She said she would send that along to the underwriting department, but that would require some additional investigation.
    ▪ He asked about getting customer service contact information. -He mentioned that they were uncomfortable working with their adjuster and his manager and that they would like a new adjuster under a different manager.
    ▪ She said she would reach out again to the Customer Service Claims Team and reiterate their wishes.
    ▪ She said she told the claims customer service people that we would like to work with an inventory specialist to work with someone on the claim side.
    ▪ She asked what he thought their limits should be set to.
    ▪ He said he did not know without a complete estimate.

- He has no way of knowing. He said that while I could tell what was in our house, I could not know how much it would cost to rebuild and that we were working on getting an estimate to tell us exactly that.
- She agreed that it made sense and asked him to send the estimate as soon as he had it.

- **4/7/2022 - C1#57** - Travelers AVP Michael Gatti spoke with Mr. Lindsay. They went through the history of the case. A request was made for the change in adjuster and manager, but the request was again refused. A confirmation email was sent to the Lindsays saying that Mr. Gatti would meet with Mr. Stone and Mr. Van Riper.
  - On the same day, VP Angi Orbann, PI Product Management asked Alan Tuvin to provide an update to her and Ed regarding the background on this reformation and confirm what the building limit was prior to the reformation to $1.2M.
- **4/8/2022 - C1#58** - Mr. Van Riper sent a letter that the policy limits were increased through the reformation process. He detailed the new dwelling limit and how that impacted the rest of the policy. The letter did not address any of the other concerns that had been raised by the Lindsays.
- **4/9/2022 - C1#59** - Mr. Lindsay sent a note to Mr. Gatti. He asked for 100% personal payment coverage. Mr. Gatti said they cannot do it because they would have to do it for everyone.[22] Mr. Lindsay made a solution for the reformation in his letter. He also sent a bulleted letter outlining his understanding of the meeting.

- 4/11/2022 - C1#60 – Mr. Gatti sent a letter to Lindsays with an update. He explained the reformation process. A thorough inspection will be scheduled. A content specialist will work on the case to assist them.
- 4/14/2022 - C1#63 - Michael Gurule at Sedgwick was assigned as a construction consultant. This was addressed in the email that was sent by Mr. Van Riper. The file was also posted, and a letter was sent. It outlined the scope of the assignment.
  - *"Include a sketch for which to base your line items off of. I'm assuming the insured will assist in laying out a floorplan if you cannot locate a floorplan through other means.*
  - *Use unit cost. If time and materials is needed, I will need supporting documentation to validate why unit cost cannot be used.*
  - *Please set all door/window/wall opening to "deduct opening larger than 32 sf".*
  - *Use drop and fill for carpet estimating.*
  - *Use Xactimate roof waste estimating feature if you are able to sketch the roof.*
  - *I will add the soft costs (plans, permits, engineers, etc.)*
  - *I will coordinate date/time: pending.*
  - *I will coordinate an inspection appointment for the three of us (I will attend for a portion of the meeting.) It is likely we will meet at their temporary residence in Boulder.*

  ➢ **Action to Erode Trust (12):**
  **Mr. Van Riper, who had been highly criticized, controlled the scope that Sedgwick provided. Furthermore, while he had the final word and was ultimately**

---

[22] I have seen situations through settlements and other negotiated resolutions where methods of compromise have occurred. It is not clear to me that the rationale Mr. Gatti indicated is accurate or completely forthright. I have not seen any Travelers policy or procedures that would have stood in the way of this type of settlement or compromise.

**responsible for the results, he did not plan on attending the full meeting to understand the pre-loss condition of the Lindsays' home.**

- *When completed please provide us with the (Esx of your estimate, in addition to supplying us with an estimate we are also requesting that you send an invoice for said services to include drive time, time on site and estimate preparation. Please do not hesitate to contact me with questions."*

- **4/17/2022** - **C1#65** -Mr. Gatti told the Lindsays that Travelers cannot pay 100% of the personal property without an inventory.
- **4/20/2022** - **C1#68** - Erin Lindsay wrote to Nikki White that she understood what needed to happen in the contents inventory. The correspondence was detailed.
- **4/26/2022** - **C1#70** - The expense for the Sedgwick consultant was 15K.
- **5/17/2022**- **C1#79** Michael Gurule of Sedgwick sent the ESX and PDF files for the Lindsay rebuild estimate to Mr. Van Riper. It was in draft form.
- **5/18/2022** - **C1#80** Mr. Van Riper sent a letter to Aaron Stone and Nikki White to strategize a response to the Lindsays about their concerns with the inventory process, because he did not want the communications to sound "too abrasive".
- **5/19/2022** - **C1#81** - Christopher Lindsay sent a letter to Mr. Van Riper asking for the Sedgwick estimate. It was originally supposed to be sent on 5/14/2022.
- **5/22/2022** - **C1#82** - Aaron Stone wrote back with comments to Peter Van Riper and Nikki White on how to respond to the Lindsays' letter. The three of them edited a draft to address the Lindsays' concerns.
- **5/25/2022** - **C1#83** Mr. Van Riper posted the file that he uploaded the estimate that was sent on 5/17. He sent an email to C. Lindsay saying he needed more time to process it. C. Lindsay responded that this delay is holding up the rebuilding schedule.
- **5/31/2022** - **C1#85** - Mr. Van Riper posted a note with his revision of the estimate and that it was approved by Mr. Stone.
- **6/1/2022** - **C1#86** - The Travelers estimate was provided to the Lindsays.
- **6/2/2022** - **C1#87** - Nikki White sent a letter to the Lindsays stating policy language regarding duties after a loss for covered property.
- **8/28/2022** - **C1#105** - C. Lindsay sent a letter to Jennifer Ruggiero. They took the second estimate from the third-party expert (Mr. Gurule) and went through it and made amendments so that it accurately reflected the pre-loss condition of their home. They attached the new scope and requested that a reformation be completed by UW.  The information had been sent to Peter Van Riper, Aaron Stone, and Michael Gatti.
- **8/29/2022 – C1#106** Mr. Lindsay sent an email to Peter Van Riper, Aaron Stone, and Michael Gatti. Amendments were made to the scope. He explained his understanding how this related to the reformation process that had already occurred and why this new material was important. It was the basis for why he was resubmitting it. The Lindsays asked that UW review this material and adjust their new limits in a similar fashion. An update was provided regarding the building process and there was an explanation regarding how the delays have impacted them.  He asked for an update in 5 business days.

- o  8/29/2022 - Mr. Van Riper sent the information to Michael Gurule. It included the solar bid from 2021 and information from Glimmer claims services.[23]
- 8/30/2022 - C1#107 - Jenifer Ruggiero - Sent a letter to Mr. Lindsay letting him know that his materials have been put in his file and forwarded to the Underwriting team as well.
- 9/1/2022 - C1#108 - Peter Van Riper posted the file and wrote, "Reviewed insured's emails with Director. Provided response to insured today addressing his concerns and directing him to contact his agent to go over his policy limits. I also attached the most recent SOL and estimate for his reference."
  - o  A formal letter was sent by Mr. Van Riper in response to the Lindsays. It detailed his position regarding the events and attempted to address the concerns that were raised about the delays caused by Travelers and his claims handling. It provided arguments in response. He directed that the Lindsays contact their agent and denied to directly get involved with the request to have underwriting perform another reformation.

- ➤ **Action to Erode Trust (13):**
  **The letter sent by Mr. Van Riper was defensive in nature. Mr. Van Riper referred the Lindsays to their agent, Geico, who had no power over the reformation process. This appears to be a delay tactic with misdirection. In the same letter, Mr. Van Riper also declined getting UW involved in the Reformation. This demonstrates preconceived thoughts and bias in the process.**

- **9/6/2022** - **C1#110** C Lindsay wrote to Mr. Van Riper. He copied Mr. Stone, Mr. Gatti, and Ms. Ruggerio. He explained why he disagreed with their position that there was no cause for underwriting to reconsider the reformation. They explained that Travelers continue to set the policy limits without all of the information. They requested that Glimmer estimate be reviewed by underwriting. He requested that the team please respond in 5 business days.
- **9/13/2022** - **C1#111** – Mr. Van Riper posted the file that he left a vm for Michael Gurule at Sedgwick, following up on status.
- **9/14/2022** - **C1#112** - Michael Gurule responded to Mr. Van Riper: I am finalizing my analysis of the estimate submitted by the insured's consultant. *"Do you have availability tomorrow afternoon to discuss and review? I'm free after 2 Pm MST for the reminder of the afternoon."*
- **9/15/2022** - **C1#113** - Mr. Van Riper responded to the Lindsays. He stated, " Thank you for your email. As stated in our prior email from 9/1/2022, we will complete a review of the estimate submitted by Glimmer Glass. We will work with our consultant on this process to ensure we provide an accurate and detailed scope of repairs. Once we have completed our review, we will advise you on this outcome. To ensure a comprehensive review, we will let you know if we have any further questions for you or your experts. Once a full review has been completed, we will determine if further consideration will be made regarding your policy limits."

---

[23] It is important to note that in my role as a standard of care expert I am reviewing the work of Geico and Travelers. I am not reviewing the work product of Sedgwick or Glimmer as they are outside the scope of my retention.

- An email documented that a meeting was being scheduled between Michael Gurule, A. Stone, Peter Van Riper and Michael's manager. The details were not posted in the claim file.

➢ **Action to Erode Trust (14):**
**The decision had already been made by Claims to not move forward with a policy reformation. The Lindsays were requesting a formal meeting. The Claims team met with Sedgwick to plan a strategy. They did not post the file with the details of the meeting or discussions. This is not in accordance with industry standards and does not exemplify a transparent process based on fairness and/ or objectivity.**

- **9/22/2022** - **C1#1116** -Mr. Van Riper posted a note in the file. He wrote the following:

    *"Email from Michael Gurule with his updated ESX. I reviewed it and discussed it with him. There were items he added on this original scope that he confirmed via photos that he obtained during his initial evaluation, or were items he couldn't confirm but agreed that they could reasonably have been there (i.e. Addition of a pantry to the left of the refrigerator in the kitchen).*

    *We discussed the items that are not on his scope. He is still working on putting together a spreadsheet that outlines the items on the insureds' estimate that is not on his scope, and the reason why. He estimates 1 more week for this. "*

- **9/23/2022** - **C1#117** - The Lindsays sent a letter asking to have the ALE tolled until they can move into their new home. The letter explained their rationale. They requested a response within 5 business days.
- **9/29/2022** - **C1#118** - Michael Gurule sent the spreadsheet to Peter Van Riper with a breakdown of the estimate from the insured's rep. He made comments and left a blank column for response. He asked for Peter's thoughts.
- **9/30/2022** - **C1#119** - Michael Gurule spreadsheet was corrupted and he lost a portion of it. This delayed his work to 10/4.
- **10/5/2022 - C1#122** - A letter was sent by Mr. Van Riper to the Lindsays addressing their concerns.  Travelers did not think a reformation discussion is warranted.

➢ **Action to Erode Trust (15):**
**Mr. Van Riper sent a letter with a decision to not reform the policy before UW had met to review all the materials. It demonstrates the preconceived thoughts and bias inherent in Travelers' process and decision making.**

- **10/10/2022** - **C1#124** - C. Lindsay responded. He believed that Mr. Van Riper's conclusion that there was not a delay is false. The letter outlines why they think there is not good faith. The Lindsays' also demand that the ALE be tolled and request a response in 5 business days.
  - A second note details that the scope that was completed was incomplete. It is missing hundreds of line items representing features from the pre-loss condition home. It also demonstrates other proof that a good faith effort has not been made. They request that Underwriting conduct a reformation review for the limits.

  > **Action to Erode Trust (16):**
  > **Travelers still had not completed a full scope of loss. The document they provided had hundreds of errors or areas of concern for the Lindsays. Nonetheless, five days before, Travelers had already decided there would not be a corrected reformation calculation.**

- **10/12/2022** - **C1#125** - C Lindsay sent a letter to Colorado DORA about their complaint asking for the ALE to be tolled.
- **10/14/2022** - **Ci#126** - P. Van Riper posted the file. He left another message for Michael Gurule at Sedgwick. He had left one previously on 10/12/2022. Because he needs clarification on the line items he designated as "additional information required."  A follow up email was sent on 10/14/2022.
- **10/19/2022** - **C1#127** - M. Gurule confirmed that the items he marked as "additional information required" were for scope items that weren't discussed, but he cannot rule out.
  - Aaron Stone sent an email to Bre Webb and others to discuss a second reformation. He wrote: "Bre, We have a few questions we want to run by you on a request from the insured for a second reformation. Thank you."

  > **Action to Erode Trust (17):**
  > **Aaron Stone was scheduling a meeting after Travelers (Mr. Van Riper) had already communicated that the policy would not be reformed. The decision had been communicated by the Claim team on 10/5/2022. Nonetheless, according to his testimony, Mr. Van Riper was the subject matter expert from Claims and he was used to influence UW's decisions at the meeting that was scheduled for this date. The content of his discussions was not documented, notated, or produced.**

- **10/21/2022** - **Ci#128** - A meeting invite was sent. Required attendees were Michael Gatti, Bre Webb, and Aaron Stone.
- **10/24/2022** - **C1#129** - A meeting invite was sent by Aaron Stone with a required attendee of Kimberly Scharder. The topic was Lindsay Review Reformation.

  > **Action to Erode Trust (18):**
  > **Mr. Stone and Mr. Gatti, who had already made up their minds on reformation, influenced the results of this meeting. It is important to note that as managers and leaders they should be making sure standards are met. It is clear from the disclosures**

**that the scope prepared by Sedgwick and Travelers still had gaps that were known by Travelers.**

- **10/27/2022 - C1#131** - C. Lindsay wrote a letter to M. Gatti outlining the severity of their situation. He laid out the following issues in detail:
    1. Toll our ALE immediately
    2. Get us an accurate Scope of loss
    3. Send a scope that we've approved back to UW to have our limits reformed.
    4. Correct the other problems we now face as a result of delays.
    5. Get us a new Adjuster and Supervisor

- **11/3/2022 C1#134** - Michael Gatti posted the file. Response to insured's email placed in file cabinet.
    o Peter Van Riper responded and copied Michael Gatti and Aaron Stone.
    o Michael Gatti sent an email, writing the following:

    *Hello Mr. Lindsay,*

    *Thank you for your email. In reviewing your concerns, I believe that several of the items will be addressed in response to your 10/10 emails. To the extent that there are other items not incorporated in those emails, I will issue a separate response. In the interim, I have forwarded your excel spreadsheet to Mr. Van Riper, who has forwarded it to the retained construction consultant.*

    *Thank you again.*

- **11/18/2022 - C1#138** - The Insurance Commissioner Michael Conway's office sent a letter to Travelers regarding the Lindsays about the complaints, request for ALE, and policy reformation.

- **11/23/2022 - C1#139** Peter Van Riper sent emails to the insured about the ALE tolling and scope of work review. They were in response to the 11/9/2022 emails. The tone of the correspondence was defensive in nature.
    ➢ **Action to Erode Trust (19):**
        **The tone of the email sent by Mr. Van Riper was defensive, and Mr. Gatti still had not considered replacing him on this claim. These communications were escalating in tone and appear to have been condoned by Travelers' leadership, who were aware of the Lindsays' concerns.**

- **11/29/2022 - C1#141** A. Stone scheduled a meeting with other stakeholders. The meeting invite indicated a change in the meeting time due to DOI extension and the availability of most people.

    ➢ **Action to Erode Trust (20):**
        **Mr. Stone was still controlling the process to review the issues raised by the Lindsays stemming from the DOI complaints submitted by the Lindsays'. Despite the repeated concerns that were raised about Mr. Stone's lack of neutrality, he was still allowed to**

**manage the process against the Lindsays' clearly stated objections.**

- **12/1/2022 – C1#142** - Jennifer Ruggiero sent a note to A. Stone. It stated,

  *"Hey There!*

  *I wanted to forward our UW response for the DOI and Insured. Did you want to combine with yours? Or did you want to submit separately?*

  *Thanks!*

  *Jen"*

  Her letter to Mr. Lindsay stated the following:

  *Dear Mr. Lindsay,*

  *We have received an additional request from the Colorado Department of Regulatory Agencies on your behalf regarding your policy. The Department has requested that we respond to you directly with a statement outlining our position.*

  *Regarding the revision to the loss of use limit of liability... you did not purchase an extra 12 months...*

- **12/27/2022 - CI#146** - Travelers agreed to extend the ALE for 12 more months, from 12 to 24 months.

- **1/5/2023 - C1#150** - C. Lindsay wrote to P. Van Riper that he disagreed with the position on scope not being completed.  The delays around this continue.

- **1/18/2023 - C1#155** - Peter Van Riper posted the file that he received an update from their construction consultant. He should have a revised estimate by 1/19/2023.

- **1/23/2022 C1#157** C. Lindsay sent a note to P. Van Riper saying they still do not have a scope of loss and this constitutes a delay.

- **1/25/2023 - C1#159** – Mr. Van Riper sent a letter to Mr. Lindsay with a CC to A. Stone and M. Gatti, detailing they are working on the scope of loss. They hope to have a revised estimate in the next 10 business days.

- **1/30/2023 -C1#162** - Mr. Van Riper posted the file with the revised scope.

- **1/31/2023 - C1#163** – Mr. Van Riper discussed the case with A. Stone and Gatti. The additional reformation that was requested is denied. A letter declining the reformation was sent to the Lindsays,

informing them of Travelers' position. Mr. Van Riper. Aaron Stone, Michael Gatti, and Jennifer Ruggiero were copied on the email.

➢ **Action to Erode Trust (21):**

**The final decision to deny a reformation was communicated by the team who had, from the very beginning, decided not to reform the policy. Jennifer Ruggiero, Peter Van Riper, Aaron Stone, and Michael Gatti were copied. Throughout 2022, each of them had sent letters indicating an unwillingness to manage this matter objectively as they rushed to deny a reformation. (Jennifer Ruggiero's first letter is an example, and the various letters from the life of the claim sent by Mr. Stone, Mr. Van Riper, and Mr. Gatti document similar positions.)**

**Section II E. Conclusions, Observations, Impressions, and Opinions:**
o **In Mr. Van Riper's first meeting with the Lindsays on 1/21/2022, he demonstrated behaviors that began to erode trust between (1) the Lindsays and Geico because of the underinsurance issue and (2) Lindsays and Travelers by his refusing to complete a full and accurate scope of loss for the pre-loss condition of their home. (C1#19)**
o **Mr. Van Riper's behavior in their first meeting led to the CO DORA complaints (1/21/2022 and 2/7/2022).**
o **Geico initially responded to the CO DORA Complaint within 5 calendar days that the Lindsays' policy accurately reflected the application for insurance. The answer did not directly respond to the issue of underinsurance, which was the nature of the complaint. This response occurred before a formal and thorough investigation had occurred. This is not aligned with insurance industry standards. (C1#20)**
o **Travelers initially responded to the CO DORA Complaint within 16 calendar days that Lindsay's policy would not be reformed because no errors had occurred. This response occurred before a formal and thorough investigation had occurred. A response without a complete and thorough investigation does not adhere to insurance industry standards. (C1#36)**
o **Without completing a thorough investigation, Travelers denied the Lindsays' request for ALE accommodations for their pre-loss standard of living regarding a request for an end table and computer and left the request for storage not clearly agreed to. The denial was communicated without considering the ambiguity of the policy language or the concerns raised by the Lindsays. No consideration was given to whether coverage counsel should be consulted as part of Travelers decision making process. The process used by Travelers appears to be reflexive, self-serving, and financially motivated to benefit Travelers over their first-party insured. The appeals to involve Travelers management team were not met with objectivity, instead they maintained an approach similar to what is seen in third-party claims (denials without clear explanations) instead of thoughtful reviews to first-party inquiries. The process to evaluate the request did not reflect insurance**

industry standards. (C1#38) (C1#40) (C1#41) (C1#42)

o **When the Lindsays raised concerns about Mr. Van Riper to his supervisor, their concerns were essentially ignored and not objectively investigated, considered, or taken seriously. When requests were made to escalate the issue above Mr. Stone, he refused.  The inactions on his part do not reflect the level of care typically seen in cases involving an erosion of trust between an insurer and the insurer's first-party insureds.  (C1#41) (C1#42) (C1#43)**

o **The Lindsays shared their concerns about the Claims team with Jennifer Ruggiero. She agreed to escalate the issues but still allowed this same team to influence the reformation process. There are no disclosures that show she raised concerns, on behalf of the Lindsays, that Mr. Van Riper and Mr. Stone were not objective in the reformation process. It is important to remember that they initially wrote that the policy would not be reformed on 2/23/2022. The actions and inactions surrounding preconceived thoughts and bias involving the reformation process do not reflect industry standards.  (C1#45) (C1#50)**

o **The policy was reformed without direct involvement of the Lindsays and was done based on the input of Mr. Van Riper, even though members of the meeting knew there were issues with the quality and thoroughness of his work and the Lindsays had expressly requested that he be replaced with another adjuster. His manager Aaron Stone condoned Mr. Van Riper's involvement and even helped facilitate it. This is especially troubling, since the Lindsays had also requested that Mr. Stone be removed from the claim. This approach is not aligned with industry standards for objectivity, transparency, and fairness.  (C1#50)**

o **Mr. Stone notified the Lindsays of the reformation results on 4/4/2022. In that call, they explained their concerns with the process and their lack of trust. He noted the file, but did not actively take action to correct the situation. A letter was sent on 4/6/2022 saying that Mr. Van Riper would complete a scope of loss but would remain on the case. Their concerns with his ability and work ethic remained unaddressed. This approach is not aligned with industry standards surrounding supervision in matters such as the ones raised in this claim. (C1#54) (C1#56)**

o **When Mr. Gatti became involved in the claim, he chose (presumably for business reasons) to leave Mr. Van Riper and Mr. Stone as the Claim team responsible for the Lindsays' claim.  He indicated that a third party (Michael Gurule - Sedgwick) would be assigned to the case to create an accurate scope of loss outlining the pre-loss condition of the home. This assignment to Sedgwick was misleading because nothing about it was neutral. Mr. Van Riper controlled the work of Sedgwick and influenced the outcome of their report. His changes appear to have been uninformed and arbitrary.[24] He made adjustments/reductions to the scope without documentation. Mr. Gatti did not directly ensure the objectivity of Sedgwick's work product or the accuracy of the changes that Mr. Van Riper made to Sedgwick's scope of loss.  This approach by Travelers (put in place by Mr. Gatti)**

