IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01413-NYW-STV

ERIN LINDSAY; and
CHRISTOPHER LINDSAY,

       Plaintiffs/Counterclaim Defendants,

v.

THE TRAVELERS HOME AND MARINE INSURANCE COMPANY,

       Defendant/Counterclaim Plaintiff,

GEICO INSURANCE AGENCY, LLC,

       Defendant.

---

**MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS BY
DEFENDANT THE TRAVELERS HOME AND MARINE INSURANCE COMPANY**

---

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................ii

INTRODUCTION........................................................................................................ 1

UNDISPUTED MATERIAL FACTS ("FACTS")................................................... 3

ADDITIONAL BACKGROUND FACTS NOT ESSENTIAL TO THE MOTION................ 5

ARGUMENT............................................................................................................ 6

I.    THE COURT SHOULD DISMISS AS A MATTER OF LAW PLAINTIFFS'
      REFORMATION CLAIM, WHICH IS AN EQUITABLE CLAIM THAT THE
      COURT DECIDES WITHOUT A JURY ............................................................... 6

      A.    Legal standards governing Plaintiffs' reformation claim............................. 6

      B.    No mutual mistake regarding the dwelling limit of insurance
            occurred......................................................................................... 8

      C.    Travelers did not engage in fraud or misconduct as to the dwelling
            limit of insurance but rather disclosed the limit in writing ......................... 8

      D.    Colorado law defeats Plaintiffs' theory that "mistakenly" believing
            the dwelling limits are sufficient requires reformation ............................... 9

      E.    Travelers' decision to voluntarily more than double the dwelling limit
            does not change the analysis or require a reformation ........................... 11

II.   THE COURT SHOULD DISMISS AS A MATTER OF LAW PLAINTIFFS'
      CLAIM AGAINST TRAVELERS FOR NEGLIGENT
      MISREPRESENTATION ................................................................................ 11

      A.    Travelers did not falsely represent a past or present fact ....................... 12

      B.    Plaintiffs could not have justifiably relied on Ms. Ruggiero's alleged
            statement ....................................................................................... 12

III.  PLAINTIFFS' EXTRA-CONTRACTUAL CLAIMS FAIL BECAUSE THEY
      HAVE NO EVIDENCE TRAVELERS VIOLATED INDUSTRY
      STANDARDS AND HAVE DISCLOSED NO EXPERT OPINION
      ESTABLISHING THAT TRAVELERS' COST ESTIMATES LACK A

REASONABLE BASIS OR WHAT AMOUNTS WERE OWED AT ANY
PARTICULAR TIME ........................................................................................ 13

A.    Plaintiffs have articulated and developed no evidence of an industry
      standard Travelers violated regarding alternative living expense
      coverage ................................................................................................... 14

B.    Plaintiffs have articulated and developed no evidence of an industry
      standard Travelers violated regarding reformation ................................... 14

C.    Plaintiffs have articulated and developed no evidence of an industry
      standard Travelers violated regarding note-taking during meetings ........ 15

D.    Plaintiffs have articulated and developed no evidence of an industry
      standard requiring Travelers to continue developing rebuild cost
      estimates after it had already decided to pay the dwelling limit ............... 15

E.    Plaintiffs have articulated and developed no evidence of an industry
      standard requiring Travelers to remove its adjuster and his
      manager from this claim ........................................................................... 16

F.    Plaintiffs have disclosed no expert opinion that Travelers' rebuild
      cost estimates during claim adjustment lacked a reasonable basis
      or that any specific amount of money owed was unreasonably
      denied or delayed .................................................................................... 16

IV.   PLAINTIFFS HAVE FAILED TO ADDUCE SUFFICIENT EVIDENCE TO
      SATISFY THE MENTAL STATE ELEMENT OF THEIR COMMON LAW
      BAD FAITH CLAIM ........................................................................................ 18

CONCLUSION ........................................................................................................ 19

**LIST OF EXHIBITS**

1.    The Travelers Policy

2.    Statement of loss

3.    Excerpts from the deposition of Christopher Lindsay

4.    Excerpts from the deposition of Erin Lindsay

5.    Excerpts from the deposition of Brian Seigal (Plaintiffs' alleged insurance

"expert")

6.    Initial report of Darwin Cooprider (Plaintiffs' costing expert)

7.    Excerpts from the deposition of Jenifer Ruggiero

8.    Excerpts from the deposition of Bre Webb

9.    Plaintiffs' first Division of Insurance complaint

10.    Xactimate estimate of Darwin Cooprider

11.    Email correspondence between Plaintiffs and Jenifer Ruggiero

12.    Summary judgment order from *Wyss v. Campbell*, Boulder Cty., Colo.,

Dist. Ct. Case No. 2022CV30810

13.    Summary judgment order from *Barshinger v. State Farm Fire & Cas. Co.*,

Boulder Cty., Colo., Dist. Ct. Case No. 2023CV31178.

Pursuant to Federal Rule of Civil Procedure 56, Defendant The Travelers Home and Marine Insurance Company ("Travelers") moves for summary judgment on all of Plaintiffs' claims against Travelers, leaving only Travelers' counterclaims for trial.

