**CHRISTOPHER LINDSAY - September 04, 2024**

```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
```

Civil Action No. 23-cv-01413-NYW-STV
_____

```
            VIDEOTAPE DEPOSITION OF:
     CHRISTOPHER LINDSAY - September 4, 2024
```
_____

ERIN LINDSAY and CHRISTOPHER LINDSAY,

Plaintiffs,

v.

THE TRAVELERS HOME AND MARINE INSURANCE COMPANY; and GEICO INSURANCE AGENCY, LLC,

Defendants.
_____

        PURSUANT TO NOTICE, the videotape deposition of CHRISTOPHER LINDSAY was taken on behalf of the Defendant The Travelers Home and Marine Insurance Company at 1200 28th Street, Suite 302, Boulder, Colorado 80303, on September 4, 2024, at 9:02 a.m., before Carin C. Geist, Registered Diplomate Reporter and Notary Public within Colorado.

CHRISTOPHER LINDSAY - September 04, 2024

1  A.  I can't.  I wasn't on that phone call.
2  I believe she was asked some questions, and she
3  answered them.  That's really the extent of my
4  knowledge.
5  Q.  Okay.  And you knew at the time you
6  originally purchased the policy in 2015 that the
7  limit of coverage for the dwelling was $500,000,
8  correct?
9  A.  Yes, I did know that was the limit.
10  Q.  Okay.  And that is correct.  The
11  original limit was $500,000, correct?
12  A.  Yes.
13  Q.  And it was adjusted upwards year after
14  year by various amounts to account for inflation,
15  correct?
16  MS. MINAMIZONO:  Objection.  Form and
17  foundation.
18  A.  I knew it was adjusted upwards, as were
19  my premiums.  When I would get a renewal notice of
20  some sort, I was usually looking at that for the
21  bill.
22  Q.  (BY MR. STEPHENSON)  Okay.  And you got
23  the bills, correct?
24  A.  I believe so, yeah.  I think I -- well,
25  I wasn't paying them.  Actually, the mortgage

CHRISTOPHER LINDSAY - September 04, 2024

1  fire was when we discovered that was not what we had
2  purchased.
3         Q.   All right.  So just to be clear, the
4  nature of the -- of the claim you're making about
5  the policy is whether or not $500,000 really was
6  enough insurance, correct?
7         A.   Correct.
8         Q.   Right.  So -- but there was no mistake
9  in -- in -- in terms of what the policy said being
10 different from what you thought you were buying.
11 You thought you were buying a $500,000 policy, and
12 you got a $500,000 policy and the other terms that
13 you got, correct?
14              MS. MINAMIZONO:  Objection.  Form.
15        A.   We got the decs page.  I don't know
16 when we got the actual policy itself with all of the
17 extra information; but in terms of the decs page, we
18 had that, and those numbers matched my understanding
19 of what we were purchasing in terms of the numbers.
20 Does that answer your question?
21        Q.   (BY MR. STEPHENSON)  I think so.  I'll
22 take it.
23        A.   I'm just trying to be very, very
24 specific with my wording.  Again, I'm not used to
25 this kind of environment.

CHRISTOPHER LINDSAY - September 04, 2024

1      A.   I don't know what they had to approve.
2  I handed it off to the real estate agent and the
3  mortgage guy, and they got it to the right people.
4  I don't know what it is they had to actually approve
5  or not approve.
6      Q.   (BY MR. STEPHENSON)  When you were
7  shopping for insurance, do you have any awareness of
8  what other products were available at the time that
9  you purchased insurance in 2015?
10      A.   I don't have any recollection of it.
11  Again, my wife took point on that one, so that would
12  be something she would have researched.
13      Q.   Did you look into buying a guaranteed-
14  replacement-cost policy?
15      A.   I didn't know that term until after the
16  fire.  So that was what we were looking for, but we
17  didn't have that language, so I don't know -- we
18  were asking for enough money to completely replace
19  our home, which I only learned after the fire is not
20  just what is normally sold.  I thought a guaranteed-
21  replacement policy was what all policies were.  I
22  didn't understand that that wasn't.
23      Q.   Got it.  That basically is your
24  position in this lawsuit via a reformation claim.
25  You're effectively seeking for your policy to act

CHRISTOPHER LINDSAY - September 04, 2024

1  like a guaranteed-replacement-cost policy, correct?
2              MS. MINAMIZONO:  Objection.  Form.
3         A.   I believe what we're asking for in the
4  reformation is that the limits be adjusted so that
5  they can encompass what we were asking for
6  originally, which was to be able to replace
7  everything should it burn down.
8         Q.   (BY MR. STEPHENSON)  Right.  But that
9  position that the limits should be whatever it costs
10 to rebuild the same house, that is indistinguishable
11 from a guaranteed-replacement-cost policy, correct?
12             MS. MINAMIZONO:  Objection.  Form and
13 foundation.
14        A.   My understanding of what a guaranteed-
15 replacement-cost policy is matches that.
16        Q.   (BY MR. STEPHENSON)  Right. And you
17 didn't actually buy a guaranteed-replacement-cost
18 policy from Travelers, correct?
19        A.   That's what I thought I was buying.
20        Q.   But you didn't, because it had a limit
21 of insurance in it, correct?
22        A.   It did have a limit of insurance.
23        Q.   And that's what makes it not a
24 guaranteed-replacement-cost policy, correct?
25             MS. MINAMIZONO:  Objection.  Foundation

