**BRIAN SEIGAL - September 18, 2025**

```
        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-014130NYW-STV

----------------------------------------------------

VIDEO-RECORDED DEPOSITION OF BRIAN SEIGAL
September 18, 2025

----------------------------------------------------

ERIN LINDSAY; and CHRISTOPHER LINDSAY,

Plaintiffs,

v.

THE TRAVELERS HOME AND MARINE INSURANCE COMPANY;
and GEICO INSURANCE AGENCY, LLC,

Defendant.

----------------------------------------------------

APPEARANCES:

For the Plaintiffs:

     SUSAN MINAMIZONO, ESQ.
     Levin Sitcoff, P.C.
     455 Sherman Street, Suite 490
     Denver, Colorado 80203
     303-575-9390
     susan@lsw-legal.com

For the Defendant The Travelers Home and Marine
Insurance Company:

     EVAN STEPHENSON, ESQ.
     Spencer Fane, LLP
     1700 Lincoln Street, Suite 2000
     Denver, Colorado 80203
     303-839-3755
     estephenson@spencerfane.com
```

EXHIBIT 5

**BRIAN SEIGAL  -  September 18, 2025**

```
1            First, do you agree that your report
2   contains no opinion about what the policy limits of
3   the Lindsays should have been at any point in time?
4   Do you agree with that?
5        A    Correct.
6        Q    Okay.  And do you agree that there is no
7   opinion in your report about how much money the
8   Lindsays should have been paid under any particular
9   coverage?  Do you agree with that?
10       A    Correct.
11       Q    Okay.  And do you agree that in your
12  report you do not have an opinion expressed
13  anywhere about when the timing of any particular
14  amount of money should have been made by Travelers?
15  Do you agree with that?
16       A    I'm thinking.  I don't think I did put a
17  date of when that should have been done, correct.
18       Q    Now, you're qualified -- I mean, you
19  claim to be qualified to adjust this claim,
20  correct?
21       A    Correct.
22       Q    You believe that you have all the
23  expertise and tools, anything that's needed to
24  actually adjust this claim as if you were Peter Van
25  Riper; you have the capability of doing that,
```

**BRIAN SEIGAL  -  September 18, 2025**

1  correct?
2      A   What I actually opined on is that I
3  understand the industry standards, and that I
4  applied those industry standards to this case and
5  reviewed this case and whether or not the
6  parties -- whether or not they performed according
7  to those industry standards.  That's what I opined
8  on.
9      Q   So let me ask you that question, then.
10 Do you believe you are qualified and capable of
11 adjusting this claim as though you were in the
12 shoes of Peter Van Riper?
13     A   I've never -- I've never, like, done
14 Xactimate, so -- that's part of his job.  I've
15 never done that.  So I wouldn't -- I wouldn't think
16 that I should be doing Xactimate.  I'm not -- I'm
17 not licensed in that.  I've never done that.
18 That's part of his job.
19         So I wouldn't -- I wouldn't say I should
20 be like Peter Van Riper.  I shouldn't be a general
21 adjuster doing this job.
22     Q   Okay. Fair enough. Is there anything
23 else that causes you to say that, other than just
24 not being expert or familiar with Xactimate?  Is
25 there anything else that causes you to say that you

**BRIAN SEIGAL  -  September 18, 2025**

1  don't consider yourself to be capable of being in
2  Peter Van Riper's shoes to adjust this claim?
3      A   I mean, I've never really been in the
4  role of being a first-party homeowner -- I mean, a
5  first-party home insurance property adjuster.  I've
6  never done that.
7      I mean, I've been in management director
8  roles over -- management roles over people like
9  that, with that kind of firsthand knowledge.  So
10 I've been more of like -- I'd say like a Gatti role
11 in this, you know, having those kinds of
12 responsibilities and overseeing people like that.
13     So -- but directly over Peter Van
14 Riper's job -- Riper's job, I probably wouldn't --
15 I wouldn't -- I wouldn't have that job.  I wouldn't
16 think that would be the right role for me.
17     Q   Okay.
18     A   And I wouldn't -- I wouldn't go out there
19 and apply for that job and say I'm ready on day one
20 to go do it.  I wouldn't want to do it, and I don't
21 think that's something I've ever done.
22     Q   Okay.  That's fair enough.  Now, tell me
23 if I'm understanding correctly.  My understanding
24 is that someone like Michael Gatti, who is in
25 leadership, and actually pretty high up in

**BRIAN SEIGAL  -  September 18, 2025**

1  parties -- that a mistake had been made, and that
2  you are trying to rectify that mistake and do
3  what's right for that situation.
4       Q    Okay.  Now, in your reports, you do not
5  include any kind of standard identifying when
6  reformation is required, correct?
7       A    I do not think I include a standard,
8  correct.
9       Q    Okay.  Why did you not include the
10 standard identifying when a reformation is
11 required?
12      A    I don't know -- I don't know if there is
13 an actual standard of when it is required.
14      Q    Do you agree that sometimes insurance
15 companies will reform policies even when they are
16 not required to do so?
17      A    I mean, I -- I have been involved in
18 many, many, many policy reformations over the
19 years, and -- and so I have never, ever heard of an
20 insurance company deciding to reform an insurance
21 policy when it's not required.
22      Q    Okay.  Travelers did do some things to
23 the benefit of the Lindsays and other people
24 involved in the Marshall Fire that it wasn't
25 required to do, right?  Do you agree with that?

**BRIAN SEIGAL  -  September 18, 2025**

```
 1       A    But I actually -- I've wanted to ask for
 2  a while now.  I'd love to take a break --
 3       Q    Sure.
 4       A    -- and just -- just do that.  I mean,
 5  we've been going for a while.
 6       Q    That's fine.  How long do you want?
 7            MR. STEPHENSON:  Let's just go off the
 8  record and we can talk about it.
 9            THE VIDEOGRAPHER:  We're going off the
10  record.  The time right now is 3:14 p.m.
11            (Break taken.)
12            THE VIDEOGRAPHER:  We're now back on the
13  record.  The time is 3:29 p.m.
14       Q    (BY MR. STEPHENSON)  Okay.  Mr. Seigal, I
15  think we covered this before.  I want to make sure
16  I've got it on the record.  You agree that your
17  report does not identify any industry standard that
18  required Travelers to remove Peter Van Riper or
19  Aaron Stone from this claim, true?
20       A    True.
21       Q    Looking at Footnote 4 of your April
22  report, from April -- your April 1st, 2025, report
23  which is Exhibit 157, look at Footnote 4 on page
24  16.  Do you see where you compare Mr. Van Riper and
25  Mr. Stone to a fox guarding the henhouse?
```