IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-CV-01413-NYW-STV

ERIN LINDSAY and CHRISTOPHER LINDSAY,

    Plaintiffs,

v.

THE TRAVELERS HOME AND MARINE INSURANCE COMPANY and
GEICO INSURANCE AGENCY, LLC

    Defendants.

## DEFENDANT GEICO INSURANCE AGENCY'S MOTION FOR SUMMARY JUDGMENT

Defendant, GEICO Insurance Agency ("Defendant" or "GIA") by and through their counsel, Lewis Brisbois Bisgaard & Smith LLP, hereby submits its motion, pursuant to Fed. R. Civ. P. 56, for an order entering summary judgment in its favor on all claims asserted by Plaintiffs Erin and Christopher Lindsay.

## INTRODUCTION

This matter arises from Plaintiffs Erin and Christopher Lindsays' (the "Lindsays") loss of their home on December 30, 2021 during the Marshall fire (the "Fire Loss"). The Lindsays allege that the limits of the Lindsays' homeowners insurance policy were insufficient to rebuild their home. The Lindsays' primary dispute is with their insurer, Travelers Home And Marine Insurance Company ("Travelers"). Nevertheless, Plaintiff also brought negligence and negligent misrepresentation claims against Geico Insurance Agency ("GIA") in a misguided attempt to hold their insurance agent liable for any rebuild costs that exceed their policy limits. The Lindsays contend that GIA sold them a homeowners' insurance policy in 2015 that, *after six subsequent renewals*, provided insufficient coverage limits to pay the costs necessary to rebuild their home in

1

the midst of an unforeseeable global pandemic, supply-chain shortage, and rampant inflation. The Lindsays' claims against GIA are an untenable effort to transform GIA into the defacto insurer of last resort for the risk of inadequate coverage limits.

Colorado courts have rejected similar efforts of underinsured policyholders to hold their insurance agent liable when policy limits are later found to be inadequate to pay a claim. Colorado law provides that insurance agents have a simple duty of reasonable care to obtain the type of insurance requested by an insured or to advise of their inability to do so. Insurance agents like GIA are not financial counselors, risk managers, or guarantors of the policies they sell, and do not have a duty to advise, guide, or direct an insured to increase limits or obtain additional coverage. Several recent district court cases arising from the Marshall fire have resulted in summary judgment for the insurance agent facing nearly identical claims by underinsured homeowners (Appendices 1-3).

GIA is entitled to summary judgment on each of the Lindsays' negligence claims because the Lindsays cannot establish multiple elements of their negligence claims against GIA. The Lindsays fundamentally allege that GIA should have procured a homeowners policy with higher coverage limits in 2015. Plaintiffs wholly ignore the fact that GIA was asked to procure a homeowners policy, and did exactly that. The Lindsays accepted the Travelers policy in 2015 and knew the limits of coverage. GIA never agreed to obtain higher coverage limits for the Lindsays. To the contrary, GIA told the Lindsays that it was unable to provide a policy with higher limits. Furthermore, by the time of the Fire Loss, the policy GIA procured in 2015 was long expired. GIA was not involved in any of the six renewals that preceded the Fire Loss. The undisputed facts show that GIA did not breach any duty owed to the Lindsays and that the allegedly inadequate limits of insurance was not caused by GIA. The Court should grant this motion and enter summary judgment in favor of GIA on Plaintiff's claims for negligence and negligent misrepresentation.

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

(1) On or about June 4, 2015, the Lindsays purchased a home located at 826 Trail Ridge Drive, Louisville, Colorado 80027 (the "Property"). **Ex. 1** (Am. Compl. at ¶9); **Ex. 2** (Property Deed); **Ex. 3** (E. Lindsay Depo. at 63:13-16, 71:14-16).

(2) On or about April 30, 2015, Ms. Lindsay called GIA to obtain homeowners insurance for the Property. Declaration of Brittany Johnson ("Johnson Decl.") at ¶5; **Ex. 3** (E. Lindsay Depo. at 99:19 – 102:22); **Ex. 4** (C. Lindsay Depo. at 70:17-24); **Ex. 5** (GIA Resp. to ROG ##6, 8).

(3) GIA uses a call center model. When a customer calls GIA, the call is taken by an available agent at one of GIA's call centers in Fredericksburg, VA, Virginia Beach, VA, Buffalo, NY, or Kansas City, KS. Johnson Decl. at ¶4.

(4) The Lindsays do not allege a special relationship with GIA. **Ex. 1** (Am. Compl. at ¶¶11-22, 81-86, 88-93); **Ex. 6** (E. Lindsay Resp. to ROG ##1-2); **Ex. 7** (C. Lindsay Resp. to ROG ##1-2).

(5) Ms. Lindsay's April 30, 2015 call was taken by Jonathan Aisel, an agent at GIA's call center. Johnson Decl. at ¶5; **Ex. 8** (GIA Resp. to ROG #6, 8).

