# GIA MOTION FOR SUMMARY JUDGMENT

# EXHIBIT 3

**ERIN LINDSAY - September 05, 2024**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01413-NYW-STV
_____

VIDEOTAPE DEPOSITION OF:
ERIN LINDSAY - September 5, 2024
_____

ERIN LINDSAY and CHRISTOPHER LINDSAY,

Plaintiffs,

v.

THE TRAVELERS HOME AND MARINE INSURANCE COMPANY; and
GEICO INSURANCE AGENCY, LLC,

Defendants.
_____

        PURSUANT TO NOTICE, the videotape
deposition of ERIN LINDSAY was taken on behalf of
the Defendant The Travelers Home and Marine
Insurance Company at 1200 28th Street, Suite 302,
Boulder, Colorado 80303, on September 5, 2024, at
9:02 a.m., before Carin C. Geist, Registered
Diplomate Reporter and Notary Public within
Colorado.

**ERIN LINDSAY - September 05, 2024**

1  how to navigate, and so I turned to what experts I
2  could.
3        Q.    Thank you.  So let's first nail down
4  the timing.
5        A.    Uh-huh.
6        Q.    So the fire happens on -- I think it's
7  the 30th?  Is that the -- or is it the 31st?
8        A.    I think it was the 30th.
9        Q.    So on the 30th of December, 2021, the
10  Marshall wildfire tragically destroyed many homes in
11  this area including your home, correct?
12        A.    Yes.
13        Q.    And you're looking to someone, to
14  experts, I guess, to help you understand what to do
15  about an insurance claim.  Is that fair?
16        A.    Yes.
17        Q.    And how soon after the fire are you
18  looking for that assistance?
19        A.    I don't remember.
20        Q.    I mean, it was within at least a week
21  or two weeks?  Can you give me any sense of how soon
22  after the fire you began seeking assistance
23  regarding insurance claims?
24        A.    Probably two weeks is fair,
25  thereabouts.  I don't know precisely.

**ERIN LINDSAY - September 05, 2024**

1  couple questions about just insurance generally.  Do

2  you agree that a policyholder must be completely

3  honest and truthful when making a claim?

4          A.   Yes.

5          Q.   Do you agree it's wrong for a

6  policyholder to mislead an insurance company in

7  making a claim?

8          A.   Yes.

9          Q.   And do you agree that a policyholder

10  who does that should take nothing for his or her

11  claim?

12          A.   I don't know.

13          Q.   Fair enough.  I understand your answer.

14  You purchased your home at 826 Trail Ridge in 2015,

15  correct?

16          A.   Yes.

17          Q.   Do you remember how much you purchased

18  the house for?

19          A.   Not precisely.

20          Q.   How many years -- or strike that.  You

21  took out a loan to buy the house, correct?

22          A.   There was a loan.

23          Q.   Do you remember how much was borrowed

24  to purchase the house?

25          A.   Not precisely.

ERIN LINDSAY - September 05, 2024

```
1   acknowledged a scope that accurately, adequately
2   reflects the home that we lost, then you turn your
3   attention to, okay, what does the list actually look
4   like.  Get that list about as accurate as you can.
5   Not about.  As accurate as you can, as accurate as I
6   can.
7              We're talking about a number that is
8   somewhere in the ballpark of four times what our
9   limits were at the time of the fire.  Again, I'm not
10  an economist, but I have a hard time imagining any
11  version, any scenario in which a gap that large
12  could be closed by change of circumstances.  That's
13  hard for me to wrap my head around.
14        Q.   (BY MR. STEPHENSON)  You bought the
15  house in 2015 for $890,000, correct?
16        A.   That sounds about right.
17        Q.   And how much do you think the house
18  should have been insured for in 2015?
19        A.   I'm not sure.  That's why I went to
20  experts to have them examine the house and advise on
21  a number.  I went to see licensed experts who
22  advertise that they could and would help me with
23  that.
24        Q.   But even if you had insured the house
25  in 2015 for the full purchase price, which even
```

**ERIN LINDSAY - September 05, 2024**

1  matter what it costs to rebuild the exact house that

2  you lost.  Whatever that ends up being, the

3  insurance company will pay for.

4          Q.   Okay.  All right.  And let's talk a bit

5  about when you purchased the subject policy, this

6  policy.  You understood that you were buying a

7  policy that did have a limit of dwelling insurance,

8  correct?

9          A.   That was my understanding, correct.

10          Q.   And you knew what the limit of

11  insurance was, the dwelling limit, at the time that

12  you purchased the policy in 2015, correct?

13          A.   I think so, correct.

14          Q.   And you knew what that limit of

15  insurance was each time you renewed from 2015 up

16  until you stopped insuring with Travelers, correct?

17          A.   At the time, yes.

18          Q.   All right.  And you accepted that

19  policy, the subject policy, correct?

20              MS. MINAMIZONO:  Objection.  Form.

21          A.   Could you rephrase the question,

22  please?