---

[24] Mr. Van Riper had not planned to attend the entire meeting with the Lindsays and Sedgwick, and during the time he was there, he was not actively engaged or participating. He did not take notes.

does not reflect insurance industry standards of good faith and fair dealing. **(C1#57) C1#59) (C1#63) (C1#79)**

o   Mr. Van Riper was aware he had issues with the tone of his communications regarding the Lindsays. He received internal counseling and feedback in his letter writing. This demonstrates an awareness on his part and Mr. Stone that the relationship between them and the Lindsays was not productive. Nonetheless, they did not objectively consider if a change in assignment should occur. **(C1#82)**

o   Mr. Van Riper adjusted the Sedgwick estimate and made many changes that reduced the value of the pre-loss scope. He went to Mr. Stone to authorize the change. Mr. Stone did not counsel him to better document the rationale for his changes to the Sedgwick estimate and allowed it to go out in an incomplete form. This authorization on Travelers' part demonstrates actions and inactions which show a lapse of judgment and lack of recognition for the importance of having an accurate and complete pre-loss scope. The ramifications of approving the scope in an incomplete form came to the detriment of their insureds and appear to be financially motivated to benefit Travelers. The Travelers' reworked scope was sent to the Lindsays in an incomplete form. This does not reflect insurance industry standards of care for good faith and fairness. **(C1#85) (C1#86)**

o   On 8/28/2022, Mr. Lindsay sent a letter to Jennifer Ruggiero reviewing Mr. Gurule's estimate and discussing errors in the accuracy of the pre-loss condition of their home. This information had been sent to Mr. Van Riper, Mr. Stone and Mr. Gatti. He requested that UW review the amended estimate with corrected errors. The following day, on 8/29/2022, Mr. Lindsay sent an email to Mr. Van Riper, Mr. Stone, and Mr. Gatti. Mr. Lindsay explained his understanding in the importance of getting the correct scope for the reformation calculation. He again asked for an UW review and corrected reformation. On 8/30/2022, Ms. Ruggiero sent a letter to Mr. Lindsay letting him know that his materials had been put in his file and forwarded to the UW Team. On 9/1/2022, Mr. Van Riper documented that he met with Mr. Stone, reviewed the emails, and provided a response to the Lindsays. Mr. Van Riper referred Mr. Lindsay to his agent, Geico to go over his policy limits.[25] It is important to note that the Sedgwick estimate was still being finalized as of 9/14/2022. On 9/15/2022, according to an email, a meeting was scheduled between Michael Gurule, Mr. Stone, Mr. Van Riper, and Mr. Gurule's manager. The details of this meeting were not posted within the file. On 10/5/2022, Mr. Van Riper sent a letter to the Lindsays informing them that Travelers did not think a reformation was warranted. This decision was made before a meeting with UW had occurred. These events from 8/28/2022 through 10/5/2022 demonstrate the Claim department's involvement and possible manipulation, bias, and predetermined decision to not reform the Lindsays' policy a second time. The process during this period does not reflect the industry standards for a good faith, transparent, objective, or fair investigation. **(C1#105)**

---

[25] The purpose of this recommendation to contact Geico is not clearly documented. Geico would not have the authority to reform the Travelers policy, but they would have authority to handle the issue through their E&O coverages. Given the information contained in Travelers' training materials, this would not be the internal policy or procedure for E&O consideration.

(C1#106) (C1#107) (C1#108) (C1#112) (C1#113) (C1#122)

o **On 10/19/2022, Mr. Gurule confirmed that the items he marked "as additional information required" were for scope items that were not discussed, but he was unable to rule out. This demonstrates that the Sedgwick scope was still in an incomplete form as of this date. Nonetheless, it had already been determined by Travelers that they did not want to change the policy limit that was reformed on 4/4/2022. On 10/9/2022, even though the scope was still incomplete, Aaron Stone moved forward with scheduling a meeting to discuss the second reformation. Another invite was sent again to additional parties on 10/24/2022. Mr. Stone's actions (under Mr. Gatti's supervision) clearly shows that Travelers as an organization was not truly concerned with accurately calculating the pre-loss scope of the Lindsays' home to inform the correct policy limit. Instead, with preconceived thoughts and bias, Travelers concluded their investigation to benefit their own financial self-interest. (C1#127) (C1#129)**

o **Again, on 10/27/2022, the Lindsays were appealing to Travelers' sense of fairness in the process. They wrote to Mr. Gatti and requested that a new adjuster and supervisor be assigned to the case. Their request was declined and Mr. Van Riper and Mr. Stone were left as key influencers and decision makers in the second reformation process. This inaction is not indicative of a fair and impartial investigation aligned with insurance industry standards. (C1#131)**

o **Within 30 days after the request to have Mr. Van Riper and Mr. Stone removed from the claim, Mr. Van Riper sent emails to the Lindsays with a tone that was defensive in nature, and Mr. Stone was scheduling meetings to respond to the DOI complaints and reformation. The possibility of retaliation was not taken seriously by Travelers. Mr. Stone and Mr. Van Riper were left to influence the results of the Lindsays' claim. The inaction of Travelers to take this concern seriously and provide transparency in the process does not follow insurance industry standards of good faith and fair dealing when it comes to unbiased investigative processes. (C1#139) (C1#141)**

o **On 1/31/2023, Mr. Van Riper discussed the case with Mr. Stone and Mr. Gatti. They denied the Lindsays' request for additional reformation. A letter was sent to the Lindsays by Mr. Van Riper, declining the reformation. It informed them of Travelers' decisions. Aaron Stone, Michael Gatti, and Jennifer Ruggiero were included in the email. The denial documented the preconceived and predetermined decisions of the Travelers team. While UW officially made the decision, the Claims team, (whose involvement and actions were highly suspicious) never completed an accurate scope of loss and were allowed to inform the policy limit calculation. Nobody involved in these meetings disclosed electronic or handwritten notes about what Claims presented or what was discussed.[26] The investigative process employed by Travelers as the basis for the**

---

[26] It is hard to believe that no one took notes during this meeting, especially when one considers it involves a CO DOI/ DORA complaint. If no notes were taken by any of the participants in the various departments including executive level attendees, the circumstances surrounding this decision would be highly suspicious if it were intentional in nature. If it were unintentional and simply coincidence that nobody took notes, it would allow a reasonable person to conclude that Travelers took an unprofessional and unserious approach to the Lindsays' concerns and request for reformation.

**1/31/2023 reformation decision does not adhere to insurance industry standards. (C1#163)**

- ❖ See Appendix Exhibit C1
- ❖ See Appendix Exhibit C2
- ❖ See Appendix Exhibit E1
- ❖ See Appendix Exhibit E2
- ❖ See Appendix Exhibit E3
- ❖ See Appendix Exhibit E4
- ❖ See Appendix Exhibit E5
- ❖ See Appendix Exhibit E6
- ❖ See Appendix Exhibit E7
- ❖ See Appendix Exhibit E8

- ❖ See Appendix Exhibit E9
- ❖ See Appendix Exhibit E10
- ❖ See Appendix Exhibit E11
- ❖ See Appendix Exhibit E12
- ❖ See Appendix Exhibit E13
- ❖ See Appendix Exhibit E14
- ❖ See Appendix Exhibit E15
- ❖ See Appendix Exhibit G6
- ❖ See Appendix Exhibit F1 -F25

## F. Discussion: Concerning Aspects of How Travelers Managed the Complaint and Reformation Process

- The Lindsays filed the Geico complaint with DORA on 1/21/2022.
- The Lindsays filed the Travelers complaint with DORA on 2/7/2022.
- The Lindsays requested evidence to be shared with them. If that evidence showed that they were denied higher coverage, they wanted higher coverage offered to them retroactively and the ability to update the coverage on their Marshall Fire claim. They asked that their policy be reformed.
- Having managed many complaints before, Travelers understood the process that would be required to calculate a new policy limit if they were to reform a policy. They also understood that UW would lead the reformation review, including the calculation process, based on input from claims to be approved by Travelers' leadership.
- The response from Travelers was disjointed. Originally on 2/23/2022, Jennifer Ruggiero responded that the policy would not be reformed. On 3/11/2022, Jennifer Ruggiero sent another letter saying that the "we are still actively reviewing the policy and the current dwelling coverage limit."  The decision to reform the policy was agreed upon as of 4/1/2022. The investigation found discrepancies in the feature selection at the time the new business was created in the application.  (See C1#53)

➢ **Available Dwelling Coverage:**
  - Original amount available as of loss date: $557,000
  - Reformed amount available for loss: $1,216,395

➢ **Review Findings:**
  - Discrepancies found in feature selections at New Business:
    - ➢ Finished living area varied significantly
    - ➢ Foundation type shows below grade when home has a walkout basement
    - ➢ Grade of bathroom was incorrect
    - ➢ Number and type of fireplaces incorrect
    - ➢ Roof style, shape and pitch incorrect
    - ➢ Roof cover selection should have been architectural shingles
    - ➢ Garage type selection was incorrect
    - ➢ Deck/Porch selections were inadequate

- Members of Travelers' leadership team in multiple departments were aware that the Lindsays had concerns about Peter Van Riper. There are many communications involving Mr. Van Riper and Aaron Stone, where requests were made to replace them. In addition, on 3/23/2022 Ms. Ruggiero was aware that the Lindsays had requested another adjuster and had not received a response. She committed to forward the concerns.  Nonetheless, Mr. Van Riper was put in the position where his verbal account became the basis for the recalculation.
- Members of Travelers' leadership team understood that there were issues concerning Peter Van Riper not completing a thorough scope of loss during the 1/21/2022 meeting.
- Travelers relied on Peter Van Riper's verbal account of the partial scope of loss from the 1/21/2022 meeting as the basis to reform the policy.
- Given the multiple departments and executives who participated in the meetings to reform the policy, nobody took notes (electronically or in writing).[27]
- The changes to the policy were made unilaterally by Travelers via calculations without involvement of the Lindsays. The nature of the breakdown of this process is clearly documented in the file notes by Aaron Stone, when he documented his call with Ms. Lindsay. He wrote:

---

[27] Based on my experience from having participated in many meetings like this, I find it very hard to believe that no records were kept of these discussions given the caliber of the people who participate in these types of discussions and given the formal nature of a DORA complaint combined with a request for policy reformation. The fact that no notes exist is highly unusual and out of the ordinary.

| 4/4/2022 2:20:30 PM | SYS - 800 | ISO | Response Received - |
|---|---|---|---|
| ISO update received | | | |
| 4/4/2022 2:52:06 PM | AARON W STONE - 877 | Management Review | File Review - |

Held call with Mrs. Lindsay on phone complaint. I advised on reformed
policy limits. She was pleased with that but still believes it is not
enough. She stated she had difficulty with her limits from her agent and
has no reason to trust us now as well. She had a few main points:

She stated that she doesn't trust Peter. She said he stopped estimating
once he hit limits and that she deserves a full estimate. I stated that we
believe one was provided but that we can certainly review this further.

She stated that because I backed up Peter on the ALE questions, she
doesn't want to work with me either. The email from 3/11 shows our
position on the purchase of computer and furniture as ALE and I stand
behind this position. I stated that we may be interested in discussion of
furniture rental. She stated that I already lost my credibility and
refuses to speak with me.

The call ended with her saying that she doesn't feel comfortable speaking
with me or Peter and she wants a new adjuster and manager. I stated Peter
and I can still help and it is atypical to change personnel. She didn't
believe me and said this is more reason she doesn't trust me. Due to her
expressing discomfort with me and the conversation not producing any
positive outcome, I stated that while I disagree with her characterization
of the events, I respect her wishes and agreed to end the call.

## TRAVELERS 000027

**Section II F. Conclusions, Observations, Impressions, and Opinions:**

- o **Travelers had a lot of experience with CO DOI/ DORA Complaints. They also understood from a process perspective what would be required to accurately reform a policy and calculate a new policy limit. Nonetheless, they undertook a process to reform the policy and recalculate the policy limit in an inherently flawed manner. The Lindsays were clearly communicating their concerns before the policy was reformed in 4/2022, but their concerns were ignored by Travelers personnel who should have known better and could have used a process to yield an accurate policy limit calculation. The approach Travelers undertook to inaccurately calculate the policy limit does not follow industry standards, because the process appears to have been designed to intentionally serve Travelers' financial interests at the detriment of the Lindsays.**

- ❖ **See Appendix Exhibit C1**
- ❖ **See Appendix Exhibit C2**
- ❖ **See Appendix Exhibit E1**
- ❖ **See Appendix Exhibit G4**
- ❖ **See Appendix Exhibit G5**
- ❖ **See Appendix Exhibit G5.5**
- ❖ **See Appendix Exhibit G7**
- ❖ **See Appendix Exhibit G8**
- ❖ **See Appendix Exhibit I20**

## G.  Discussion: First party and third-party claims – Travelers handling of the Lindsays Claim

### 1. Definition: First and Third-Party Claims

**First-Party:** A first-party claim occurs when there is a claim by an insured or organization seeking to recover from its insurer for a loss that its insurance policy may cover.

**Third-Party:** A third-party claim occurs when a party or organization claims an injury by a person or organization other than the insured or the insurer seeking recover for damage that may be payable by the insured's liability insurance.

### 2. Insurer Duties: First and Third-Party Claims

**First-Party:** The insurer must explain to the insured the need for the investigation and how the insured can facilitate the investigation. The insured is the insurance company's customer. The insurance company, committed to providing prompt, professional service, and timely payment of claims, fulfills its duties by adhering to the jurisdiction's laws and industry standards. In Colorado, there are defined standards of good faith and fair dealing for insurers to follow.  During the investigation, evaluation, and negotiation phases of the claim, the carrier approaches the insured with objectivity, fairness, and an open inquiry devoid of preconceived thought, bias, without the intention of skewing results in the carrier's favor. Settlement offers are provided after thorough investigation and evaluation with offers being made at fair values of responsible levels to address covered damage or loss.

During the claim process, the carrier assumes the role of an umpire, whose job is to investigate the claim with fairness and objectively, "calling balls and strikes" honestly without showing favor to any one side, (the carrier or the policyholder). This balance is well understood as an industry standard. It is highly frowned upon within the insurance industry and most jurisdictions (including Colorado) for a carrier to actively skew results for the carrier's interest against their first-party insured, as this goes against industry standards, statutes, and case-law for good faith and fair dealing.

**Third-Party:** The claim representative in a third-party claim is focused on keeping their insured out of harm's way by providing their insured with a defense against a claim filed against them or by settling with a claimant who is pursuing a claim against the insured.

### 3. Travelers Handling of The Lindsays' Claim

From the time the Lindsays tried increasing their coverage with Geico and Travelers (pre-loss) and when Mr. Van Riper evaluated the Lindsays' loss on 1/21/2022 followed by the DORA complaints against Geico and Travelers, an ongoing pattern of events can be seen where the Defendants acted in a questionable manner against the Lindsays.  Specifically, Travelers (with regularity) influenced the process, "put their thumbs on the scale", and "called balls and strikes" in their own interest. Below is a list of situations where

this occurred and in doing so, I believe Travelers fell short in the duties they owed to the Lindsays, their first-party insureds:

| | |
|---|---|
| 1 | Geico did not increase the policy limit pre loss – during the renewal process which was under Travelers' control.  This was not followed up by Travelers with Geico. |
| 2 | Peter Van Riper did not complete a full scope of loss on 1/21/2022. |
| 3 | A DORA complaint against GEICO was filed to increase the coverage limit on 1/21/2022. Geico responded promptly that the policy was created accurately. |
| 4 | When Peter Van Riper's failure to complete the full scope of loss was brought to his attention, he refused to complete a full one. |
| 5 | A DORA complaint against Travelers was filed to increase the coverage limit/ reform the policy on 2/7/2022. |
| 6 | When the situation was escalated to Aaron Stone with a request to remove Peter Van Riper, the Lindsays' request was denied. |
| 7 | When the Lindsays wanted to escalate issues above Aaron Stone with a request to contact his manager, the request was denied. |
| 8 | When the Lindsays requested ALE considerations (computer and entryway table), their requests were denied outright without Travelers fairly reviewing ambiguous policy language, conducting a thorough investigation, or obtaining an objective opinion of outside coverage counsel. |
| 9 | Jennifer Ruggiero answered the DORA complaint and determined the policy would not be reformed, 16 days after the complaint was filed. Her decision was sent before an investigation by UW had occurred. |
| 10 | After some additional communication, Jennifer Ruggiero wrote back that Travelers would agree to continue their investigation. |
| 11 | Multiple members of the Travelers team were aware of concerns surrounding Peter Van Riper and Aaron Stone. This includes the Claims team and Jennifer Ruggiero. This also includes concerns that the Lindsays had raised about them being removed from the claim. Nonetheless, Travelers chose to keep this team in place. |
| 12 | UW investigated and determined that the policy needed to be reformed. They identified errors in the New Business Application process. To calculate the new policy, they relied on Peter Van Riper's verbal recollection from his 1/21/2022 meeting.  They allowed Peter Van Riper to be the voice of truth for the basis of the calculation (despite the fact he had been publicly questioned by the Lindsays as a credible source, and it was well known and understood he had not done a thorough job).  This resulted in an undervalued calculation of a new policy limit. |

| | |
|---|---|
| 13 | Despite Travelers' deep experience with DORA complaints and reformation processes (this was not their first one), there were many departments and executives involved in the Lindsay's reformation process. Nobody involved took written or electronic notes. This is highly suspicious and unusual. It demonstrates an environment without accountability. |
| 14 | Immediately after reforming the policy (unilaterally without involving the Lindsays in the process) the Lindsays were informed of the change. They voiced their concerns about the lack of trust in how the process was managed. This was documented by Aaron Stone in the claim file. |
| 15 | Michael Gatti, Aaron Stone's boss, met with the Lindsays and committed to getting an accurate scope of loss. He understood that Peter Van Riper had not accomplished this previously. This was presented as a new scope of loss by an " independent third party." Michael Gurule of Sedgwick was chosen to conduct this scope.  Unfortunately, this was not an independent scope. Peter Van Riper controlled the process. He documented in the claim file and in communications how Sedgwick's work needed to occur before and after the assessment. Sedgwick is a vendor of Travelers and Peter Van Riper made it clear that he was in charge of managing this vendor's scope of work. He dictated the work and methods for Sedgwick to use.  An MSA or contractual relationship between Sedgwick and Travelers needs to be fully understood through discovery. |
| 16 | During the initial meeting with the Lindsays, Sedgwick, and Travelers, Mr. Van Riper did not pay close attention. He delegated the responsibilities with note taking to Sedgwick. He did not plan on attending the whole meeting. |
| 17 | When Sedgwick presented their scope of work to Travelers, it was considered a draft that was amended by Peter Van Riper. The initial scope indicated a pre-loss value of $1,557,715. Peter Van Riper arbitrarily reduced categories (without documentation, notes, or the ability to recall why he had done so during his deposition) and changed the scope to $1,048,709. |
| 18 | Over many months, the Lindsays kept asking for a new claims team, but their requests were routinely and repetitively denied (despite other resources being available). |
| 19 | Over many months, the Lindsays kept sending letters with concerns about the delays it was taking to get an accurate scope of loss. Their letters and arguments were often put off or responded to in defensive ways that attempted to blame the Lindsays. Specifically, this was occurring because there were concerns that the scope that was being developed did not accurately reflect the condition of their pre-loss home. An incomplete scope would continue to compound the issue of incorrectly calculating the policy limit in a reformed policy leaving the Lindsays underinsured. |

| | |
|---|---|
| 20 | When requests for a corrected reformation were being made, the Claims team wrote letters declining a second reformation. This was done before they had engaged other departments (UW) in their decision making. This demonstrates the preconceived thoughts and bias. |
| 21 | After a great deal of documentation and pushing by the Lindsays, their policy was reviewed by various departments for reformation. Peter Van Riper again without an accurate scope of loss was utilized as the basis for the review. The decision to reform the policy was declined. Again, there were no notes taken. |
| 22 | During the various depositions that were taken in the litigation, nobody takes clear responsibility for the reformation process and decisions that were made. Jennifer Ruggiero maintains it is a UW decision to reform or not reform the policy. UW stated they depend on the expertise of Claims. Claims state it is UW who decides and in doing so repeatedly minimizes the role Claims plays in the process. Claims also referred the Lindsays back to Geico (who they knew had no decision-making authority over the Travelers policy), but suggested they could address the financial concerns regarding the Lindsays' reformed policy limit. |
| 23 | Throughout the course of the claim, the Lindsays repeatedly raised issues about Peter Van Riper not doing thorough, accurate, or complete work. It is well documented that Mr. Van Riper did not do a thorough scope on 1/21/2022, he did not take notes during the meeting with the Lindsays and Sedgwick, he did not take any notes during his interactions with UW, he did not take notes to document the basis for how and why he altered Sedgwick's scope of loss, he could not remember basic facts about key conversations and interactions, and did not document the meetings he had with Sedgwick and Sedgwick's leadership about the scope they presented to UW. Nonetheless, nobody at Travelers seemed to care about these issues or were willing to do anything about them. |
| 24 | Mr. Gatti ultimately took responsibility for the decision to leave Peter Van Riper and Aaron Stone in their roles in the Lindsays' claim. He even recognized the value in having an outside perspective in the form of Sedgwick. However, he conveniently took a hands-off approach ("not my job") to ensure that the work was done accurately with fairness and transparency. In doing so, he enabled past acts of poor behavior to be repeated throughout the life of the claim to the benefit of Travelers' profitability at the Lindsays' detriment. |

**Section II G. Conclusions, Observations, Impressions, and Opinions:**

- o **Throughout the claim process, Travelers did not treat the Lindsays with the level of care an insurer typically shows a first-party insured.**
- o **The trends shown in this case (as indicated in the chart that lists 24 actions and inactions where Travelers acted in a questionable manner) demonstrate a pattern of behavior suggesting that the Travelers' leadership team condoned or intentionally embraced a process to undervalue the Lindsays' claim by suppressing the policy limit calculation. This approach had a clear financial benefit to Travelers. The Travelers leadership team was repeatedly indifferent to the concerns raised by the Lindsays' about the unfairness and inaccuracy of the Travelers process.**

❖ **See Appendix Exhibit C1**                    ❖ **See Appendix Exhibit C2**

## H.  Discussion: Contracts of Adhesion - Interpreting Ambiguous Policy Language and how this relates to the Lindsays' ALE claim

**1. Contracts of Adhesion**
An insurance policy is considered a contract between the carrier and the insured. The carrier agrees to protect the insured from loss (as defined in the policy) and the insured pays the carrier a premium in advance for this protection. The carrier is selling the insured a promise to pay when calamity occurs.