## INTRODUCTION

This matter arises out of Plaintiffs' procurement of a homeowners insurance policy from Travelers with a dwelling limit of $500,000 (with periodic increases for inflation). At the time Plaintiffs procured the policy, they knew the dwelling limit to be $500,000 and accepted that limit. After Plaintiffs sustained a loss at their property due to the Marshall Fire, they challenged the dwelling coverage limits, specifically contending those limits were inadequate. In response to the loss Plaintiffs sustained, Travelers voluntarily increased the dwelling limit, despite having no legal compulsion to do so. Plaintiffs nevertheless remained unsatisfied with Travelers' voluntary provision of additional dwelling coverage and now seek to transform their policy to one providing guaranteed-replacement-cost coverage with no limit, a type of policy that they did not purchase, nor did Travelers offer in Colorado.

The primary basis for Plaintiffs' lawsuit is that Plaintiffs' insurance policy should be "reformed" to whatever dwelling limit will enable them to build a new luxury custom home. Plaintiffs' "reformation" claim has no basis in the law of reformation, which is an equitable claim that the Court, not a jury, decides. The undisputed facts developed in discovery prove Plaintiffs knew they were buying $500,000 of dwelling insurance and that both parties intended this amount to serve as the dwelling limit. Consequently, there was no mistake warranting reformation at any point in time. Travelers' decision to voluntarily more than double the limits offers Plaintiffs no legal basis to simply demand more, on top of the increase Travelers already agreed to. Indeed, this case presents a stronger case against reformation than any other Marshall Fire case involving

allegations of underinsurance. Other courts have rejected other such reformation claims. This Court should reach the same conclusion here and reject Plaintiffs' reformation claim.

The Court should also reject Plaintiffs' negligent misrepresentation claim as a matter of law. This claim rests on the notion that a customer service person in a phone call made a non-committal statement that Travelers may, in the future, either make them "whole" or decline their request for higher limits. Under Colorado law, such a statement cannot be an actionable negligent misrepresentation. It contains no representation of a present or past fact. Rather, it addresses future possibilities, which do not give rise to any such claim. Nor can Plaintiffs show justifiable reliance on such a statement. Additionally, Plaintiffs cannot logically show that the customer service representative's statement was inaccurate, as any action taken by Travelers would fall somewhere between making Plaintiffs' "whole" or declining their request.

Finally, the Court should reject Plaintiffs' extra-contractual claims under the Tenth Circuit's recent decision in *El Dueno, LLC v. Mid-Century Ins. Co.*, 2025 WL 1540329 (10th Cir. May 30, 2025). There, the Tenth Circuit explained that extra-contractual claims for common law or statutory bad faith must rest on the insurance company's violations of industry standards. Here, however, Plaintiffs' litany of criticisms cannot meet that test. For example, Plaintiffs complain that Travelers did not remove a specific adjuster from the claim and assign a new adjuster upon their request. But they have failed to articulate or support with evidence any industry standard requiring an insurance company to fire an adjuster from working on a claim, much less such a standard that a reasonable juror could conclude Travelers violated here. The same is true of Plaintiffs' other criticisms. They have no basis in industry standards and, thus, cannot support

extra-contractual claims against Travelers. All of Plaintiffs' extra-contractual claims should be dismissed.

For these reasons, the Court should dismiss Plaintiffs' claims against Travelers, leaving only Travelers' counterclaims for trial.

## UNDISPUTED MATERIAL FACTS ("FACTS")

1.      Travelers issued homeowners policy no. 994039763 633 1 ("Policy") to Plaintiffs, with effective dates from June 4, 2021 to June 4, 2022. (Ex. 1 at Travelers 2320.)

2.      When Travelers issued the Policy, it had a dwelling limit of insurance of $557,000 and various other limits tied to the dwelling limits, and it afforded certain coverage for a house located at 826 Trail Ridge Dr. in Louisville, Colorado ("Trail Ridge house"). (Ex. 1 at Travelers 2321.)

3.      After the Marshall Fire tragically destroyed Plaintiffs' house in December 2021, Travelers paid Plaintiffs their originally purchased dwelling limits within 40 days of the fire. (Ex. 2, Stmt. of Loss at Travelers 1907–09; *see id.* at Travelers 1908 (listing dwelling payments).) Travelers' total payments to Plaintiffs now exceed $1.8 million—far more than the amount possible under the limits Plaintiffs originally purchased. (*Id.*)

4.      Plaintiffs insured their Trail Ridge house with Travelers continuously beginning in 2015. That entire time, they knew the Policy accurately stated the amount of dwelling insurance ($500,000, plus certain inflation adjustments over time) they had purchased. (Ex. 3, C. Lindsay Dep. 75:5–21, 81:8–20; Ex. 4, E. Lindsay Dep. 85:10–17; 87:19–88:9; Ex. 9, DOI Compl. at GIA 6058.) In Plaintiff Erin Lindsay's words: "If we're talking about just the Coverage A limits, then yes, I don't think there was a mistake in my understanding of that." (Ex. 4, E. Lindsay Dep. 88:1–5.)