CHRISTOPHER LINDSAY - September 04, 2024

1   and form.
2        A.   We found out after the fire that the
3   policy we purchased was not, in fact, a
4   guaranteed-replacement policy.
5        Q.   (BY MR. STEPHENSON)  Right.  Exactly.
6   And do you know whether it was even possible to
7   insure your house with an actual true guaranteed-
8   replacement-cost policy when you purchased a policy
9   from Travelers in 2015?
10            MS. MINAMIZONO:  Objection.  Form.
11       A.   I don't know anything about the
12   insurance industry to that level of detail.
13       Q.   (BY MR. STEPHENSON)  Okay. All right.
14   Let's go to previously marked Exhibit 45.
15       A.   Okay.
16       Q.   Mr. Lindsay.
17            MR. GILL:  I'm sorry, what did you say?
18            MR. STEPHENSON:  We're going to go to
19   previously marked Exhibit 45.
20       A.   Okay.
21       Q.   (BY MR. STEPHENSON)  Are you there,
22   Mr. Lindsay?
23       A.   I am.
24       Q.   And I want to draw your attention to
25   the second page and further pages --

CHRISTOPHER LINDSAY - September 04, 2024

```
 1        A.   I did.
 2        Q.   You personally did?
 3        A.   I personally did.
 4        Q.   You typed them yourself?
 5        A.   I typed them myself.
 6        Q.   Did you have any assistance?
 7        A.   I had my wife with me, but I don't know
 8   what communications of that are protected.
 9        Q.   Did she give the green light or okay or
10   all-clear for you to submit the complaints that are
11   within Exhibit 45?
12        A.   Yes.
13        Q.   Did she provide input into the
14   complaints that appear in Exhibit 45?
15        A.   Yes.
16        Q.   Okay.  All right.  So looking at these
17   complaints.
18        A.   Uh-huh.
19        Q.   If we could go to the first one that
20   shows up in Exhibit 45.  It's dated February 7,
21   2022.  Do you see that?
22        A.   Which page?
23        Q.   Actually, I'm sorry.  Let's go to
24   the -- one that's earlier in time but appears
25   second.  So let's go to page GIA-6281.
```

CHRISTOPHER LINDSAY - September 04, 2024

1        A.    Okay.

2        Q.    Do you see that complaint?

3        A.    I do.

4        Q.    And that's your e-mail address there,
5 weedlum@me.com?

6        A.    Yes, it is.

7        Q.    Just out of curiosity, what is the
8 origin of that e-mail address?

9        A.    When I was in third grade, a bully in
10 an older grade called me "Mildew." My best friend
11 at the time, I was telling him about it. His dad
12 heard and to this day calls me Mildew. One day
13 while partying at my friend's house when I was much
14 older, people were writing names on Solo cups, and
15 one of the -- well, my friend's older brother, who
16 was quite inebriated at the time, wrote it
17 backwards, and he said, "Your name's Wedlim, ha, ha,
18 ha," and I changed it to Weedlum. And it's never
19 taken whenever I go to make a username. So I've
20 kept it all these years, and it's always available.
21 So that's the origins of Weedlum.

22        Q.    Wow.

23        A.    So it's now on the record forever.

24        Q.    It is. That is true. No protective
25 order for that one, my friend. All right.

CHRISTOPHER LINDSAY - September 04, 2024

```
 1              (Deposition Exhibit 69 was marked.)
 2         Q.   This is an e-mail exchange between you
 3   and Jenifer Ruggiero --
 4         A.   Sure.
 5         Q.   -- dated March 29, 2022.  Do you see
 6   that e-mail with the Bates No. LINDSAY 314?
 7         A.   Yes.
 8         Q.   And I want to draw your attention to
 9   the sentence kind of a third of the way down the
10   page where you say that Travelers would either find
11   that the policy limits were set correctly or they
12   would find that they were not set correctly, in
13   which case the contract would be reformed to make us
14   whole.  Do you see that?
15         A.   Yes, I do.
16         Q.   Were you on this specific call with
17   Jenifer Ruggiero?
18         A.   Yes.  I was the one who was talking to
19   her.
20         Q.   Okay.  And is that an exact quote of
21   what she said?
22         A.   The "make us whole" part was.  Let's
23   see here.  So she said there were two possible
24   outcomes.  Either they would find the policy limits
25   were set correctly.  That was a direct quote.  Or
```

**CHRISTOPHER LINDSAY - September 04, 2024**

1  they would find they were not set correctly, and I
2  think -- I can't remember.  I'd have to look at my
3  notes if it was a direct quote for the other part of
4  the second bullet, but I do remember specifically
5  when she said they would be reformed to make us
6  whole.  She said that.
7         Q.   Okay.  Are you aware that Jenifer
8  Ruggiero has been deposed in this case?
9         A.   Yes, I am.
10        Q.   Did you see her transcript or her
11 video?
12        A.   No, I have not.
13        Q.   Are you aware that she denies that?
14        A.   I am now.  Okay.
15        Q.   And do you actually remember her using
16 the phrase "make us whole"?
17        A.   I remember her using those exact
18 words.
19        Q.   And what do you think that means, "make
20 us whole"?
21        A.   Well, to me, it means ensure that we
22 have enough coverage to cover all of our losses.
23        Q.   Okay.  So it basically means you would
24 have no limits on your insurance, correct?
25               MS. MINAMIZONO:  Objection.  Form.