(6) Mr. Aisel used a decision tree program to identify Travelers as an appropriate insurance carrier for the Lindsays' Property, and then interfaced with Travelers' electronic system to obtain a quote to insure the Property. Johnson Decl. at ¶6.

(7) To quote a Travelers' insurance policy, GIA was required by Travelers to obtain a replacement cost estimate for the Property, using a third-party estimating tool from Marshall Swift/Boeckh ("MSB"). Johnson Decl. at ¶7; **Ex. 5** (GIA Resp. to ROG #5-6, 11).

(8) Ms. Lindsay provided information to Mr. Aisel about the components and characteristics of the Property, which he entered into the MSB replacement cost estimator to generate estimates for the Property. Johnson Decl. at ¶¶7-8; **Ex. 9** (04-30-2015 Replacement Cost Estimates in the amounts of $443,050 and $482,204); **Ex. 5** (GIA Resp. to ROG #5-6); **Ex. 3** (E. Lindsay Depo. at 100:17-102:22).

(8.1) During the call, Ms. Lindsay reports that she "insisted on increasing the policy limit" and that Mr. Aisel was able to increase the dwelling limit to $500,000, but could not increased the limit any further. **Ex. 6** (E. Lindsay Resp. to ROG #1, 8, 11, 17.)

(9) On or about May 1, 2015, Ms. Lindsay independently sought homeowners insurance quotes from other insurance agents, including a quote for a State Farm policy with dwelling limits of $989,300 at a premium of $1,815.00 and for a Farmers policy with dwelling limits of $822,500 at a premium of $2,991.00. **Ex. 6** (E. Lindsay Resp. to RFA #9.) **Ex. 3** (E. Lindsay Depo. at 122:15-126:21); **Ex. 10** (State Farm quote); **Ex. 11** (Farmers quote).

(10) The Lindsays chose to purchase the Travelers homeowners policy quoted by GIA because they were "informed that Travelers had a better reputation than the other insurers." **Ex. 6** (E. Lindsay Response to ROG #15); **Ex. 7** (C. Lindsay Response to ROG #15).

(11) On May 11, 2015, Travelers issued Policy number 994039763-633-1 to Erin and Christopher Lindsay, effective from June 4, 2015 to June 4, 2016 and showing a Dwelling limit of $500,000 (the "2015 Policy"). Johnson Decl. at ¶8; **Ex. 12** (2015 Policy).

(12) Ms. Lindsay recalled a second call to GIA in 2015 sometime after they closed their purchase of the Property, wherein property coverage limits were discussed and the GIA agent told her that GIA was unable to provide higher limits of insurance for the 2015 Policy. **Ex. 3** (E. Lindsay Depo. at 102:23-112:9).

4

(13) The 2015 Policy was the least expensive option and offered the lowest dwelling limit, as compared to the quotes Ms. Lindsay obtained from State Farm and Farmers. *Compare* **Ex. 12** (2015 Policy at Bates no. 001935 showing dwelling limit of $500,000 at a cost of $1,481.00); **Ex. 10** (State Farm quote showing dwelling limit of $989,300 at a cost of $1,815.00); **Ex. 11** (Farmers quote showing dwelling limit of $822,500 at a cost of $2,991.00).

(14) The Lindsays accepted the 2015 Policy knowing that it provided $500,000 dwelling limits and were not under a mistaken belief that their dwelling limit was higher than what was actually reflected in the 2015 Policy. **Ex. 3** (E. Lindsay Depo. at 85:4 – 88:9); **Ex. 4** (C. Lindsay Depo. at 76:20-81:20).

(15) The Lindsays never asked GIA to procure an insurance policy with "guaranteed replacement cost" coverage and admit that they did not know anything about "guaranteed replacement cost" coverage until they learned about it after the Fire Loss. **Ex. 6** (E. Lindsay Resp. to ROG #1-2, 6-7, 10-14, and 18(8)-(10)); **Ex. 7** (C. Lindsay Resp. to ROG #1-2, 6-7, 10-14, and 18(8)-(10)).

(16) GIA did not sell any homeowners policies with guaranteed replacement cost coverage from 2015 - 2021. Johnson Decl. at ¶14; **Ex. 8** (GIA Resp. to ROG #13).

(17) GIA never represented to the Lindsays that it would obtain higher limits for the Property than were stated by the terms of the 2015 Policy. **Ex. 6** (E. Lindsay Resp. to RFA #5); **Ex. 7** (C. Lindsay Resp. to RFA #5).

(18) Travelers retained Information Providers, Inc. to inspect the Property after the 2015 Policy was issued, which resulted in a July 2, 2015 report stating that the replacement cost for the Property was $393,252.00. **Ex. 6** (E. Lindsay Resp. to RFA #13); **Ex. 7** (C. Lindsay Resp. to RFA #13); **Ex. 13** (Information Providers Report); **Ex. 21** (Webb Depo. at 98:16–111:15.)