23          Q.   (BY MR. STEPHENSON)  Yeah.  You

24  accepted the policy.  You paid the premiums.  You

25  accepted the policy, correct?

ERIN LINDSAY - September 05, 2024

 1        A.   I accepted it under the terms that it
 2   was represented to me.
 3        Q.   Okay.  And to be clear, this is not a
 4   situation where you thought that the policy said it
 5   had a higher limit than what it actually ended up
 6   having, correct?
 7        A.   Could you say that again, please?
 8        Q.   Yeah.  Let me explain that a little
 9   better.  So every once in a while, you get a case --
10   I get a case where somebody thinks that their limit
11   is one number, and then they actually go look at
12   their policy, and the number in their declarations
13   is different than what they thought they were
14   buying.  Are you understanding the situation I'm
15   describing?
16        A.   I think so.
17        Q.   Right.  So if you want to have an
18   example, somebody might say, "Oh, I want to buy a
19   policy that has $1 million limits," and they really
20   think that they bought a policy with $1 million
21   limits.  And then somehow they get their policy, and
22   they look at it, and they look at the limits, and
23   the limit says 500,000.  And they say, "Wait a
24   minute.  I thought that I bought a $1 million
25   policy, and now I'm looking at this policy, and this

**ERIN LINDSAY - September 05, 2024**

1   is a mistake.  You know, you guys put the wrong

2   number on here than what I bought."  Every once in a

3   while you run into a case like that.  Do you

4   understand the situation I'm describing?

5           A.   I think so.

6           Q.   So this is not that situation.  This is

7   not a situation where you thought you were buying

8   certain limits, and then the policy showed up and

9   had different limits than you thought you were

10  buying, correct?

11          A.   I did not think I had a different

12  dollar value than what was on the policy.

13          Q.   Got it.  That's what I was asking.

14          A.   Yeah, it matched.

15          Q.   Right.  There was no mistake about what

16  the policy says, correct?

17              MS. MINAMIZONO:  Objection.  Form.

18          A.   How do you mean?

19          Q.   (BY MR. STEPHENSON)  Just what I was

20  describing just now.  A mistake about what the

21  policy says is where someone says, I bought a policy

22  with X dollar limits and, you know, you made a

23  mistake in what the policy says.  You put the wrong

24  number on the policy.

25          A.   Yeah.

**ERIN LINDSAY - September 05, 2024**

1    Q.    Does that make sense?  Here, there's no

2  mistake about what the policy says, correct?

3    A.    If we're talking about just the

4  Coverage A limits, then yes, I don't think there was

5  a mistake in my understanding of that.

6    Q.    Okay.  All right.  And you had a

7  mortgage company at the time that you purchased this

8  policy, right?

9    A.    Yeah.

10    Q.    And, of course, the mortgage company, I

11  think, actually ended up paying the premiums through

12  your escrow account; is that right?

13    A.    I believe -- wait.  Are we talking

14  about at the time of purchase?

15    Q.    Yeah.

16    A.    Okay.  It's been a while.  I remember

17  that starting up, there was something a little bit

18  different about how it works, as opposed to once

19  you're established in the loan.  You're just paying

20  your mortgage.  Is that -- is that what you were

21  asking?

22    Q.    Yeah.  So some people when they pay

23  their monthly mortgage bill, it includes money for

24  insurance.

25    A.    Oh, I see.

ERIN LINDSAY - September 05, 2024

```
 1          Q.    The 2015 call with GEICO.
 2          A.    If I'm not mistaken, there were two
 3   calls, right?
 4          Q.    The one -- well, the earlier one.
 5          A.    Okay.
 6          Q.    The one before the policy was issued.
 7          A.    Got it.
 8          Q.    That one.  Are you with me?
 9          A.    Yes.
10          Q.    That's the one we were talking about
11   before, right?
12          A.    I -- I just wanted to clarify.
13          Q.    Okay.  Fair enough.  So when we're
14   talking about the first 2015 call with GEICO before
15   the policy was issued, we're searching your memory
16   for paraphrases of what was said because you don't
17   remember the exact words, correct?
18          A.    That sounds right.
19          Q.    Okay.  And you mentioned earlier you
20   remembered the goal of the call.  What was the goal
21   of the call?
22          A.    I wanted to get coverage on the house
23   that I was planning to buy.
24          Q.    Okay.  Anything else?
25          A.    I was asking for a quote on getting my
```

**ERIN LINDSAY - September 05, 2024**

1  house fully covered.

2          Q.   Okay.  Anything else?

3          A.   Yes.  I remember there being some

4  general questions about the house I was trying to

5  insure and my giving detail.

6          Q.   Okay.  Anything else?  Well, we're

7  still talking about the goal, right?