The policy is written by the carrier. The insured does not write the contract. Because of this take-it-or-leave-it dynamic, an insurance policy is legally considered a contract of adhesion.

The definition of a contract of adhesion is widely understood in the industry. The Cornell Law School explains this concept on its website.

https://wwwiy.law.cornell.edu/wex/adhesion_contract_%28contract_of_adhesion%29

In this section, it is written:

> *adhesion contract (contract of adhesion)*
> *An adhesion contract exists if the parties are of such disproportionate bargaining power that the party of weaker bargaining strength could not have negotiated for variations in the terms of the adhesion contract. Adhesion contracts are generally in the form of a standardized contract form that is entirely prepared and offered by the party of superior bargaining strength to consumers of goods and services. Adhesion contracts are commonly used for matters involving insurance, leases, deeds, mortgages, automobile purchases, and other forms of consumer credit.*

*Because adhesion contracts do not afford consumers a realistic opportunity to bargain, the consumers are often faced with adhesion contracts on a take-it-or-leave-it basis. Under such conditions, the consumer has little to no ability to negotiate more favorable terms. Instead, consumers cannot obtain the desired product or service except by acquiescing in the form contract.*

*Courts may look at the doctrine of reasonable expectations to determine whether to strike down an adhesion contract. The doctrine of reasonable expectations states that a party who adheres to the other party's standard terms does not assent to the terms if the other party has reason to believe that the adhering party would not have accepted the agreement if he had known that the agreement contained the particular term. In other words, people are bound by terms a reasonable person would expect to be in the contract.*

**2. Insurance Industry Practice:**
Insurance industry claims personnel are aware of the take-it-or-leave-it approach of contracts of adhesion. They understand how the nature of the insurance contract has been interpreted by courts. Insurers commonly recognize and accept that the insured has no significant role in drafting the contract language and as a result, exercise the good faith practice of interpreting the insuring agreements broadly, the exclusions and limitations narrowly, and ambiguities in favor of the insured.

**3. The Lindsays' ALE Claim**
The Lindsays pointed out that the policy language speaks to placing them in a similar standard of living as to what they had before their loss occurred. The temporary living situation they were in did not meet this definition. The policy terms which were written by Travelers were ambiguous. There are many letters documenting the issues. It does not appear that the Claims team interpreted the language in this area broadly, the exclusions and limitations narrowly, and the ambiguities in favor of the insured. Instead, they dug in and interpreted the policy in a manner to benefit Travelers (by eroding contents coverage) and did not consider how to look at the policy objectively. This could have been a situation where coverage counsel was hired to evaluate the language relating to this dispute. Instead, the approach Travelers took was heavy handed, lacked empathy, and appeared to be personal in nature given that the Lindsays were actively filing complaints and questioning the way the claim was being managed. Relatively speaking, the requests were small dollar issues and not out of line with the type of requests I have seen by similarly situated policyholders in similar types of claims.

<u>**Section II H. Conclusions, Observations, Impressions, and Opinions:**</u>
- o **The Travelers' policy meets the definition of a contract of adhesion. When the policy language (which was ambiguous) was questioned by the Lindsays, Travelers did not follow the industry standard of interpreting the language broadly, the exclusions and limitations narrowly, and ambiguities in favor of the insured.**

- o **The position Travelers took to not include the computer or entryway table as ALE was to Travelers' financial interest, because it would erode the Lindsays' contents coverage limit.**
- o **Travelers did not consider obtaining an outside opinion of coverage counsel to address the Lindsays' concerns about the ambiguous language concerning their pre-loss standard of living.**

❖    **See Appendix Exhibit C1**          ❖    **See Appendix Exhibit C2**

## I. Discussion: Removing Claim Personnel when Trust Issues Arise

**1. Mr. Gatti's Testimony**

Within this claim the Lindsays repeatedly requested that Mr. Van Riper and Mr. Stone be removed from their claim. Ultimately, Mr. Gatti made the decision to keep Mr. Van Riper and Mr. Stone in place. This was discussed in depth during Mr. Gatti's deposition. Below are key excerpts from his testimony that discuss his rationale and the availability of other resources within the Travelers organization who could have managed the Lindsays' claim:

**Pages 49, 50, 51, 52, 53, 60, 61, 62, and 63**

13· · · · Q.· ·Do you recall Mr. Lindsay mentioning how
14· ·Mr. Van Riper refused to attempt to prepare a good scope
15· ·during their initial meeting?
16· · · · A.· ·Mr. Lindsay expressed numerous concerns, and
17· ·that was one of them, yes.
18· · · · Q.· ·Okay.· I think you memorialized here, like,
19· ·going back to Exhibit 1, "He stated the GA" -- and the
20· ·GA refers to Mr. Van Riper?
21· · · · A.· ·Yes.
22· · · · Q.· ·Okay.· "He stated that the GA missed items in
23· ·the estimate (solar panels, et cetera)."· So this
24· ·conforms with your memory of Mr. Lindsay's complaints
25· ·about Mr. Van Riper, right?

12· · · · Q.· ·And then further down, you say, "He asked for
13· ·a new GA and new director.· I explained that this was
14· ·not the best path forward."· Why was it your opinion
15· ·that that was not the best path forward?
16· · · · A.· ·Well, given where we were at the claim, and
17· ·Peter had already written the estimate, and to bring
18· ·somebody in from another territory, and a new director
19· ·from another territory, and get them up to speed, would
20· ·just set things backwards.· There'd be certainly a
21· ·learning curve, and I felt the best path forward was to
22· ·keep Peter and Aaron on the file.· I hadn't completely -
23· ·-- hadn't even started yet in my new role.· So I -- I
24· ·needed to get more familiar

with the situation.· But at
25· ·that point in time on the call, I felt the -- the best
·1· ·fast -- path forward to the quickest resolution was to
·2· ·leave both Peter and Aaron in place.
·3· · · · Q.· ·You believe that they were both well suited
·4· ·for this claim, based on all the reasons that you just
·5· ·mentioned?
·6· · · · A.· ·Yes.
·7· · · · Q.· ·Were there any other GAs and directors working
·8· ·on Marshall Fire claims at the time?
·9· · · · A.· ·Yes.
10· · · · Q.· ·How many GAs were handling Marshall Fire
11· ·claims at the time?
12· · · · A.· ·I'm sorry.· I -- I -- I don't recall.
13· · · · Q.· ·How many -- do you know how many claims in
14· ·general Mr. Van Riper was handling at the time?
15· · · · A.· ·No, I do not.
·1· · · · Q.· ·And since you didn't personally know how many
·2· ·cases Van -- Mr. Van Riper was handling at the time, do
·3· ·you know who did, besides Mr. Van Riper, of course?
·4· · · · A.· ·Probably Mr. Stone could give at least a -- an
·5· ·approximation.· It is, you know, a little bit ago, but
·6· ·Mr. Stone would be a better resource certainly than
·7· ·myself.
·8· · · · Q.· ·Do you recall Mr. Lindsay telling you, during
·9· ·this April 7th, 2022, phone call,

that not only did
10· ·Mr. Van Riper miss items in the estimate but that most
11· ·of what was contained in -- in Mr. Van Riper's estimate
12· ·was incorrect?
13· · · · · · MR. STEPHENSON:· Object to form and foundation.
14· · · · · · THE WITNESS:· The -- the concerns were things
15· · · ·that were -- were missed.· I'm not sure if I'm
16· · · ·understanding everything, but he had some items that
17· · · ·were missed, and -- and felt Peter left too early.
18· ·BY MS. MINAMIZONO:
19· · · · Q.· ·What do you mean, left too early?
20· · · · A.· ·Well -- well, as you stated before, didn't --
21· ·refused to do a full -- full scope, as you stated.
22· · · · Q.· ·Do you think that was wrong of Mr. Van Riper
23· ·to do so?
24· · · · A.· ·That's not a -- that's not the -- the best way
25· ·to do it, although my investigation revealed that he did
·1· ·do a complete estimate.
·2· · · · Q.· ·At what point did he do a complete estimate?
·3· · · · A.· ·When I -- when I spoke with Mr. Lindsay, he
·4· ·gave me the impression that, once Peter wrote his
·5· ·estimate to the amount of coverage, and I'm paraphrasing
·6· ·here, sort of said, well, I'm done.· Just going to send
·7· ·you a check for the policy limits, you know, and -- and
·8· ·excused himself.· And Mr.

Lindsay is like, you -- you're
·9· ·not completed.· You're not
completed.· So took that
10· ·seriously.· I -- I took a look at it
and then I saw
11· ·Peter's initial estimate was
about $270,000 above the
12· ·policy limit.· So clearly, Mr.
Lindsay was mistaken in
13· ·his impression that Peter
concluded his estimate when he
14· ·reached the policy limit.
15· · · · Q.· ·Did you do a line item
review of Mr. Van
16· ·Riper's estimate?
17· · · · A.· ·No, I did not.
18· · · · Q.· ·Why not?
19· · · · A.· ·I really don't do that in -
- in this role.
20· ·That would be more of an
Aaron Stone function.

·1· ·do a complete estimate.
·2· · · · Q.· ·At what point did he do
a complete estimate?
·3· · · · A.· ·When I -- when I spoke
with Mr. Lindsay, he
·4· ·gave me the impression that,
once Peter wrote his
·5· ·estimate to the amount of
coverage, and I'm paraphrasing
·6· ·here, sort of said, well, I'm
done.· Just going to send
·7· ·you a check for the policy limits,
you know, and -- and
·8· ·excused himself.· And Mr.
Lindsay is like, you -- you're
·9· ·not completed.· You're not
completed.· So took that
10· ·seriously.· I -- I took a look at it
and then I saw
11· ·Peter's initial estimate was
about $270,000 above the

12· ·policy limit.· So clearly, Mr.
Lindsay was mistaken in
13· ·his impression that Peter
concluded his estimate when he
14· ·reached the policy limit.
15· · · · Q.· ·Did you do a line item
review of Mr. Van
16· ·Riper's estimate?
17· · · · A.· ·No, I did not.
18· · · · Q.· ·Why not?
19· · · · A.· ·I really don't do that in -
- in this role.
20· ·That would be more of an
Aaron Stone function.

·1· ·do a complete estimate.
·2· · · · Q.· ·At what point did he do
a complete estimate?
·3· · · · A.· ·When I -- when I spoke
with Mr. Lindsay, he
·4· ·gave me the impression that,
once Peter wrote his
·5· ·estimate to the amount of
coverage, and I'm paraphrasing
·6· ·here, sort of said, well, I'm
done.· Just going to send
·7· ·you a check for the policy limits,
you know, and -- and
·8· ·excused himself.· And Mr.
Lindsay is like, you -- you're
·9· ·not completed.· You're not
completed.· So took that
10· ·seriously.· I -- I took a look at it
and then I saw
11· ·Peter's initial estimate was
about $270,000 above the
12· ·policy limit.· So clearly, Mr.
Lindsay was mistaken in
13· ·his impression that Peter
concluded his estimate when he
14· ·reached the policy limit.
15· · · · Q.· ·Did you do a line item
review of Mr. Van
16· ·Riper's estimate?

17· · · ·A.· ·No, I did not.
18· · · ·Q.· ·Why not?
19· · · ·A.· ·I really don't do that in -
- in this role.
20· ·That would be more of an
Aaron Stone function.

**61**
1· · · ·Q.· ·And you don't know who
they are?
·2· · · ·A.· ·The AVP for Colorado is
Kathy Lynch.· Now, I'm
·3· ·not sure if her team handled
any, or if it was the
·4· ·outside -- not outside, but our
catastrophe -- we have a
·5· ·specific catastrophe team that'll
also come in and
·6· ·handle claims.· And -- and they
have a number of AVPs. I
·7· ·don't know who would've been
involved on that end. And
·8· ·I'm not saying Kathy's team did
or did not, but she may
·9· ·have had some involvement
from her team as well.
10· · · ·Q.· ·Okay.· Did you handle
any -- or I'm sorry.
11· ·Strike that.· Did you supervise
any claims arising from
12· ·the Marshall Fire that involved
partial loss and not a
13· ·total loss of the home?
14· · · ·A.· ·When you say
supervised, are you -- when I was
15· ·a director?
16· · · ·Q.· ·Director and -- yeah.·
Let's start there, as a
17· ·director.
18· · · ·A.· ·As a director, I believe
everything that my
19· ·team responded to was a total.
20· · · ·Q.· ·And what about in your

current role?
21· · · ·A.· ·Yeah.· Don't -- I don't
really supervise
22· ·claims in this role and -- and I
can't -- I -- I don't
23· ·know if there are any partial
losses within the entire
24· ·organization of the -- in the
entire personal insurance
25· ·major case unit.

**62**
·1· · · ·Q.· ·Okay.· Yeah.· And
generally speaking, do you
·2· ·know if the major catastrophe
team handles partial loss
·3· ·claims?
·4· · · ·A.· ·Oh, we do.· Yes.
·5· · · ·Q.· ·And is it typically -- are
cases that
·6· ·typically get assigned to the
major catastrophe team
·7· ·claims resulting from a major
event like a wildfire or a
·8· ·hurricane?
·9· · · ·A.· ·Okay.· I want to just
differentiate a little
10· ·bit.· There's a catastrophe
team, and a major claims
11· ·unit -- the -- the major case
unit.· Major case is where
12· ·I am.· The catastrophe team,
they are known for flying,
13· ·you know, into event from
event.· If there are no
14· ·events, they'll help a field
office with claims,
15· ·certainly.· They are -- they do
not handle exclusively
16· ·total losses, but that's not my
team.· So you -- you
17· ·said major catastrophe.· I was
assuming you meant my
18· ·team, but I just want to

differentiate.· So my team will
19· ·handle anything, standalone
fires -- you know, careless
20· ·cooking can -- can come to my
team.· Frozen pipes can
21· ·come to my team.· Tree on a
house, careless smoking.· It
22· ·doesn't have to be a -- a
wildfire event, or a tornado
23· ·event, to come to my team.
24· · · · Q.· ·Okay.· And when you
say my team, you're
25· ·referring to the team which
you supervised in your role

**63**
·1· ·as a director?
·2· · · · A.· ·The -- the major case
unit.· I -- I only have
·3· ·four direct reports, but when I -
- I said team, I -- I
·4· ·was referring to the entire
major case unit.
·5· · · · Q.· ·Okay.· So you're still part
of the major case
·6· ·unit?

·7· · · · A.· ·Yeah.· I -- I head up the
personal insurance
·8· ·part of the major case unit.·
There is -- there are AVPs
·9· ·on the business insurance side
as well.
10· · · · Q.· ·Is there a monetary
minimum, in terms of the
11· ·value of the claim, for it to be
assigned to your team?
12· · · · A.· ·Yes.
13· · · · Q.· ·And what is that
amount?
14· · · · A.· ·$250,000.
15· · · · Q.· ·In 2022, was Mr. Stone
part of the major case
16· ·team?
17· · · · A.· ·Yes, he was.
18· · · · Q.· ·And what about Mr.
Van Riper?
19· · · · A.· ·Yes.· He reported
directly to Mr. Stone.
20· · · · Q.· ·Okay.· Thank you for
the clarification.
21· · · · A.· ·Certainly.· That gets
involved.

## 2. My Experience with these types of matters

Like many businesses involving the public and customers in general, it is not a unique phenomenon for claimants or insureds to request a change in claims personnel. This occurs in most lines of business and happens with some level of frequency. These types of requests are routinely received, listened to, and responded to considering the circumstances of the situation. Several factors are typically evaluated by the supervisors and managers who wrestle with these types of requests. These include:

- Alternative staffing options
- The nature of the dispute and whether it can be rectified
- If trust is involved, can trust be restored
- Company policy
- Managing the process with objectivity, fairness, and transparency
- Doing the right thing
- Evaluating any impact on contractual obligations or responsibilities to other regulatory considerations (licensing, deadlines, etc.)

Managers and supervisors who investigate these concerns and ultimately make the decision to replace or retain staff on a claim maintain industry standards about being objective, listening, being empathetic, practicing fairness, not being biased, or indulging in preconceived thoughts. In situations where credibility has been lost or trust has been eroded beyond repair, it is commonplace for staffing changes to be made to get the claim back on track. If after recognizing that trust has been eroded beyond repair, and staffing changes are still not made, the manager typically takes on the extra responsibility of close engagement to make sure there is accountability and transparency going forward in the process. The manager's involvement and engagement are meant to directly restore trust into the process for fairness, objectivity, and good faith.

**3. Mr. Gatti's decision to keep Mr. Van Riper and Mr. Stone but his failure to stay engaged without making sure there was accountability and transparency in the process.**

Mr. Gatti decided to keep Mr. Van Riper and Mr. Stone in the claim process against the repeated requests of the Lindsays. There were other personnel who could have been assigned to the claim. Nonetheless, Mr. Gatti, in his own discretion, decided to keep the claims team. He did, however, recommend an independent third party (Sedgwick) to conduct a scope of loss. Unfortunately, Mr. Gatti was not engaged in the process and allowed Mr. Van Riper to control the Sedgwick scope under Mr. Stone's supervision. (Both Mr. Van Riper and Mr. Stone had been highly criticized by the Lindsays and the appearance of retribution lingered.) Mr. Gatti left the auditing and supervision of Mr. Van Riper to Mr. Stone. When Sedgwick completed their scope, Mr. Van Riper did not document his rationale, but dramatically reduced the scope in many areas. When questioned about this during his deposition, Mr. Van Riper could not explain himself.

<u>**Mr. Van Riper's Testimony**</u>

<u>**Page 159 to 163**</u>

25· · · · Q.· ·And you did not prepare an accurate scope of
·loss after your meeting with -- or immediately after
·2· ·meeting with the Lindsays back in January of 2022,
·3· ·correct?
·4· · · · MR. STEPHENSON:· I'm sorry.· Could you repeat
·5· · · · that question, Susan?
·6· · · · · ·BY MS. MINAMIZONO:
·7· · · · Q.· ·Yeah.· You did not prepare an accurate scope
·8· ·of loss for the Lindsays prior to your retention of
·9· ·Michael Gurule at Sedgwick,
correct?
10· · · · · MR. STEPHENSON:· Objection, form and foundation.
11· · · · THE WITNESS:· That's not correct.· I did provide
12· · · · · an accurate scope and estimate.
13· · · · · · ·BY MS. MINAMIZONO:
14· · · · Q.· ·But it was significantly different from what
15· ·Mr. Gurule provided, right?
16· · · · A.· ·It was different.
17· · · · Q.· ·So if it was different, it wasn't accurate,
18· ·right?
19· · · · · MR. STEPHENSON:· Object to form and foundation.
20· · · · · THE WITNESS:· I prepared an

accurate scope and

21· · · · · estimate based on the facts, using an -- using --

22· · · · · not underwriting, I'm sorry, using the estimating

23· · · · · tool Xactimate.· We tasked Michael Gurule to

24· · · · · provide the same.· And using Xactimate, he -- he

25· · · · · wrote his estimate a different way, and gave us -

·loss after your meeting with -- or immediately after

·2· ·meeting with the Lindsays back in January of 2022,

·3· ·correct?