5.     Plaintiffs have not disclosed any expert in this case who will opine that Travelers' rebuild cost estimates lacked a reasonable basis. Their insurance "expert" has offered no opinions about the amount of any covered benefit Travelers owed, much less that any specific amount was unreasonably denied or that any particular amount should have been paid or even that any payment should have been made at any specific time. (Ex. 5, Seigal Dep. 149:1–17.) Plaintiffs' insurance expert admits he is unqualified to use the costing program Travelers used. (*Id.* at 150:9–151:6.)

6.     Plaintiffs' retained cost expert, Darwin Cooprider, has opined that the cost to rebuild the original house is more than $730,000 ***lower*** than Plaintiffs' cost estimate presented to Travelers during claim adjustment, and he has not offered an opinion that Travelers' own rebuild cost estimates during claim adjustment lacked a reasonable basis. (*Compare* Prop. Scheduling Order 7, ECF No. 33 (Plaintiffs demand reformation of the policy "based on the accurate as/was-built specifications of Plaintiffs' home, or $2,731,440.74"), *with* Ex. 10, Cooprider Xactimate at 79 (costing the rebuild at $2,049,471.43); Ex. 6, Cooprider Report 1–4 (no unreasonableness opinion regarding Travelers' rebuild cost estimates).)

7.     Plaintiffs' reformation claim depends on an alleged verbal statement in a phone call with a Travelers customer service person, Jenifer Ruggerio, in which she allegedly told Plaintiffs that Travelers would possibly either make them "whole" or not change their dwelling limit of insurance. (*See* Am. Compl. ¶¶ 102–06, ECF No. 76; Ex. 3, C. Lindsay Dep. 288–89; Ex. 4, E. Lindsay Dep. 168–69.)

8.     Ms. Ruggerio is a customer service person, not an underwriter, and she has no knowledge of the reformation process and no authority to reform anything. (Ex. 7, Ruggerio Dep. 13, 18–19.)

9.      Plaintiffs knew this about Ms. Ruggerio, as shown from their email correspondence in which they asked her to forward information to Travelers' underwriting department rather than analyze it. (Ex. 11 (Dep. Ex. 70) at Travelers 9275–76.)

10.     Mr. Lindsay testified that Plaintiffs' reformation claim effectively seeks to force Travelers to provide Plaintiffs with a guaranteed-replacement-cost policy, meaning a policy with no actual limit of dwelling insurance. (Ex. 3, C. Lindsay Dep. 83:13–84:15.)

**ADDITIONAL BACKGROUND FACTS NOT ESSENTIAL TO THE MOTION**

Travelers presents further facts that are not essential to granting this motion but nevertheless provide helpful background for the Court:

11.     Travelers has never offered a guaranteed-replacement-cost homeowners insurance product in Colorado. (Ex. 8, Webb Dep. 97:25–98:15.)

12.     Travelers gave notice to Plaintiffs of the requirement that they permit an inspection of their house in its new business packet. (*Id.* at 114:20–115:5.).

13.     Travelers sent an inspector to the house to inspect the interior and backyard, and to assist in determining a dwelling replacement cost figure for the Policy. Although someone was home when the inspector came to the house, Plaintiffs failed to (i) answer the door, (ii) answer any of three telephone calls, (iii) return multiple messages, or (iv) respond to a follow-up letter Travelers sent them alerting them to the need for them to respond with "information that would result in a different estimated construction cost" to rebuild their house. (*Id.* at 98:16–111:15.)

14.     All of the information Travelers later used to increase Plaintiffs' dwelling limit post-loss would have been provided to Travelers in 2015 if Plaintiffs had answered their door, responded to repeated voicemails, answered their phone, or complied with Travelers' request in its letter. (*See id.* at 110:17–111:15.)

5

**ARGUMENT**

I.    **THE COURT SHOULD DISMISS AS A MATTER OF LAW PLAINTIFFS'
      REFORMATION CLAIM, WHICH IS AN EQUITABLE CLAIM THAT THE
      COURT DECIDES WITHOUT A JURY**

The Court should dismiss Plaintiffs' claim for reformation on summary judgment

because there are no genuine disputes of material fact regarding that claim, and

Travelers is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

   A.    **Legal standards governing Plaintiffs' reformation claim**

This Court, not a jury, determines whether an insurance contract should be

reformed, because reformation is an equitable remedy. *See, e.g.*, *Amica Mut. Ins. Co. v.

Farhar*, 2006 WL 8454578, at *1–8 (D. Colo. Feb. 17, 2006); *Loukowski v. Pryor*, 106 P.

7, 8 (Colo. 1909). Reformation "is an equitable remedy which is available only upon an

extraordinary showing." *Jackson Enters., Inc. v. Maguire*, 355 P.2d 540, 542 (Colo.

1960). A claim of reformation based on mutual mistake is quintessentially a claim that

the contract as written does not express the true intentions of the parties. *See Md. Cas.