5

(19) GIA does not work with Information Providers, had no involvement in the inspection process, did not receive a copy of the inspection report, and was not responsible for reviewing the findings of the inspection. Johnson Decl. at ¶9.

(20) In the following years, the Lindsays' renewed their policy annually.[1] Johnson Decl. at ¶10; **Ex. 14** (2016 Policy Declarations); **Ex. 15** (2017 Policy Declarations); **Ex. 16** (2018 Policy Declarations); **Ex. 17** (2019 Policy Declarations); **Ex. 18** (2020 Policy Declarations); **Ex. 19** (2021 Policy).[2]

(21) Travelers sent renewal notices to the Lindsays and handled each of the six policy renewals directly with the Lindsays, and without GIA's involvement or input. Johnson Decl. at ¶10; **Ex. 3** (E. Lindsay Depo. at 215:4-15).

(22) The Lindsays did not contact GIA to discuss policy renewal for any of the six Renewal Policies. Johnson Decl. at ¶10; **Ex. 3** (E. Lindsay Depo. at 213:5-25).

(23) The Lindsays received a copy of the Declarations for each of the six Renewal Policies, and knew the amount of the dwelling limit contained within each of the Renewal Policies. **Ex. 3** (E. Lindsay Depo. at 85:4-88:5); **Ex. 4** (C. Lindsay Depo. at 76:20-81:20); **Ex. 6** (E. Lindsay Resp. to RFA #1); **Ex. 7** (C. Lindsay Resp. to RFA #1).

(24) GIA never represented to the Lindsays that it would obtain higher limits for the Property than were stated by the terms of each of the Renewal Policies. **Ex. 6** (E. Lindsay Resp. to RFA #5); **Ex. 7** (C. Lindsay Resp. to RFA #5).

---

[1] The renewal policies will be referred to by the first year of the policy period (e.g., the "2016 Policy" was effective 06/04/2016 – 06/04/2017). The six renewal policies effective through the Fire Loss may be collectively referenced as the "Renewal Policies" herein. The original 2015 Policy and the Renewal Policies may be collectively referenced as the "Policies" herein.

[2] Ex. 19 is a copy of the 2021 Policy Declarations *as reformed*. The original Declarations in effect at the time of the Fire Loss are shown at Bates TRAVELERS_002320 – 2323.

(25) On March 28, 2019, Ms. Lindsay called the GIA call center. During the call, GIA agent Jesse Broulette received information from Ms. Lindsay and used the required MSB replacement cost estimator to generate an estimate of $436,205. Johnson Decl. at ¶¶11-12; **Ex. 20** (2019 RCE); **Ex. 5** (GIA Resp. to ROG #8); **Ex. 3** (E. Lindsay Depo. at 130:13 – 134:14); **Ex. 6** (E. Lindsay Resp. to ROG #9); **Ex. 7** (C. Lindsay Resp. to ROG #9); **Ex. 1** (Am. Compl. at ¶¶15-16).

(26) During the March 28, 2019 call, Ms. Lindsay was told that the dwelling limit could not be increased because the estimate generated by the MSB replacement cost estimator was lower than the current dwelling limit in the 2018 Policy. Johnson Decl. at ¶¶11-12; **Ex. 6** (E. Lindsay Resp. to ROG #1, 8-9, 11, 17.); **Ex. 16** (2018 Policy Declarations); **Ex. 20** (2019 RCE).

(27) The March 28, 2019 call was the last communication the Lindsays had with GIA concerning their coverage limits prior to the Fire Loss on December 30, 2021, a period of over 33 months. Johnson Decl. at ¶13; **Ex. 3** (E. Lindsay Depo. at 214:1-11); **Ex. 6** (E. Lindsay Resp. to RFA #14); **Ex. 7** (C. Lindsay Resp. to RFA #14).

(28) Travelers renewed Policy number 994039763-633-1 effective from June 4, 2021 to June 4, 2022 and with a dwelling limit of $557,000 (the "2021 Policy"), which was in effect on the date of the Fire Loss. **Ex. 19** (2021 Policy at Bates 2317).

(29) The Lindsays admit they received a copy of the 2021 Policy Declarations before the Fire Loss and knew that the dwelling limit was $557,000. **Ex. 6** (E. Lindsay Resp. to RFA #2-4); **Ex. 7** (C. Lindsay Resp. to RFA #2-4).

(30) GIA was not involved in the policy renewal that led to the 2021 Policy, as Travelers handled the renewal directly with the Lindsays, and the Lindsays did not contact GIA for guidance.

7

Johnson Decl. at ¶13; **Ex. 3** (E. Lindsay Depo. at 215:16 – 216:7); **Ex. 4** (C. Lindsay Depo. at 318:6-22); **Ex. 6** (E. Lindsay Resp. to RFA #15); **Ex. 7** (C. Lindsay Resp. to RFA #15).

(31) On or about December 30, 2021, the Lindsays' Property was destroyed in the Marshall Fire. **Ex. 1** (Am. Compl. at ¶¶23-24); **Ex. 3** (E. Lindsay Depo. at 18:9-12).