8          A.   I thought you were asking about --

9          Q.   What was said?

10         A.   Yeah.

11         Q.   I asked what was the goal, and then you

12  told me the goal was to get coverage for your house,

13  and then I said, "Anything else?"  Were there any

14  other goals, is what I meant to ask you.

15         A.   Ah, I see.  No, I can't remember

16  anything right now.

17         Q.   Okay.  Okay.  So now go ahead and tell

18  me everything that you can remember from the first

19  conversation in 2015 with GEICO, to the best of your

20  recollection, understanding that this is a

21  paraphrase.

22         A.   I remember discussing that I had plans

23  to purchase my home, and that I was interested in

24  getting a homeowners insurance policy to cover that

25  home.  I remember there being some questions about

**ERIN LINDSAY - September 05, 2024**

1  what the house was, and I remember answering them.

2  Yeah.

3          Q.   Okay.  Thank you.

4          A.   Uh-huh.

5          Q.   Can we drill down a little bit on that?

6  You said that there were questions about what the

7  house was, and you remember answering them.

8          A.   Uh-huh.

9          Q.   Can you tell us what the questions were

10 and how you answered them?

11         A.   I believe they asked the address and

12 the square footage, and I believe I was asked other

13 questions about all kinds of features of the home,

14 and I remember that I answered truthfully to the

15 best of my knowledge.

16         Q.   Okay.  Can you give me anything more

17 specific about the questions that were asked?

18         A.   I remember trusting that the licensed

19 expert that I was consulting would understand what

20 needed to be asked, and that I would follow the

21 lead.

22         Q.   Okay.  I understand that.  But what was

23 asked?  Can you be more specific about what was

24 asked?

25         A.   I remember that there were some -- I'm

**ERIN LINDSAY - September 05, 2024**

1  not sure how I would describe it.  Like standard

2  questions like, you know, the address and square

3  footage, things that are -- how can I put it?

4  Numbers assigned to them.  And then I also remember

5  there being some open-ended questions just about,

6  tell me about your home, that sort of thing.

7          Q.   Okay.

8          A.   I'm afraid I can't remember anything

9  else at this moment.

10         Q.   All right.  And to the best of your

11 recollection, what were your responses to the

12 questions?

13         A.   Truthful answers based on what I knew.

14         Q.   Okay.  And can you be more specific

15 about the content of your answers to the questions

16 in the first call in 2015 with GEICO?

17         A.   I don't remember the very, very

18 specifics, but I believe that I conveyed the special

19 qualities of the house.

20         Q.   Can you be any more specific than that

21 about your answers?

22         A.   Not for that call.  I don't think so.

23         Q.   Okay.  Thank you, Ms. Lindsay.  All

24 right.  So let's talk about the second call in 2015.

25 Can you tell me to the best of your ability when

**ERIN LINDSAY - September 05, 2024**

1  that occurred?

2        A.    I don't know the exact date.  I know it

3  would have been -- excuse me.  I believe it would

4  have been sometime after we closed on the house but

5  not terribly long after.

6        Q.    Okay.  What prompted that call?

7        A.    I don't remember.

8        Q.    You called, and how long did that call

9  last, the second call with GEICO in 2015?

10        A.    I don't know.

11        Q.    Do you remember who you spoke with?

12        A.    Not by name.

13        Q.    Do you remember the sound of that

14  person's voice?

15        A.    I remember it was a woman.

16        Q.    Okay.  And do you remember the exact

17  words spoken on the second call in 2015 with GEICO?

18        A.    I remember some of them.

19        Q.    Okay.  Can you recount as closely as

20  you can the words spoken on the second call with

21  GEICO in 2015?

22        A.    Some of this will have to be

23  paraphrasing, but I remember on the call doing a

24  check-in to make sure that our limits were set

25  correctly; that we did have enough to cover the

**ERIN LINDSAY - September 05, 2024**

1  house fully.  I remember the woman that I spoke

2  to -- excuse me -- representing that I needed less

3  coverage than what I had.

4           I believe I was given a number that was

5  somewhere in the $300,000 range.  I remember saying

6  that I wanted more than that, and I remember her

7  telling me no.  She had told me that I was

8  overinsured and that she couldn't sell me more

9  insurance; that she wasn't allowed.

10          I remember her telling me that she

11  wouldn't sell me more insurance.  I remember her

12  explaining something about -- about it -- she was

13  being prevented -- she seemed to feel like she

14  couldn't sell me more because it was illegal.

15  Something about concern that I would somehow be

16  making money on the insurance company, which was

17  confusing to me.

18          I remember conveying to her that it was

19  a -- an interesting and unique home; that it had a

20  lot of complex angles and detailing not found in

21  most -- most homes.  Trying to make sure that we --

22  I remember just trying to make sure that we were on

23  the same page for what was being insured.