·4· · · · · MR. STEPHENSON:· I'm sorry.· Could you repeat

·5· · · · · that question, Susan?

·6· · · · · · ·BY MS. MINAMIZONO:

·7· · · · Q.· Yeah.· You did not prepare an accurate scope

·8· ·of loss for the Lindsays prior to your retention of

·9· ·Michael Gurule at Sedgwick, correct?

10· · · · · MR. STEPHENSON:· Objection, form and foundation.

11· · · · · THE WITNESS:· That's not correct.· I did provide

12· · · · · an accurate scope and estimate.

13· · · · · · ·BY MS. MINAMIZONO:

14· · · · Q.· But it was significantly different from what

15· ·Mr. Gurule provided, right?

16· · · · A.· It was different.

17· · · · Q.· So if it was different, it wasn't accurate,

18· ·right?

19· · · · · MR. STEPHENSON:· Object to form and foundation.

20· · · · · THE WITNESS:· I prepared an accurate scope and

21· · · · · estimate based on the facts, using an -- using --

22· · · · · not underwriting, I'm sorry, using the estimating

23· · · · · tool Xactimate.· We tasked Michael Gurule to

24· · · · · provide the same.· And using Xactimate, he -- he

25· · · · · wrote his estimate a different way, and gave us -

·1· · · · · - and reported that to us.

·2· · · · · · ·BY MS. MINAMIZONO:

·3· · · · Q.· And --

·4· · · · A.· And based on his -- and based on his -- based

·5· ·on his reporting to us, we reevaluated the claim and

·6· ·adjusted the claim accordingly.

·7· · · · Q.· And you agree that Michael Gurule's estimate

·8· ·was significantly higher than what you had estimated,

·9· ·correct?

10· · · · A.· It was -- I -- it's -- it's -- it's a

11· ·subjective term.· It was higher and we adjusted it. It's

12· ·-- it -- it's additional information that I took in as a

13· ·-- as an adjuster, and I revised my -- my estimate. I

14· ·revised my valuation.

15· · · · Q.· Was your original estimate using Xactimate

16· ·approximately 980,000?

17· · · · A.· Yes.

18· · · · Q.· Do you recall what Mr. Gurule's initial

19· ·estimate was?

20· · · · A.· No, I don't.· I'd have to look in the -- in

21· ·the notes.

22· · · · Q.· I'm showing you Exhibit 10 and Sedgwick's

23· ·estimate.· Does this refresh your recollection as to
24· ·what Mr. Gurule estimated this total loss?
25· · · · A.· ·Yes.
·1· · · · Q.· ·And you see a total of $1,571,00.063?
·2· · · · A.· ·Yes, I see that.
·3· · · · Q.· ·You agree that the difference between your
·4· ·initial scope using Xactimate was roughly $600,000 less
·5· ·than what Mr. Gurule estimated?
·6· · · · A.· ·Roughly.
·7· · · · Q.· ·I'm going to show you what I'm going to mark
·8· ·as Exhibit 13, and it's Travelers 2928 to 3032.
·9· · · · · · (EXHIBIT 13 MARKED FOR IDENTIFICATION)
10· · · · MS. MINAMIZONO:· All right.· Sorry.· I have to
11· · · · black out again.· One second.
12· · · · MR. STEPHENSON: I'm sorry, Susan.· Why do you
13· · · · need to do that?· It looks like you're moving
14· · · · your camera.· I'm just curious.
15· · · · MS. MINAMIZONO:· Yeah.· No.· It -- I'm working
16· · · · off of three screens, including my laptop.· And
17· · · · sometimes when I open a PDF, if it appears on my
18· · · · laptop screen, I am unable to move it, so...
19· · · · MR. STEPHENSON: Oh, all right.
20· · · · MS. MINAMIZONO:· Yeah.· It's a rudimentary fix,
21· · · · but it's working, so I

apologize.· Okay.· So I
22· · · · will share with you what I will mark as Exhibit
23· · · · 13.
24· · · · · · BY MS. MINAMIZONO:
25· · · · Q.· ·Okay.· Have you ever seen this document before

Page 165

·7· · · · Q.· ·Was Aaron Stone involved in your
·8· ·communications with Michael Sedgwick?
·9· · · · A.· ·I don't know.
10· · · · Q.· ·Was he -- what do you mean by "I don't know"?
11· ·You -- that you don't recall if Aaron jumped on a call
12· ·with you and Michael at any point in time?
13· · · · A.· ·No, he -- he did not.· If Aaron called him and
14· ·he didn't tell me about it, then I wouldn't have known.
15· ·But I don't see a circumstance where he would have
16· ·called Michael.

Page 170

·6· · · · Q.· ·I'm going to go back and look at Exhibits 5
·7· ·and 6.· Let's look at Exhibit 5.· And we did talk about
·8· ·this before, but is it fair to say that Michael Gurule
·9· ·incorporated line items from Glimmer's estimate in this
10· ·chart?
11· · · · A.· ·I'm not sure how he developed his estimate.
12· · · · Q.· ·So you never verified with him -- or you never

13· ·-- did you ever ask the question, "Hey, Michael, did you
14· ·incorporate all the line items from the Glimmer
15· ·estimate"?
16· · · · A.· ·No, I did not ask him that question.
17· · · · Q.· ·Why not?
18· · · · A.· ·Because I tasked him to provide me with his
19· ·estimate of reconstruction taking into account -- taking
20· ·into account the information he was able to gather.· If
21· ·there was a line item on the Glimmer estimate that he
22· ·didn't agree with, and he didn't put it on his estimate,
23· ·then it wouldn't appear on his estimate.
24· · · · Q.· ·I'm not going to go through every single line
25· ·item, but I wanted to just take a look at a few items as

Page 172 to 177
Q.· ·Okay. So yeah, Exhibit 5.· If you could see
·5· ·here on page Bates stamped Travelers 1656, I just use as
·6· ·an example the line item called, "Roof vent turtle type
·7· ·metal."· Michael indicated scope is agreed upon, and
·8· ·then our clients indicated this is missing from the
·9· ·scope.· There's no comments by you in this for this
10· ·particular line item.· So then I go to Exhibit 6 in the
11· ·Travelers estimate.· If we look at the upper roof, there
12· ·is no indication that that particular item was included.

13· ·Why is that?
14· · · · A.· ·I don't know.· That would be a question I'd
15· ·have to ask Michael.
16· · · · Q.· ·Is it a question for Michael because he
17· ·already said it's agreed upon?
18· · · · A.· ·Correct.· So in that instance, that would mean
19· ·that it's already in the estimate, but --
20· · · · Q.· ·But --
21· · · · A.· ·-- if it's not in the Travelers estimate when
22· ·I -- when I -- what do you call it, when I merged that, I
23· ·don't know why that is.· So I'd have to -- I would have
24· ·had to ask Michael.
25· · · · Q.· ·But this is -- and I'm looking at Exhibit 5.

·1· ·This is information that he provided, correct?
·2· · · · A.· ·Yes.
·3· · · · Q.· ·So why would this not have transferred into
·4· ·your estimate?
·5· · · · A.· ·I don't know why it's not -- it's I -- I don't
·6· ·know why it's not on -- the -- the estimate, our
·7· ·estimate, was merged from his estimate.· If he did not
·8· ·put that line item, even though it says "scope agreed
·9· ·upon" in the spreadsheet, I don't know why that is.
10· · · · Q.· ·Okay.· So is there a separate file that he
11· ·would have inputted that would have transferred the
12· ·information here into the Travelers estimate?

13· · · · A.· ·No.

14· · · · Q.· ·It would have been this document that we're

15· ·looking at, Exhibit 5, that would have transferred into

16· ·the Travelers scope?

17· · · · A.· ·Exhibit 5?

18· · · · Q.· ·Right.

19· · · · A.· ·No.· That's -- Exhibit 5 wouldn't transfer

20· ·into the -- the -- the -- into the Travelers estimate.

21· ·That's --

22· · · · Q.· ·It would be --

23· · · · A.· ·-- just -- Exhibit 5 is just a spreadsheet

24· ·explaining the differences.

25· · · · Q.· ·So this information should have been

1· ·transferred -- or at least the items that were agreed

·2· ·upon should have been transferred to, like, an ESX file?

·3· · · · MR. STEPHENSON:· Object to form and foundation.

·4· · · · · THE WITNESS:· Michael provided an ESX of his

·5· · · · estimate, and we transferred it to our estimate.

·6· · · · And then when we -- the -- and then later on, he

·7· · · · developed a spreadsheet to show the differences –

·8· · · · · or to break down and analyze what was on

·9· · · · Glimmer's -- the estimate from Glimmer.· As it

10· · · · pertains to that line item that you've

11· · · · highlighted, "scope is agreed upon" tells me that

12· · · · Michael was in agreement with that line item and

13· · · · · it -- and it -- and it would belong in the

14· · · · estimate.· Now, if it didn't transfer to the

15· · · · Travelers estimate when we merged it, I don't

16· · · · know why that is.

17· · · · · · BY MS. MINAMIZONO:

18· · · · Q.· ·Were you aware that there were approximately

19· ·370 line items that Sedgwick agreed to that should have

20· ·been included in the scope of loss, but were missing

21· ·from Travelers' final scope?

22· · · · MR. STEPHENSON:· Object to form and foundation.

23· · · · · THE WITNESS:· No, I don't know.

24· · · · · · BY MS. MINAMIZONO:

25· · · · Q.· ·Should that have been part of your quality

·1· ·control process in ensuring that the items that Sedgwick

·2· ·agreed should be included in the scope was, in fact,

·3· ·included in the Travelers scope?

·4· · · · A.· ·Yeah, we did.· We -- we did --

·5· · · · · MR. STEPHENSON:· You just got to give me a second

·6· · · · to object.· Object to form and foundation.· Go

·7· · · · ahead, Mr. Van Riper.

·8· · · · · THE WITNESS:· We did review the estimate from

·9· · · · Sedgwick and -- and we took it -- we took his

10· · · · reporting, merged it into our estimate, and then

11· · · · presented it to the Lindsays.

12· · · · · · BY MS. MINAMIZONO:

13· · · · Q.· ·Okay.· But isn't it true that the Lindsays
14· ·indicated to you that there were hundreds of line items
15· ·that they or Glimmer indicated should be included in the
16· ·scope of loss, but were missing from Travelers' scope
17· ·dated January of 2023?
18· · · · A.· ·Can you repeat that?· Sorry.
19· · · · Q.· ·Yeah.· Were you --
20· · · · · MS. MINAMIZONO:· Ashley, do you mind --
21· · · · · THE REPORTER:· Yes, ma'am.
22· · · · · MS. MINAMIZONO:· -- repeating it?
23· · · · · · (REPORTER PLAYS BACK REQUESTED TESTIMONY)
24· · · · · THE WITNESS:· As part of my review with Michael,
25· · · · · I asked him if his estimate was -- if there's --

·1· · · · · if his estimate was accurate, given -- given all
·2· · · · · the information presented, and he -- and he said
·3· · · · · it was.
·4· · · · · · ·BY MS. MINAMIZONO:
·5· · · · Q.· ·Did you give Michael Gurule the opportunity to
·6· ·review Travelers' scope of loss dated January of 2023?
·7· · · · A.· ·That's the Exhibit 6, correct?
·8· · · · Q.· ·Correct.
·9· · · · A.· ·I believe so, but I don't remember.
10· · · · Q.· ·Would you have e-mailed it to him?
11· · · · A.· ·Yes.
12· · · · Q.· ·Would that have been

noted in the claim file
13· ·notes?
14· · · · A.· ·I don't know.· I would imagine I would have
15· ·put in a note that, you know, "forwarded estimate to
16· ·consultant for review" or something like that.
17· · · · Q.· ·So is it fair to say that if there is no note
18· ·like that in the claim file notes that you didn't do
19· ·that?
20· · · · · MR. STEPHENSON:· Object to form and foundation.
21· · · · · THE WITNESS:· Not necessarily.· I mean, I'm
22· · · · · trying to -- yeah, if -- if I put that -- yeah,
23· · · · · if -- if I did that, it -- it would appear in the
24· · · · · notes.· But again, it's -- it's -- I didn't make
25· · · · · any changes to the estimate.· And he -- and --

·1· · · · · and he confirmed that, "Yeah, that's accurate."
·2· · · · · · ·BY MS. MINAMIZONO:
·3· · · · Q.· ·He confirmed after reviewing the Travelers
·4· ·scope that it was accurate?
·5· · · · A.· ·He confirmed that -- because he reported on --
·6· ·he was reporting to us on what his estimate of
·7· ·reconstruction is.· And we relied on that as a basis of
·8· ·evaluating our claim, or the -- evaluating the claim.
·9· · · · Q.· ·If you had sent to Michael Gurule Travelers --
10· ·the Travelers scope dated January of 2023, that e-mail

11· ·would have been uploaded
into the file cabinet, correct?
12· · · · MR. STEPHENSON:· Object
to form and foundation.
13· · · · THE WITNESS:· Yes.· It
would have.

**Page 179 to 186**

17· · · · Q.· ·So if we go to Exhibit 6 -
sorry one second.
18· ·If we look at -- this is, again,
whoops, page Bates
19· ·stamped Travelers 1811.· This
is for the dining room,
20· ·and the flooring here indicates
that there's oak
21· ·flooring.· Is there a reason why
you did not correct
22· ·this particular entry to indicate
that there was
23· ·actually carpet in the dining
room area, as indicated by
24· ·the Lindsays?
25· · · · A.· ·Is this -- were there any
further supplements

1· · · · A.· ·It depends what they're
responding to.· Like,
·2· ·it depends on what they're
responding to.
·3· · · · Q.· ·Yeah.· And like I said, I
mean, this is a very
·4· ·lengthy document.· But, you
know, I'll represent to you
·5· ·there are hundreds of these line
item entries for which
·6· ·the Lindsays indicated that they
were missing from the
·7· ·Travelers scope.· Is it fair to say
that -- again, and I
·8· ·believe this is what you
testified to earlier, that you
·9· ·saw the notes in this, in what's

been marked as Exhibit
10· ·5, didn't conduct further
investigation for those items
11· ·that are indicated as missing
from scope, where you
12· ·didn't add a comment -- well,
yeah, let me -- sorry.
13· ·This is going to be a very long
convoluted question, so
14· ·let me try to break it down.
15· · · · · · ·Looking at Exhibit 5, as
you notice, there are
16· ·some items where you
indicated -- or I'm sorry, where
17· ·the Lindsays indicated were
missing from the scope. Some
18· ·of them have comments that
you provided.· Some of them
19· ·don't; do you see that?
20· · · · A.· ·Yes.
21· · · · Q.· ·What type of
investigation did you do, or ask
22· ·Michael Gurule to do, for those
items listed or
23· ·described by the Lindsays as
missing from scope?
24· · · · A.· ·Michael Gurule, he was
tasked with providing
25· ·us the -- the reconstruction
estimate.· And along the

·1· ·after this estimate?· I don't
remember without looking
·2· ·at the notes.
·3· · · · Q.· ·You had previously
testified that you don't
·4· ·recall any subsequent estimates
past January 30th of
·5· ·2023.
·6· · · · A.· ·Okay.
·7· · · · Q.· ·Is that fair?
·8· · · · A.· ·I don't -- that's fair.· I
don't recall.· And
·9· ·that's why I'm asking now, was

there anything in the
10· ·notes that we issued any
further supplements --
11· · · · Q.· ·We can certainly --
12· · · · A.· ·-- after the 30th?·
Because if -- if we
13· ·didn't, then -- then that was --
that was a -- an
14· ·innocent omission, and I -- and
I apologize.· The dining
15· ·room, you know, the -- the
dining room should have --
16· ·should have been carpet based
on that statement in the
17· ·spreadsheet.· Now, the reason
I pose my answer that way
18· ·is because there was an
instance where, you know, we saw
19· ·that we'd initially estimated for
oak in the bedroom
20· ·floors, and they pointed out,
"No, that's carpeting," so
21· ·we changed it to carpet.
22· · · · Q.· ·So going back to Exhibit
5, do you believe
23· ·that some of the items that the
Lindsays indicated as
24· ·missing from scope should be
corrected in the January
25· ·30th, 2023, Travelers estimate?

·1· ·way, he was given -- or he
provided the spreadsheet and
·2· ·then also provided -- I'm sorry.·
He was provided with
·3· ·the spreadsheet with the
Lindsays' comments on the -- on
·4· ·that column.· And the estimate,
the final estimate that
·5· ·we did present to the Lindsays
was what Michael reported
·6· ·to us as being his -- his -- his
evaluation of the cost
·7· ·of reconstruction.

·8· · · · · ·So it says on this
spreadsheet, it's -- it's a
·9· ·disagreement.· Michael said
that the scope is agreed
10· ·upon, and the Lindsays said it's
missing from the scope.
11· ·So there was no -- there was no
further comment on that.
12· ·You know, at the end,
Michael's instructions were, "Take
13· ·all this into consideration and,
you know, provide us
14· ·with your estimate for
reconstruction."
15· · · · Q.· ·Right.· So if Michael
indicated that a scope
16· ·is agreed upon, that particular
line item should have
17· ·been included in the Travelers
scope, correct?
18· · · · MR. STEPHENSON:· Object
to form and foundation.
19· · · · THE WITNESS:· In theory,
yes.
20· · · · · ·BY MS. MINAMIZONO:
21· · · · Q.· ·What about it in
practicality?
22· · · · A.· ·If -- if -- so this is what I
explained
23· ·earlier.· We -- our -- that
estimate, Exhibit 6, was
24· ·based on merging Michael's
estimate into our Xactimate
25· ·assignment.· So if that line that
says scope is -- in

·1· ·this -- if that line in the
spreadsheet says, "Scope is
·2· ·agreed upon," then -- then
presumably it's in that
·3· ·Travelers estimate.· And if it's
not in that Travelers
·4· ·estimate, then I don't know
why Michael said, "Scope is

·5· ·agreed upon," and it did not appear in his estimate.

·6· · · · Q.· ·So you agree that the Lindsays provided these

·7· ·comments such as, "Missing from scope," because they

·8· ·looked at the Travelers estimate and noticed that that

·9· ·particular line item, which was agreed upon by Mr.

10· ·Gurule, was not -- was not in the Travelers estimate,

11· ·right?

12· · · · A.· ·Correct.· He would have been commenting on --

13· ·that column from the Lindsays would have been from our

14· ·estimate.

15· · · · Q.· ·Okay.· So wouldn't it been your responsibility

16· ·to ensure that those items that were missing from the

17· ·Travelers scope was properly included?

18· · · · A.· ·It's my responsibility to -- to adjust the

19· ·claim, pay what the policy owes, and be the claims

20· ·adjuster for them.· And as part of that, I consulted

21· ·with -- with Michael Gurule.

22· · · · Q.· ·So are you saying that --

23· · · · A.· ·Now, in -- in this process -- like, for

24· ·example, Michael reports at the top of that Page 36 in

25· ·Exhibit 5, that -- it's on the screen -- you just went

·1· ·past it.· Okay.· There's a line there where Michael

·2· ·says, "Duplication of 1037."· And Mr. Lindsay comes back

·3· ·and says, "Oh, he --" no, that's a bad example.· I'm

·4· ·sorry. "Line item appears to be in error," is Michael's

·5· ·comment, and that's his reporting to us.· And -- and the

·6· ·Lindsays say it's not an error.· And in that instance, I

·7· ·agreed it wasn't an error; we already accounted for

·8· ·recessed lighting.

·9· · · · · · ·And there was -- there was -- I saw other

10· ·instances when this -- when you were flashing the -- the

11· ·thing, the -- the spreadsheet where Michael says, you

12· ·know, it's -- he -- he explained -- he gives his reasons

13· ·why it wasn't in the estimate, and the Lindsays

14· ·disagreed.· And we can't take it any further.

15· · · · Q.· ·Why can't you take it any further?

16· · · · A.· ·We still -- we still disagreed with the

17· ·Lindsays on that item.

18· · · · Q.· ·Okay.· And if you disagree with the

19· ·policyholder, isn't it your duty to find information

20· ·from other sources to decide who was correct?

21· · · · A.· ·It's my duty to take into consideration all

22· ·the facts.· We did take it into consideration, and we

23· ·provided our estimate that we felt was fair -- fair and

24· ·reasonable.