Co. v. Buckeye Gas Prods. Co.*, 797 P.2d 11, 13 (Colo. 1990). The burden of the party

seeking reformation is "heavy." *Farhar*, 2006 WL 8454578 at *6. "The evidence must

clearly and unequivocally show that reformation is appropriate under the

circumstances." *Md. Cas.*, 797 P.2d at 13; *see also Jackson Enters.*, 355 P.2d at 542.

Reformation based on mutual mistake applies only in the narrow situation

"[w]here a writing that evidences or embodies an agreement in whole or in part fails to

express the agreement because of a mistake of **both** parties as to the **contents** or

effect of the ***writing***" itself. Restatement (Second) of Contracts § 155 (1981) (emphasis

added). As courts applying Colorado law articulate this principle:

> Reformation is an appropriate remedy when the evidence **clearly and
> unequivocally** shows that an ***instrument*** does not express the true intent
> or agreement of the ***parties***. . . . However, where a party's unilateral

> mistake is the result not of fraud, but of its own failure to use due diligence
> in reading the contract before signing it, that party will be held to the terms
> of the contract.

*Poly Trucking, Inc. v. Concentra Health Servs., Inc.*, 93 P.3d 561, 563 (Colo. App. 2004)

(emphasis added). To reform a contract, it must be that "both parties . . . 'labor under

the same erroneous conception in respect to the terms and conditions of the

***instrument***.'" *Md. Cas.*, 797 P.2d at 13 (emphasis added; quoting *Smith v. Anderson*,

214 P.2d 366, 370 (Colo. 1950)).

A party cannot reform an insurance policy merely by attributing to an insurance

company employee a verbal comment describing a purported possibility of increased

coverage, as Plaintiffs seek to do here with Ms. Ruggiero. *Pete's Satire, Inc. v. Comm'l*

*Union Ins. Co.*, 698 P.2d 1388, 1391 (Colo. App. 1985) ("Oral representations by an

agent cannot impose liability on an insurer where they contradict the terms of the

insurance contract.").

For example, in *Farhar* the insurer and the policyholder both believed that a PIP

insurance policy endorsement contained a $200,000 limit, even though the insurance

company's forms coordinator made a "scrivener's error" removing the PIP limit from the

endorsement, which was not subsequently noticed by her "jurisdictional officer" when it

was approved. 2006 WL 8454578 at *3, 6. The insured subsequently attempted to take

advantage by asserting a right to limitless PIP benefits due to the absence of an

expressed limit of insurance on the PIP endorsement. *Id.* at *2–6. Judge Blackburn

reformed the policy to include a $200,000 PIP limit, finding not "credible" the insured's

professed belief she had purchased infinite PIP insurance. *Id.* Instead, the Court found

both parties labored under a mutually incorrect belief that the text of the endorsement

included a $200,000 PIP limit, as prior versions had. *Id.* at *5–6. *Farhar* teaches that

reformation properly occurs when the parties mutually make a mistake about what the

insurance policy language **says**. *See id.* at *5–7. It can also be proper where one party knows the other party made a mistake "regarding the **expression** of the contract" and attempts to take unfair advantage. *Id.* at *7 (emphasis added).

**B.    No mutual mistake regarding the dwelling limit of insurance occurred**

Plaintiffs have not even alleged that a mutual mistake regarding the swelling limits occurred. Nor could they. The undisputed facts refute any notion that a mutual mistake regarding the dwelling limits occurred. Both Plaintiffs testified under oath that they knew the amount of the dwelling limit of insurance from the beginning and that those limits reflected the amount of insurance they chose to purchase. (Facts ¶ 4.) Plaintiffs openly testified there was no mistake in what their policy said about the limits they purchased. (*Id.*) Plaintiffs' own complaint against their insurance agent to the Division of Insurance stated they knew how much they had purchased in dwelling limits. (*Id.*) This is not a case like *Fahrar*, where the insured and the insurance company agreed to different terms than those expressed in the contract due to a scrivener's error. *See* 2006 WL 8454578 at *3–7. As Plaintiffs themselves have testified, the Policy does reflect the parties' true intention to provide them with $500,000 of dwelling insurance. (Facts ¶ 4.) No mistake justifying reformation occurred.

**C.    Travelers did not engage in fraud or misconduct as to the dwelling limit of insurance but rather disclosed the limit in writing**

Reformation based on a unilateral mistake may be appropriate in the context of fraud or materially similar conduct. *Poly Trucking*, 93 P.3d at 563. But that is legally impossible here under the undisputed facts. As Mr. Lindsay stated under oath, "We got the decs page" confirming he received the limit of dwelling insurance he thought he was buying. (Ex. 3, C. Lindsay Dep. 81:8–20.) These undisputed facts preclude, as a matter of law, any argument that Travelers somehow defrauded them or engaged in other misconduct regarding the amount of their limits within the meaning of reformation law.