(32) After the Fire Loss, the Lindsays discovered that their Property was underinsured. **Ex. 1** (Am. Compl. at ¶¶28-29); **Ex. 6** (E. Lindsay Response to ROG #3); **Ex. 7** (C. Lindsay Response to ROG #3).

(33) Travelers reformed the 2021 Policy, increasing the Dwelling Limit from $557.000 to $1,216,395.00, the Other Structures limit from $55,700 to $121,639, and the Personal Property limit from $389,900 to $851,500. **Ex. 19** (2021 Policy, *Compare* Bates 2317 *with* Bates 2321); **Ex. 1** (Am. Compl. at ¶43).

## **LEGAL STANDARD ON SUMMARY JUDGMENT**

"A 'court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Aubrey v. Koppes*, 975 F.3d 995, 1004 (10th Cir. 2020) (quoting F.R.C.P. 56(a)). "[I]f the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1180 (10th Cir. 2018) (internal quotation marks omitted). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018).

8

**ARGUMENT**

**A.    SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFFS' FIRST CLAIM FOR NEGLIGENCE AGAINST GIA.**

As for any negligence claim, for Plaintiffs to prevail in a negligence claim against an insurance agent, they must show: (1) a duty or obligation, recognized by law, requiring the defendant to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) a failure or breach of duty by the defendant to conform to the standard required by law; (3) a sufficient causal connection between the offensive conduct and the resulting injury; and (4) actual loss or damage resulting to the interests of the plaintiff. *Bayly, Martin & Fay, Inc. v. Pete's Satire, Inc.,* 739 P.2d 239, 242 (Colo. 1987) (internal citations omitted). "The burden of proving the elements of a negligence claim is on the plaintiff, and that burden is by a preponderance of the evidence." *Id.* at 242–43.

**1.    The Scope of GIA's Duty as an Insurance Agent.**

"[T]he initial question in any negligence action is whether the defendant owed a legal duty to protect the plaintiff against injury." *HealthONE v. Rodriguez ex rel. Rodriguez,* 50 P.3d 879, 888 (Colo. 2002). "Whether a specific defendant owes a specific plaintiff a legal duty and the scope of any such duty are questions of law properly determined by a court." *Ryder v. Mitchell*, 54 P.3d 885, 889 (Colo. 2002). In this case, GIA was the Lindsays' insurance agent. Colorado law provides that "insurance agents have a duty to act with reasonable care toward their insureds, but absent a special relationship between the insured and the insurer's agent, that agent has no affirmative duty to advise or warn his or her customer of provisions contained in an insurance policy." *Kaercher v. Sater*, 155 P.3d 437, 441 (Colo. App. 2006). Rather, the limited "general duty" of an insurance agent "is to refrain from affirmative fraud, not to watch out for all rights of the insured and inform the latter of them." *Id. quoting* 4 Couch on Insurance § 55:5 (3d ed.).

9

Consistent with this limited general duty, an insurance agent does not have a general duty to give advice, including "advice about what policies should be purchased as well as advice about what coverage is contained in an insured's existing policy." *Id.* An insurance agent does not have a duty "to ensure complete protection to the policyholder or to recommend higher policy limits." *Apodaca v. Allstate Ins. Co.*, 232 P.3d 253, 259 (Colo. App. 2009), *aff'd*, 255 P.3d 1099 (Colo. 2011). Further, "an insurance agent does not have a duty to advise of additional and available insurance coverages suitable for the customer's needs." *Id*. "Insurance agents or brokers are not personal financial counselors and risk managers, approaching guarantor status, and it is well settled that agents have no continuing duty to advise, guide, or direct a client to obtain additional coverage." *Kaercher*, 155 P.3d at 441. "A negligence claim against an insurance agent may be premised on one category of conduct; specifically, when an agent promises to obtain a specific type of insurance requested by the insured, the agent assumes a duty to act reasonably to procure the requested insurance or to notify the insured of the inability or failure to do so." *Apodaca*, 232 P.3d at 259.

"Whether a special relationship has been formed turns on whether there is 'entrustment,' that is, whether the agent or broker assumes additional responsibilities beyond those which attach to an ordinary, reasonable agent possessing normal competencies and skills." *Kaercher*, 155 P.3d at 441 citing *Parker v. State Farm,* 630 N.E.2d 567, 570 (Ind. Ct. App. 1994) (articulating the kinds of factors required to establish a special relationship of entrustment). "Even when an agent represents that he or she is knowledgeable about insurance coverages, and regularly in the course of his or her business, informs, counsels, and advises customers about their insurance needs, the agent does not incur duties beyond those of the standard policyholder-insurance agent relationship." *Apodaca*, 232 P.3d at 259.