24      Q.   Have you told me everything that you

25  can remember from the second call in 2015?  With

ERIN LINDSAY - September 05, 2024

```
1   GEICO, I mean.
2           A.    I remember having to persuade her for a
3   limit that was higher than the roughly 300,000-ish
4   number that she -- she was proposing.
5           Q.    What was said in that regard?
6           A.    Just that I wanted more.
7           Q.    Did you explain a reason why you felt
8   more was needed?
9           A.    I don't recall at the moment.
10          Q.    What in your mind was the reason why
11  you thought you needed more insurance in 2015?
12          A.    Yeah.  So this was post-2008, and I
13  remember hearing about a whole bunch of
14  finance-related housing-crash issues in the air
15  around that time, in the fallout from 2008.  And I
16  remember previously we had owned a different home.
17  At that point we had sold it.  It was the -- the
18  other deposition that I was talking about earlier
19  that I had been a part of.  It was a condo, and
20  there had been litigation with the HOA and the
21  builder.  Like I said, I wasn't directly involved in
22  that.
23                And between what was going on in the
24  wake of 2008 and the litigation that our specific
25  HOA was going under at that time, we believed for a
```

**ERIN LINDSAY - September 05, 2024**

1  while during our residence in that condo that we

2  were underwater; that -- and by that, I mean that if

3  we'd have sold the condo that we owned and lived in,

4  that we would not have been able to get as much

5  money as what we owed in the loan on that home.

6          I remember that being a really scary

7  prospect at the time when we were living in the

8  condo, and I remember thinking it prudent to make

9  sure that we had at least the coverage needed to

10  roughly cover the loan for the existing home, the

11  one that we were buying, the home I lost.  So I was

12  trying to get coverage for that.

13          Q.  Anything else?  Anything else that

14  prompted you to think that you needed more

15  insurance?

16          A.  I just remember doing the check-in

17  asking if I needed more insurance.

18          Q.  Did you have a specific reason to think

19  that you didn't have enough insurance?

20          A.  Well, there was getting the loan

21  covered.

22          Q.  Okay.  The loan was more than the

23  insurance policy, correct?

24          A.  Yeah.  That's correct.

25          Q.  Was that the specific reason why you

**ERIN LINDSAY - September 05, 2024**

1  thought you needed more insurance?

2          A.    Yeah.  That's what I remember.

3          Q.    Okay.  What did the agent say to that?

4  You pointed out that your loan was more than your

5  insurance policy limit.  And I'm referring to your

6  second conversation with GEICO in 2015, of course.

7  Go ahead.

8          A.    Yeah.  I don't remember that specific

9  reasoning happening.  I remember that when -- when

10 she said no, the focus seemed to be about the

11 dwelling itself.

12         Q.    Did you tell the GEICO agent in the

13 second conversation in 2015 that the loan on the

14 house was more than the limit of dwelling insurance?

15         A.    I don't remember telling her.

16         Q.    Okay.  You may not have told her?

17         A.    I don't -- I don't remember telling

18 her.

19         Q.    Okay.  Were there questions by the

20 GEICO person in the second conversation in 2015

21 about the characteristics of the house?

22         A.    I remember there being discussion about

23 the characteristics of the house.

24         Q.    Please tell me all about that,

25 everything you remember.

ERIN LINDSAY - September 05, 2024

```
 1        A.   As I mentioned before, I -- I remember
 2   getting into, in this call, same deal, all the
 3   interesting angles, the intricacies and the detail,
 4   arches all around the house.  The general degree of
 5   polish, the quality of the home.
 6        Q.   Can you be more specific about what was
 7   said about the house in the second conversation with
 8   GEICO in 2015?
 9        A.   I remember saying that it was a custom
10   home; that it was a special house.  I believe there
11   were more specifics conveyed about various details
12   of the home.  At this exact moment -- at this exact
13   moment, nothing else is coming to mind.
14        Q.   You can't be more specific about the
15   details of the home; is that right?
16             MS. MINAMIZONO:  Objection.  Form.
17        Q.   (BY MR. STEPHENSON)  That you related
18   in that conversation.  You can't be more specific
19   about what you said in the second conversation in
20   2015 with GEICO beyond what you've already told me?
21        A.   I remember believing that I had
22   adequately conveyed the luxury quality of the home,
23   the specialness.
24        Q.   Okay.  Can you remember in either of
25   the conversations with GEICO in 2015 what you said
```

**ERIN LINDSAY - September 05, 2024**

1  about the characteristics of the home to the person
2  on the other end?
3          A.    Sorry.  Could you repeat the question?
4          Q.    Right.  In the conversations you had in
5  2015 with GEICO, can you recall what you said about
6  the characteristics of your house at 826 Trail Ridge
7  Drive?
8          A.    I recall the things that I had just
9  mentioned.  The quality, the luxury, the interesting
10 angles, architecture, detailing, arches, and the
11 fact that it was a custom house.  Pardon me.  And
12 conveying the general quality and specialness of the
13 house.  I believe that there were additional
14 specifics discussed, but at this moment, I can't
15 think of them.
16         Q.    Okay.  Going back to Exhibit 45, do you
17 see in the January 2022 complaint to Division of
18 Insurance, it says, "When we bought our insurance,
19 we asked for a higher limit for our coverage and
20 were denied."  Do you see that?
21         A.    Uh-huh.
22         Q.    What limit did you request before you
23 bought your insurance?
24         A.    I don't recall giving a precise
25 number.