25  Q.· ·Did you consider the Glimmer estimate in

·1· ·determining whether or not those line items should or
·2· ·should not be included?
·3· · · · A.· ·I'm sorry.· Could you repeat that?
·4· · · · Q.· ·Yeah.· Did you consider Glimmer's estimate in
·5· ·determining whether or not those particular line items
·6· ·should be included or not included?
·7· · · · A.· ·Yes, it was considered.
·8· · · · Q.· ·So going to that line item that you mentioned
·9· ·on page Bates stamped 1624 with respect to the
10· ·duplication, I want to go back to that really quickly.
11· ·When you wrote down "looks like a duplicate," did you go
12· ·back to the Travelers estimate and remove that line
13· ·item?
14· · · · A.· ·No.· It would have already been removed by
15· ·Michael because we just merged his estimate into ours.
16· · · · Q.· ·Okay.· Did you make sure that --
17· · · · A.· ·Actually, let me restate that because it
18· ·wouldn't be in his original estimate.· So it's a
19· ·question for Michael.· But I did not remove anything. I
20· ·didn't remove it from -- from Michael's estimate when he
21· ·--- when it was merged into ours.· How he considered the
22· ·information from Glimmer is -- is a question for him.
23· · · · Q.· ·Do you agree that it's your responsibility as
24· ·a claims handler to review the

work performed by your
25· ·consultants?

·1· · · · A.· ·Yes.· It's part of taking into consideration
·2· ·all the facts.
·3· · · · Q.· ·Before we step away from these exhibits, I'll
·4· ·just want to take a look at one other item.· Okay.· So
·5· ·I'm looking at Exhibit 5, Bates stamped Traveler 1605
·6· ·and 1606 and 1607.· And then I want to compare this with
·7· ·Exhibit 6 starting at Travelers 1805.· And I'm looking
·8· ·at the specifications of the garages one and two.
·9· ·Actually, it's ending at 1805.· So let me -- sorry. This
10· ·starts at Travelers 1803.· There is an item in 46 -- I'm
11· ·sorry, on page Bates stamped 1804.· It is line item
12· ·1616; do you see that?
13· · · · A.· ·Yes.
14· · · · Q.· ·Maybe -- I'm sorry. Strike that.· I'm looking
15· ·at item 1620 under electrical.· And it says R&R metal
16· ·decking, and it's for an amount of -- RCV of $5,003.94;
17· ·do you see that?
18· · · · A.· ·Yes.
19· · · · Q.· ·Okay. If you go to Sedgwick's estimate -- I'm
20· ·going to scroll slowly here, but could you tell me where
21· ·that particular line item is located in this chart?· And
22· ·let me know when you're ready to scroll down.
23· · · · A.· ·I don't see it on this page.· How many pages

24· ·is this spreadsheet again?
25· · · · Q.· ·This spreadsheet -- well, I -- this exhibit is

·1· ·105 pages.
·2· · · · A.· ·Okay.
·3· · · · Q.· ·We're referring to Exhibit 5.· But I -- it's
·4· ·been separated by areas of the house, and so I'm looking
·5· ·particularly at garage one and two.
·6· · · · A.· ·Okay.· I don't see that line item on this
·7· ·page, and I don't see it on this page.
·8· · · · Q.· ·Is it fair to say that

included in the
·9· ·Travelers estimate are line items that wasn't
10· ·acknowledged or included in the Sedgwick estimate?
11· · · · A.· ·I --
12· · · · MR. STEPHENSON:· Object to form and foundation.
13· · · · THE WITNESS:· Yeah.· I don't know.· That -- I
14· · · · don't know how that line item appeared there
15· · · · without looking at the -- looking at the entire
16· · · · document and then maybe even asking Michael.

**The Sedgwick Scope and Travelers Revision (Reduction of 32.7%)**

**Sedgwick**

7400 E. Orchard Rd, Suite 4015
Greenwood Village, CO 80111
Office: (303)-713-6000

**Summary for Dwelling**

| | |
|---|---|
| Line Item Total | 1,258,654.80 |
| Material Sales Tax | 39,439.65 |
| Subtotal | 1,298,094.45 |
| Overhead | 129,810.55 |
| Profit | 129,810.55 |
| Replacement Cost Value | $1,557,715.55 |
| Net Claim | $1,557,715.55 |

Michael J. Gurule
Building Consultant

TRAVELERS_000490

**TRAVELERS**

| O&P Items | | RCV | Deprec. | ACV |
|---|---|---|---|---|
| WINDOWS - WOOD | | 52,392.53 | 5,239.26 | 47,153.27 |
| Coverage: Dwelling | @ 100.00% = | 52,392.53 | | |
| O&P Items Subtotal | | 1,167,084.70 | 322,154.42 | 844,930.28 |
| Material Sales Tax | | 39,094.63 | 10,101.77 | 28,992.86 |
| Coverage: Dwelling | @ 85.81% = | 33,546.25 | | |
| Coverage: Other Structures | @ 11.37% = | 4,443.35 | | |
| Coverage: Trees Plants Shrubs | @ 2.83% = | 1,105.03 | | |
| Overhead | | 120,619.23 | 33,226.06 | 87,393.17 |
| Coverage: Dwelling | @ 83.68% = | 100,928.77 | | |
| Coverage: Other Structures | @ 10.24% = | 12,352.66 | | |
| Coverage: Debris Removal - Dwelling | @ 3.71% = | 4,480.00 | | |
| Coverage: Trees Plants Shrubs | @ 2.37% = | 2,857.80 | | |
| Profit | | 120,619.23 | 33,226.06 | 87,393.17 |
| Coverage: Dwelling | @ 83.68% = | 100,928.77 | | |
| Coverage: Other Structures | @ 10.24% = | 12,352.66 | | |
| Coverage: Debris Removal - Dwelling | @ 3.71% = | 4,480.00 | | |
| Coverage: Trees Plants Shrubs | @ 2.37% = | 2,857.80 | | |
| Total | | 1,447,417.79 | 398,708.31 | 1,048,709.48 |

**TRAVELERS_000675**

**Gatti 53**

15····Q.··Did you do a line item review of Mr. Van
16·Riper's estimate?
17····A.··No, I did not.
18····Q.··Why not?
19····A.··I really don't do that in -- in this role.
20··That would be more of an Aaron Stone function.

**Gatti 104**

·5····Q.··Okay.· I'm showing you the spreadsheet that is
·6··Bates stamped Travelers 1589.· Do you recall ever seeing
·7··this?
·8····A.··I do not recall, although it's -- I can't see
·9··any of it now.· But I -- I -- I don't recall, and -- and
10··I don't think I would've opened up something about, you
11··know, going back -- the -- the

negotiation so to speak
12··of -- of line items within an estimate.· I would leave
13··that to the general adjuster and the consultant, and to
14··a lesser extent, Aaron.
15····Q.··Okay.· Do you recall if Mr. Stone spoke to you
16··about this spreadsheet?
17····A.··The specific spreadsheet, I don't recall if we
18··discussed that.· He may have told me we reviewing
19··feedback from the insured with the consultant.· He
20··probably did tell me something along those lines in --
21··in our meetings, but I don't have a specific recall on
22··it.

**Section II I. Conclusions, Observations, Impressions, and Opinions:**

o   The Lindsays repeatedly requested that Mr. Van Riper and Mr. Stone be removed from their claim. Ultimately, Mr. Gatti made the decision to leave Mr. Van Riper and Mr. Stone in place. This was discussed in depth during Mr. Gatti's deposition. Key excerpts from his testimony discuss his rationale and the availability of other resources within the Travelers organization who could have managed the Lindsays' claim. Mr. Gatti made a business decision to leave the Claim staff in place, and he did not take any meaningful steps to address the Lindsays' concerns regarding the accuracy of the Claim team's work or their ability to remain objective. This approach by Mr. Gatti did not reflect industry standards.

o   Typically, when managers and supervisors investigate the type of concerns raised by the Lindsays, the manager ultimately makes the decision to replace or retain staffing on a claim. In doing so, the manager makes sure the team follows the industry standards of being objective, listening with empathy, practicing fairness, not being biased, or indulging in preconceived thoughts. This did not happen effectively in this claim.

o   In situations where credibility has been lost or trust has been eroded beyond repair, it is commonplace for staffing changes to be made to get the claim back on track. If after recognizing that trust has been eroded beyond repair and staffing changes are still not made, the manager typically takes on the extra responsibility of engagement to make sure there is accountability and transparency going forward in the process. The manager's involvement and engagement are meant to directly restore trust into the process for fairness, objectivity, and good faith. It is my opinion that this is an area where Mr. Gatti fell short. It appears based on his testimony that this was intentional because he did not see it as his job. By taking a hands-off approach he essentially "left the fox to guard the henhouse" by allowing Mr. Van Riper to control the Sedgwick scope under Mr. Stone's supervision. Mr. Gatti left the auditing and supervision to Mr. Stone. When Sedgwick completed their scope, Mr. Van Riper, did not document his rationale, but dramatically reduced the scope in many areas. When questioned about this during his deposition Mr. Van Riper could not explain himself.

   ❖ See Appendix Exhibit E1
   ❖ See Appendix Exhibit G4
   ❖ See Appendix Exhibit G5
   ❖ See Appendix Exhibit G5.5

## J. Discussion: Vendor Management and MSA Agreements

Organizations like Travelers typically have departments and teams dedicated to making sure vendor relationships are managed properly. These resources are responsible for ensuring the vendor partners are compliant with company and industry standards. The contracts which govern these relationships typically outline the terms of the services that are provided and the expectations of the parties. Often these contracts or Master Service Agreements (MSA) outline financial incentives and penalties that govern the vendor's performance guarantees. The enforcement of these relationships and the nature of these very lucrative contracts include the day-to-day management, regular report monitoring on a predetermined schedule[28], and auditing.

In the Lindsays' case, the agreements Travelers had with Geico and Sedgwick are important to understand. Both Geico and Sedgwick demonstrated they followed Travelers lead as they engaged the Lindsays on Travelers' behalf. The disclosures clearly demonstrate that Travelers had the responsibility for controlling how these vendors performed and had the ultimate say over each vendor's work product. It remains unclear at the organization-to-organization level how the relationship was structured and if the parties deviated from their own internal processes or procedures, or if the parties transacted the Lindsays' policies and claim as intended by Travelers.

### Section II J. Conclusions, Observations, Impressions, and Opinions:

- **It remains unclear at the organization-to-organization level between Travelers and Geico and Sedgwick whether the parties deviated from their own internal processes or procedures, or if the parties transacted the Lindsays' policies and claim as intended by Travelers. The contractual agreements and additional discovery will help bring clarity to understanding why these vendors engaged the Lindsays in the way they did.**

  - ❖ **See Appendix Exhibit C1**
  - ❖ **See Appendix Exhibit C2**
  - ❖ **See Appendix Exhibit G3**

## K. Discussion: Agent Files, Underwriting Files, Claim Manuals, and Carrier Auditing/Training Practices within the Insurance Industry

### 1. Agent Files:

It is common in the insurance industry for insurance agents to keep files and records of their dealings with their clients. They run their own businesses and are licensed by the states they do

---

[28] I have seen and negotiated contracts like these with report monitoring at the monthly, quarterly, and annual intervals tied to compensation performance guarantees. Auditing is typically a component of verification that accompanies reporting. Given the lucrative nature of these relationships, oversight in these contractual agreements is a standard part of the process.

business in. In this case, Geico works within strict parameters dictated and managed by Travelers. This is true for new business applications, renewal business, and customer service matters.

Usually, licensed agents/producers customarily have controls within their practice to ensure they are accurate, and their work product performs as their clients intend. The records they maintain are used for future reference and to address concerns as they arise.  Agents often serve as front-line underwriters for the carriers that they write policies with. Agents/producers work for the carrier and are expected to be the carrier's representative as experts in that carrier's policies, underwriting guidelines, and underwriting appetites. Licensed agents complete applications for potential clients and are permitted to bind coverage under certain circumstances and coordinate the rest of the underwriting process with the carrier's underwriting department. Sometimes the agent's files are electronic, paper, and/or in both formats. There are state guidelines for maintaining records. Agents routinely carry E&O insurance, and their carriers may impose other guidelines for document retention.

It is common practice for insurers to train and audit the agents and producers who transact business for them.

2. **Underwriting Files:**

It is common in the insurance industry for underwriters to keep underwriting files and records within the carrier's underwriting systems. The records they keep are electronic, paper, and /or in both formats. The underwriters work within the carrier's guidelines and procedures. They work within the carriers written performance metrics and are subject to internal audit for compliance. The records they keep are used to evaluate the accuracy of their decisions and can be used to reconcile questions and problems as they arise. Regulators require that their files be available for review in certain circumstances.

3. **Claim Manuals:**

Carriers use claim manuals to create consistency within their claim organizations. Carriers like Travelers have claim manuals that detail their internal guidelines and procedures and outline how they intend to comply with industry standards, statutory, and other legal requirements. When carriers, like Travelers, use vendors to manage their claims or provide specific services to support their claim functions, they regularly require that their vendors adhere to the carrier's company guidelines, are trained according to the carrier's practices, and the vendor understands the duties and obligations that a carrier has to a first-party insured. These responsibilities related to the vendors are documented in the contracts between the carrier and the vendor and are often outlined in a master service agreement (MSA) or other special handling document.[29]

4. **Carrier Internal Auditing and Training:**

Carriers often use their own internal auditing teams to audit the agents who write policies with

---

[29] Throughout my career I have reviewed, negotiated, and evaluated the performance of many vendor contracts (MSA) and been responsible for managing these relationships inside and outside the claims arena. I understand how they work from an organization-to-organization level (macro) and at the claim adjuster to claim resource/ task (micro) level. In this case the Sedgwick and Geico contracts would provide valuable insight into understanding why the Lindsays' policies and claim were managed the way they were.

them to ensure that they are following the guidelines and practices that are established by the carrier for agents. The carrier's auditors also audit the underwriters to make sure they are following the underwriting policies and guidelines that are established for the underwriting department.  Auditors evaluate the claims department to make sure they are following the guidelines outlined within the claims manual and that the vendors used by the claims department are meeting the carrier's expectations for claims handling. It is the responsibility of the claims department to manage the vendors they use to manage the claims. The auditors audit the claim department and help the management team by providing additional oversight to let them know if the vendors and the team managing the vendors are doing their jobs effectively as they carry out their duties to policyholders.

Like the auditing department, most carriers have training guidelines and trainers who ensure that agents, underwriters, and the claims team (including the vendors they use) are properly trained to meet the carrier's internal guidelines and comply with industry standards including statutory and other legal requirements.  Training is an important and fundamental element of how carriers bring consistent quality to their operations.  Records for all the audit and training activities including templates and the results of actual audits and training of staff are typically retained within the carrier's records for future reference. In Colorado, there are statutory requirements for a carrier to be able to produce documents when requested.

**Section II J. Conclusions, Observations, Impressions, and Opinions:**
- ○ **It is common in the insurance industry for agents and carriers to maintain records and files as it relates to agencies, underwriting claims, claim manuals, auditing, and training records for future reference. These documents are maintained for internal company use, customer needs, and compliance with statutory and/or legal requirements. These materials are used by carriers in their efforts to manage performance and ensure quality controls within their operations.**
- ○ **It is my understanding that some of these materials have been disclosed, but others are still being discussed by the parties. I plan to review them if they are disclosed.**

  - ❖ **See Appendix Exhibit D1**
  - ❖ **See Appendix Exhibit D2**

## L. Discussion: (Industry Standards) Review of Geico Disclosure Training Materials from Geico and Travelers

Within Geico's disclosures there were 39 documents with bates numbers GIA 000062 through 006025that comprised 5963 pages of training materials. Many of these materials were repetitive in nature, however they were helpful in understanding

some key aspects relating to the Lindsays' claim and the experience they had with Geico and Travelers. (Appendices Exhibits X1 through X15 and Y1 through Y9 were created to inform this analysis and portions or segments may be used at trial.)

In this section I will provide 15 examples that relate to this case and form as the basis of my opinions. There are many more pages within the 5,963 disclosed pages of training materials that relate to this case. These pages are demonstrative of the issues directly expressed within this report and are supported more thoroughly by the rest of the appendices.

**1. Within the Travelers Service Guidelines for Geico, there is a section on how to respond to issues involving E&O.**



GIA-000236

**2. Within the Geico Licensed Agent Training this graphic appears multiple times. It explains the importance of making sure that the customer's largest and most important asset is the #1 priority. This approach is aligned with industry standards.**



## Providing Peace of Mind, One Policy at a Time

Protecting our customers' largest and most important asset is our #1 priority and passion!  You should feel a sense of pride and empowerment knowing that you are providing our customers with a lifetime of protection and peace of mind.  In the Providing Peace of Mind, One Policy at a Time module you will learn the MOAT Mantra and be introduced to the culture of MOAT.

**GIA-000414**

**3. Within the Geico Licensed Agent Training, part of the training ties to the licensed professional's responsibility to protect the customers' assets. It also sets the expectation of being knowledgeable, providing expert advice, and keeping an eye out for coverage gaps. In this section, "*Coverage gaps*" is underlined.   This demonstrates the importance of this function within Geico. It is aligned with industry standards.**

## The Licensed Insurance Professional 

At GEICO, the Licensed Insurance Professional always conducts themselves according to the following characteristics and expectations.

- Fanatical Customer Service
  - The Licensed Insurance Professional is always *friendly*, *courteous*, and *engaged* when speaking with the customer.
  - They always are *personable* and speak in a *sincere* and *professional* manner.
- Knowledgeable and Expert Advice
  - The Licensed Insurance Professional provides *expert* and *accurate* advice about our products, contracts and coverages.
  - The Licensed Insurance Professional is able to anticipate the needs of a customer and identify potential *coverage gaps*.
  - The customer always has the utmost *confidence* in the information and guidance given by the Licensed Insurance Professional.
- Takes Ownership
  - The Licensed Insurance Professional never tries to place blame on the customer or another agent because they are *service* and *solution* focused.

### Why is this Important?

Protecting our customers' largest and most important asset is our #1 priority and passion!  You should feel a sense of pride and empowerment knowing that you are providing our customers with a lifetime of protection and peace of mind.  As a Licensed Insurance Professional, you will strive to build customer **confidence** through professional and knowledgeable conversations. This will increase **retention**, **customer satisfaction**, and promote the **growth** of our company.

**GIA-000419**

**4. Within the Geico Licensed Agent Training, this chart outlines the expectations for the sales agent. There is a focus on savings but not a large focus on getting coverage appropriately placed. This**

theme of sales and saving money to remain competitive is seen throughout many of the training documents. While this is part of a sales agent/producer's job, in this case understanding the concerns of the policyholder for adequate coverage must have been seen as more important. As stated above, it is *the #1 responsibility of Geico to protect the customers' largest and most important asset*.



GIA-000894

5. This page details the importance of getting coverage right. The blue box is especially relevant to this situation. This slide seems to fit with the reason for Ms. Lindsay's call in 2018/ 2019 about increasing coverage.



GIA-000895

6. This page details the MOAT Mantra, Mission, and Vision. It appears that with respect to the Lindsays' claim, Geico fell short when it came to the vision statement. Specifically, in the section that

states: "We will *coverage counsel* our customers to ensure we are meeting their needs…."



**7. This page details a situation where a policyholder calls because they received a notice that their coverage should be decreased. They are concerned and do not want their policy decreased. The scripted conversation trains the Geico customer service agent on how to navigate this situation. It leads one to understand that the call Ms. Lindsay made to Geico was not an isolated incident. Geico was receiving many calls like this, as depicted in the training slide.**



**8. This page explains how to explain to customers why coverages increase from year to year. This demonstrates that Geico and Travelers were aware of increased costs and were actively explaining**

this element to clients. When the Lindsays called with concerns about their coverage levels, it does not appear that Geico understood or was well-versed with the issues addressed in this page.

*CIL. – Travelers Reason for Increase: Coverage A*

## Reason for Increase: Coverage A

Your task is to read through the following information, and complete the activities in order to understand what causes a Coverage A increase and how to explain why the increase occurred to the customer. Be sure to complete any questions you come across in the packet by writing the answers in your workbook under the Reason for Increase: Coverage A section.

<u>Why does Coverage A increase from year to year?</u>

We know that Coverage A is one of the main contributors to the overall premium of the policy. Costumers expect this coverage to be just enough to cover their home, and to pay a fair price for this coverage. However, this coverage can change from year to year due to a few factors.

1. Inflation Protection: This is the most common reason for an increase to occur to the Coverage A from year to year. As prices to rebuild the home increase due to inflation in the economy, we need to be sure that we are compensating our coverages for these changes. To ensure that we are always properly covering the home, we have this built into all of our policies. The cost of materials, labor and debris removal are included in Coverage A, as we have previously learned. As these increase, so does the amount of dwelling coverage we need on the policy.

2. Increase due to Inspection: We have learned that when an inspector reviews a home, occasionally the amount of coverage is not enough to rebuild the home. The coverage will be increased, accompanied by a letter to an insured. They may wait until the coverage is increased on the policy before calling in.

3. Underwriting Reasons: During our Coverage A lesson, we learned that a customer does not always agree to increase their dwelling amount when the estimator comes back at a higher amount. We will notify the underwriting team about the customer declining the change, and they will normally increase the coverage at the renewal. This information is often found in the Contact Management on the policy.