As a matter of law, Plaintiffs could not have been fraudulently led to believe that the
Policy provided unlimited coverage or any coverage other than what it actually provided.
*See Unigard Sec. Ins. Co. v. Mission Ins. Co. Tr.*, 12 P.3d 296, 300 (Colo. App. 2000)
("An insured is charged with knowledge of the policy's terms and is therefore on notice
that the scope of his, her, or its insurance coverage is governed by the terms of the
policy rather than by the terms of the binder."); *Spaur v. Allstate Ins. Co.*, 942 P.2d
1261, 1265 (Colo. App. 1996) (". . . it is the policyholder's responsibility to read the
policy."); *Pete's Satire*, 698 P.2d at 1391 ("The Lounge and its agents were in
possession of this policy and are charged with knowledge of the restrictions in the
policy."). For these reasons, Travelers is entitled to summary judgment as to Plaintiffs'
reformation claim, which should be dismissed.

### D.    Colorado law defeats Plaintiffs' theory that "mistakenly" believing the dwelling limits are sufficient requires reformation

Plaintiffs cannot avoid these arguments by contending that the "mistake"
justifying reformation consisted of the mistaken belief that the dwelling limit was
sufficient to rebuild their home. This novel theory has never been recognized. It conflicts
with and finds no support in the reformation principles from *Maryland Casualty*, *Fahrar*,
*Jackson Enterprises*, the Restatement (Second) of Contracts § 155, or *Poly Trucking*. It
also conflicts with the well-established principle of Colorado law that "[a]n insurance
company 'does not have a common law duty to ensure complete protection to the
policyholder or to recommend higher policy limits.'" *Richardson v. Amica Mut. Ins. Co.*,
693 F. Supp. 3d 1182, 1186–87 (D. Colo. 2023) (quoting *Apodaca v. Allstate Ins. Co.*,
232 P.3d 253, 259 (Colo. App. 2009)). Insureds bear responsibility for their own
coverage limits. *Kaercher v. Sater*, 155 P.3d 437, 441 (Colo. App. 2006).

Plaintiffs' novel theory of mistake has also been rejected in other Marshall Fire
insurance cases. The Boulder County District Court's recent summary judgment orders

in *Wyss* and *Barshinger* are instructive. (Combined Order Re Defs.' Mots. for Summ. J.,
*Wyss v. Campbell*, Boulder Cty., Colo., Dist. Ct. Case No. 2022CV30810, at 13, July 11,
2024 ("Wyss Order," attached as Exhibit 12); Combined Order on Mots. for Summ. J.
Filed by Defs. State Farm Fire & Cas. Co. & M. Vanags, *Barshinger v. State Farm Fire
& Cas. Co.*, Boulder Cty., Colo., Dist. Ct. Case No. 2023CV31178, at 14–15
("Barshinger Order," attached as Exhibit 13).)

 Similar to the *Wyss* and *Barshinger* plaintiffs, Plaintiffs here assert they "desired
to obtain an insurance policy that provided full replacement cost for [the] home in case
of a loss." (*Id.*) Like the insurers in *Wyss* and *Barshinger*, here Travelers "offered a
policy with specifically stated limits for coverage" of which Plaintiffs had actual notice.
(Wyss Order 13; Barshinger Order 13–14.) And like the *Wyss* and *Barshinger* plaintiffs,
"Plaintiffs accepted the policy with those limits." (Wyss Order 13; Barshinger Order 13–
14.)

 On those facts, Judge Volz in *Wyss* held:

> Even if the Court were to accept that Plaintiffs "mistakenly" believed that
> the policy provided full replacement cost coverage, there is no evidentiary
> basis for the Court to find that [the insurer] had a similar belief. Therefore,
> there is no mutual mistake upon which reformation could be based.

(Wyss Order 13; *see also* Barshinger Order 13–14.) The same rationale applies here.
There is no evidence on which the Court could find Travelers believed the limit of
dwelling insurance guaranteed the full cost of a rebuild without limit, regardless of
inflation, supply chain crises, pandemics, or other unexpected cost increases. Rather,
the undisputed facts show Travelers believed (and in fact knew, as did Plaintiffs) the
Policy provided the coverages and the limits it stated. (Facts ¶ 4.)

10

**E.    Travelers' decision to voluntarily more than double the dwelling limit does not change the analysis or require a reformation**

Travelers expects Plaintiffs to argue this case does not fall within *Wyss*, *Barshinger*, or the other reformation cases because Travelers voluntarily increased Plaintiffs' dwelling limit once already, a business decision made in these specific circumstances, when it did not have to do so. Such an argument lacks any legal basis and would perversely punish Travelers for making a decision it was not required to make that greatly benefited its customers. Travelers should not be punished for this decision or be judged under a different reformation standard for that reason. No case law, statute, regulation, or any other law permits Plaintiffs to hold Travelers to a different reformation standard just because it already increased Plaintiffs' limits when it had no obligation to do so. Travelers' decision to reform the coverage limits upward once is not, as a matter of law, a decision to reform the Policy to eliminate the coverage limits in their entirety. The Court should reject any such suggestion.