10

In this case, the Lindsays do not even allege the existence of a special relationship with GIA. (UMF[3] 4.) This is not surprising, as GIA operates as a call center model. (**UMF** 3.) There is no evidence that the Lindsays ever met a GIA agent, let alone had an established relationship with any particular GIA agent. The Lindsays course of dealing with GIA prior to the Fire Loss, over a period of more than six years, consisted of a few phone calls with different GIA representatives at remote call centers. (**UMF** 2-8, 12, 25-26.) Moreover, a special relationship is not established simply by virtue of the fact that GIA had a six-year relationship with the Lindsays at the time the 2021 Policy was issued. *See, e.g., Richardson v. Amica Mutual Ins. Co.*, 693 F. Supp.3d 1182, 1186-88 (D. Colo. 2023) ("Plaintiffs have not cited any case where a Colorado court found that an insurance agent had a duty to procure coverage for a customer on the basis of the agent's previous dealings with the customer, and the Court is aware of none."); *see also Wyss v. Campbell, et al.*, case no. 2022CV30810 (Boulder Cnty., Colo., Dist. Ct. May 24, 2024)[4] (Appendix 1 at p. 16) (In another Marshall fire case the district court rejected argument that a special relationship may arise "simply because the agent had worked with the client in the past to procure insurance."); *Mayfield v. DeLaCroix et al.*, case no. 2022CV30463 (Boulder Cnty., Colo., Dist. Ct. October 1, 2024) (Appendix 2 at p. 14-15) (finding no special relationship in another Marshall fire case involving multiple policy renewals, noting plaintiffs "at best merely assert that [defendant agent] had served as their insurance agent over several years."); *Barshinger v. State Farm et al.*, case no. 2023CV31178 (Dist. Ct. Arapahoe Cnty., Colo. March 5, 2025) (Appendix 3 at p. 20) (In another Marshall fire case, the Court rejected the plaintiffs' "insufficient" argument for an "enhanced duty

---

[3]   "UMF" refers to the numbered statement of undisputed material facts within this Brief.

[4]   Plaintiffs' attorneys in this case are also counsel of record in *Wyss*, which is now fully briefed in the Colorado Court of Appeals and scheduled for oral argument on January 7, 2026 (Colorado Court of Appeals case no. 2024CA1352).

11

of care" based on their "assertion that [the agent] understood their desire for coverage sufficient to rebuild their home in the future if there was a total loss….") The facts here are far less compelling than *Richardson*, *Mayfield*, or *Barshinger*, given the lack of any personal relationship between the Lindsays and any of GIA's agents, and the very few instances when Ms. Lindsay contacted GIA about their policies.

Given the lack of evidence supporting a "special relationship" with GIA, the standard of care applicable to GIA is the standard policyholder-insurance agent relationship duty to act with reasonable care toward the Lindsays. *Kaercher*, 155 P.3d at 441. GIA did not have a duty to advise or warn the Lindsays of provisions contained within their insurance policies, nor a duty advise of additional and available insurance coverages suitable for the Lindsays needs. *Id.*; *Apodaca*, 232 P.3d at 259.

### 2.      GIA Did Not Breach Its Duty of Reasonable Care.

#### (a)     GIA Played No Role In Determining The 2021 Policy's Dwelling Limit.

The 2021 Policy was in effect on the date of the Fire Loss, December 30, 2021. (**UMF** 28.) The Lindsays' negligence claim against GIA fails for the simple reason that GIA had no involvement in determining the dwelling limit of the 2021 Policy. (**UMF** 30.) GIA quoted and procured the 2015 Policy for the Lindsays. (**UMF** 2-8. 10-11.) Each of the six subsequent policy renewals were handled directly by Travelers and GIA had no involvement in any of the policy renewals from 2016 through the Fire Loss. (**UMF** 20-22.)

GIA's role as the Lindsays' agent was minimal. With respect to the dwelling limits, Ms. Lindsay had discussions with GIA about the procurement of the 2015 Policy on April 30, 2015. (**UMF** 2-8.) Ms. Lindsay provided information to GIA's agent about the components and characteristics of the their Property, which GIA's agent then input into the MSB replacement cost estimator to generate a replacement cost estimate for the Lindsays' Property, as required by

12

Travelers. (**UMF** 7-8.) GIA's agent was the conduit through which the information provided by Ms. Lindsay about the Property was submitted to the MSB replacement cost estimator. Thus, the resulting replacement cost estimate was based on information from Ms. Lindsay and generated by a third-party replacement cost estimator GIA was required to use. GIA's agent was only able to increase the dwelling limit to $500,000, at Ms. Lindsay's request, and Ms. Lindsay was informed the limit could not be increased any further. (**UMF 8.1, 12**.)

Travelers issued the 2015 Policy with dwelling limits of $500,000. (**UMF** 11.) After the 2015 Policy issued, Travelers independently sought to verify the amount of the Lindsays' dwelling limit through an in-person independent inspection. (**UMF** 18-19.) The inspector's report showed a lower replacement cost estimate ($393,252) than the dwelling limit provided by the 2015 Policy. (**UMF** 18.) GIA had no involvement in the inspection or other verification of the dwelling limit for the 2015 Policy. (**UMF** 19.)