**ERIN LINDSAY - September 05, 2024**

1          Q.    Do you just not remember what precise

2    number you requested or do you not remember whether

3    or not you had a precise number?  Do you see the

4    distinction I'm getting at?

5          A.    Yes, I do.

6          Q.    Tell me what is the answer to that.

7          A.    I don't know that I gave a precise

8    number.

9          Q.    Did you have a specific number for an

10   insurance limit that you thought you needed to

11   obtain in your calls with GEICO in 2015?

12         A.    I remember trying to get the loan

13   covered, so trying to make sure it wasn't ultimately

14   going to be less than that.

15         Q.    I mean, based on what you're telling

16   me, it sounds like your main concern in trying to

17   get higher insurance was to make sure, as you put

18   it, you were not underwater; is that right?

19         A.    That -- I mean, that was part of it,

20   but it was also just a check-in, just to make sure

21   that we were good.

22         Q.    Right.  I mean, you were looking to

23   have insurance that would cover the loan.

24               MS. MINAMIZONO:  Objection.  Form.

25         Q.    (BY MR. STEPHENSON)  Correct?

ERIN LINDSAY - September 05, 2024

1        A.    In part.

2        Q.    Okay.  And would you have been

3   satisfied with GEICO and Travelers saying, "Hey,

4   we're going to write you a policy that is in the

5   amount of what you owe on this loan"?

6        A.    Given that it was represented to me

7   that the insurance policy that I was getting was

8   going to be enough to cover the loss of the house,

9   then yes.  But I expected that when I'd be given

10  that number, advised that number, that that would be

11  an accurate figure coming from an expert.

12       Q.    Okay.  Am I right, though, that the

13  only specific number for insurance limits that you

14  had in your mind when you talked to GEICO in 2015

15  about getting higher limits was the amount of the

16  loan?  Is that right?

17       A.    Since it was being represented to me

18  that I had enough to fully cover my house, then that

19  remained the only number I was specifically

20  concerned with.

21       Q.    Okay.  All right.  Looking again at the

22  January 2022 DOI complaint within Exhibit 45, do you

23  see how it says that there were two conversations

24  that could have information about you requesting

25  higher coverage, one in April 2015 and the other in

**ERIN LINDSAY - September 05, 2024**

1  January 2016.  Do you see that?

2         A.   Yes.

3         Q.   Is the January 2016 date there a

4  mistake factually?

5         A.   At this point, I think it is.

6         Q.   Okay.  I just wanted to confirm that.

7         A.   Yeah.  At the time we wouldn't have

8  thought something -- or written down something like

9  that that we didn't actually believe was true.

10        Q.   Okay.  And then do you see the last

11 sentence of the section of the January 2022 DOI

12 complaint where it says, "Describe what you would

13 consider to be a fair resolution of your complaint,"

14 and the last line of that section says, "We would

15 also like the ability to update the coverage to our

16 current claim."  Do you see that?

17        A.   Yes.

18        Q.   What does that mean?

19        A.   I believe this was in reference to a

20 reformation.

21        Q.   And, therefore, updating the coverage

22 to the current claim would simply be to reform the

23 policy limit to be enough to rebuild the house that

24 was affected in the fire, correct?

25        A.   Under the advice given out by United

**ERIN LINDSAY - September 05, 2024**

1  wouldn't say that she was screaming at me.  I

2  wouldn't -- I'm not even sure I would say that she

3  was outright yelling, but it felt like she was

4  somehow heated on her end of the phone call, which,

5  I mean, I suppose it depends on who you ask, but --

6              At the time I remember her coming

7  across to me as extremely confident of what it was

8  she was advising.  Now looking back at the

9  interaction with the benefit of time and -- I

10  wouldn't call having my house burn down a benefit,

11  really, but I've had the opportunity to see the

12  other side of this, what has actually turned out to

13  be -- that I was underinsured.  I -- looking back, I

14  wouldn't call it totally professional.

15         Q.    Thank you, Ms. Lindsay.  I want to just

16  finish up with this DOI complaint, and then we

17  should probably take a lunch break.  I just want to

18  ask you about another part of this February 2022 DOI

19  complaint within Exhibit 45.  Do you see where it

20  says, "I shopped around and found I could only get

21  similar coverage elsewhere, so I signed with

22  Travelers"?  Do you see that?

23         A.    Yes, I do.

24         Q.    Can you describe the basis for that

25  statement?