2

Confidential Information of the GEICO Companies
©2018 Government Employees Insurance Companies, Staff Development and MOAT Service Training
Sensitivity: Confidential                                                     Updated 03/22/2018
**GEICO**
CONFIDENIAL - SUBJECT TO PROTECTIVE ORDER                    GIA-001490

**9. Travelers set expectations within the Geico training materials that they did not want to underinsure their policyholders. This page sets that expectation clearly for Geico and explains that they can run the Replacement Cost Estimator to ensure that it is at the correct amount.**

CONFIDENIAL - SUBJECT TO PROTECTIVE ORDER          GIA-001492

*CIL – Travelers Reason for Increase: Coverage A*

How can we assist the customer?

We never want to knowingly underinsure the customer at any time. As their agents, we want to advise them why the increase to their coverages took place over the last year. We can also run through the Replacement Cost estimator for them to ensure that we do have them at the correct amount.

We always want to let the customer know that the increase is common and may happen every year. We encourage our policyholders to give us a call whenever they are unsure of something on their policy.

**10. Within the training, it is understood that policyholders (customers) will be reliant on Geico to explain the concepts involved in Coverage A limits. This chart explains how to explain these key terms to customers to make sure they get the appropriate level of coverage.**

In the chart below are the most common terms which the customer may ask you to explain regarding the Coverage A limit on their policies. Take a few minutes to read through each example.

What is….

| Market Value | "The Market Value of your home is the price that you would receive if you were to list your home for sale. The market value typically is influenced by different things such as the housing market in your area, schools, the land value, etc. This is different than what is used to determine the replacement cost of your home." |
|---|---|
| Replacement Cost | "The Replacement Cost of your home is the amount that it would cost to rebuild your home using materials of the same like, kind, and quality that you have now. The replacement cost considers the cost of materials, cost of labor, and debris removal" |
| Replacement Cost Estimator | "To come up with the replacement cost of your home, a replacement cost estimator is used. The replacement cost estimator is a tool that calculates the price to rebuild your home as it stands today. The estimator uses the current price of materials and the features of your home to come up with the estimate." |
| Insured to Value | "Being Insured to Value means that you are properly insured to the calculated replacement cost of the home." |

8

Confidential Information of the GEICO Companies
©2018 Government Employees Insurance Companies, Staff Development and MOAT Service Training
: Confidential          **GEICO**
Updated 03/22/2018

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          GIA-002857

11. Within the training, there are clear instructions on running an estimator when one already exists. In this case, the original estimator had the wrong information. This was identified within the Travelers investigation during the first reformation. That is why they reformed the policy. The later estimations used by Geico used the same faulty information as the original time it was run.



*Lesson Nineteen – Coverage A Change*

## Running an Existing Estimator

Sometimes, an estimator already exists in the system. If that is the case, you will not need to create a new one and will update the existing MSB. Depending on the situation, you may or may not have to confirm the information from the inspection or the estimator. In CA, you always have to review certain specifics.

The guidelines regarding what information needs to be reviewed with the customer for each situation can be seen in the MRC using the path: *MRC Homepage → Service & Billing → "T" → Travelers Service → Coverage A Topics → Estimator*  Look at this information and see how you'll review the replacement cost with the customer.

To locate a saved estimator you can search by:
- Policy number (with and without the tail)
- Name
- Property address

**Note:** You must search using the three criteria mentioned above to locate the estimator.  This will ensure that you are not unnecessarily creating a new estimator when one is already on file. This will save you and the customer time and unnecessary rework.



http://www.interiorcharm.com/kitchen/kitchen-islands/

35
Confidential Information of the GEICO Companies
©2018 Government Employees Insurance Companies, Staff Development and MOAT Service Training
nsitivity: Confidential
GEICO
Updated 03/22/2018

CONFIDENIAL - SUBJECT TO PROTECTIVE ORDER                    GIA-002884

12. This slide is important because it documents two key concepts. (1) It is the responsibility of a Licensed Insurance Professional to process changes to the policy while making sure the customer is adequately insured. (This statement is aligned with industry standards). (2) Customers normally call regarding their Coverage A for four main reasons: "(a) the customer feels over/under insured (b) the customer disagrees

**with the replacement cost calculation." The Lindsays called Geico with both concerns (a) and (b).**



CONFIDENIAL - SUBJECT TO PROTECTIVE ORDER                GIA-002890

**13. This page is included because it discusses two important issues that tend to be in tension with each other. On one hand it discusses the importance of a licensed insurance professional to "Always act with the best interests of the customer and company above their own."   On the other hand, it talks about the importance of retaining customers and policies.   Staying focused on profit margin and retention of customers is important, especially for the agency and carrier, however, when that business is retained by underinsuring customers under the misguided strategy of "premium savings," that tension does not easily allow the agent to focus on Geico's #1 priority of protecting their customers' most important asset.**

*Lesson One — Welcome to the GEICO Insurance Agency — Foundation* 

# Expectations of a Licensed Insurance Professional

A licensed professional agent displays six behaviors.

1. **Always acts with the best interests of the customer and company above their own.**
   This means you act with uncompromising integrity and make sure you secure information, handle calls to fully assist our customers, and always focus on retention and further developing MOAT and GEICO.

2. **Listens to understand and identify the wants and needs of each customer.**
   To do this, we will learn how to listen to our customers' needs and emotions, as well as life changing events that could result in additional insurance coverage we can offer. Throughout training, we will learn how to tailor our call handling to each customer.

3. **Retains policies with the GEICO Insurance Agency by speaking with confidence, providing personalized service, and making it easy for customers to do business with the MOAT Department.**
   By learning to execute Customer Interaction (CI) behaviors, we are better able to communicate with our customers, and therefore, we are better able to retain policyholders.

4. **Understands the correlation between the retention of MOAT policies and the growth of GEICO as a company.**
   By retaining more policies with MOAT, we help GEICO grow, as well as ensure more opportunities and profit sharing for our agents. Customers who retain their MOAT policy are more likely to also retain their auto policy with GEICO.

5. **Operates with uncompromising integrity and delivers high quality service to our customers, while never ignoring cues from the customer to make their job easier.**
   There may be times when not assisting our customers to the best of our ability or avoiding an offer of additional coverage will make your job easier, however, the professional agent will avoid taking short cuts to ensure the best possible experience for our customers and will always do want is necessary to protect our customer's #1 asset.

6. **Anticipates future needs and makes it easy to do business with GEICO by providing self-service options and other helpful information to ensure retention of the policies written with MOAT.**
   This includes further offers to assist, First Call Resolution, and taking care of everything correctly the first time. When we make sure that we fully handle a customer's request and needs, or empower them to do so online, we are creating promoters of GEICO, which helps retain policies.

33

Confidential Information of the GEICO Companies
©2018 Government Employees Insurance Companies, Corporate Training and MOAT Service Training

**GEICO**

tivity: Confidential                    Updated 08/24/2018

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER            GIA-004414

**14. This page reiterates the above tension and confusion. In this page it asks** *"What do you think a Sales agent's primary objective is? In sales the goal is a little more obvious. …If you said, sell policies, you would be correct. A service agent's goal is to  retain those policies. MOAT becomes profitable not by selling new policies, but by keeping policies active and on the books. "Your goal is to retain, retain, retain….  Every call is a retention call."*



*Lesson One – Welcome to the GEICO Insurance Agency – Foundation*

## Your Goal as a MOAT Service Agent

Let's discuss a theme that has come up several times and will be recurring throughout the rest of Billing training (and then again in Service training) – your goal as a MOAT Service agent. In Sales, the goal is a little more obvious. What do you think a Sales agent's primary objective is? If you said to sell policies, you would be correct. A Service agent's goal is to *retain* those policies. MOAT becomes profitable not by selling new policies, but by keeping policies active and on the books. That's where you come in!

**Your goal is to retain, retain, retain!** But how do you retain customers you might ask? Well, every call is a retention call. That's right. **Every call is a retention call.** This is because the customer service experience that you deliver, no matter the customer's reason for calling, is what retains the customer. Throughout the remainder of training, you will hear a lot about the customer service experience and how what you do on a call can impact that experience.

**As you continue in training, understand you are key to delivering the outstanding customer service that GEICO expects, that our customer deserves, and that drives your goal of retaining.**



35

Confidential Information of the GEICO Companies
©2018 Government Employees Insurance Companies, Corporate Training and MOAT Service Training

Sensitivity: Confidential          GEICO          Updated 08/24/2018

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          GIA-004416

15. This page outlines how an estimator disclaimer is supposed to be shared with policy holder. I reviewed the materials that were disclosed and could not find where this disclaimer was given to the Lindsays.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          GIA-005872

**Section II L. Conclusions, Observations, Impressions, and Opinions:**

o   **The disclosed training materials from Geico are aligned with the type of training documents routinely utilized within the insurance industry. However, the way Geico and Travelers followed these in the administration of the Lindsays' case is concerning for the various reasons outlined in this section. It is my opinion that Geico and Travelers were aware of industry standards and had internal documents that were aligned with those standards, but at times deviated from them during their management of the Lindsays' insurance policies and their Homeowners Insurance claim.**

❖  **See Appendix Exhibit J1**
❖  **See Appendix Exhibit J2**
❖  **See Appendix Exhibit J3**
❖  **See Appendix Exhibit J4**
❖  **See Appendix Exhibit J5**

❖  **See Appendix Exhibit J6**
❖  **See Appendix Exhibit J7**
❖  **See Appendix Exhibit J8**
❖  **See Appendix Exhibit J9**
❖  **See Appendix Exhibit J10**
❖  **See Appendix Exhibit J11**

❖ **See Appendix Exhibit J12**   ❖ **See Appendix Exhibit J19**
❖ **See Appendix Exhibit J13**   ❖ **See Appendix Exhibit J20**
❖ **See Appendix Exhibit J14**   ❖ **See Appendix Exhibit J21**
❖ **See Appendix Exhibit J15**   ❖ **See Appendix Exhibit J22**
❖ **See Appendix Exhibit J16**   ❖ **See Appendix Exhibit J23**
❖ **See Appendix Exhibit J17**   ❖ **See Appendix Exhibit J24**
❖ **See Appendix Exhibit J18**

## M.   Discussion: (Industry Standards) Agent Training Resources

**1.   Property & Casualty Insurance License Exam Manual**

- Responsibility to Applicants
- Agent Authority
- Suitability Considerations
- Insurable Interest
- Underwriting
- Field Underwriting
- Application
- Binders
- Fiduciary Trust
- Adhesion
- Utmost Good Faith and Reasonable Expectation
- Statements on applications are considered representations
- Misrepresentation
- Material Misrepresentation
- Concealment

- Negligence
- Tort and Negligence
- Establishing Negligence
- 4 Elements of Negligence
- Defenses against Negligence
- Contributory and Comparative Negligence
- Other Defenses Against Negligence
- Definition of Agency
- Definition of Agent
- Definition Binder
- Definition of Degree of Care
- Definition of Errors and Omissions Insurance (E&O)
- Definition of Negligence

On Page 23, in the section **Responsibility to Applicants/ Insureds** it states, *"Agents have a fiduciary responsibility to applicants, insureds, and the insurance company. A fiduciary is a person in a position of financial trust……The agent must be knowledgeable about the features and provisions of various insurance policies and to be able to explain important features to the insured…. An agent must use suitability considerations to make purchase recommendations that are appropriate, or suitable, in light of a client's particular needs, objectives, and circumstances. Suitable recommendations can only be made if an agent obtains information about an applicant's needs, objectives, and circumstances, and then gives thought to how a product's features and benefits will address the applicant's situation."*

On Page 38, ***Utmost Good Faith and Reasonable Expectation*** is discussed. It states, "*Insurance is a contract of utmost good faith. This means that each party is entitled to a **reasonable expectation** that the other party will not try to conceal pertinent information or otherwise act deceptively. Violation of that reasonable expectation can void the claims of the offending party under a contract of utmost good faith…… **Utmost Good Faith** – The insured and insurance company have a right to expect honesty from each other."*

On page 531, **Degree of Care** is defined as *"Extent of legal duty owed by one person to another, also called standard of care."*

On page 541, **Utmost Good Faith** is defined as, *"A Characteristic of insurance contracts meaning that the insurance company must be able to rely on the honesty and cooperation of the insured, and the insured must rely on the company to fulfill its obligations."*

2. **Offline Q Bank - (Kaplan Online practice testing tool)**
   - Policy Binder
   - Underwriting classifying and assigning risk
   - Underwriting
   - Needs Analysis
   - 4 Factors of negligence
   - Insurance Producer Summary Disclosure Statement
   - Good Faith
   - Representation
   - Negligence

**Good Faith** – *"Each party must assume that the other party is telling the truth." Reference 2.3.2.3 in the License Exam Manual*

**Representation** – *"statements believed to be true  a factual statement on an application that is made to the best of one's knowledge." Reference 2.3.28 in the License Exam Manual*

**Needs Analysis** – *A needs analysis is necessary to identify the exposures and insurance needs, and to estimate and find funds necessary to pay for those needs. Without a proper analysis, the insured may spend their insurance dollars unwisely. Reference 1.9.2 in the License Exam Manual*

**Insurance Producer Summary Disclosure Statement** – *"The producer must provide the applicant at the time of purchase with a summary disclosure form containing the following information: major coverages, major exclusions and limitations, customary reasons for cancellation and non-renewal, and any right the company retains to increase the premium. This disclosure need not specify the amount of the premium charged or the payment schedule." Reference: See State Supplement. This content is not in the License Exam Manual.*

3. **Colorado Property & Casualty Insurance Law Supplement**

   - Duties of the principal to the producer
   - The Producers Ethical Responsibility to the Policyowners
   - Full Disclosure
   - Twisting
   - Code of ethics
   - Producers Ethical Responsibilities to the Public
   - Lines of Authority
   - Pre licensing Education
   - Misrepresentation
   - Unfair Claims Practices
   - Colorado Fraud Statute

On page 42 and 43, in the section **The Producer's Ethical Responsibilities to the Policy Owners,** it states, *"A producer must sell the kind of policies that best fit the prospect's needs and in amounts that the prospect can afford. Needs Selling involves problem analysis, action planning, product recommendations, and plan implementation. This requires two important commitments on the producer's part:*

  o  *A commitment to obtain and maintain the knowledge and skills necessary to perform those tasks, and*

  o  *A commitment to educating the prospect or client about the products and plans that may be implemented on the producer's recommendation.*

  o  *Educating the client before, during and after the sale, ensuring that he or she fully understands the application and underwriting processes, the policy purchased, and any attached rider.*

  o  *Disclosing all information so that the policy owner or applicant can make an informed decision.*

*A producer's primary responsibility in the application process is to the insurer, however he also has an ethical duty to the prospective insured…*

4.  **Insuranceopedia Terms**

**Field underwriting** *refers to the initial decision an insurance agent or producer makes about a potential client's ability to meet the insurer's* <span style="color:blue">*underwriting*</span> *requirements. The agent decides after performing an initial evaluation of the asset or person. The role of an insurance advisor has many facets. On one hand, they represent the client's best interests, advises them on the coverage they need, breaks down policy terms, and ultimately helps their clients find the best coverage possible for their needs and budget. On the other hand, an insurance advisor also represents the insurance company's best interests at the same time. In this capacity, the advisor is responsible for accurately communicating the risks to the insurer and also to perform some field underwriting (sometimes referred to as frontline underwriting).*

<u>**Section II M. Conclusions, Observations, Impressions, and Opinions:**</u>

  o  **As Licensed Producers in Colorado, these standards would apply to the Geico Agents who worked on the Lindsays' policies.**

❖ **See Appendix Exhibit L1**
❖ **See Appendix Exhibit L2**
❖ **See Appendix Exhibit L3**
❖ **See Appendix Exhibit L4**
❖ **See Appendix Exhibit L5**
❖ **See Appendix Exhibit L6**
❖ **See Appendix Exhibit L7**
❖ **See Appendix Exhibit L8**

❖ **See Appendix Exhibit L9**
❖ **See Appendix Exhibit L10**
❖ **See Appendix Exhibit L11**
❖ **See Appendix Exhibit L12**
❖ **See Appendix Exhibit L13**
❖ **See Appendix Exhibit L14**
❖ **See Appendix Exhibit L15**
❖ **See Appendix Exhibit L16**

## N.  Discussion: (Insurance Industry Standards) Claims Standards – AIC Texts

The issues in this case encompass and necessitate consideration of: (1) an insurer's duty of good faith and fair dealing (2) insurance industry standards; and (3) statutory and regulatory standards. All of these are important to and support my opinions.

To explain applicable industry norms and standards, I am referencing applicable sections from four claims handling textbooks which have been utilized by The Institutes for the AIC (Associates in Claims) designation. (Per their website - https://web.theinstitutes.org/) The Institutes was formed by a group of insurance leaders to provide knowledge and resources to those interested in property-casualty insurance. It is a leading provider of risk management and insurance education and resources.) These texts have been used across the nation and over many years. I am citing these texts: Claim Handling Principles and Practices, The Claims Environment, Property Loss Adjusting Vol I., and Property Loss Adjusting Vol. II, because they are written in easy-to-understand prose, and the content remains relevant and has withstood the test of time.

Below I will reference topics discussed in each of these texts which relate to the Lindsays' claim, the type of investigations which commonly occur, and elements of this litigation. In the appendices which relate to these sections, I am including copies of the text I reviewed. The content may be utilized as exhibits during trial. I have found these materials directly relate to the types of industry norms and standards that claims organizations adhere to in the day-to-day practice of good faith and fair claims handling for first-party claims.

> **NOTE:** Below the bulleted content headings, I am expanding on some of the relevant sections in each of the selected texts. The expanded sections do not reflect all the material I may utilize as exhibits during trial. To obtain a full understanding of these materials the appendix for each textbook should be reviewed.

### Claim Handling Principles and Practices

- Goals of the Claims Function
- Keeping the Insurer's Promise
- First Party Claim
- Supporting the Insurer's Profit Goal
- Importance of Ethics and Professionalism Claims Representatives
- Ethics
- Professionalism
- Role of Ethics and Professionalism in

Good Faith
- Recognizing the Ethical and Professional Concerns Claim Representatives Face
- Conflicts of Interest
- Codes of Ethics and Quality Claim Practices
- Codes of Ethics
- Quality Claim Practices
- Unfair Claims Practices Laws

- Chapter 1 Summary
- Activities in the Claim Handling Process
- Claim Handling Process
- Good Faith
- Investigating and Documenting the Claim
- Investigating the Claim
- Insured/Witness Investigation
- Claim Handling Process: Concluding the Claim
- Insurer's Duty to Investigate
- Reasonableness of the Investigation
- Good Faith Investigation
- Promptness of Investigation
- Insured's Duty to Cooperate
- Law of Bad Faith
- Development of the Law of Bad Faith
- Duty of Good Faith and Fair Dealing
- Public Interest
- Higher Standard of Conduct
- Insureds
- First-Party Lawsuits
- Claim Denial
- Excess Liability Claims

- Unfair Claims Settlement Practices Acts
- Fair Dealing and Good Documentation
- Elements of Good-Faith Claim Handling
- Thorough, Timely, and Unbiased Investigation
- Thorough Investigation
- Timely Investigation
- Unbiased Investigation
- Complete and Accurate Documentation
- Fair Evaluation
- Good Faith Negotiation
- Effective Claim Management
- Preface
- The Claim Professional
- Knowledge of Coverage
- Knowledge of the Law
- Knowledge of Damages
- Service Providers – Legal
- Consumer Protection
- General Public
- Summary Chapter 1

## The Claims Environment

- Insuring Agreements
- Conditions
- Exclusions
- Framework for Analysis of Coverage
- Is the Cause of Loss Covered?
- The Claim Representative's Duties
- Determination of Coverage
- The Insurance Contract
- Declarations
- Damages Covered?
- Is the Location of Loss Covered?
- Is the Time of the Accident or Occurrence Within the Policy Period?