**II.    THE COURT SHOULD DISMISS AS A MATTER OF LAW PLAINTIFFS' CLAIM AGAINST TRAVELERS FOR NEGLIGENT MISREPRESENTATION**

Plaintiffs purport to bring a claim for negligent misrepresentation against Travelers. (Am Compl. ¶¶ 94–101, ECF No. 76.) This claim, like their reformation claim, rests on an alleged verbal statement a customer service person made on the phone that it was possible that Travelers would either make Plaintiffs "whole" or not reform their policy. (*Id.*) It is undisputed that Jenifer Ruggiero, a customer service person, is not an underwriter, is not involved in reformations, does not know Travelers' process for reformation, and does not have authority to grant a reformation. (Facts ¶¶ 7–9.) Further, Plaintiffs themselves understood she had no underwriting role. (*Id.*) On that basis alone, Ms. Ruggiero's alleged comment in one phone call cannot possibly justify giving Plaintiffs unlimited insurance coverage on any basis. Indeed, no such oral comment,

even if it had been within Ms. Ruggiero's purview, could support Plaintiffs' demand for unlimited insurance coverage. *Pete's Satire*, 698 P.2d at 1391 ("Oral representations by an agent cannot impose liability on an insurer where they contradict the terms of the insurance contract.").

Moreover, the undisputed facts do not meet the elements of negligent misrepresentation. To prevail on both their negligent misrepresentation claims, Plaintiffs must prove, among other things: (1) Travelers made a false representation of a past or present fact; and (2) Plaintiffs justifiably relied on that representation. Colorado Jury Instructions-Civ. 9:4, 19:1 (citing authorities).

## A.    Travelers did not falsely represent a past or present fact

"A mere expression of an opinion as to the happening of a future event is not actionable." *Burman v. Richmond Homes Ltd.*, 821 P.2d 913, 921 (Colo. App. 1991). Plaintiffs' negligent misrepresentation claim fails because the statement attributed to Ms. Ruggiero is not a representation of a past or present fact. At most, according to Plaintiffs themselves, Ms. Ruggiero told them in March 2022 of two future possibilities— an increase in their policy limits or a decision not to increase them, depending on Travelers' own decisions. (Facts ¶ 7.) This alleged statement does not describe any past or present fact. Both future possibilities are classic examples of expressing an opinion about a future event, not a statement of a past or present fact. *Burman*, 821 P.2d at 921. On this basis alone, the negligent misrepresentation claim fails.

## B.    Plaintiffs could not have justifiably relied on Ms. Ruggiero's alleged statement

Plaintiffs also cannot establish justifiable reliance. *Patterson v. BP Am. Prod. Co.*, 360 P.3d 211, 224–25 (Colo. App. 2015). As noted above, Plaintiffs knew Ms. Ruggiero was not making the decision about reformation and even sent her information to pass along to Travelers' underwriting department because they understood Ms. Ruggiero

12

was a customer service representative without any role or authority to reform their policy. (Facts ¶ 9.) It is legally impossible that Plaintiffs justifiably relied on her alleged statement.

Plaintiffs could not have justifiably relied on Ms. Ruggiero's verbal comment for a second reason: the statement did not promise anything to Plaintiffs. At most, Ms. Ruggiero allegedly said Travelers would either increase their limits or not. (Facts ¶ 7.) Even if a prediction could support a negligent misrepresentation claim (which it cannot), Plaintiffs have no evidence that anyone at Travelers ever promised them in advance that it would increase their limits a second time. The equivocal statement Ms. Ruggiero allegedly made promised Plaintiffs nothing and encompasses every possible outcome, from a declination of any change to allegedly making Plaintiffs "whole." As a matter of law, no reasonable person hearing that Travelers either will or will not reform a policy sometime in the future would conclude that a reformation would occur and act in reliance upon that. The Court should dismiss Plaintiffs' negligent misrepresentation claim as a matter of law.

## III.    PLAINTIFFS' EXTRA-CONTRACTUAL CLAIMS FAIL BECAUSE THEY HAVE NO EVIDENCE TRAVELERS VIOLATED INDUSTRY STANDARDS AND HAVE DISCLOSED NO EXPERT OPINION ESTABLISHING THAT TRAVELERS' COST ESTIMATES LACK A REASONABLE BASIS OR WHAT AMOUNTS WERE OWED AT ANY PARTICULAR TIME

"Industry standards determine whether an insurer's actions were reasonable," and reasonableness is an essential element of both common law bad faith claims and statutory bad faith claims under Colorado Revised Statutes sections 10-3-1115 and -1116. *El Dueno, LLC v. Mid-Century Ins. Co.*, 2025 WL 1540329, at *3 (10th Cir. May 30, 2025). To establish that Travelers' conduct lacked a reasonable basis, Plaintiffs must articulate an industry standard "with which to compare Defendant's conduct." *Id.*; *Sandoval v. Unum Life Ins. Co. of Am.*, 952 F.3d 1233, 1239 (10th Cir. 2020) (stating

that, under Colorado law, "Industry standards supply the guidepost to assess the reasonableness of the insurer's conduct.").