Ms. Lindsay inquired about the amount of dwelling limits again several years later, on March 28, 2019. (**UMF** 25-27.) This call was mid-policy period during the 2018 Policy, and was not associated with a policy renewal. (**UMF** 25.) At this time, GIA again used the MSB replacement cost estimator to generate an estimate based on information from Ms. Lindsay, as required by Travelers. (**UMF** 25.) Ms. Lindsay was told that the dwelling limit could not be increased because the replacement cost estimate of $436,205 was less than the 2018 Policy's existing dwelling limit. (**UMF** 25-26.) Nevertheless, when Travelers later renewed the policy and issued the 2019 Policy, the dwelling limit was increased to $524,000. (**UMF** 26.)

The Lindsays acknowledge that they never consulted GIA with regard to any policy renewals, including the renewal of the 2020 Policy and issuance of the 2021 Policy. (**UMF** 30.) In fact, the Lindsays did not seek any assistance from GIA between the March 28, 2019 phone call

13

and the December 30, 2021 Fire Loss, a period of over thirty-three months. (**UMF** 27.) Thus, the Lindsays' negligence claim against GIA is premised upon the two telephone calls in 2015 and a single telephone call in 2019. In effect, the Lindsays are attempting to impute GIA's procurement of the 2015 Policy to each of the six subsequent renewal policies. This theory of liability is contrary to Colorado law.

Under Colorado law, "a renewal policy is 'just as much a new contract as if issued on a form carrying a different number than the original policy.' " *Breaux v. Am. Fam. Mut. Ins. Co.*, 554 F.3d 854, 864 (10th Cir. 2009) *citing Hoang v. Monterra Homes (Powderhorn) LLC*, 129 P.3d 1028, 1035 (Colo. App. 2005), *rev'd on other grounds*, 149 P.3d 798 (Colo. 2007); *Aronoff v. Carraher*, 361 P.2d 354, 357 (Colo. 1961); *Am. Cas. Co. v. Glaskin*, 805 F.Supp. 866, 872 (D.Colo. 1992) ("Each renewal of an insurance policy is a separate contract that may be enforced as written."). Here, the 2021 Policy is a separate and distinct policy of insurance, which GIA had no involvement in procuring for the Lindsays. Thus, the Lindsays' negligence claim fails because GIA was not asked to obtain homeowners policy for the Lindsays for the 2021 Policy period and did not fail to do so. *Apodaca*, 232 P.3d at 259 (the "one category of conduct" supporting a negligence claim against an agent is "when an agent promises to obtain a specific type of insurance requested by the insured" and fails to notify the insured of an inability to do so.) *citing Kaercher*, 155 P.3d. at 442. As such, GIA cannot be held liable for the allegedly inadequate limits of the 2021 Policy. GIA met its obligation to obtain homeowners coverage for the Lindsays in 2015, and cannot be imputed through six different renewals to form the basis for a negligence action arising from allegedly inadequate dwelling limits in 2021. Such a result would be fundamentally unfair, as GIA was never even asked to review the Lindsays' coverage contained within the 2021 Policy. (UMF 21-22, 30.) The Lindsays' cannot maintain a negligence claim against GIA absent evidence

14

of GIA's direct involvement in procuring the 2021 Policy. This result was reached in an analogous Marshall Fire case wherein Judge Volz's order granting summary judgment noted "the policy in effect at the time Plaintiffs made their claim for a loss due to the Marshall fire, was not a policy obtained through [defendant agent]. … Thus, any alleged misrepresentations concerning the [prior] Policy are inapplicable to their claim." Appendix 2 (*Mayfield* Order at p. 13.)

The Lindsays negligence claim seeks to hold GIA liable for a much broader duty than has been recognized in Colorado. As it pertains to the 2021 Policy, the Lindsays' necessarily argue that GIA had an ongoing duty to review the renewal policies and advise about available coverages. To the contrary, it is well settled that an agent does not have a "duty to advise of additional and available insurance coverages suitable for the customer's needs" or "duty to ensure complete protection to the policyholder or to recommend higher policy limits." *Apodaca*, 232 P.3d at 259 *citing Kaercher*, 155 P.3d at 441. While GIA was the Lindsays' agent, GIA was not the Lindsays' "personal financial counselors and risk managers" and cannot be the "guarantor" of the Lindsays' inadequate coverage limits. *Kaercher*, 155 P.3d at 441.