**ERIN LINDSAY - September 05, 2024**

```
           IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01413-NYW-STV
_____

              VIDEOTAPE DEPOSITION OF:
         ERIN LINDSAY - September 5, 2024
_____

ERIN LINDSAY and CHRISTOPHER LINDSAY,

Plaintiffs,

v.

THE TRAVELERS HOME AND MARINE INSURANCE COMPANY; and
GEICO INSURANCE AGENCY, LLC,

Defendants.
_____

              PURSUANT TO NOTICE, the videotape
deposition of ERIN LINDSAY was taken on behalf of
the Defendant The Travelers Home and Marine
Insurance Company at 1200 28th Street, Suite 302,
Boulder, Colorado 80303, on September 5, 2024, at
9:02 a.m., before Carin C. Geist, Registered
Diplomate Reporter and Notary Public within
Colorado.
```

**ERIN LINDSAY - September 05, 2024**

```
 1  how to navigate, and so I turned to what experts I
 2  could.
 3          Q.    Thank you.  So let's first nail down
 4  the timing.
 5          A.    Uh-huh.
 6          Q.    So the fire happens on -- I think it's
 7  the 30th?  Is that the -- or is it the 31st?
 8          A.    I think it was the 30th.
 9          Q.    So on the 30th of December, 2021, the
10  Marshall wildfire tragically destroyed many homes in
11  this area including your home, correct?
12          A.    Yes.
13          Q.    And you're looking to someone, to
14  experts, I guess, to help you understand what to do
15  about an insurance claim.  Is that fair?
16          A.    Yes.
17          Q.    And how soon after the fire are you
18  looking for that assistance?
19          A.    I don't remember.
20          Q.    I mean, it was within at least a week
21  or two weeks?  Can you give me any sense of how soon
22  after the fire you began seeking assistance
23  regarding insurance claims?
24          A.    Probably two weeks is fair,
25  thereabouts.  I don't know precisely.
```

**ERIN LINDSAY - September 05, 2024**

1  couple questions about just insurance generally.  Do

2  you agree that a policyholder must be completely

3  honest and truthful when making a claim?

4          A.   Yes.

5          Q.   Do you agree it's wrong for a

6  policyholder to mislead an insurance company in

7  making a claim?

8          A.   Yes.

9          Q.   And do you agree that a policyholder

10 who does that should take nothing for his or her

11 claim?

12         A.   I don't know.

13         Q.   Fair enough.  I understand your answer.

14 You purchased your home at 826 Trail Ridge in 2015,

15 correct?

16         A.   Yes.

17         Q.   Do you remember how much you purchased

18 the house for?

19         A.   Not precisely.

20         Q.   How many years -- or strike that.  You

21 took out a loan to buy the house, correct?

22         A.   There was a loan.

23         Q.   Do you remember how much was borrowed

24 to purchase the house?

25         A.   Not precisely.

**ERIN LINDSAY - September 05, 2024**

1  acknowledged a scope that accurately, adequately

2  reflects the home that we lost, then you turn your

3  attention to, okay, what does the list actually look

4  like.  Get that list about as accurate as you can.

5  Not about.  As accurate as you can, as accurate as I

6  can.

7          We're talking about a number that is

8  somewhere in the ballpark of four times what our

9  limits were at the time of the fire.  Again, I'm not

10 an economist, but I have a hard time imagining any

11 version, any scenario in which a gap that large

12 could be closed by change of circumstances.  That's

13 hard for me to wrap my head around.

14         Q.   (BY MR. STEPHENSON)  You bought the

15 house in 2015 for $890,000, correct?

16         A.   That sounds about right.

17         Q.   And how much do you think the house

18 should have been insured for in 2015?

19         A.   I'm not sure.  That's why I went to

20 experts to have them examine the house and advise on

21 a number.  I went to see licensed experts who

22 advertise that they could and would help me with

23 that.

24         Q.   But even if you had insured the house

25 in 2015 for the full purchase price, which even

ERIN LINDSAY - September 05, 2024

```
 1          Q.    The 2015 call with GEICO.
 2          A.    If I'm not mistaken, there were two
 3   calls, right?
 4          Q.    The one -- well, the earlier one.
 5          A.    Okay.
 6          Q.    The one before the policy was issued.
 7          A.    Got it.
 8          Q.    That one.  Are you with me?
 9          A.    Yes.
10          Q.    That's the one we were talking about
11   before, right?
12          A.    I -- I just wanted to clarify.
13          Q.    Okay.  Fair enough.  So when we're
14   talking about the first 2015 call with GEICO before
15   the policy was issued, we're searching your memory
16   for paraphrases of what was said because you don't
17   remember the exact words, correct?
18          A.    That sounds right.
19          Q.    Okay.  And you mentioned earlier you
20   remembered the goal of the call.  What was the goal
21   of the call?
22          A.    I wanted to get coverage on the house
23   that I was planning to buy.
24          Q.    Okay.  Anything else?
25          A.    I was asking for a quote on getting my
```

ERIN LINDSAY - September 05, 2024

1  house fully covered.