- Is the Property Involved in the Loss Covered?
- Is the Type of Loss Covered?
- Are the Types and Amounts of

- Are the Hazards Involved in the Loss Covered?
- Advice From Others
- Advice From Counsel
- Insureds as First-Party Claimants
- The First-Party Relationship
- Third-Party Claimants
- The Third-Party Relationship

- Preconceived Thoughts
- Biases
- Bad Faith Possibilities
- Bad Faith: Excess Verdicts
- The Need for Bad Faith Laws
- What is Bad Faith?
- Definitions
- How To Avoid Bad Faith Claims
- Objectivity
- Bad Faith: Unfair Practices
- Recovery for Unfair Claim Practices

- Avoiding Bad Faith-A Final Word
- Important Good Faith Concerns
- Attitude

- Supervision
- Training
- Manuals and Other Printed Materials
- Outside Legal Counsel
- Claim Supervisory Responsibilities
- Maintaining Quality Control Over Files
- Training
- Conducting Performance Appraisals on Claim Staff
- Focus of Audits
- Claim Procedures
- Professional Ethics in Claims
- The Potential for Conflict
- Sources for Continuing Education
- CPCU/IIA Programs

**Property Loss Adjusting Vol I.**
- Preface
- Bad Faith
- Unfair Claims Practices Acts

The first book, **_Claim Handling Principles and Practices,_** begins with Chapter 1, The Claim Function and Professional Ethics.  It states:

- The "GOALS OF THE CLAIMS FUNCTION" are addressed in the beginning of chapter 1 of Claim Handling Principles and Practices. These training materials emphasize the promise made under the policy: *"namely to indemnify the policyholder for financial losses*." The section which follows is captioned: "*Keeping the Insurer's Promise*." It includes that: *"The insurer fulfills its promise by providing fair, prompt, and equitable service to the policyholder…."*

The text in this first chapter in section 1.3 states:

- *The insurer fulfills its promise by providing fair, prompt, and equitable service to the policyholder.*

Chapter 2 describes the "*Claim Handling Process*" and includes descriptions of the process and elements of the process. Claims representatives are informed they must "*conduct thorough claims investigations and clearly document the results in the claim file."*

At pgs. 3.12 and 3.15 it sets forth a section on "Good Faith of Investigation." It provides that:

- *Knowing how and when to conduct an appropriate claim investigation can help reduce the frequency and severity of breach of contract and other actions against the insurer and its claim representative.*

- *The investigation should not be biased. When investigating claims, claims representatives should pursue all relevant evidence, especially evidence that establishes the claim's legitimacy, without bias.*

Chapter 9 addresses *"Good-Faith Claim Han*dling," and includes a section on "*Fair Dealing and Good Documentation.*"

- It includes a listing of some of the best practices insurers use throughout the claim handling process, including insurers should *"avoid delays in handling a claim," "support their analyses with facts and documents in their files, not rumors," "avoid making derogatory or malicious comments about the insured, counsel, or witnesses,"* and *"avoid exploiting or making comments about exploiting the claimant's or insured's financial hardship."* And under the heading "Unbiased Investigation" the chapter provides:

- *Investigations should seek to discover the facts and consider all aspects of the claim to reach an impartial decision. Claim representatives should consider all relevant evidence, especially evidence which establishes the claim's legitimacy without bias…. In addition, claim representatives should work with service providers that are unbiased and have no conflict of interest. Courts and juries may not look sympathetically on medical providers or repair facilities that always favor insurers.*

- *Supervisors and managers are responsible for ensuring that claims are investigated, evaluated, and resolved promptly and accurately and that claim representatives follow proper claim handling practices. Managers develop guidelines for claim handling and are ultimately responsible for ensuring that the guidelines are followed.*

- *Insurers should provide continuous and consistent training for claim representatives relating to all necessary claim handling procedures and best practices as well as to good-faith claim handling. Training is essential when a claim representative handles a new type of claim or more complex, serious claim for the first time.*

The second book, **_The Claims Environment_**, addresses issues, skills, and concerns common to all claims (as discussed in the preface) and covers the special duties claim representatives have to their policyholders as well as good faith claim practices.

Page 66 also addresses the insurance policy. It states:

- *"The insurance product is unusual in that it is a promise rather than an exchange of goods for money. Insurance companies collect premiums, and in exchange, promise to reimburse the policyholder should certain events occur. The insurance*

*contract is a legal contract, and the insurance policy buyer simply "adheres" to them. That is, the policy buyer takes the policy with all its terms, conditions, and exclusions as they are."*

Page 68 discusses the first party relationship and, relevant to my opinions, states:

- *"The claim representative must explain to the insured the need for the investigation and how the insured can facilitate the investigation." This section also details the nature of the first-party relationship between an insured and the insurer and provides: "The insured is the insurance company's customer. The insurance company has promised prompt, professional service and timely payment of claims."*

Page 93 on "Preconceived Thoughts" discusses how prior conceptions or opinions of a claim representative formed before considering all the relevant information hinders the evaluation of a claim. It states:

- *"Preconceived thoughts are conceptions or opinions before relevant, complete or accurate data are considered. When the claim representative forms opinions prior to gathering the necessary information, he or she hinders good listening."*

    For reasons discussed in more detail below, this section is relevant to my review of this case and informs my opinions on the conduct throughout the adjustment of this claim.

Page 301 discusses Manuals and Other Printed Material. This section states the following:

- *"Most companies have a set of operating procedures that are circulated to all offices. Those procedures have detailed instructions on how to handle almost every type of claim. These are important for claim representatives to review often because plaintiff attorneys will try to obtain them during the discovery process of a lawsuit against the company……. Other insurance textbooks and general reference material are good sources of information to have available in claim offices. Those books can help to answer questions and enable the claim representative to make informed decisions on specific claims. In addition, law journals or summaries of important legal issues should be kept on file."*

Page 381 and 382 discusses "Professional Ethics in Claims" and "Conflicts of Interest." It states,

- *"There are special ethical concerns that arise out of a claim representative's professional obligations. Claim representatives should be careful to avoid conflicts of interest and should strive to be competent. Claim representatives should make decisions based on the best interest of their customers. Anytime a claim representative allows the pursuit of his or her personal interests to interfere with the customer's interest, a conflict of interest exists."*

The third book, ***Property Loss Adjusting Vol. I***, addresses its purpose in the Preface. It states:

- "Expert property loss adjusting requires a thorough understanding of the rights and duties of the insured and insurer as dictated by the insurance contract. Consequently, a great deal of this text is devoted to insurance policy analysis. An adjuster must also have both a practical and an academic understanding of how to

investigate losses and determine damages for a wide variety of property. This text thoroughly describes these important practices."

**Section II N. Conclusions, Observations, Impressions, and Opinions:**

- o **These standards apply to the way in which Travelers managed the Lindsays' claim.**
- ❖ **See Appendix Exhibit M1**
- ❖ **See Appendix Exhibit M2**
- ❖ **See Appendix Exhibit M3**

# O. Discussion: (Industry Standards) Applicable Colorado Statutes

1. *C.R.S §10-1-101—*

   The general assembly finds and declares that the purpose of this title is to promote the public welfare by regulating insurance to the end that insurance rates shall not be excessive, inadequate, or unfairly discriminatory, to give consumers thereof the greatest choice of policies at the most reasonable cost possible, to permit and encourage open competition between insurers on a sound financial basis, and to avoid regulation of insurance rates except under circumstances specifically authorized under the provisions of this title. Such policy requires that all persons having to do with insurance services to the public be at all times actuated by good faith in everything pertaining thereto, abstain from deceptive or misleading practices, and keep, observe, and practice the principles of law and equity in all matters pertaining to such business.

   - **Establishes standard of good faith in everything pertaining to insurance.**

2. **C.R.S. § 10-3-1102 – The Unfair Claims Practices Act – Definitions**

   "Person" means any individual, corporation, association, partnership, reciprocal exchange, interinsurer, Lloyd's insurer, non-admitted insurer, fraternal benefit society, and other legal entities engaged in the insurance business, including agents, limited insurance representatives, agencies, brokers, surplus line brokers, and adjusters. The term also includes medical service plans and hospital service plans regulated under parts 1 and 3 of article 16 of this title 10, health maintenance organizations regulated under parts 1 and 4 of article 16 of this title 10, and multiple employer welfare arrangements operating pursuant to section 10-3-903.5 (7)(d). The plans, arrangements, and organizations shall be deemed to be engaged in the business of insurance for purposes of this part 11 only.

   - **Establishes who is held accountable to the standard of good faith in everything pertaining to insurance.**

3.  **C.R.S §10-3-1104 – The Unfair Claims Practices Act - Colorado**

The "Unfair Claims and Deceptive Practices Act" contains insurance industry standards which are for regulatory purposes. The Act encompasses insurance industry standards. The most relevant provision of the Act is contained in the section entitled "unfair clam settlement practices."

h)  Unfair claim settlement practices:  Committing or performing, either in willful violation of this part 11 or with such frequency as to indicate a tendency to engage in a general business practice, any of the following:

- (II) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;  or
- (III) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;  or
- (IV) Refusing to pay claims without conducting a reasonable investigation based upon all available information;  or
- (V) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; or
- (VI) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear;  or
- (VII) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;  or
- (VIII) Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;  or
- (IX) Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of, the insured; or
- (XIV) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement; or

- **The above sections are relevant to this case and support my opinions.**

❖  **See Appendix Exhibit N1**
❖  **See Appendix Exhibit N2**
❖  **See Appendix Exhibit N3**

## P. Discussion: (Industry Standards) Colorado Case Law

### 1. Travelers Ins. Co. v. Savio 706 P.2d 1258 *; 1985

This case makes it clear that In the first-party context an insurer that delays or denies payment for a valid claim to its own insured customer knowing that its conduct is unreasonable or reckless commits bad faith.

- **In my opinion, in the insureds' situation, Travelers unreasonably delayed their claim process by conducting an inadequate investigation with significant delays. It has done so by denying or failing to consider valid elements of the claim in contradiction to industry standards. It is my belief that Travelers should have known it was unreasonable and recklessly disregarded industry standards and the fact the insureds were its customers and had sustained a significant loss that is covered by the policy.**

### 2. Kisselman v. Am. Family Ins. Co., 292 P.3d 964 (Colo. App. 2011)

Requires only proof of insurer unreasonable conduct in denying or delaying payment of a claim without a reasonable basis.

- **This case law is utilized and referenced in Jury instructions Chapter 25:1, 25:4, 25:7, 25:8, and 25:10.**
- **As discussed in this report, these various examples of where Travelers took unreasonable actions in conducting their investigation. Aspects of the claim have been denied and delayed without reasonable basis that did not follow industry standards.**

### 3. Thompson v. State Farm Mut. Auto. Ins. Co., 457 F.Supp.3d 998, 1004 (D. Colo. 2020)

"Implicit in the duty to investigate is the requirement that the investigation be adequate and fair. Adequacy and fairness mean that the insurer has a duty to diligently search for evidence which supports [the] insured's claim and not merely seek evidence upholding its own interests."

- **It is my opinion; Travelers has not taken fair positions during the investigation and phases of the case. In doing so, they did not complete its investigation timely and key components of the scope of loss for the pre-loss condition of the home were routinely not considered in an accurate or complete manner. This approach appears to intentionally benefit the carrier over their first-party insured by incorrectly calculating the reformed policy limit. The investigation into ALE followed a similar pattern of inadequate investigation to benefit Travelers over their first-party insureds.**

### 4. Cary v. United of Omaha Life Ins. Company 68 P.3d 462 (Colo. 2003)

"Every insurer owes its insured a non-delegable duty of good faith and fair dealing. Because of the "special

nature of the insurance contract and the relationship which exists between the insurer and the insured," an insurer's breach of this duty gives rise to a separate cause of action sounding in tort. Farmers Group, Inc. v. Trimble, 691 P.2d 1138, 1141 (Colo. 1984). The duty is non-delegable so that insurers cannot escape their duty of good faith and fair dealing by delegating tasks to third parties."

- **Travelers has a responsibility to their insureds to manage the claim in good faith and with fair dealing. It is my opinion that in this case, they violated that duty by not following industry standards. This is the basis for this litigation.**

### 5. Casaretto v. Geico Casualty Company, Civil Action No. 16–cv–00285–MEH

"To prove a claim for violation of Colo. Rev. Stat. § 1115, a plaintiff must demonstrate that the insurer unreasonably delayed or denied benefits. To establish a common law bad faith claim, the insured must additionally prove that the insurer knowingly or recklessly disregarded the validity of the insured's claim."
"In sum, because Ms. Casaretto presented sufficient evidence regarding the unreasonableness of GEICO's actions, the Court will not disturb the jury's verdict on the statutory unreasonable denial claim. Furthermore, Ms. Casaretto provided sufficient evidence supporting her theory that GEICO recklessly disregarded the validity of her claim. Accordingly, the Court denies GEICO's Motion for Judgment as a Matter of Law."

"Indeed, Dr. Kezer concluded as much when he stated that his review of the claim notes demonstrated GEICO's reckless disregard for the validity of Ms. Casaretto's claim. Trial Tr. 132:1–18, ECF No. 110–2."

- **In Section I and II of this report, I document various examples of where (in my opinion) Travelers had unreasonable delays and denials that were not in accordance with industry standards. I recognize that "unreasonableness" is ultimately the purview of the Judge and Jury and will refrain from expressing my belief at trial.**
- **It is my opinion that Travelers may be found by the jury to demonstrate a reckless disregard for information that did not further their own financial interest. This can be seen in the way the policy reformation and the pre-loss condition scope was investigated and evaluated. This dramatically influenced the value Travelers gave to the insureds' claim.**

  - ❖ **See Appendix Exhibit O1**
  - ❖ **See Appendix Exhibit O2**
  - ❖ **See Appendix Exhibit O3**

  - ❖ **See Appendix Exhibit O4**
  - ❖ **See Appendix Exhibit O5**

# Section III: Conclusion

Geico fell short of the industry standards for a Colorado Insurance Producer. While procuring coverage for the Lindsays during the initial application and during renewals, they did not adequately fulfill the duties of adequate care and good faith/ fair dealing that were owed to their clients. The application they submitted on the Lindsays behalf lacked the level of detail and care worthy of the type of coverage the Lindsays were looking to purchase. As a result, Geico failed to protect the Lindsays' home from loss and left their clients significantly underinsured. Travelers investigated this and came to the same conclusion and as a result reformed the Lindsays' policy. However, the method they used to calculate the new policy limit was flawed as it was based on an incomplete scope of loss that did not take into consideration the accurate pre-loss condition of the Lindsays' home.

In addition, the Lindsays' claim was not handled in a manner consistent with the insurance industry standards of good faith and fair dealing and elements of their claim were unreasonably denied and delayed according to insurance industry standards. Travelers did so knowingly or in reckless disregard of whether their conduct was unreasonable. There is plenty of evidence that shows that Travelers and Geico had the knowledge of industry standards but fell short in carrying out their duties in meeting the standards of care typically shown by licensed producers/ agents and insurers in Colorado. Geico and Travelers conduct, as described within this report, fails to meet applicable insurance industry norms and standards, as explained above.

Because of the sheer number of problems with how this matter was handled, it is my opinion that Travelers and Geico acted unreasonably and failed to manage and explain its decisions regarding the Lindsays' policies and claim, reasonably to its insureds in a manner that is standard within Colorado's insurance industry.

The evidence in this case shows a pattern and practice by Geico and Travelers of making numerous unreasonable decisions as explained in detail above. Further, based on my review of the entirety of this matter, it is my opinion that Geico and Travelers recklessly disregarded the validity and reasonableness of the Lindsays' requests for an accurate policy reformation and ALE considerations.

As additional materials are made available for my review, I reserve the right to supplement or modify this report and summary of expert opinions. Thank you for asking me to work on this matter.

Sincerely,

Brian Seigal

Brian Seigal

4323 Bella Vista Dr.

Longmont, CO 80503

(303) 929-7912
bseigal@fivelco.com

August 18, 2025

Susan Minamizono, ESQ
Levin Sitcoff PC
455 Sherman St. Ste 490
Denver, CO 80203

| | |
|---|---|
| **Re:** | Erin and Christopher Lindsay |
| **Carrier:** | The Travelers Home and Marine Insurance Company and Geico Insurance Agency, LLC |
| **DOL:** | 12/30/2021 |
| **Claim #:** | IRX8418 |
| **Civil Action Number:** | 2023CV30297 |

| **Policy Numbers:** | **Policy Effective Dates:** |
|---|---|
| 994039763633 | 6/4/2021 to 6/4/2022 |

Dear Ms. Minamizono,

Thank you for providing me with Travelers's expert disclosure of Chris Hoag. This letter is being sent in response to your request for a rebuttal to his June 25, 2025, report. Mr. Hoag was retained by Travelers and Geico, as a Standard of Care Expert.

This is a preliminary rebuttal report and may be supplemented after the discovery period is complete.

*********************

Page **1** of **13**

## Table of Contents

- **Section I: Discussion: Concerning Aspects of Mr. Hoag's Analysis Regarding Travelers' Claim Handling of the Lindsay's Request for Coverage Under Their Policy**               **Page 02**

- **Section II: Concerning Aspects of Mr. Hoag's Analysis Regarding Travelers' Counterclaim Against the Lindsays**               **Page 09**

- **Section III: Conclusions and Next Steps**               **Page 13**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## Section I: Concerning aspects of Mr. Hoag's Analysis Regarding Travelers' Claim Handling of the Lindsay's Request for Coverage Under Their Policy

A. <u>The Role of a Standard of Care Expert</u>

In my experience, the role of a Standard of Care Expert is to highlight the specific facts surrounding the actions and inactions of the plaintiff and the carrier while a claim is being investigated, evaluated, and negotiated. The expert then explains how these actions did or did not comply with accepted industry standards.

It is improper for a Standard of Care Expert to cherry-pick information that favors one side or to advocate on behalf of their client. Rather, the expert's sole responsibility is to explain how the facts of the case relate to industry standards and to opine on whether those standards were followed.

**Concern #1:** After reading Mr. Hoag's report and observing how it was constructed, I became concerned that he and I may disagree about the role of a standard of care expert. I did not see anywhere within his report where his understanding was specifically defined. I do not criticize him for not explaining this within his report. However, I am concerned with his objectivity, neutrality, and his tendency to cherry pick information.  I saw a general trend that was pervasive throughout his report which leads me to believe that we may have a fundamental disagreement on the role of a standard of care expert.

- **Rebuttal Opinion #1: Throughout Mr. Hoag's report he demonstrated an approach of advocacy for Travelers that seemed focused on discrediting the Lindsays while omitting information and presenting important aspects of the claim in a biased manner. This was pervasive throughout his report. Below is just one example that**

**demonstrates the difference between his approach and my approach in how we depict the same information. This below example is from his timeline on page 17 of his report:**

**On 4/4/2022 he wrote:**

| 4/4/2022 | Aaron W Stone speaks with Mrs. Lindsay via phone. She appreciates limit increases but it isn't enough. |
|---|---|
| ✱ | *Lodestone emails updated contract to Mrs. Lindsay for Architectural Services. Approximately 4000sf of living space, $16,200. (Lindsay 4195-4203)* |

- o **The yellow highlight demonstrates what was written about Travelers in a neutral or positive manner.**
- o **The red marks demonstrate negative comments about the Lindsays.**
  - **The first details that the limit increase is appreciated, "but is not enough." This makes her look greedy or unappreciative.**
  - **The second section with the red star (bold italics) is a communication that the Lindsays's had without Travelers.**

**Below is what I wrote from my timeline from the same day. (page 52 and 53) It is important to note that my timeline is based on analysis from Appendix C1 which has the correspondence and file information from that date and is referenced as such.) Mr. Hoag's material only contains a reference to information that is not positive for the Lindsays. Where my reference has all the information in neutral manner.**

- **4/4/2022** - **C1#54** Aaron Stone had call with Ms. Lindsay and posted the file. He explained reformed policy limits. She was pleased with that but still believes it is not enough. She states she had difficulty with her limits from her agent and has no reason to trust us now as well. She had a few main points: He wrote the following:

   *(a) She does not trust Peter Van Riper. She said he stopped estimating once he hit limits and that she deserves full estimate.  He agreed to review this further.*

   ➢ **Action to Erode Trust (8):**
   **Ms. Lindsay directly explained to Aaron Stone that she did not trust Peter Van Riper. Yet, he did nothing to respond to this concern.**

   *(b) Because Aaron Stone backed up Peter on ALE she does not want to work with him either. The email from 3/11/2022 shows our position on the purchase of a computer and furniture as ALE and I stand behind the position. I stated that we may be interested in discussion of furniture rental. She stated that I already lost my credibility and refuses to speak with me.*

   ➢ **Action to Erode Trust (9):**
   **Ms. Lindsay also explained that she did not trust Aaron Stone. He did nothing to respond to this concern. He was aware that he had allowed a process to continue that impacted the reformation calculation, essentially tainted the result and yielded a miscalculation. It is not clear if he fully disclosed his level of involvement in influencing the reformation process with Ms. Lindsay.**

   *(c) The call ended with her saying that she doesn't feel comfortable speaking with me, or Peter and she wants a new adjuster and manager. I stated that Peter and I can still help, and "it is atypical to change personnel."[21] She didn't believe me and said this is more reason she doesn't trust me. Due to her expressing discomfort with me and the conversation not producing any positive outcome, I stated that while I disagree with her characterization of the events, I respect her wishes and agreed to end the call.*

   ---
   [21] See Analysis in Section II. This is not a true statement based on my industry experience.

   ➢ **Action to Erode Trust (10):**
   **Aaron Stone did not provide any direct solution to the problems that were raised. Instead, he ended the call. The harm he had already caused was not acknowledged or addressed in a meaningful or constructive manner.  His statement about it being "atypical to change personnel!" was misleading.**

## Below is an excerpt from Appendix Exhibit C1 -#54

54. 4/4/2022

| 4/4/2022 2:20:30 PM | SYS - 800 | ISO | Response Received - | | 000 FILE LEVEL |
|---|---|---|---|---|---|
| ISO update received | | | | | |
| 4/4/2022 2:52:06 PM | AARON W STONE - 877 | Management Review | File Review - | | 000 FILE LEVEL |

Held call with Mrs. Lindsay on phone complaint. I advised on reformed policy limits. She was pleased with that but still believes it is not enough. She stated she had difficulty with her limits from her agent and has no reason to trust us now as well. She had a few main points:

She stated that she doesn't trust Peter. She said he stopped estimating once he hit limits and that she deserves a full estimate. I stated that we believe one was provided but that we can certainly review this further.

She stated that because I backed up Peter on the ALE questions, she doesn't want to work with me either. The email from 3/11 shows our position on the purchase of computer and furniture as ALE and I stand behind this position. I stated that we may be interested in discussion of furniture rental. She stated that I already lost my credibility and refuses to speak with me.