### A. Plaintiffs have articulated and developed no evidence of an industry standard Travelers violated regarding alternative living expense coverage

Plaintiffs have not developed any evidence in this case that could satisfy this test. They have not articulated an industry standard that Travelers violated and presented admissible evidence regarding that purported standard. For example, Plaintiffs fault Travelers for not approving furniture under additional living expense coverage more quickly. (Am. Compl. ¶¶ 77–79, ECF No. 76.) Missing from Plaintiffs' case, however, is any articulated standard determining when that should have occurred "with which to compare" Travelers' actions. *El Dueno*, 2025 WL 1540329 at *3. Plaintiffs' alleged insurance "expert," Brian Seigal, testified at his deposition that his report did not provide any opinions about the amount or timing of any payment Travelers may have owed. (Facts ¶ 5.) Plaintiffs' own hired expert, therefore, did not supply an opinion capable of permitting a jury to conclude Travelers' approval of furniture expenses violated any industry standard. (*See id.*)

### B. Plaintiffs have articulated and developed no evidence of an industry standard Travelers violated regarding reformation

Many of Plaintiffs' other criticisms of Travelers in their amended complaint pertain to their demand for a higher limit of dwelling insurance. (Am. Compl. ¶¶ 36–76, ECF No. 76.) But because Travelers owed no duty to reform the Policy in the first instance, Travelers cannot be liable for bad faith for not doing so. Nor does Colorado recognize extra-contractual liability for an insurer's decision not to reform a policy in any circumstance. There is no cognizable extra-contractual claim against Travelers for a decision not to alter the terms of a contract.

But even in this regard, Plaintiffs have not articulated any industry standard
regarding reformation that Travelers deviated from. *El Dueno*, 2025 WL 1540329 at *3.
To the contrary, Plaintiffs' own paid insurance expert testified at deposition that he did
not include any industry standard governing reformation in his report, stating, "I don't
know if there is an actual standard of when it is required." (Ex. 5, Seigal Dep. 235.)
Plaintiffs therefore have no evidence Travelers violated any industry standard regarding
its reformation decisions. *El Dueno*, 2025 WL 1540329 at *3.

> ### C.    Plaintiffs have articulated and developed no evidence of an industry standard Travelers violated regarding note-taking during meetings

As to the remainder of Plaintiffs' criticisms, Plaintiffs again have not articulated
and developed admissible evidence of an industry standard Travelers violated. For
example, Plaintiffs fault Travelers' adjuster for allegedly ceasing his note-taking during a
meeting with them. (Am. Compl. ¶¶ 30–31, ECF No. 76.) But no industry standard
requires a certain level of persistence of note-taking. Plaintiffs have no evidence to the
contrary.

> ### D.    Plaintiffs have articulated and developed no evidence of an industry standard requiring Travelers to continue developing rebuild cost estimates after it had already decided to pay the dwelling limit

Plaintiffs criticize Travelers' adjuster for allegedly not adding more costs to his
rebuild estimate after he had already determined that the "loss exceeded the Policy
limits." (*Id.* ¶ 33.) But no provision in the Policy and no industry standard requires any
adjuster to act as a cost consultant for its own sake. Plaintiffs have no evidence of any
industry standard that prohibits an insurance company from tendering the limits in lieu of
creating any cost estimate at all. (Cost estimates are tools to determine whether a
portion or all the limits are owed.) Plaintiffs have no admissible evidence that Travelers
had any obligation under industry standards or the Policy to create any cost estimate for

them after it already agreed to pay them their limits, *see El Dueno*, 2025 WL 1540329 at

\*3, which Travelers promptly did within 40 days of the fire. (Facts ¶ 3.)

> **E.    Plaintiffs have articulated and developed no evidence of an industry standard requiring Travelers to remove its adjuster and his manager from this claim**

Plaintiffs have harshly criticized Travelers for not acquiescing to Plaintiffs'

request to remove Travelers' assigned adjuster and his manager from this claim. But

Plaintiffs' insurance expert, Mr. Seigal, admitted at deposition that his report identifies

no industry standard that required Travelers to remove either of them, as shown below:

> 14      Q    (BY MR. STEPHENSON)  Okay. Mr. Seigal, I
> 15    think we covered this before.  I want to make sure
> 16    I've got it on the record. You agree that your
> 17    report does not identify any industry standard that
> 18    required Travelers to remove Peter Van Riper or
> 19    Aaron Stone from this claim, true?
> 20      A    True.

(Ex. 5, Seigal Dep. 272.) This criticism, too, finds no support in any articulated industry

standard, much less a standard supported with admissible evidence.