### (b) GIA Did Not Breach Any Duty To Plaintiffs.

The Lindsays asked GIA to quote homeowners insurance for their Property in 2015. (**UMF 2**.) Consequently, GIA had "a duty to act reasonably to procure the requested insurance or to notify the insured of the inability or failure to do so." GIA met its duty by procuring the 2015 Policy for the Lindsays. (**UMF 2-8, 10-11**.) The Lindsays are charged with knowledge of the terms of the Policies and cannot claim ignorance of their insurance only after suffering a loss. *Pete's Satire*, 698 P.2d at 1391; *Spaur v. Allstate Ins. Co.,* 942 P.2d 1261, 1265-66 (Colo. App. 1996) ("It is the policyholder's responsibility to read the policy.") To their credit, the Lindsays do not dispute that they knew the dwelling limits provided by each of their Policies. (**UMF 14, 23**.) The Lindsays do not dispute that GIA's agents clearly informed them that GIA was unable to increase the dwelling

15

limit any further. (UMF **8.1, 12, 26**.) Thus, the Lindsays were fully informed of GIA's inability to secure higher limits due to the replacement cost estimate. The Lindsays were also fully aware that they could get higher limits from a different agent. (**UMF 9**.)

Despite acknowledging that they knew the dwelling limits for the 2015 Policy and the subsequent Renewal Policies (**UMF 14, 23**), the Lindsays claim in written discovery that they *actually* wanted guaranteed replacement cost coverage when they purchased the 2015 Policy and its subsequent renewals. This argument is contradicted by their own admissions that GIA never represented that it would obtain higher dwelling limits for the Lindsays' Property than were stated by the terms of the renewal policies. (**UMF 17, 24**.) There is no evidence that the Lindsays ever *asked* GIA to procure guaranteed replacement cost coverage. In fact, GIA does not sell policies with guaranteed replacement cost coverage and the Lindsays admit that they did not know anything about guaranteed replacement cost coverage until *after* the Fire Loss. (**UMF 15-16**.)

The crux of Plaintiff's claim is not a failure to procure the requested insurance. Rather, Plaintiffs believe that they should have been *educated* about guaranteed replacement cost coverage. This theory fails because GIA did not have a duty to advise Plaintiffs of about what insurance coverage should be purchased, what additional and available insurance coverages suitable for their needs, or to warn Plaintiffs of provisions contained in an insurance policy. *Apodaca*, 232 P.3d at 259. The Lindsays claim in this regard is in all material aspects identical to the facts in *Wyss*, *Mayfield*, and *Barshinger*. (**Appendices 1 – 3**.) The rejection of this theory of liability by Judge Volz in those cases, while certainly not binding on this court, are persuasive. The Lindsays' theory is contrary to the Court of Appeals' admonition that insurance agents like GIA "are not personal financial counselors and risk managers, approaching guarantor status" and "have no continuing duty to advise, guide, or direct a client to obtain additional coverage."

16

*Kaercher*, 155 P.3d 437, 441. GIA met its obligation to procure a homeowners' policy, as the Lindsays requested. (**UMF 2-8, 10-11**.) GIA's call center agents cannot be expected to educate the Lindsays about guaranteed replacement cost coverage they never asked for, and which GIA did not sell. (**UMF 15-16**.) It is also worth noting that the Lindsays shopped their insurance to two different insurance agents before purchasing the 2015 Policy, neither of which educated the Lindsays about guaranteed replacement cost coverage. (**UMF 9, 15**.)

    **3.    Plaintiffs Alleged Damages Were Not Caused By GIA.**

        **(a) Plaintiffs Cannot Show That GIA Caused Them To Be Underinsured In 2021.**

"To succeed on a negligence claim, a plaintiff must prove that the defendant's breach of its duty of care caused the claimed injury." *Garcia v. Colo. Cab Co., LLC*, 538 P.3d 328, 333 (Colo. 2023) (internal citations omitted). Intervening forces may also affect foreseeability and the scope of the actor's liability." *Id.* In this case, the dwelling limit of the 2015 Policy was informed by the replacement cost estimate generated during the application process. However, the replacement cost estimate was generated by a third-party tool that GIA was required to use, the MSB replacement cost estimator. (**UMF 7-8**.) GIA did not control the information provided by Ms. Lindsay and did not control the manner in which the MSB replacement cost estimator generated the estimate. (**UMF 7-8**.) GIA had no involvement or control over the inspection ordered by Travelers in 2015 to verify the dwelling limit. (**UMF 18-19**.) GIA had no input or involvement in any of the subsequent six policy renewals, including the 2021 Policy. (**UMF 21-22, 27, 30.**) Thus, Plaintiff cannot show a causal connection between GIA's procurement of the 2015 Policy and the allegedly insufficient limits in the 2021 Policy.

17

### (b) Plaintiffs Cannot Show That GIA Caused Damage Over and Above the Limits of the Reformed 2021 Policy.

To the extent that the Lindsays argue that GIA did not adequately account for the features of their Property when quoting the 2015 Policy and/or obtaining replacement cost estimates from the MSB estimator tool, they cannot show that any such error caused them damage. Travelers reformed the 2021 Policy, more than doubling the dwelling limit from $557,000 to $1,216,395. (**UMF 33**.) Thus, in order to show damage, the Lindsays must show that absent GIA's alleged errors, the 2021 Policy would have had limits in excess of the reformed policy limit of $1,216,395. Plaintiffs have not produced any evidence demonstrating that the reformation of the 2021 Policy failed to cure any alleged errors in the replacement cost estimates GIA generated in 2015.