2         Q.   Okay.  Anything else?

3         A.   Yes.  I remember there being some

4  general questions about the house I was trying to

5  insure and my giving detail.

6         Q.   Okay.  Anything else?  Well, we're

7  still talking about the goal, right?

8         A.   I thought you were asking about --

9         Q.   What was said?

10         A.   Yeah.

11         Q.   I asked what was the goal, and then you

12  told me the goal was to get coverage for your house,

13  and then I said, "Anything else?"  Were there any

14  other goals, is what I meant to ask you.

15         A.   Ah, I see.  No, I can't remember

16  anything right now.

17         Q.   Okay.  Okay.  So now go ahead and tell

18  me everything that you can remember from the first

19  conversation in 2015 with GEICO, to the best of your

20  recollection, understanding that this is a

21  paraphrase.

22         A.   I remember discussing that I had plans

23  to purchase my home, and that I was interested in

24  getting a homeowners insurance policy to cover that

25  home.  I remember there being some questions about

**ERIN LINDSAY - September 05, 2024**

1  what the house was, and I remember answering them.

2  Yeah.

3       Q.    Okay.  Thank you.

4       A.    Uh-huh.

5       Q.    Can we drill down a little bit on that?

6  You said that there were questions about what the

7  house was, and you remember answering them.

8       A.    Uh-huh.

9       Q.    Can you tell us what the questions were

10  and how you answered them?

11       A.    I believe they asked the address and

12  the square footage, and I believe I was asked other

13  questions about all kinds of features of the home,

14  and I remember that I answered truthfully to the

15  best of my knowledge.

16       Q.    Okay.  Can you give me anything more

17  specific about the questions that were asked?

18       A.    I remember trusting that the licensed

19  expert that I was consulting would understand what

20  needed to be asked, and that I would follow the

21  lead.

22       Q.    Okay.  I understand that.  But what was

23  asked?  Can you be more specific about what was

24  asked?

25       A.    I remember that there were some -- I'm

**ERIN LINDSAY - September 05, 2024**

1  not sure how I would describe it.  Like standard

2  questions like, you know, the address and square

3  footage, things that are -- how can I put it?

4  Numbers assigned to them.  And then I also remember

5  there being some open-ended questions just about,

6  tell me about your home, that sort of thing.

7        Q.   Okay.

8        A.   I'm afraid I can't remember anything

9  else at this moment.

10        Q.   All right.  And to the best of your

11  recollection, what were your responses to the

12  questions?

13        A.   Truthful answers based on what I knew.

14        Q.   Okay.  And can you be more specific

15  about the content of your answers to the questions

16  in the first call in 2015 with GEICO?

17        A.   I don't remember the very, very

18  specifics, but I believe that I conveyed the special

19  qualities of the house.

20        Q.   Can you be any more specific than that

21  about your answers?

22        A.   Not for that call.  I don't think so.

23        Q.   Okay.  Thank you, Ms. Lindsay.  All

24  right.  So let's talk about the second call in 2015.

25  Can you tell me to the best of your ability when

ERIN LINDSAY - September 05, 2024

```
 1  that occurred?
 2          A.   I don't know the exact date.  I know it
 3  would have been -- excuse me.  I believe it would
 4  have been sometime after we closed on the house but
 5  not terribly long after.
 6          Q.   Okay.  What prompted that call?
 7          A.   I don't remember.
 8          Q.   You called, and how long did that call
 9  last, the second call with GEICO in 2015?
10          A.   I don't know.
11          Q.   Do you remember who you spoke with?
12          A.   Not by name.
13          Q.   Do you remember the sound of that
14  person's voice?
15          A.   I remember it was a woman.
16          Q.   Okay.  And do you remember the exact
17  words spoken on the second call in 2015 with GEICO?
18          A.   I remember some of them.
19          Q.   Okay.  Can you recount as closely as
20  you can the words spoken on the second call with
21  GEICO in 2015?
22          A.   Some of this will have to be
23  paraphrasing, but I remember on the call doing a
24  check-in to make sure that our limits were set
25  correctly; that we did have enough to cover the
```

**ERIN LINDSAY - September 05, 2024**

1  glowing orange, when there was ash floating in the

2  air.  She -- she's a hound.  She's very, very

3  nose-oriented.  She hunts.  I imagine she smelled

4  the fire.

5         Q.   Okay.  Looking at the bottom of page 3,

6  TRAVELERS 1560 of the October 27 e-mail that is

7  Exhibit 75, do you see how it says, "Peter magically

8  came up with a new scope of loss with a total value

9  that was near our new reformed limits"?  Do you see

10 that?

11         A.   Oh, yeah, at the very bottom.

12         Q.   Yeah, the very bottom.  That's some

13 sarcasm, right?

14         A.   Well, I -- Chris would have written

15 that.  I think you'd have to ask him.