The call ended with her saying that she doesn't feel comfortable speaking with me or Peter and she wants a new adjuster and manager. I stated Peter and I can still help and it is atypical to change personnel. She didn't believe me and said this is more reason she doesn't trust me. Due to her expressing discomfort with me and the conversation not producing any positive outcome, I stated that while I disagree with her characterization of the events, I respect her wishes and agreed to end the call.

TRAVELERS_000027

o **(NOTE: In appendix C1 – I analyzed the Travelers claim file information to determine how they managed the claim with the information available to them.) The Lodestone report - referred to in the timeline by Mr. Hoag - had a communication that was not included in the Travelers file. According to industry standards I do not see anywhere in the notes where Travelers documented an expectation to the Lindsays that they needed to be included on all communications between the Lindsays and the contractors they hired. In my opinion this is an attempt by Mr. Hoag at deflection from the core issues of this claim that he intentionally omitted from the facts that occurred on this date. It demonstrates his advocacy and an attempt to insinuate something nefarious about the Lindsays. This is an example of where his advocacy can be seen and where he steps outside the typical role of a standard of care expert.**

B.  <u>Discussion: Mr. Hoag's Timeline</u>

1. Within his report, Mr. Hoag constructed a timeline that spans pages 14 through 31. The purpose of this timeline and its organization is explained as follows:

> The information contained in the timeline below is my summary of information, within the case material provided, I feel will be beneficial to the reader of the report. The timeline does not depict all the events and/or activities which occurred, or all the information exchanged between parties but rather provides a general overview of activities and information related to the claim and allegations in the complaint.
> Of note, the dates and activities in plain text are activities/actions Travelers was aware of. Dates and/or activities in ***bold and italics*** are activities/actions the Lindsays ***did not inform*** Travelers of.

Over the years, I have read many reports created by experts and written many as well. I understand the importance of creating an accurate timeline and the purposes these timelines serve. I have not come across an expert designing a timeline like Mr. Hoag's. Specifically, his timeline appears to be focused not on capturing the main facts of the case, but rather on asserting points that benefit his client, Travelers. He also appears to be constructing the timeline in a manner to insinuate a case of fraud or concealment rather than displaying a full accounting of the facts.

**<u>Concern #2:</u>** In the first paragraph, Mr. Hoag explains that his summary of information was developed from the case material provided. This is the same material that I was provided. However, Mr. Hoag only used the information that he *"feels will be beneficial to the reader"*. Understanding that cherry picking information could be a problem, he provides a soft disclaimer that states, *"The timeline does not depict all the events and/or activities which occurred, or all the information exchanged between parties but rather provides a general overview of activities and information related to the claim and allegations in the complaint."*

- **Rebuttal Opinion #2: This admission is concerning because Mr. Hoag explains that he is intentionally picking and choosing the facts he feels are worthy of being presented to the reader.  In evaluating the facts he presented, it appears he focused his timeline on displaying dates and the information associated with them in a cleaned-up manner for Travelers while attempting to use dates and the corresponding entries in a manner designed to discredit the Lindsays.  At the same time, Mr. Hoag appears to have intentionally omitted dates and information that could be perceived or interpreted as unflattering or unhelpful to Travelers defense. [1]The approach and design of Mr. Hoag's timeline calls into question his level of objectivity throughout the timeline.**

**Concern #3:** In the second paragraph, Mr. Hoag explains why some sections are not bold in his timeline and other sections are bold and italicized. He writes, "*in plain text are activities/actions Travelers was aware of. Dates and/or activities in **bold and italics** are activities/actions the Lindsays **did not inform** Travelers of.*"

This section is misleading, because Travelers did not set the expectation that the Lindsays needed to be copied on all communications. In my experience, it is not an industry standard or expectation for an insured to include the insurer in every communication they have during the claim period.  This expectation by Mr. Hoag is unusual, and borders on absurd. For instance, why would any insured need to include their insurer in communications with the SBA about a home loan application?  But, according to Mr. Hoag this is information that would be _beneficial to the reader_ during the period of 1/19/2022 through 1/28/2022.  That is why he included it in his timeline, and he **bolded** it to bring attention that it was not shared with Travelers.

| | |
|---|---|
| *1/19/2022* | *SBA receives the Lindsay's home loan application. (Lindsay 8454)* |
| 1/21/2022 | Xactimate evaluation tool completed with the insured's input of features and materials. Discussion of policy limits and possible rebuild costs per square foot. |
| *1/28/2022* | *SBA requests a copy of the insurance settlement sheet and spouse's name.* |
| | *SBA and Mr. Lindsay exchange email with SBA asking how much money Mr. Lindsay received from the claim. (Lindsay 8460-8462)* |

In my report I addressed the same period, however, I noted sections that Mr. Hoag omitted. I suspect the omissions occurred because according to Mr. Hoag, "they would_ **not** be _beneficial for the reader._"

---

[1] The example expressed in Rebuttal Opinion 1 demonstrates this.

- **1/12/2022 - C1#15** - The Lindsays requested that the Xactimate estimate be done in person (face to face) instead of over the phone. Van Riper agreed.
- **1/21/2022 - C1#19** - Mr. Van Riper met with the Lindsays and completed his estimate. The file was noted. He indicated the following: "Expressed concerns about limits. Builders are telling them

+$600/ square foot to rebuild. Confirmed that policy limits do not increase for inflation or increased cost of materials/ labor. We can adjust price list if there is a reasonable delay in reconstruction beginning, but that won't increase limits available. Cannot speculate on what DOI will make insurance companies do, if anything, beyond what benefits are available under the policy. "

> **Action to Erode Trust (1):**
> Mr. Van Riper alerted the Lindsays that their policy limits were inadequate. He made it seem like it was out of the carrier's control, and they would have to follow the DOI's lead.

> **Action to Erode Trust (2):**
> Mr. Van Riper did not want to complete the full scope of loss; he appeared to give up midway during his assessment.

- **1/21/2022 - C1#19** - The Lindsays filed a DORA complaint against Geico insurance agency.
- **1/26/2022- C1#20** - GEICO sent a response to the DORA Complaint.
- **1/27/2022 - C1#22** - Mr. Van Riper posted the file with Xactimate property estimate dates and details of coverage confirmations. A letter was sent by Van Riper detailing the estimate and coverage.
- **1/28/2022 - C1#23** - Van Riper completed a LLR and sent it the Director Aaron Stone for review. Director Stone approved it. It was published and distributed.

- **Rebuttal Opinion #3:** Mr. Hoag is misleading in what he captures within both the specific date postings and how he used date ranges. For example, on 1/21/2022 he omitted the information that would provide insight into the nature of the discussion at Travelers and cleaned-up what occurred by referring only to a "discussion", without providing any of the detailed content of the discussion (because it is not flattering for Travelers). He then uses the rest of the date range to deflect attention onto the Lindsays by insinuating that they did not communicate properly with Travelers by not providing them with information about an SBA loan request. This is another example of his advocacy and biased approach in the construction of his report and timeline.

C. Mr. Hoag whitewashed Mr. Van Riper's inadequate investigation that formed the basis of his inaccurate pre-loss scope of loss which led to an inadequate reformation of the Lindsays's policy by Travelers' Underwriting Department.

   **Concern #4:** The foundation of the Lindsay's concerns stems from Mr. Van Riper's initial investigation of the claim where he completed an inadequate investigation and an inaccurate scope of loss. This was used by Travelers' Underwriting to calculate a

reformed policy limit that still kept the Lindsays underinsured. Within his report he sidesteps the whole issue by writing these three paragraphs. In doing so, he continues his pattern of protecting Travelers by neutralizing information or omitting it. He takes the position that Mr. Van Riper did what was necessary (under CRS 10-3-1104) to investigate the claim and decides to move on. (page 34)

> Mr. Van Riper utilized the information provided to him through his investigation and determined the Lindsays were entitled to the full limits of the Dwelling coverage, the Other Structures coverage, and the TSP coverage under the policy.
>
> ********
>
> Mr. Van Riper used the information available to him to effectuate settlements under the Dwelling, Other Structure, Debris Removal, and TSP coverages available by the policy, which complies with the requirements under C.R.S. § 10-3-1104, fulfills Travelers' obligation under the policy, and meets industry standard.
>
> <u>Allegation that Travelers failed to conduct a reasonable investigation:</u>
>
> I've addressed Mr. Van Riper's investigation of the Lindsay's dwelling claim through March 2022 in the section above so I will not restate it here. I will address Mr. Van Riper's investigation starting in April 2022 when Travelers endorsed the Lindsay's policy to increase the Coverage A policy limit to $1,216,395.

- **<u>Rebuttal Opinion #4:</u> Mr. Hoag is again misleading. Mr. Van Riper did not complete a full investigation of the property when he went to the home. According to industry standards, as outlined in my report, (in addition to CRS 10-3-1104), investigations are expected to be prompt, thorough, and fair. Mr. Van Riper's investigation does not meet this standard, and Mr. Hoag is aware that the Lindsays were concerned about this. Furthermore, Mr. Hoag ignores the connection that this inadequate investigation was the basis for the calculation used in the reformation of the Lindsay's policy. Through my experience, I can personally understand how insurers could apply CRS 10-3-1104 to this situation, however this is ultimately a determination for the Judge or Jury to decide and outside the scope of Standard of Care Expert.**

  **When Mr. Hoag states, in the last paragraph cited above** *"I've addressed Mr. Van Riper's investigation of the Lindsay's dwelling claim through March 2022 in the section above so I will not restate it here. I will address Mr. Van Riper's investigation staring in April 2022 when Travelers endorsed the Lindsay's policy to increase the Coverage A policy limit to $1,216,395."* **He ignores the entire method of how Mr. Van Riper influenced the amount of the reformation through his inadequate investigation. This oversight/ omission by Mr. Hoag is noteworthy and deeply concerning given the pivotal nature that this event had on the entire claim. The**

**absence of this information and Mr. Hoag's attempt to move away from it without mentioning it, points to his bias as an expert.**

D.  Mr. Hoag Offers Analysis Outside the Scope of Standard of Care Expert

**Concern #5:** On page 42 of his report, Mr. Hoag addresses CRS 10-3-1115 and 10-3-1116. Like Concern #4 and my Rebuttal Opinion #4, (above) Mr. Hoag attempts to apply his interpretation of this statute to the claim.

This is a practice that is ultimately a determination for the Judge or Jury to decide and outside the scope of Standard of Care Expert.

Nonetheless, Mr. Hoag provides two conclusory statements.

o  The first is a derogatory comment about the Lindsays. (see red underlined statement below) I am not sure what he specifically is accusing them of, but it appears to insinuate that they are attempting to steal or obtain benefits from Travelers that do not belong to them.

o  The second statement (see yellow highlight) appears to indicate that Travelers "reasonably investigated" the claims and "timely" made payments.

> **Allegation of Violation of C.R.S. §§ 10-3-1115 & 1116:**
>
> C.R.S. § 10-3-1115 states, in part, that an insurance carrier shall not unreasonably delay or deny payment of a claim for benefits and that an insurer's delay or denial was unreasonable if the insurer delayed or denied authorizing payment of a covered benefit without a reasonable bases for that action. I've included the specific language below.
>
> § 10-3-1115. Improper denial of claims--prohibited--definitions—severability
>
> (1)(a) A person engaged in the business of insurance shall not unreasonably delay or deny payment of a claim for benefits owed to or on behalf of any first-party claimant.
>
> (2) Notwithstanding section 10-3-1113(3), for the purposes of an action brought pursuant to this section and section 10-3-1116, an insurer's delay or denial was unreasonable if the insurer delayed or denied authorizing payment of a covered benefit without a reasonable basis for that action.
>
> C.R.S. § 10-3-1116 states, in part, that an insured whose claim for payment of benefits has been unreasonably delayed or denied may bring an action in a district court to recover reasonable attorney fees and court costs and two times the covered benefit. I've included the specific language below.
>
> §10-3-1116. Remedies for unreasonable delay or denial of benefits--required contract provision--frivolous actions--severability--definition--rules
>
> (1) A first-party claimant as defined in section 10-3-1115 whose claim for payment of benefits has been unreasonably delayed or denied may bring an action in a district court to recover reasonable attorney fees and court costs and two times the covered benefit.
>
> In review of the materials provided to me in this matter, it is clear the Lindsays continuously attempted to receive benefits in excess of what they were entitled to under the policy.
>
> As identified in detail in the sections above, Travelers reasonably investigated the claims made by the Lindsays and timely issued benefits determined to be owed by the policy.

•  **Rebuttal Opinion #5:** My report clearly outlines many examples where Travelers violated industry standards in the way they investigated the Lindsays's claim and delayed issuing benefits. Taking this into consideration,

**it is my opinion that Travelers violated industry standards in the way they investigated and paid the Lindsays. It is my opinion that their administration of the claim did not appropriately follow industry standards or practices. Furthermore, it is my opinion that an interpretation like the one made by Mr. Hoag under the heading of 10-3-1115 and 10-3- 1116 falls within the role of the Judge and Jury and not the Standard of Care Expert.**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## Section II: Concerning Aspects of Mr. Hoag's Analysis Regarding Travelers' Counterclaim Against the Lindsays

A.  <u>Mr. Hoag Addresses Travelers Personal Property Claim</u>

**Concern #6:** On pages 45 to 48 of his report, Mr. Hoag addresses the Personal Property claim and the Lindsays's request to waive the policy provision requiring them to complete an inventory. Instead, they asked that they be awarded the full 100% coverage amount listed under the policy. This request was denied by Mr. Gatti.  Ultimately the Lindsays decided not to complete the full inventory and dropped this part of the claim. Now, post-suit, Travelers engaged them in a process where they are being forced to complete the inventory they chose not to do. It is my understanding that the Lindsays have retained a rebuttal expert to address the contents issue, and the disclosures have not yet been produced. Given the time constraints of this deadline, I will address this aspect of the claim in detail via a supplement if the information warrants a response.

- **Rebuttal #6: In my initial report I wrote the following on page 19,**

    *I have been responsible for the management of thousands of litigated matters on behalf of insurers. It is well understood within the insurance industry that filing a lawsuit can be a daunting process for a policyholder, and this deterrent can lead to a resolution that is often unfair to the insured. The litigation process often uses defense strategies which target the credibility of the plaintiff and the plaintiff's experts and seeks to make the process costly to pursue from a financial, emotional, and time perspective. Because of these various costs, filing a lawsuit against a large insurance carrier/insurance agency is seen as an option of last resort that is not taken lightly for many policyholders.*

**In my experience, I have found that preparing an inventory after a total loss can be a daunting experience for many policyholders. People are often emotionally attached to their possessions and completing the inventory can be an upsetting part of the grieving process. I have seen many insureds struggle with this over the years. The**

Lindsays's request to waive the inventory request is not the first time I have seen this occur. Nonetheless, the request was denied. Having to complete this request post-suit by Travelers is extremely rare, and I cannot remember ever seeing a situation where this has occurred because of a counter claim. It strikes me that this is the type of defense scenario where the insurer through their defense strategy *"makes the process costly to pursue from a financial, emotional, and time perspective."*

B.  Mr. Hoag Addresses Concealment and Fraud

**Concern #7:** On page 48 of his report, Mr. Hoag addresses the topic of **Concealment and Fraud**. He cites the policy language and then makes this statement:

> *"As indicated in the timeline earlier in this report the Lindsays concealed and misrepresented material facts related to Travelers investigation of this claim."*

He then provides three examples where in his opinion:

> *"the Lindsays either concealed from or misrepresented to Travelers which resulted in an overpayment of benefits and/ or impeded Travelers' investigation of the Lindsays's claim."*

He cites (1) the 8/9/2022 Glimmer Claim Service Estimate, (2) Debris Removal,[2] and (3) Engineering and Architect Fees.

He concludes the following:

- *The Lindsays misrepresented the intent of Glimmer's August 9, 2022, estimate to Travelers. (page 51)*
- *The Lindsays misrepresented the true cost of the debris removal. This misrepresentation caused Travelers to overpay the Lindsays $29,051.84 for debris removal. (page 51)*
- *The concealment of the Lodestone contract has resulted in Travelers overpaying the Lindsays at least $27,115.20 and the concealment of these contracts and invoices has resulted in Travelers overpaying the Lindsays at least $2,212.60. (page 53)*

---

[2] On 6/24/2024, a letter was sent to Defense Counsel that stated the following: Dear Evan and Nate: As mentioned in my previous letter dated May 10, 2024, after the Lindsays broke ground a few months ago for the rebuild of their home, they were informed, for the first time, that construction could proceed without the removal of the caissons buried at the lot. Accordingly, they are returning the enclosed amount of $29,051.84 paid by Travelers for debris removal. By returning this sum, the Lindsays do not waive any of their claims or defenses in this litigation. Please let me know if you have any questions. Very truly yours, Susan Minamizono.

- **Rebuttal #7: The Lindsays are not insurance experts. They are not construction experts. They are first-party insureds who purchased a homeowners' insurance policy and lost their home and all their possessions in a wildfire.**

  **Over the years I have worked with SIU investigators and have been involved in the fraud investigation of claims. After reading through all the materials produced in this case, I did not see any indication that a Fraud investigation had occurred during the claim or that Fraud had been reported.**

  **In my opinion the Lindsays hired contractors and sent reports to Travelers to understand the scope of loss. They actively worked with Travelers to do this after the report was submitted. In my experience the type of attempts to collaborate with Travelers after the Glimmer report was submitted do not reflect the type of situation usually seen in fraudulent claims.[3] I did not see any red flags, and none were noted by personnel at Travelers during the claim process. There is no indication that a fraud claim was reported.**

  **It was not until a bad faith claim was filed and defense counsel was hired that this issue was raised as a part of counter claim. In my opinion, Mr. Hoag's standard of care report appears constructed to support these post-suit counterclaim allegations with many pages and a great deal of space allotted to support Travelers' defense without any comment about other key aspects or important parts of the claim. For example, he omitted the ways the Claims Department and its Claim Leadership manipulated the reformation process throughout the life of the claim[4] and puts Travelers' financial interests ahead of the Lindsays. It is my opinion that this whole argument is a defense tactic to blame the plaintiff, attack their credibility, and distract from Traveler's actions and inactions.**

C.    Mr. Hoag Addresses United Policyholders

**Concern #8:** On pages 56 to page 62 of his report, Mr. Hoag discusses the Lindsays use of United Policyholders as a resource. He goes to great lengths to discredit their use of this resource. In my opinion, this is another distraction from the core issues of this claim. Nonetheless, one statement on page 62 caught my attention and needs to be addressed. Mr. Hoag was critical of the Lindsays when he wrote:

---

[3] My initial report and appendix exhibits detail the collaborative attempts to work with Travelers to obtain an accurate scope of loss after the Glimmer report was submitted. In my opinion, the accusation of concealment, misrepresentation, and fraud considering all these attempts by the Lindsays to collaborate with Travelers to obtain an accurate scope of loss and an accurately revised policy reformation, comes off as a hollow attempt at deflection.
[4] This includes the various reformation reviews and the decisions by Mr. Gatti to allow Mr. Van Riper and Mr. Stone to manage the claim despite the repeated concerns raised by the Lindsays regarding their retaliation and influence into the ultimate outcome of the case.

*"While the Lindsays are stating the original limits and the revised limits were not sufficient to rebuild their home, they did not look into any cost saving options/ideas provided by UP, other than using savings."*

- **Rebuttal #8: I have read this statement multiple times and cannot ascertain Mr. Hoag's accusation. I suspect he is trying to insinuate that the Lindsays are frivolous or greedy. Regardless, when considering this section (which spans 7 pages of his report) combined with this statement, it appears he intended to smear the Lindsays's credibility as witnesses, which was one of the tactics I addressed previously in Rebuttal #6 and the excerpt from my initial report on page 19.**

## Section III: Conclusions and Next Steps

As demonstrated throughout this rebuttal, Mr. Hoag used his 65-page report to attack the Lindsays' credibility, downplay Travelers' misconduct, and deflect from actions that cast the company in a negative light. In my opinion, Mr. Hoag also stepped outside the proper role of a standard-of-care expert on several occasions by advocating directly for Travelers and offering legal interpretations that are the exclusive province of the judge and jury. Furthermore, Mr. Hoag appears indifferent to Travelers' violations of industry standards, consistently omitting or glossing over key facts that would have highlighted these failures.

Regarding the counterclaims, Mr. Hoag insinuated, and at times directly stated, that the Lindsays intended to defraud and conceal material information from Travelers. In his analysis, he neglected to address the retaliatory nature and timing of these claims, which Travelers filed only after the Lindsays had brought their bad faith suit. Mr. Hoag also failed to mention that Travelers never conducted a Special Investigations Unit (SIU) investigation or filed a formal fraud report. Moreover, he omitted that Travelers is now forcing a litigation strategy to make the Lindsays absorb the costs associated with the personal property inventory as part of Travelers' counterclaim, even though the Lindsays had previously indicated they did not want to pursue that portion of their claim.

For all the reasons stated above in Section I and Section II, Mr. Hoag's report presents him not as an objective standard-of-care expert, but as a biased advocate intent on advancing his client's litigation strategy. As next steps, as additional reports and documents are produced, I intend to issue a supplemental report. Thank you for allowing me the opportunity to review Mr. Hoag's report.

Sincerely,

Brian Seigal