> **F.    Plaintiffs have disclosed no expert opinion that Travelers' rebuild cost estimates during claim adjustment lacked a reasonable basis or that any specific amount of money owed was unreasonably denied or delayed**

Nor have Plaintiffs provided any expert evidentiary basis to conclude Travelers'

cost estimates shared during claim adjustment lacked a reasonable basis. Such a

conclusion requires expert testimony because the cost to construct a building, including

depreciating its elements, requires expert testimony. *See James River Ins. Co. v. Rapid

Funding, LLC*, 658 F.3d 1207, 1214–15 (10th Cir. 2011) (reversing a jury verdict of bad

faith against an insurer that was affected by inadmissible lay testimony regarding such

issues); *Hart v. State Farm Lloyds*, 713 F. Supp. 3d 282, 287 (N.D. Tex. 2024) (holding

"a lay witness cannot testify about estimated repair costs," and noting that a "repair cost

estimate requires, 'at a minimum, [a witness] to forecast the amount, type, and costs of materials needed, as well as the amount of labor required to complete the long list of repairs. These forecasts are not common knowledge.'" (quoting *Pendarvis v. Am. Bankers Ins. Co. of Fla.*, 354 F. App'x 866, 868–69 (5th Cir. 2009))); *see also RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, 2020 WL 6063895, at *3 (D. Colo. Oct. 13, 2020).

"Myriad federal courts" have "held that opinions as to cost estimates for repairs and other services constitute expert testimony within the scope of Rule 702, Fed. R. Evid., and are therefore subject to the disclosure requirements of Rule 26(a)(2)." *Ivy Marine Consulting, LLC v. Monarch Energy Parts., Inc.*, 2019 WL 1173356, at *2 n.4 (S.D. Ala. Mar. 13, 2019) (collecting cases); s*ee also Pryszmont v. Allstate Vehicle & Prop. Ins. Co.*, 2024 WL 3090384, at *6 (D. Md. June 21, 2024) (recognizing that "[t]he overwhelming majority of federal courts to consider this issue have held that repair cost estimates in breach of insurance contract cases must be supported by expert, rather than lay, opinions") (collecting cases); *High Rock Westminster St. LLC v. Bank of Am., N.A.*, 2017 WL 1040355, at *2 (D.R.I. Mar. 16, 2017) ("[E]stimating the cost of future repair work is generally the subject of expert testimony because estimating the cost of a complex repair requires the forecasting of the amount, type and costs of materials and labor, which are not common knowledge or familiar in everyday life and requires specialized knowledge.") (cleaned up) (collecting cases).

Here, Plaintiffs have disclosed a retained cost expert, Darwin Cooprider, who has nowhere opined that Travelers' rebuild cost estimates during claim adjustment lacked a reasonable basis. (Facts ¶ 6.) Plaintiffs have also disclosed an insurance "expert," Brian Seigal, who admitted he was not qualified to give opinions about the use of Xactimate (the software Travelers used), and who also offered no opinions in his report about any

amount of benefits Travelers owed at any particular time. (Facts ¶ 5.) Mr. Seigal and Mr. Cooprider, therefore, have offered no opinion that Travelers' rebuild cost estimates lacked a reasonable basis or that any of its payments were wrong or unreasonably delayed. (*Id.*) Plaintiffs' failure to disclose any expert opinions to this effect, along with their other failures identified above, are fatal to their extra-contractual claims.

## IV. PLAINTIFFS HAVE FAILED TO ADDUCE SUFFICIENT EVIDENCE TO SATISFY THE MENTAL STATE ELEMENT OF THEIR COMMON LAW BAD FAITH CLAIM

Independently, the lack of any evidence that Travelers knew or recklessly disregarded the alleged fact that its claim handling was supposedly unreasonable is fatal to Plaintiffs' common law bad faith claim. "If an insurer does not know that its denial of or delay in processing a claim filed by its insured is unreasonable, and does not act with reckless disregard of a valid claim, the insurer's conduct would be based upon a permissible, albeit mistaken, belief that the claim is not compensable." *Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1275 (Colo. 1985); *see also Wahlert v. Am. Standard Ins. Co. of Wis.*, 173 F. Supp. 3d 1187, 1193 (D. Colo. 2016) (granting insurer's motion for summary judgment on common law bad faith claim where plaintiff identified no evidence to suggest that the insurer "knew or recklessly disregarded the (alleged) fact that its evaluation was unreasonable").

Here, the record contains no admissible evidence Travelers knowingly or recklessly disregarded any unreasonableness. To the contrary, Travelers promptly paid the originally purchased dwelling limits within 40 days of the fire and increased Plaintiffs' limits by more than double without any obligation to do so. (Facts ¶ 3.) These undisputed facts negate any suggestion that Travelers knew or recklessly disregarded the fact that it was acting unreasonably. The Court should therefore dismiss Plaintiff's common law bad faith claim.

## CONCLUSION

For these reasons, the Court should dismiss all of Plaintiffs' claims against Travelers, leaving only Travelers' counterclaims for trial.

Dated:  October 17, 2025.                    Respectfully submitted,


                                            *s/ Evan Bennett Stephenson*
                                            Evan Bennett Stephenson
                                            Nathaniel Barker
                                            Spencer Fane LLP
                                            1700 Lincoln Street, Suite 2000
                                            Denver, CO 80203
                                            Telephone: 303.839.3800
                                            Facsimile:  303.839.3838
                                            Email:  estephenson@spencerfane.com
                                                    nbarker@spencerfane.com

                                            Attorneys for Defendant

**CERTIFICATE OF SERVICE (CM/ECF)**

I HEREBY CERTIFY that on October 17, 2025, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.


*s/ Evan Bennett Stephenson*