**B.   SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFFS' SECOND CLAIM FOR NEGLIGENT MISREPRESENTATION AGAINST GIA.**

"To prevail on a claim for negligent misrepresentation," a plaintiff must prove that "(1) [the defendant] supplied false information in a business transaction; (2) it failed to exercise reasonable care or competence in obtaining or communicating that information; and (3) [the plaintiff] justifiably relied upon the false information." *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106 (10th Cir. 2009). "If the plaintiff has access to information that was equally available to both parties and would have led to discovery of the true facts, [they have] no right to rely upon the misrepresentation." *Bedard v. Martin*, 100 P.3d 584, 592 (Colo. App. 2004).

Plaintiffs are not arguing that GIA "agreed to obtain … higher limits, for the policyholder and failed to exercise reasonable care in doing so." *Apodaca*, 232 P.3d at 259. Plaintiffs admit that GIA never represented that it would procure higher limits than were shown in the policies. (**UMF 17, 24**.) The Lindsays admit that they had copies of the declarations for the 2021 Policy and knew the dwelling limits. "[A] negligent misrepresentation claim will fail if the insured has a copy of

18

his or her policy and can see that the alleged oral misrepresentation contradicts the express terms of the policy." *Colo. Pool Sys., Inc. v. Scottsdale Ins. Co.*, 317 P.3d 1262, 1270 (Colo. App. 2012).

The Lindsays instead base their misrepresentation claim on the allegation that GIA "failed to exercise reasonable care in communicating that the type of insurance coverage necessary to protect the Home was generally available in the insurance market in Colorado when Geico agreed to obtain the coverage." (Am. Compl. at ¶89.) In combination with their discovery responses, the Lindsays are arguing that they should have been advised that guaranteed replacement cost coverage was available on the market. This argument fails for multiple distinct reasons.

First, the Lindsays claim is premised upon an alleged nondisclosure (i.e., the failure to inform the Lindsays that "the type of insurance coverage necessary to protect the Home was generally available in the insurance market in Colorado…"). (Am. Compl. at ¶89.) This claim fails as a matter of law because a negligent misrepresentation claim must focus on what GIA "affirmatively represented, not what it failed to disclose." *Hildebrand v. New Vista Homes II, LLC*, 252 P.3d 1159, 1167 (Colo. App. 2010).

Second, the Lindsays' argument is contrary to well-settled Colorado law holding that "an insurance agent does not have a duty to advise of additional and available insurance coverages suitable for the customer's needs." *Apodaca*, 232 P3d at 259 *citing Kaercher*, 155 P.3d at 441. The Lindsays do not dispute that they never asked GIA to procure guaranteed replacement cost coverage. Quite the opposite, the Lindsays admit that they did not know anything about guaranteed replacement cost coverage until after the Fire Loss. (**UMF 15**.) In *Barshinger*, another Marshall fire case, Judge Volz cited *Apodaca* and rejected a misrepresentation claim premised upon the plaintiffs' "statements that they wanted insurance coverage that would fully protect them from any financial loss if their home was destroyed…" and contention that the agent "understood their desire

19

for coverage sufficient to rebuild their home in the future if there was a total loss…" (**Appendix 3**, *Barshinger* Order at p. 18-20.) Likewise in this case, the Lindsays cannot extrapolate their broad desire to be fully covered into a specific request for guaranteed replacement cost coverage.

Third, the Lindsays cannot plausibly show the element of "justifiable reliance on the alleged misrepresentation." *Colorado Pool*, 317 P.3d at 1270. The Lindsays' are presumed not only to have had equal access to the Policies, but to have actually read them. *Pete's Satire*, 698 P.2d at 1391; *Branscum v. Am. Cmty. Mut. Ins. Co.*, 984 P.2d 675, 680 (Colo. App. 1999). The Lindsays cannot show justifiable reliance because they were fully aware that higher coverage limits were available for their Property given Ms. Lindsay obtained quotes from other agents offering substantially higher limits than were offered by the 2015 Policy quoted by GIA. (**UMF 9-11**.) The Lindsays chose to purchase the less expensive Travelers homeowners policy quoted by GIA despite knowing that they could obtain a policy with higher dwelling limits, albeit at a higher cost. (**UMF 9-11**.) The Lindsays should not be rewarded in litigation for their economic choice to buy less expensive insurance with lower coverage limits.

## CONCLUSION

For the foregoing reasons, Defendant Geico Insurance Agency, respectfully requests that this Court grant summary judgment in its favor on all claims asserted against it by Plaintiffs.

Dated:  October 17, 2025

*s/ Ryan C. Gill*
Ryan C. Gill
LEWIS BRISBOIS BISGAARD & SMITH LLP
1700 Lincoln Street, Suite 4000
Denver, Colorado 80203
Phone:  303.861.7760
Email:  Ryan.Gill@lewisbrisbois.com
*Attorneys for Defendant GEICO Insurance Agency*