16         Q.   I mean, he's saying "magically."  I

17 mean, that has to be sarcasm, right?

18         A.   I don't know what Chris was thinking

19 when he wrote that.  I think that's a good Chris

20 question.

21         Q.   Okay.  And then you see on the next

22 page, page 4 of Exhibit 75, the e-mail accuses Peter

23 of will- -- Peter Van Riper of willful ignorance,

24 and then in the next -- top sentence of the next

25 paragraph, of gross negligence.  Do you see that?

**ERIN LINDSAY - September 05, 2024**

1      A.    I'm so sorry.  I'm trying to find it.

2      Q.    Yeah, so willful ignorance is right

3  here, and gross negligence is right here.

4      A.    Yes, I see that.

5      Q.    And do you agree with that, that Peter

6  Van Riper was guilty of willful ignorance and gross

7  negligence?

8      A.    I do.

9      Q.    Okay.  Do you agree this is an

10  aggressive e-mail?

11      MS. MINAMIZONO:  Objection.  Form and

12  foundation.

13      A.    I would offer the word strong.

14      Q.    (BY MR. STEPHENSON)  Okay.

15      A.    So sorry, if I might interject with

16  just one additional thought.  United Policyholders

17  advised that when policyholders are writing

18  communications, that they -- they use strong

19  language.

20      Q.    United Policyholders told you to use

21  strong language?

22      A.    They didn't look straight into the

23  camera and tell me, no.  But that was one of the

24  pieces of advice on one of the materials that I got

25  from them.

**ERIN LINDSAY - September 05, 2024**

1    Q.    Okay.  All right.  Do you still feel

2    like that was a good thing to do?

3         A.    I think that United Policyholders are

4    experts in helping people navigate through this, and

5    the best option that I believe I had was to follow

6    their advice.

7         Q.    Okay.  All right.  So looking at page

8    6, TRAVELERS 1563 of the Exhibit 75 e-mail, the

9    e-mail calls Peter Van Riper's work sloppy, right

10   under No. 5 there.  Do you see that?

11        A.    Uh-huh.

12        Q.    Do you see that?

13        A.    Yes, sorry.

14        Q.    Down here at the bottom in the

15   second-to-last paragraph calls the -- I guess the

16   claim a disaster.  Do you see that?

17        A.    I see -- I see the sentence you're

18   talking about.

19        Q.    All right.  And then above that, the

20   last sentence of the paragraph above that, the

21   e-mail accuses both Peter Van Riper and Aaron Stone

22   of gross negligence and reckless stonewalling.  Do

23   you see that?

24        A.    I do.

25        Q.    I mean, this is very harsh language,

**ERIN LINDSAY - September 05, 2024**

1  isn't it?

2        A.    I think it's in line with what United

3  Policyholders was advising.

4        Q.    And do you agree with these statements?

5        A.    Well, for instance, you look at this

6  word "disaster" you were pointing to toward the

7  bottom of the page.  "We are only two people

8  struggling to take care of our first baby as we work

9  through every aspect of this disaster."  I just feel

10  the need to point out, the -- the on-site resource

11  recovery center that we were talking about, I think,

12  was actually called the disaster recovery center.

13        Q.    Fair enough.  Maybe it was meant in

14  that way.  That's a good point.

15        A.    I look at this, and I don't feel like I

16  can be certain --

17        Q.    No, that's a fair point.  So I'll focus

18  more on the accusing Mr. Stone and Mr. Van Piper of

19  gross negligence and stonewalling and accusing

20  Mr. Van Riper of being sloppy.  I mean, do you agree

21  with this language?

22        A.    Let's just say, I don't think that

23  Peter or Aaron were living up to what they were

24  supposed to be doing in their jobs.

25        Q.    But you're saying it much more nicely

ERIN LINDSAY - September 05, 2024

```
 1        Q.    Okay.  All right.  Do you still feel
 2  like that was a good thing to do?
 3        A.    I think that United Policyholders are
 4  experts in helping people navigate through this, and
 5  the best option that I believe I had was to follow
 6  their advice.
 7        Q.    Okay.  All right.  So looking at page
 8  6, TRAVELERS 1563 of the Exhibit 75 e-mail, the
 9  e-mail calls Peter Van Riper's work sloppy, right
10  under No. 5 there.  Do you see that?
11        A.    Uh-huh.
12        Q.    Do you see that?
13        A.    Yes, sorry.
14        Q.    Down here at the bottom in the
15  second-to-last paragraph calls the -- I guess the
16  claim a disaster.  Do you see that?
17        A.    I see -- I see the sentence you're
18  talking about.
19        Q.    All right.  And then above that, the
20  last sentence of the paragraph above that, the
21  e-mail accuses both Peter Van Riper and Aaron Stone
22  of gross negligence and reckless stonewalling.  Do
23  you see that?
24        A.    I do.
25        Q.    I mean, this is very harsh language,
```